## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 21-24-1 (EGS) |
| | Hon. Emmet G. Sullivan |
| ROBERT GIESWEIN, | Status Hr'g: July 29, 2021 |
| Defendant. | Hearing Requested: July 2, 2021 |

## MR. GIESWEIN'S MOTION FOR
## HEARING & REVOCATION OF DETENTION ORDER

Robert Gieswein, through undersigned counsel, and pursuant to 18 U.S.C. § 3145, respectfully requests (1) that the Court convene a hearing on detention no later than July 2nd, 2021, and (2) that the Court revoke the detention order in this case. Mr. Gieswein requests release to the custody of a third party custodian in Oklahoma who has been screened and deemed suitable by this district's Pretrial Services Agency, and subject to several conditions. Specifically, he proposes that the Court release him subject to the conditions that he remain on home detention, and that he submit to location monitoring, computer monitoring, a bar from using social media, an assessment for mental health treatment, and any such treatment recommended by Pretrial Services.

As detailed below, Mr. Gieswein is 24 years old and has no criminal record. What he is accused of doing on January 6th at the U.S. Capitol is completely inconsistent with his history and characteristics, according to those who know him well. Moreover, notwithstanding the seriousness of the charges lodged against him,

his alleged conduct was materially less violent and troubling than that of many others at the Capitol on January 6th, including some who have been released. He is not a flight risk, and does not present an ongoing danger to the community. Finally, the proposed conditions are extensive and tailored to this case, and will be more than adequate to negate any flight risk or danger concerns. Accordingly, Mr. Gieswein respectfully requests release.

## FACTUAL AND PROCEDURAL BACKGROUND

In the days before January 6th, 2021, Mr. Gieswein traveled to the District of Columbia to attend events surrounding what promised to be Donald J. Trump's last rally as President. Friends knew he was a supporter of the former President. But he never suggested to them that he had any plan to engage in any violence or lawlessness in support of the now former President.[1]

On January 5th, 2020, Mr. Gieswein was at Freedom Plaza in the District along with other Trump supporters. He was approached by someone with a video camera, who engaged him in conversation. He had just smoked a significant amount of marijuana, and his intoxication is palpable in his dilated pupils and grin, and in the rambling comments that ensued.[2] Asked why he had come, he said "to keep President Trump in."[3] But he did not describe any particular plan, least of all a plan

---

[1] Exs. 1, 2 (declarations of friends of Mr. Gieswein).

[2] *See Protestors Break Window at Capitol Building*, KION Central Coast News (Jan. 6, 2021, *cited in* Aff., Doc. No. 1-1, *available at* https://www.youtube.com/watch?v=jtPmi4BShNM, at 00:00, [hereinafter "Protestors Break Window"].

[3] *Id.* at 00:22.

to engage in violence. Indeed, it is not clear whether he was answering why he came to the District, or why he was at Freedom Plaza at that very moment. In any case, in the same breath, he made clear that his wish was for "both sides [to] stay peaceful."[4]

The next day, Mr. Gieswein was with thousands of others at the Capitol. The indictment alleges that he corruptly attempted to obstruct, influence, and impede an official proceeding before Congress, in violation of 18 U.S.C. § 1512(c)(2) (Count One); that he assaulted officers with an aerosol spray and bat, in violation of 18 U.S.C. §§ 111(a)(1), (b) (Counts Two-Four); that he aided and abetted the willful destruction of federal property, in violation of 18 U.S.C. § 1361 and § 2 (Count Five); and that he trespassed with dangerous weapons (the spray and bat), in violation of § 1752(a)(1) (Count Six). Indictment, Doc No. 3.

Following January 6th, Mr. Gieswein returned to his home in Woodland Park, Colorado. Unlike many other Capitol protest defendants, upon learning that law enforcement officers were looking to speak with him, he voluntarily turned himself in to the local authorities on January 18th. He was arrested on a federal warrant issued on the basis of an affidavit and complaint, Compl. & Aff., Doc. Nos. 1, 1-1, but indicted on January 27th, before preliminary proceedings had been concluded. Indictment, Doc. No. 3. After a detention hearing on January 29th, during which the government argued that he presented a danger to the community, a Magistrate Judge in the District of Colorado ordered that he be detained pending transfer to this

---

[4] *Id.*

District, and trial.[5]

Mr. Gieswein's transfer to this district took almost 70 days, and he made his first appearance in this district and was appointed counsel on March 29th. He is now held at CTF. He is housed with other "January 6th" defendants. He is generally allowed out of his cell for no more than two hours a day, and allowed to go outside only once every two weeks for about 90 minutes. His family does not have the means to visit him even if restrictive jail policies stemming from the pandemic would permit them to. His family has spent hundreds of dollars per month on maintaining contact with him through phone calls and texts.

Over Mr. Gieswein's consistent objections, Magistrate Judge Faruqui and this Court have excluded from Speedy Trial Act calculations all of the dates between March 29th and July 29th. He still does not have a trial date, and the soonest one will be scheduled is July 29th, the date on which the Court has scheduled the next status conference. Minute Entries March 29, 2021; May 19, 2021.

The merits of the charges will be adjudicated in due course. However, in the meantime, the defense respectfully requests that the Court release Mr. Gieswein because the combination of conditions that the defense proposes can ensure his appearance and the safety of the community pending his trial.

---

[5] Order of Commitment to Another District, Doc. No. 13, No. 1:21-mj-00010-STV (D. Colo. Jan. 29, 2021).

## LEGAL STANDARDS

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose"); *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) ("The default position of the law . . . is that a defendant should be released pending trial") (internal quotation marks and citation omitted)).

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, provides that a hearing shall be held to determine whether a defendant should be detained pretrial upon a motion by the government if the defendant is charged with an offense that involves one of five enumerated categories of offense. 18 U.S.C. § 3142(f)(1)(A)-(E). Pursuant to that portion of the statute, upon the government's motion, a court must consider detention if the case "involves" either a "crime of violence," or "a felony that is not otherwise a crime of violence that involves the possession or use of any dangerous weapon." 18 U.S.C. § 3142(f)(1)(A), (E).

A defendant detained by a magistrate judge may file "a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). Although neither the statute nor the Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") provide definitive guidance on the standard of review to be applied by a district court reviewing a magistrate judge's detention order, courts in the D.C. Circuit review detention *de novo*. *See, e.g.,* Mem. Op., Doc. No. 56 at 14, *United States v. Sabol*, No. 1:21-cr-00035-EGS at 14 (D.D.C. Apr. 14, 2021) (citing support for the practice).

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that, though a defendant may be eligible for detention, a court "shall" release a defendant pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community," 18 U.S.C. §§ 3142(b), (c)(1)(B), unless "after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community . . ." § 3142(e).

As a general rule, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id*. at 1405.

Subsections 3142(e)(2) and (e)(3) of the Bail Reform Act lists certain conditions that trigger a presumption against release. The government has not previously argued that one applies here, and, in any case, "[r]egardless of whether the presumption applies, the government's ultimate burden is to prove that no conditions of release can assure that the defendant will appear and to assure the safety of the community." *Id*. (quoting *United States v. Stone*, 608 F.3d 939, 946 (6th Cir.2010)). The factors the Court must consider to determine whether the government has met

its ultimate burden, include, but are not limited to, those listed in 18 U.S.C. § 3142(g):

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g); *see United States v. Lee*, 195 F. Supp. 3d 120, 125-26 (D.D.C. July 1, 2016).

At the detention hearing, both the government and the defendant may offer evidence or proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam). When concern that the defendant is a flight risk is given as a

reason to detain him, the Court should not detain the him unless the government demonstrates that detention is necessary by a preponderance of the evidence. *See United States v. Xulum*, 84 F. 3d 441, 442 (D.C. Cir. 1996). By contrast, when danger is the asserted basis for detention, the Court should release a defendant unless the Court concludes that there is clear and convincing evidence that there are no combination of conditions that can assure the safety of the community. 18 U.S.C. § 3142(f); *see also United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

More specifically, the D.C. Circuit recently held that the fact that a defendant incurred charges stemming from the events of January 6th at the Capitol is not in itself a sufficient basis upon which to conclude that he or she is a present danger. "To order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community. The threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.' But it must be clearly identified." *Munchel v. United States*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) (citation and internal quotations omitted).

Further, "the threat must be considered in context." *Id.* (internal citation omitted). "It follows that whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant. *Id.* at 1283 (providing, as an example, that to determine "[w]hether the defendant poses a threat of dealing drugs," judge must consider "the defendant's past experience dealing . . . and her means of continuing to do so in the future"). Thus, in *Munchel*, the D.C. Circuit reversed an order to detain one January 6th defendant

where the district court failed to "demonstrate that it considered the specific circumstances that made it possible, on January 6," for the defendants in question "to threaten the peaceful transfer of power," namely the "unique opportunity to obstruct democracy on January 6 because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests." *Id.* at 1284.

## ARGUMENT

The claims against Mr. Gieswein, including that he assaulted several federal officers, are indisputably serious. However, there are several legal issues with these charges, and the facts underlying them are materially less troubling than in many of the January 6th cases alleging assaults. Moreover, there is little to suggest here that Mr. Gieswein would have acted as he did on January 6th in a smaller, less riled-up crowd than he found himself in while in D.C. in January, particularly in light of his history and characteristics. Finally, there is nothing to suggest that he would, or could, present a danger to any person if released pursuant to the conditions proposed above.

**I.    This Court has previously determined that charges under 18 U.S.C. § 111(b) make a defendant eligible for detention.**

Mr. Gieswein does not concede that 18 U.S.C. § 111(b), with which he is charged, qualifies as a "crime of violence," or that the aerosol spray the indictment alleges he used is a "dangerous weapon." Nevertheless, he acknowledges that this Court has previously determined that "because using a deadly or dangerous weapon while assaulting a federal officer" under 18 U.S.C. § 111(b) is a crime of violence, an indictment alleging violation of § 111(b) makes a defendant eligible for detention

pursuant to subsection (f) of the Bail Reform Act. Mem. Op., Doc. No. 56 at 16-17, *Sabol*, No. 1:21-cr-00035-EGS (collecting cases and concurring that under the categorical approach, § 111(b) is a crime of violence). However, when all of the factual circumstances of Mr. Gieswein's conduct and history are considered, there is no cause for concern that he is flight risk, and there is not clear and convincing evidence establishing that the proposed conditions cannot assure Mr. Gieswein's appearance and the safety of the community while he awaits trial.[6]

## II.   The proposed conditions will ensure that Mr. Gieswein appears for further proceedings.

There is nothing in Mr. Gieswein's record to establish by a preponderance that he would not appear for further proceedings if he were released. To the contrary, he turned himself in, and has never failed to appear for any court proceeding. Also, he has no passport and had never flown anywhere until he was moved by the U.S. Marshals, and has very few resources with which to flee.[7] *United States v. Chrestman*, No. 1:21-mj-218-ZMF, 2021 WL 765662 (D.D.C. Feb. 26, 2021) ("[T]here's nothing in the record suggesting [the defendant] has much in the way of accumulated financial resources, and therefore he doesn't appear to have way to finance flight from the jurisdiction for any extended period of time"); *see also United States v. Nwokoro*, 651 F.3d 108, 110–11 (D.C. Cir. 2011) (noting that evidence "favoring appellant's pretrial release" included the fact that appellant had no assets under his control, no ability to

---

[6] The government did not assert that any presumption applies to this case in the proceedings in Colorado.

[7] Pretrial Services Report, District of Colorado.

flee the country, and "no prior criminal record").

### III.   The proposed conditions will ensure that Mr. Gieswein poses no risk to the community.

    *A.   The strength of the evidence weighs in favor of release.*

        1.   <u>The strength of the evidence on Count One weighs in favor of release.</u>

The strength of the evidence underlying the charge in Count One, that Mr. Gieswein obstructed an official proceeding, favors release for two reasons. Section 1512(c) of Title 18 provides that whoever

> corruptly—
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

Mr. Gieswein is charged with violating the second subsection, § 1512(c)(2). Indictment, Doc. No. 3. This offense requires proof that Mr. Gieswein "(1) corruptly (2) did or attempted to obstruct, influence, or impede an official proceeding . . ." *United States v. Ring*, 628 F. Supp. 2d 195, 224 (D.D.C. 2009). Here, although the indictment fails to provide notice of what proceeding the government has in mind, the defense takes from other filings and evidence that the government alleges that the proceeding in question was the ceremonial certification of the Electoral College vote. *See* Aff., Doc. No. 1-1 ¶¶ 6-7.

Although the definition of "official proceeding" is defined in § 1515 to mean, among other things, "a proceeding before the Congress," the word "proceeding" is not defined. The defense is not aware of any case in which it has been interpreted to include sessions during which Congress performs legislative functions, let alone ceremonial functions, as opposed to fact-finding, or adjudicative functions. Thus, it is far from clear that the government can prove this charge as a matter of law.

2.    The strength of the evidence on Counts Two through Four, and Six, weighs in favor of release.

The strength of the evidence on Counts Two through Four is also not overwhelming, yet again favoring release. These counts charge that Mr. Gieswein assaulted officers using a dangerous weapon in violation of 18 U.S.C. § 111(a)(1) and (b). Specifically, they all allege assaults with a baseball bat and an aerosol irritant spray. Indictment, Doc. No. 3, at 2-3. However, though there is evidence that Mr. Gieswein carried a bat and aerosol spray, it is far from clear that the government can meet its burden to prove that either qualifies as a "dangerous weapon."

"Dangerous weapon" is not defined in § 111. Most federal courts, including those in this circuit, apply a two-pronged approach to defining the term:

> In the District of Columbia, a dangerous weapon is anything that is *likely* to produce death or great bodily injury by the use made of it. An object is likely to produce great bodily injury if: (1) the design of the object is such that in its ordinary use it is likely to cause great bodily injury; or (2) the surrounding circumstances indicate that an object capable of causing great bodily injury is likely in fact so to be used.

*United States v. Broadie*, 452 F.3d 875, 881–82 (D.C. Cir. 2006) (citing *Strong v. United States*, 581 A.2d 383, 386 (D.C.1990)) (internal quotations omitted). Judge Lamberth recently reiterated this definition in a January 6 case. *United States v. Chansley*, 2021 WL 861079, at *7 (D.D.C. Mar. 8, 2021) (Lamberth, J.) (collecting cases) ("[A dangerous weapon is an] object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm.").[8] An inherently dangerous weapon is one that, in its ordinary use, is likely to cause great bodily injury. *Broadie*, 452 F.3d at 881-82. Common examples of inherently dangerous weapons are guns, knives, and explosives. *See e.g.*, *Arrington*, 309 F.3d at 46; *see also Chansley*, 2021 WL 861079, at *7 (finding that a makeshift speak is an inherently dangerous weapon). But, for ordinary instruments, proof of a charge under § 111(b) requires proof of commission of any acts described in § 111(a) (*i.e.*, a forceful and threatening conduct), coupled with use of an ordinary instrument such that it causes or appears likely to cause great bodily injury. 18 U.S.C. § 111(b).

Mr. Gieswein acknowledges evidence suggesting that, at points during January 6th, he appeared to spray something from a can in his hand. But that is not proof that the aerosol spray was designed to cause great bodily injury, or that it did in this case. Indeed, to date, the government has not produced any evidence that any

---

[8] In *United States v. Moore*, 149 F. Supp. 3d 177, 182 (D.D.C. 2016), the D.C. District Court defined dangerous weapon even more narrowly, as an instrument: (1) "designed to be used in destroying, defeating, or injuring an enemy, or as an instrument of offensive or defensive combat; (2) under the circumstances of the case, immediately useable to inflict serious or deadly harm (e.g., unloaded gun or starter's pistol useable as a bludgeon); or (3) actually used in a way likely to inflict that sort of harm (e.g., microphone cord used as a garrote)." *Id.*

officer was injured in this case. *Cf.* Mem. Op., *United States v. Owens*, No. 1:21-cr-286 (BAH), Doc. No. 26 at 8, 19-20 (D.D.C. May 28, 2021) (describing medical records for officer that government offered to establish that the skateboard that defendant brought down on an officer's head caused serious bodily injury).

Likewise, although Mr. Gieswein may have been *holding* a baseball bat, the defense has yet to see evidence of him "brandishing" it in front of officers, let alone using it in a way so as to cause anyone great bodily injury or even an apprehension of imminent bodily injury.

Without such evidence regarding the spray and bat, the government cannot meet its burden to prove this critical element of its assault charges in Counts Two through Four to a jury beyond a reasonable doubt. And the same issues undermine the strength of the evidence underlying Count Six, which charges Mr. Gieswein with entering and remaining in a restricted building or grounds with a deadly or dangerous weapon. Indictment, Doc. No. 3. This doubt about the strength of the evidence on these charges – arguably the most serious leveled against Mr. Gieswein – weighs in favor of release.

3.   The strength of the evidence on Count Five weighs in favor of release.

Finally, the evidence underlying the charge in Count Five, that Mr. Gieswein aided and abetted the destruction of government property, is also not strong. The affidavit alleges that he "observe[d] and encouarage[d] other rioters as they strike a window . . . until it breaks." *See* Aff., Doc. No. 1-1 ¶ 7. However, the affidavit fails to

specify how Mr. Gieswein encourages others. Moreover, in the video the government relied in the complaint, Mr. Gieswein does not even come into view until one of the windows has begun to break because of another person's effort with a police shield.[9] And though there are voices seeming to encourage those actually working to break the window, the government has offered no evidence that Mr. Gieswein is among them. And proof that Mr. Gieswein "observed" a breaking would not prove this offense, as presence while another person commits a crime is "insufficient to support a conviction for aiding and abetting." *United States v. Salamanca*, 990 F.2d 629, 638, (D.C. Cir. 1993). Again, this weakness in the evidence favors release.

> ### B. *The nature and circumstances of the instant offense factor weigh in favor of release.*

Subsection 3142(g)(1) requires that the Court consider the nature and circumstances of the offense charged, particularly given the range of conduct that the statutes at issue cover.

The D.C. Circuit has made clear that the gravity of the events of January 6th is not, in itself, a sufficient ground to detain each participating defendant. *Munchel*, 991 F.3d at *8. Instead, the Court must consider whether the particular circumstances suggest that Mr. Gieswein "poses an articulable threat to the community in view of [his] conduct on January 6, and the particular circumstances of January 6." *Id.* This Court has previously relied on Judge Howell's guideposts for assessing the "comparative culpability of a given defendant in relation to fellow

---

[9] *See* Protestors Break Window, *supra* note 2, at 00:00-00:30.

rioters." Mem. Op., Doc. No. 56 at 27-28, *Sabol*, No. 1:21-cr-00035-EGS (citing *Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *7-8). These so-called *Chrestman* factors are:

> (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, for example, by obtaining weapons or tactical gear; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's words and movements during the riot—e.g., whether the defendant remained only on the grounds surrounding the Capitol or stormed into the Capitol interior, or whether the defendant injured, attempted to injure, or threatened to injure others.

Mem. Op., Doc. No. 56 at 28, *Sabol*, No. 1:21-cr-00035-EGS (citing *Chrestman,* 2021 WL 765662, at *7-8) (internal quotations omitted). Here, the balance of these "*Chrestman* factors," and other pertinent facts, weigh in favor of release.

1. Mr. Gieswein is charged with felony offenses.

As for the first factor, Mr. Gieswein is charged with several felonies, to be sure, and they are undoubtedly serious, particularly the charges of assault on federal officers with a dangerous weapon. *See* Mem. Op., Doc. No. 56 at 29, *Sabol*, No. 1:21-cr-00035-EGS (noting that this Court has determined that this charge is a "crime of violence," which the Court must weigh pursuant to section 3142(g)(1)). He is exposed to significant imprisonment if found guilty, another factor relevant to the analysis. *Id.* at 43.

2. Mr. Gieswein's conduct leading up to, during, and after January 6th does not support a conclusion that he poses a continuing threat

Turning to the sixth *Chrestman* factor, by seeking pretrial release, Mr. Gieswein does not suggest that all of his conduct on January 6th was appropriate. And he acknowledges that the D.C. Circuit has stated that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 991 F.3d at 1284.

But this does not mean that *all* of those who fall into the first category identified by the D.C. Circuit in *Munchel* must be detained. As acknowledged by various District Court Judges since *Munchel* was decided, there are many ways in which one defendant charged with assault can differ from others. "[D]efendants are entitled to an individualized determination of dangerousness based on the discrete facts before the court, and such determinations would be defeated by a determination based solely on *Munchel*'s categorical distinction." *Owens*, No. 1:21-cr-286 (BAH), 2021 WL 2188144, at *11; *see also United States v. Padilla*, No. 1:21-214 (JDB), 2021 LEXIS 84859 at *19 n.4 (D.D.C. May 4, 2021) (stating that the "[Munchel] dichotomy is useful" but that this Court must "probe the precise nature of defendant's actions— including the type of any force employed—when assessing" a defendant's dangerousness).

Mr. Gieswein's actions compare favorably to many others who are charged with assault after January 6th. First, the defense has seen no suggestion that, before

January 6th, Mr. Gieswein ever espoused violence or illegal action in support of then-President Trump.

In previous filings and argument, the government has focused on Mr. Gieswein's participation in a group called the Woodland Wild Dogs, which Mr. Gieswein described as a "militia" when he was interviewed on January 5th. Aff., Doc. No. 1-1 at 5.[10] But this "militia" amounted to a group of friends who like to shoot guns, pretend to be in battles, and go camping to practice survival skills. Indeed, one of Mr. Gieswein's closest friends, and the one who ordered "Woodland Wild Dog" patches for his friends, described it to the FBI as "more of a group of friends than anything else. There is no initiation, there are no membership rolls, and there are no dues. They are just a group of friends who like guns and Star Wars."[11] Another friend who participated also emphasized its casual nature.[12] Both said it was not anti-government.[13] But no matter what they discussed around the campfire or in online chats, the group was loose: it had no formal leadership, structure, rules, dues, or defining ideological principles; it had few participants, and they rarely gathered.[14] Most important, by January 6th, the so-called Woodland Wild Dogs had not gathered to go camping or shooting in many months, and there has been no suggestion that anyone who ever joined Mr. Gieswein on a Woodland Wild Dog excursion was in

---

[10] *See* Protestors Break Window, *supra* note 2.

[11] Ex. 3 at 2 (FBI Form 302 of interview of friend); *see also* Ex. 1.

[12] Ex. 2.

[13] Exs. 1, 2.

[14] Exs. 1, 2.

Washington, D.C. with him on January 6th.[15] In short, his association with this group is not evidence of any propensity for anti-government violence, or of planning for January 6th.

Mr. Gieswein did briefly associate with people in their area of Colorado who identified as "Three Percenters," as the government has emphasized in the past. Aff., Doc. No. 1-1, at 5. But, according to friends, this was several years ago, and he withdrew from spending time with these people.[16] Accordingly, this chapter should be of little weight in assessing whether Mr. Gieswein is a present risk to the community.[17]

Second, turning to precisely what Mr. Gieswein appears to have done on January 6th, it is critical to compare what he is accused of with the conduct of others charged with assault. Critically, there is no allegation or evidence that Mr. Gieswein physically attacked any federal officer, nor any evidence that he caused anyone any serious bodily injury, or could have caused lasting damage. Thus, Mr. Gieswein is unlike the many people who apparently actually intended to seriously injure or did seriously injure federal officials.

For example, this Court detained defendants Jack Wade Whitton and Jeffrey Sabol because of the evidence that they made statements such as "you're going to die tonight," and instigated and participated in a physical assault of officers that left

---

[15] *See also* Exs. 1, 2 (two such friends stating that they did not attend).

[16] Exs. 1, 2.

[17] Exs. 1, 2; *see also* Ex. 3 at 5.

them wounded and in need of medical care. Whitton was the "instigator" of "chilling" attack, in which he also participated by striking officers with a metal crutch, kicking an officer who was on the ground, and dragging an officer into a mob, as well as a second kicking attack on police." *United States v. Whitton*, No. CR 21-35-5 (EGS), 2021 WL 1546931, at *3, 8 (D.D.C. Apr. 20, 2021); *Sabol*, No. 1:21-cr-00035-EGS, 2021 WL 1405945, at *2 (describing assault as "brutal"). Sabol snatched a baton out of the hands of one officer who was laying on the ground after having been assaulted by other protestors. He then participated in separating an officer away from other officers – by pushing him while holding the baton against his back and neck, and pushing him into a crowd waiting to assault him with flagpoles, mace, other poles, feet and hands. *Id.* at *2, 12.

Others' assaults on January 6th included similarly aggravated conduct, including: striking an officer with a flagpole multiple times, tackling officers, and pinning officers to the ground while trying to remove officer's shield and mask; pushing an officer, throwing a bottle at officer, and shoving a flagpole into an officer's face; striking an officer on the ground with a flagpole; lifting a hockey stick above head-level and striking officer lying on the ground multiple times; throwing nine items at officers, including three stick-like objects, a wooden drawer, and a flagpole; and swinging a bat at officer's shields; and repeatedly striking or attempted to strike at officers' necks between their helmets and body armor. *United States v. Klein*, No. CR 21-236 (JDB), 2021 WL 1377128, at *8 n.8 (D.D.C. Apr. 12, 2021) (describing such cases) (internal citations omitted). Mr. Gieswein's alleged conduct was materially less

aggravating than those of these defendants who "clearly sought to incapacitate and injure members of law enforcement[.]" *See id.* at *8 (also distinguishing Klein's conduct, "consistently position[ing] himself face-to-face with multiple officers and also repeatedly press[ing] a stolen riot shield against their bodies and shields," from these cases).

Finally, after January 6th, Mr. Gieswein did not brag to others about his actions, as others did. For instance, after January 6th, Sabol crowed about his role as a "warrior" against "tyranny." *Sabol*, No. 1:21-cr-00035-EGS, 2021 WL 1405945, at *3. Likewise, Whitton, who was also denied release by this Court, "sent messages to a mutual acquaintance that included a photo of a bloody and bruised right hand: "(1) 'This is from a bad cop' and (2) 'Yea I fed him to the people. Idk his status. And don't care tbh.'" *Whitton*, No. CR 21-35-5 (EGS), 2021 WL 1546931, at *3; *see also Padilla*, 2021 LEXIS 84859 at *4–5 (granting government's motion for pretrial detention where defendant, among other things, expressed, both before and after that date, the intention to fight with reference to weapons). There is no such evidence of lack of remorse or perspective in Mr. Gieswein's case.

3.   The evidence does not suggest that Mr. Gieswein arrived at the Capitol with a plan to participate in trespass, assault, or other violations of law.

Turning to the second *Chrestman* factor, the defense is not aware of any evidence that Mr. Gieswein engaged in any pre-planning to storm the Capitol, to participate in violence, to disrupt the certification, or anything like it, in stark contrast to many others who privately communicated or publicly posted such intent.

For example, the government has alleged that others, like Jessica Watkins, had begun training members for a government coup even before election results were announced. Gov't Mem. in Support of Pretrial Detention at 4-5, *United States v. Watkins*, No. 1:21-cr-28-APM-3 (D.D.C. Feb. 11, 2021). And the defendant in *United States v. Meredith* texted a group: "[t]hinking about heading over to Pelosi (C——'s) speech and putting a bullet in her noggin on Live TV" and "I'm gonna run that (C—-) Pelosi over while she chews on her gums" and "Dead (B——) Walking. I predict that within 12 days, many in our country will die." Aff., Doc. No. 1-1, *Meredith*, No. 1:21-mj-00017-GMH (D.D.C. Jan. 8, 2021). In this case, the government has not pointed to any equivalent evidence of planning before January 6th, and Mr. Gieswein's close friends say he never suggested to them that he had any plan to get into the Capitol, prevent the counting of electoral votes,  or prevent Joe Biden from taking office as President.[18]

The government's affidavit in support of complaint emphasized that, in the video of Mr. Gieswein taken on January 5th, described above, he stated that "[we] need to get the corrupt politicians out of office."[19] But he did not state that that this should be accomplished with violence. To the contrary, he stated that he hoped to make sure neither "side" became violent in the coming days. His remarks were hardly threatening, especially when viewed alongside posts suggesting particular

---

[18] Exs. 1, 2.

[19] *See Protestors Break Window*, *supra* note 2.

representatives should die, like those featured in other cases.[20]

The government has also previously emphasized that Mr. Gieswein appears to have arrived at the Capitol wearing a plate carrier and helmet, but that should not weigh strongly in favor of detention. These items are *defensive*, not aggressive, in contrast with the "steel-toe boots," and "zip ties" that Sabol carried. *Sabol*, No. 1:21-cr-00035-EGS, and the stun gun that Richard Barnett brought with him to the Capitol, *United States v. Barnett*, No. 1:21CR38-CRC, and the guns, homemade bombs, and crossbow that Lonnie Coffman brought with him from Alabama, *United States v. Coffman*, No. 1:21-cr-00004-CKK.

Moreover, it has been widely documented that many Trump supporters who traveled to the District anticipated that they would be the subjects of violence from Antifa or other leftwing counter-protestors.[21] And Mr. Gieswein's comments on January 5th are consistent with an expectation that those who opposed the former President could be violent, and with the hope that his presence would help deter violence. Indeed, the fact that he was wearing the same gear on January 5th, and did not assault anyone then, is consistent with this view. Finally, Mr. Gieswein's friends

---

[20] *See id.*

[21] *See, e.g., Antifa Didn't Storm the Capitol, Just Ask the Rioters*, NPR (Mar. 2, 2021), available at https://www.npr.org/2021/03/02/972564176/antifa-didnt-storm-the-capitol-just-ask-the-rioters ("Many alleged rioters spoke of antifa as if the movement were an enemy combatant in a war, court documents show, and they were doing so before Jan. 6 [...]. Several rioters said they brought a weapon to the Capitol because of the perceived threat of antifa, according to court documents").

note that he often wore his plate carrier, even around his hometown.[22] In short, his attire shows that he arrived in D.C. prepared to defend himself, not hurt anyone.

In *Sabol*, the defendant also asserted that concern about Antifa motivated his choice to wear a helmet and steel-toe boots to the Capitol. *Sabol*, No. 1:21-cr-00035-EGS, 2021 WL 1405945, at *10. He also argued that he was "just caught up on the frenzy of the crowd" on January 6th. In that case, the Court was not persuaded, but the Court cited circumstances that are not present here. Specifically, the Court emphasized that Sabol also brought a radio and ear piece to the Capitol, and that he had made statements both before and after January 6th that suggested that he had been planning to engage in violence for the purpose of preventing what he viewed as tyranny. *Id*. The Court found that these facts significantly undermined Sabol's position that he had not actually planned aggressive action. *Id*. Here, there is no equivalent evidence of pre-planning to undercut the conclusion that Mr. Gieswein wore what he wore on January 6th for the purpose of defending himself – not attacking anyone.

Some brought firearms to the Capitol. *See, e.g.,* Aff., Doc. No. 1-1, *Coffman*, No. 1:21-cr-00004-CKK (alleged that Coffman traveled to the District with an M4 assault rifle, multiple loaded magazines, three handguns and 11 mason jars filled with homemade napalm, among various other weapons). In contrast, though he legally owned firearms, Mr. Gieswein left them at home in Colorado. On this issue, the

---

[22] Exs. 1, 2.

government would no doubt point to evidence that Mr. Gieswein was carrying a bat and spray on January 6th. However, evidence that Mr. Gieswein held a bat or spray can on January 6th is not evidence that he planned to have them or use them before January 6th. Nor is it proof that he planned to use them aggressively against officers, rather than to defend himself against Antifa. And, again, it is far from established that either item qualifies as a "dangerous weapon" as defined in the law, a point relevant to both the second and third *Chrestman* factors.

This lack of evidence that Mr. Gieswein's actions on January 6th reflected anything approaching a plan to engage in violence or violate the law in any way, and the doubt about whether the bat and spray in question qualify as dangerous weapons, both favor release.

4.   <u>There is minimal evidence that Mr. Gieswein coordinated with others before, during, or after the protest.</u>

The fourth *Chrestman* factor also weighs in favor of release, as there is minimal evidence that Mr. Gieswein coordinated with other protestors before, during, or after the events at the Capitol.

Again, Mr. Gieswein was never a member of the Oathkeepers, or Proud Boys, he had long been unaffiliated with the Three Percenters by the time of January 6th, 2021, and the Woodland Wild Dogs had nothing to do with his trip to Washington.

The government will no doubt note that Mr. Gieswein is seen in various photos near individuals the government has since identified as Proud Boys, some of whom the government has alleged were participating in in a conspiracy dating to before

January 6th. Also, various photographs show that he had orange tape on his helmet, and the government has alleged in other cases that Proud Boys and others "[a]ffix[ed] orange tape to their clothing and gear to identify each other" as a manner and means of their conspiracy to "(1) to stop, delay, and hinder Congress's certification of the Electoral College vote on January 6, 2021, and (2) to obstruct, influence, impede, and interfere with law enforcement officers engaged in their official duties in protecting the U.S. Capitol and its grounds." *See* Indictment at ¶ 24, *United States v. Kuehne et al.,* No. 1:21-cr-00160-TJK (D.D.C. Feb. 26, 2021).

But the government has not alleged that Mr. Gieswein was a Proud Boy, or that he had any idea what the Proud Boys had planned before January 6th, or that he had any idea what specifically their plans were during the course of January 6th. Further, discovery to date discloses no such evidence. Nor is there evidence that Mr. Gieswein was in radio communication with anyone else during the protest, in contrast with other cases in which coordination with others has been given as a ground to detain other defendants. *See, e.g.*, *United States v. Caldwell*, No. CR 21-181 (CKK), 2021 WL 2036667, at *8 (D.D.C. May 21, 2021) (disagreeing that there was no evidence of coordination during the protest in light of "photograph offered by the Government showing him using a Baofeng radio during the riot").

Finally, there is nothing suggesting that Mr. Gieswein coordinated with any Proud Boy, or any January 6th participant, after that day. Thus, as in *Sabol*, this factor is not implicated here. *See Sabol*, No. 1:21-cr-00035-EGS, 2021 WL 1405945, at *13 (finding that "evidence of coordination" factor was not implicated where

government did not proffer "evidence of Mr. Sabol communicating before, during, or after the riot with anyone else in an attempt to amplify or assure the success of the U.S. Capitol breach").

### 5. Mr. Gieswein did not engage in a leadership role.

The fifth *Chrestman* factor also weighs in favor of release, as there is no evidence that Mr. Gieswein played any leadership role on January 6th. *See id.* ("[W]hile Mr. Sabol voluntarily admitted that when he arrived at the U.S. Capitol on January 6, 2021, he sought to be on the front line of the 'battle,' . . . the government has not proffered any evidence that suggests Mr. Sabol urged other rioters to advance on the U.S. Capitol or attack law enforcement, other than his conduct, which arguably was leading by example."); *contra Whitton*, No. CR 21-35-5 (EGS), 2021 WL 1546931, at *8 (noting that Whitton was a "de facto" leader because he "was the first to pull the officer away from his post and into the crowd").

### 6. On balance, Mr. Gieswein compares favorably to others in the *Chrestman* analysis.

On balance, Mr. Gieswein compares favorably to others in the *Chrestman* analysis. Though the allegations against Mr. Gieswein are more serious than the allegations against many, the nature and circumstances of the allegations against Mr. Gieswein are also far less serious than the allegations against other January 6th defendants, including some who have been released. For example:

- *United States v. Sanford*, 1:21-CR-52-ZMF. Sanford is alleged to have hurled a fire extinguisher into a crowd of police officers, striking at least three officers in the head. Video footage captures Sanford screaming "traitors" and "cowards" at the officers. *See* Doc. No. 10 (Government's Opposition to Defendant's Motion to Reconsider

Detention). Like Mr. Gieswein, Sanford is charged with, inter alia, assaulting police officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). On March 2nd, 2021, Judge Friedman granted Sanford's motion for release and placed him on GPS monitoring. Doc. No. 11.

- *United States v. McCaughey*, 1:21-CR-40-TNM. McCaughey is alleged to have forcibly assaulted an officer with a shield. Doc. No. 1-1 at 6 (Affidavit in Support of Complaint.) On May 4th, Judge McFadden granted Mr. McCaughey's motion for release. Min. Entry, May 4, 2021, Doc. No. 54 (Order).

- *United States v. Blair*, 1:21-CR-86-CRC. Blair was captured on body worn camera brandishing a lacrosse stick which served as a pole for a large confederate flag. *See* Doc. No. 1 (Complaint and Statement of Facts). While walking back and forth between the crowd and police officers, Blair is alleged to have exhorted, "hell naw, quit backing up, don't be scared. . .". As an officer advanced, Blair yelled at the officer: "what's up motherfucker, what's up, what's up bitch." *Id*. He then struck the officer in the chest with the lacrosse stick and had to be forcibly restrained by multiple officers *Id*. Notwithstanding this direct physical assault with a lacrosse stick, Blair was ordered released conditions. Doc. 6. Like Mr. Gieswein, Blair is charged with, *inter alia*, assaulting police officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).

Given all of the circumstances discussed above, Mr. Gieswein should be released as well.

C. *Mr. Gieswein's history and characteristics weigh in favor of release.*

In evaluating the history and characteristics of the defendant, the Court "shall […] take into account":

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release

> pending trial, sentencing, appeal, or completion of sentence
> for an offense under Federal, State, or local law[.]

§ 3142 (g)(3). These factors strongly weigh in favor of release here.

Mr. Gieswein is a 24-year-old with no criminal history whatsoever. Before January 6th, he had never been accused of engaging in any violence, notwithstanding his enthusiasm for guns and shooting. He is a gun enthusiast, and does own several firearms.[23] But friends say they never saw him threaten or engage in violence.[24] This is yet another way in which he is different from at least some of the protestors who have been detained, such as Daniel Caldwell, whose prior convictions for driving while intoxicated, disorderly conduct, and history of resisting arrest and domestic abuse arrests were important contributions to the court's decision in his case that he could not be trusted to comply with the law on pretrial release. *Caldwell*, No. CR 21-181 (CKK), 2021 WL 2036667, at *9, 11 (noting that prior "acts of aggression in response to law enforcement intervention" weighed against release).

According to his friends and family, until losing his job at the local casino in fall of 2020 due to the pandemic, Mr. Gieswein had worked consistently since he was 14 years old.[25] As already discussed, he is not currently affiliated with any group that promotes the overthrow of the United States government, or that has taken any

---

[23] The Pretrial Officer in Colorado noted in the report prepared for the first detention hearing that Mr. Gieswein would not share information about where his firearms were, whether he was married, and more. Uncertainty about what one should share is not surprising in someone who has never before been arrested. But his mother has confirmed to the undersigned that before turning himself in, Mr. Gieswein entrusted his firearms to his mother.

[24] Exs. 1, 2.

[25] Ex. 4 (Letters of Support) at 1.

position on either former President Trump, or the 2020 election. Letters submitted by his friends and family show he is known for being hard-working, respectful, and kind.[26] One close friend told the FBI that he "should have been homeless a few times, but Bobby was always there to help him out when he needed it."[27] A person who witnessed Mr. Gieswein at work in the past described Mr. Gieswein as having a positive attitude and good work ethic, specifying that he got on well with both co-workers and those they served, and that he was always willing to pick up extra shifts.[28] Further, the proposed third-party custodian, who is discussed further below, has described Mr. Gieswein as a respectful person who typically answers her with "yes, ma'am." She said she had seen him react calmly to people cursing him, and that she trusts him.[29]

She also relayed that he has had a difficult time since his step-father passed away unexpectedly. Indeed, many others noted that this has been difficult for Mr. Gieswein (and his entire family), and that Mr. Gieswein had also been struggling with ups and downs in his relationship with his longtime girlfriend leading up to

---

[26] *Id.*

[27] Ex. 5 (FBI 302 of interview of second friend), at 1.

[28] This person did not wish to submit a letter to the Court because he was reluctant to subject himself or others to calls from the press, or worse. Mr. Gieswein has worked, among other things, as a certified nurse assistant at a nursing home, and as a dealer at a casino.

[29] The proposed third party custodian's information has been submitted to Pretrial Services and will be available to the Court, but she also preferred to maintain her privacy.

January 6th.[30] During the height of the pandemic, he also lost the job with which he had been helping to support his girlfriend's family.[31]

Mr. Gieswein told others that he wanted to be a police officer someday, and he explored joining the Army as well.[32] A friend told the FBI that "Bobby has always been pro-government and pro-law enforcement," and that "it was absolutely mind blowing for him to see what Bobby involved himself in at the Capitol."[33]

In short, Mr. Gieswein's nature and characteristics strongly suggest that any offenses he committed on January 6th were completely out of character, and that conditions of release can be fashioned to ensure that he does not present a continuing danger to any person or the community if released.

> D.    *Mr. Gieswein does not pose a danger to anyone in the community, particularly if he is released pursuant to the terms proposed.*

Finally, there is nothing else making it "clear that [Mr. Gieswein] poses a concrete, prospective threat to public safety." *Munchel*, 2021 WL 1149196, at *4. January 6th was over five months ago. Nothing like it has followed, notwithstanding former President Trump's (and others') continued claims that the election was "stolen." And nothing in Mr. Gieswein's past indicates that he has a propensity to participate in violence in any environment other than that he found in the District in early January 2021.

---

[30] Ex. 4 at 6; Ex. 5 at 1.

[31] *See, e.g.,* Ex. 4 at 2.

[32] Exs.1 & 2.

[33] Ex. 3 at 3.

The terms of release that Mr. Gieswein proposes will ensure that he does not join another dangerous crowd, or otherwise pose a danger to the public or the proper administration of government. The conditions he proposes should "bear[] heavily on the Court's analysis," given the "substantial[] overlap" between measuring the "danger he poses" with the ultimate question of whether any conditions of release 'will reasonably assure . . . the safety of any other person and the community,' [pursuant to] 18 U.S.C. § 3142(e)." *Klein*, 2021 WL 1751056, at *6.

Indeed, in *Klein*, the Court noted evidence that the defendant had participated in forcefully breaching Capitol barriers, assisted others to "climb a wall and gain access to an external stairwell," entered the Capitol building, and "worked in combination [with his brother] to forcibly open a secured door on the Capitol's north side," and also previously "participated in at least two Proud Boys event[s] during which he was, at the very least, prepared to engage in violent conduct," and to which he brought weapons, and which led to criminal charges that were pending as of January 6th. *Klein*, 2021 WL 1751056, at *1, 5-6. Judge Bates raised "serious concerns" about Klein, but concluded that "it was possible that appropriate conditions on Klein's release might provide sufficient assurances of community safety." *Id.* at *6 (denying release in part because, at that point, the defendant had proposed third party custodians who were either unsuitable, or had not yet been vetted); *see also Caldwell*, 2021 WL 2036667, at *11 (noting that the court's concerns in that case, in which defendant had admitted to spraying several officers with pepper spray, might be ameliorated by "appropriate conditions, including a suitable third-party

custodian," but that defendant had not suggested such terms). Eventually, Klein proffered a suitable third-party custodian, and he was released pursuant to strict conditions. Doc. Nos. 37, 38,1:21-CR-236 (JDB) (May 13, 2021).

Mr. Gieswein proposes to be released pursuant to terms very similar to those imposed in the *Klein* case. Mr. Gieswein has lived in Woodland Park, Colorado for the last few years. But he also has significant ties in Oklahoma, where he proposes to live on home detention if released. He was born there, his paternal grandparents remain there, and he proposes to live in the third-party custody of his godmother.

Although Mr. Gieswein does not concede that the Woodland Wild Dogs, or any other connections in Colorado, had anything to do with his actions on January 6th, the proposed terms of release would take him far from the environment he was in immediately leading up to January 6th. In Oklahoma, Mr. Gieswein would also be far away from his firearms.

Further, the Court could require Mr. Gieswein to undergo an assessment to determine whether mental health treatment would be helpful to manage the effects of stress stemming from the loss of his father, the loss of his job, disappointment in the outcome of the 2020 election, this prosecution, or anything else. And standard conditions would bar Mr. Gieswein from using drugs, or overusing alcohol, to ensure that his judgement is not clouded while on release.

Mr. Gieswein's proposal that he remain on home detention would ensure that he would not be able to attend anything without the approval of Pretrial Services or this Court. That condition, along with location monitoring, computer monitoring, and

a bar from using social media, will ensure that he is not be able to surreptitiously gather or communicate – in person or virtually – with any groups associated with advocating violence or illegal methods of protest.[34]

Most importantly, with the proposed conditions in place, Mr. Gieswein would be under the watchful eye of an upstanding third-party custodian with much to lose were she to fail in their obligations to help ensure that Mr. Gieswein does not violate any of the Court's conditions. Mr. Gieswein's godmother is a clinical nurse who is now employed as a risk management officer for a healthcare organization, and her husband is a Master Sergeant in an Oklahoma police department who also trains other police officers. They both have known Mr. Gieswein since he was a baby. He is close with the couple, and he looks up to the husband, with whom he discussed the possibility of applying to become a police officer. He and his mother have stayed with this family when visiting Oklahoma. The proposed custodian informed undersigned counsel that, although she and her husband love their godson and would welcome

---

[34] Judge Moss ordered that Klein not use the internet except for "educational and work purposes related to computer sciences self-study." Doc. No. 38 (condition 7(t)). To the extent that such a condition would bar Mr. Gieswein from reading news on the internet, counsel proposes that this goes too far. A more reasonable condition would limit him from using the internet for purposes of searching for employment, entertainment, correspondence (other than through social media), research related to his case, reading news, and reviewing discovery or meeting virtually with counsel.

Further, Pretrial Services has informed undersigned counsel that computer monitoring software is very costly in the Western District of Oklahoma. Accordingly, given Mr. Gieswein's indigency, counsel proposes that monitoring of a single computer or mobile device be accomplished by ordering that Mr. Gieswein must configure settings to track the history of his website and application usage, and allow a pretrial officer to regularly review his history.

him into their home given everything they know and have seen of about his character over the years, they will not facilitate his violation of the law or Court rules. She stated that she would not hesitate to alert the Court if Mr. Gieswein were to violate any rule the Court imposed. She is also willing to regularly submit reports regarding his compliance with conditions. Further, the family can ensure all family computers are password-protected and inaccessible to Mr. Gieswein, facilitate other conditions imposed, follow the directions of Pretrial Services, and support Mr. Gieswein financially.[35]

Undersigned counsel submitted the proposed third party custodian's information to Pretrial Services in this District, who screened her and authorized counsel to state that she has been found to be a suitable custodian. Finally, counsel's contact in this District informed counsel that Pretrial Services in the Western District of Oklahoma is willing to accept courtesy supervision of Mr. Gieswein.

Taken together, the factors in section 3142(g) show there is not clear and convincing evidence that Mr. Gieswein remains a danger to any person or the community, and the proposed terms of release will ensure that he is not.

---

[35] Undersigned counsel brought to the attention of Pretrial Services that the proposed third-party custodian's husband's duties require that he keep service weapons at home. He keeps the weapons, along with personal firearms, in a room secured by a combination lock, and undersigned counsel understands that both the D.C. and W.D. Oklahoma Pretrial Service Agencies discussed this issue with the proposed custodian and were satisfied with the safety precautions the family has, or will put, in place.

## CONCLUSION

For these reasons, and such others as may be offered in reply to any government opposition, and at a hearing that Mr. Gieswein requests be set no later than July 2nd, 2021, Mr. Gieswein respectfully requests release.[36]

Respectfully submitted on June 8th, 2021.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender

by:_____s/_____
Ann Mason Rigby
DC Bar No. 491902
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0869
Facsimile: (703) 600-0880
ann_rigby@fd.org

---

[36] The proposed hearing date would fall three days after any reply in support of this motion would be due pursuant to Local Rule 47(b). That rule provides that, unless the Court otherwise directs, the government should take no longer than two weeks to respond to this motion, and the defense would then have one week to file any reply. Given the nature of the relief requested, Mr. Gieswein respectfully requests that the Court not extend these deadlines, and has no objection to any shortening of these deadlines.