# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **No. 1:21-cr-24 (EGS)** |
| **v.** | : | |
| | : | |
| | : | |
| **ROBERT GIESWEIN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION FOR HEARING & REVOCATION OF DETENTION ORDER

On January 6, 2021, the defendant, Robert Gieswein, was one of the first rioters to physically breach the U.S. Capitol, entering through the first broken window on that building just moments after it was broken with a stolen police riot shield.  During his journey from the exterior of the Capitol grounds to the interior of the building, the defendant placed himself at the front of the crowd as it toppled police barricades and fought with police.  Mr. Gieswein, along with other rioters, pushed on barricades being deployed by police in a futile attempt to keep the rioters at bay. He sprayed an aerosol irritant—likely oleoresin capsicum ("OC") spray—at officers on at least three separate occasions, including at the top of a set of stairs during which police and rioters did battle, and including as officers tried to retreat under a set of metal rolling doors inside the Capitol. Mr. Gieswein committed these assaults while armed with a baseball bat and this OC spray, and while wearing a full paramilitary-style kit, including a helmet, flak jacket, and goggles.  This case involves a statutory rebuttable presumption in favor of detention, and the defendant has not rebutted that presumption.

**Procedural Background**

On January 19, 2021, the defendant was arrested in Teller County, CO, pursuant to an arrest warrant issued by a magistrate judge in the District of Columbia.  He was presented in the District of Colorado on that same date, and the Court set a combined preliminary, detention, and identity hearing on January 22, 2021.  On that date, the detention hearing proceeded, and the defendant agreed to continue the preliminary hearing and waive his right to an identity hearing.  *See United States v. Gieswein*, No. 21-mj-10 (D. Colo.) (Minute Entry Dated January 22, 2021).

On January 22, 2021, after conducting a detention hearing and hearing from both sides, Magistrate Judge Scott T. Varholak, in the District of Colorado ordered the defendant detained pending trial and transported to the District of Columbia.  Judge Varholak found, after considering the parties' submissions, that there is clear and convincing evidence that no conditions or combination of conditions of release can assure the safety of the community.  Case No. 1:21-mj-10 (D. Colo.), Doc. 8.  A copy of that order is attached hereto as Exhibit 1. On March 29, 2021, the defendant made his initial appearance in this jurisdiction, and his current counsel, Ann Rigby, Esq., was appointed to represent him.

On June 8, 2021, the defendant filed a motion for modification of bond, asking to release him to a third-party custodian in Oklahoma and to subject him to several release conditions, including home detention and electronic monitoring.  For the reasons set forth below, the United States of America, by and through the Acting U.S. Attorney for the District of Columbia, respectfully urges this Court to deny defendant's motion to reconsider and to order that he remain detained pending trial.

On January 29, 2021, the Grand Jury returned an indictment charging the defendant with three counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon,

in violation of 18 U.S.C. §§ 111(a)(1) and (b); Destruction of Government Property, in violation of 18 U.S.C. §§ 1361 and 2; Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and Entering and Remaining in a Restricted Building or Grounds with a Deadly Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A).

### <u>Factual Background</u>

The government proffers the facts as alleged in the affidavit in support of a complaint, and that affidavit is incorporated herein. The government also provides the below recitation of facts, which includes some additional facts, for the court's convenience. On January 6, 2021, the defendant arrived on the grounds of the Capitol dressed in camouflage fatigues, a tactical vest, and a helmet. He had with him at least a baseball bat, goggles, and an aerosol chemical irritant, likely OC spray. In the photograph below, Mr. Gieswein can be seen circled in red, carrying the aerosol spray can in his right hand with his finger on the spray button, and the baseball bat in his left hand.



During the morning of January 6, 2021, the defendant marched through the streets of Washington, D.C., with the Proud Boys, an organization that bills itself as "Western chauvinist" and "nationalist," multiple of whom have been charged in conspiracy indictments that allege a conspiracy that predates January 6.  A photo of the defendant marching is below:



Shortly before 1:00 p.m., while then-President Trump was still speaking, a number of rioters breached police barricades at a pedestrian entrance to the Capitol grounds near the Peace Monument on First Street NW.  This same group of rioters then breached another set of barricades closer to the Capitol façade, allowing hundreds, if not thousands, of rioters to pour into the plaza to the west of the Capitol building ("West Plaza").  The defendant was one of the rioters who was in the West Plaza, and he positioned himself initially near the front of the line between police and rioters:



There were a number of confrontations between rioters and the police—first the U.S. Capitol Police, and then the Metropolitan Police Department, who had been called in to assist. At one point, the police attempted to move back the line of rioters with a bike rack, and the defendant was among those who pushed on the rack, seemingly in an attempt to thwart the officers' attempts to push the crowd back.

At approximately 1:48 p.m., rioters assaulted Capitol Police guarding a set of stairs that went under the Inauguration scaffolding and up to the Upper West Terrace and the entrances to the Capitol proper. Inside those stairs, the battle raged. Police and rioters deployed pepper spray against one another and used metal barriers as weapons. At one point, a police officer was tossed down by rioters (not the defendant) and dragged from an internal doorway within the stairs:



Up approximately one flight's worth of stairs to the right of the above photograph, police had formed the next police line in what would prove to be a futile attempt to keep the defendant and other rioters from advancing on the Capitol proper. The defendant positioned himself again near the front line of the rioters, where the Capitol Police had set up its next line of defense. He is then captured on multiple publicly available videos, spraying the likely OC spray at police. A screenshot from one such video is below. The officers are just beyond the edge of the scaffolding. They are not visible in this screenshot because they are blocked by other rioters.



In choosing to deploy his spray in this particular moment, the defendant was endangering not only the police, but his fellow rioters as well in this crowded, largely enclosed space.

After the rioters broke through the last line of police defenses from the Capitol proper, the defendant ran towards the building, bat in one hand and spray canister in the other. Once he reached the Capitol, he began banging on one of the windows that was eventually broken. He then went to a different window in the same alcove—the one shortly thereafter broken by another rioter using a stolen riot shield—and watched the others' attempts to break the window. The defendant then turned back to the door proper and alerted two rioters kicking that door that others were in the process of breaking the window. After he pointed at the window, those two followed him there. Once the window was broken, the defendant was the second or third rioter to ender the Capitol proper, at approximately 2:14 p.m.[1] On Capitol surveillance footage, he is still carrying a bat and pepper spray inside the building:

_____

[1]      On the video, he can be seen entering at virtually the same time as one other person. It is hard to tell who crossed the threshold first.



Once inside the building, the defendant was one of a group of rioters who walked toward the still-occupied Senate chamber. Other members of that group confronted Officer Eugene Goodman and chased him up the stairs towards that chamber.[2] The defendant followed the charge up the stairs, which led to the photograph at the beginning of the factual section above.

It would not be long before the defendant would use the pepper spray inside the Capitol— not to defend himself from Antifa, which he claims is the reason he came armed to Washington, D.C. (Mot. at 23)—but to assault police who were trying to keep the rioters at bay. The defendant made his way to the Capitol crypt on the lower level, where numerous fights broke out. As captured on surveillance video, at approximately 2:29 p.m., several U.S. Capitol Police officers ran away from the occupied area of the crypt toward a set of metal doors that were rolling down.

---

[2]     The rioters' encounter with Officer Goodman was widely publicized after video of it surfaced, in part because the mob was at that point very close to the Senate chamber, which had not yet been evacuated. Officer Goodman's actions in redirecting this group of rioters, which included Mr. Gieswein, may well have kept the rioters out of the Senate chamber. *See, e.g.*, https://www.washingtonpost.com/local/public-safety/goodman-capitol-police-video/2021/01/13/08ab3eb6-546b-11eb-a931-5b162d0d033d_story.html (last visited June 15, 2021).

Many rioters tried to stop the doors from rolling down by placing chairs and trash cans under them. Once that proved successful, many of those same rioters then threw those chairs and trash cans at the officers. As this was occurring, the defendant sprayed his aerosol canister at officers as the doors rolled up, as captured in the below screenshot:



Once the doors were rolled up and rioters began to advance on the police position, the defendant encouraged his follow rioters to join the advance. Many did so:



Gieswein later went near the Capitol Visitor Center, where he and other rioters encountered a group of U.S. Capitol Police officers, and he again deployed his aerosol spray on those officers. Although there is not video of this incident that undersigned counsel is aware of, the defendant is charged with spraying and then assaulting a U.S. Capitol Police officer in the Capitol Visitor Center. According to that Officer, a person matching largely matching Gieswein's description took out an unknown chemical-type aerosol agent, which one officer likened to OC spray, and sprayed a group of officers, causing irritation of the eyes. One officer recalls the person who matches the defendant's description throwing punches at police. When the Capitol Police took the defendant to the ground to arrest him, other individuals around the defendant advanced on the officers, pushed them back, and freed Gieswein, who fled the area. Parts of the aftermath of this incident, including the defendant and Capitol police on the ground, and the defendant fleeing, are captured on Capitol surveillance video.[3]

On January 16, 2021, agents executed a search warrant at the defendant's residence in Colorado. By that point, the defendant's image had been broadcast on numerous news networks nationwide. The FBI did not locate the distinctive clothing the defendant was wearing, nor did they locate the bat, suggesting the defendant deliberately disposed of those items. Defendant was not present at the time of the search; according to his mother, he was camping. The defendant's

---

[3]     Mr. Gieswein claims that he did not physically attack any officer. Mot. at 19. The government submits that spraying a chemical irritant at officers from a range at which they are likely to be exposed to that spray is in fact a physical attack, but putting that aside, the defendant did in fact wind up in a physical altercation with the Capitol police as described herein.

phone was also not recovered by the FBI during that search warrant or incident to arrest, despite (per records from AT&T) its use up to and including January 16, 2021.[4]

The defendant turned himself in to the Teller County Jail on January 18, 2021.  He was subsequently transported from there to Denver for his initial appearance in the District of Colorado. The defendant invoked his right to counsel, and as such was not interviewed by agents about the events of January 6.  He did, however, make several unsolicited statements to the agents transporting him to Denver.  Among those statements were a claim that although he was present at the Capitol on January 6, he did nothing wrong, and that is why he turned himself in.  He also described himself as a "constitutionalist" who wants the military to take back over the country and restore the Constitution.

### Principles Governing Requests for Detention

Under the Bail Reform Act, courts consider the following factors in determining whether some condition, or combination of conditions, will reasonably assure community safety or the defendant's appearance at trial and pre-trial proceedings:  the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *see United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1

---

[4]     The defendant's girlfriend, whose letter was presented as a defense exhibit and who was present at the time of the search, told the FBI that the defendant had told her that he left his phone in someone else's car.  According to the girlfriend, this call took place when the defendant was on his way back to Colorado from Washington, D.C.  However, the AT&T records belie this claim, as they show the defendant's phone in use through at least January 16, about a week after he had returned to Colorado.

(D.D.C. 2013).  A magistrate judge's determination regarding bail is reviewed de novo.  *See*, *e.g.*, *United States v. Hudspeth*, 143 F. Supp. 2d 32, 35-36 (D.D.C. 2001).

At a detention hearing, the government may present evidence by way of a proffer.  *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996); *United States v. Roberson*, No. 15-cr-121, 2015 WL 6673834, at *1 (D.D.C. Oct. 30, 2015).  A judicial determination that a defendant should be detained pending trial on the ground of community safety must be supported by clear and convincing evidence. *Smith*, 79 F.3d at 1209.  When the government seeks to detain a defendant on the ground that the defendant is a risk of flight pursuant to 18 U.S.C. § 3142 (f)(2)(A), the government must demonstrate the defendant's flight risk by a preponderance of the evidence.  *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

The United States seeking detention pursuant to, *inter alia*, 18 U.S.C. § 3142(e)(3)(C), which provides a rebuttable presumption of detention if there is probable cause to believe that the defendant committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." That rebuttable presumption applies to Defendant because 18 U.S.C. § 1361 is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B) and carries a maximum sentence of ten years in prison. The Grand Jury found probable cause to believe that the defendant committed a felony violation of 18 U.S.C. § 1361.[5]

---

[5]     The defendant notes that "the government has not previously argued that [a rebuttable presumption] applies here."  Mot. at 6. That assertion is immaterial to the Court's adjudication of this motion, where its review of the magistrate's decision is *de novo*.  Moreover, multiple judges who have considered this issue have found that a rebuttable presumption in favor of detention applies when a defendant is charged with a violation of 18 U.S.C. § 1361. *See*, *e.g.*, *United States v. Pezzola*, No. 21-cr-52, ECF No. 25 at 11-12 (Kelly, J.); *United States v. Watkins*, No. 21-cr-28, ECF No. 68, at 69 (Mehta, J.).  The Court should apply the rebuttable presumption to this case as well.

Once a rebuttable presumption is created, it imposes a burden of production on the defendant to offer contrary credible evidence. *See United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). However, "[t]he presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to the factors listed in § 3142(g)." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008), (quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)); *see also United States v. Ali*, 793 F. Supp.2d 386, 387-88 (D.D.C. 2011); *United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) ("[The presumption] is incorporated into the § 3142(g) factors considered by the court when determining whether conditions of release can be fashioned or whether the defendant must be detained pretrial.").

The United States also seeks detention pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) and (f)(1)(E) because the defendant is charged with crimes of violence, as well as other felonies that involve the possession of a dangerous weapon.

### No Condition or Combination of Conditions Will Reasonably Assure the Community Safety or the Defendant's Appearance in Court

**1. Nature and Circumstances of the Offenses Charged**

The circumstances of the offenses charged in this case overwhelmingly support detention. The defendant charged by indictment with multiple gravely serious crimes that occurred during an attempt to occupy the Capitol to prevent Congress from carrying out its duty of certifying the Electoral College results.  Among the things the Court is statutorily required to consider is whether the defendant is charged with any crimes of violence or terrorism.  18 U.S.C. § 3142(g)(1).  He is charged with both.

    a.  <u>Defendant Committed a Federal Crime of Terrorism and Two Crimes of Violence.</u>

13

Felony destruction of property, under the facts as laid out above, is a federal crime of terrorism. Title 18, U.S.C., Section 2332b(g)(5), defines "federal crime of terrorism" as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is included in an enumerated list of statutes, which includes § 1361. *See* 18 U.S.C. §§ 2332b(g)(5)(A) & (B). The Grand Jury found probable cause in Count One of the Indictment to believe that the defendant intended to obstruct an official proceeding by committing, among other things, acts of civil disorder and entering and remaining in the Capitol building on January 6. He entered through the very window whose destruction he is charged with aiding and abetting. In his motion, the defendant does not contest his obstructive mental state, instead focusing on whether the Electoral College certification is an "official proceeding" for purposes of 18 U.S.C. § 1512. Mot. at 11-12. Moreover, because § 1361 is listed in § 2332b(g)(5)(B), there is a rebuttable presumption that no conditions or combination of conditions can assure community safety or the defendant's appearance. *See* 18 U.S.C. § 3142(e)(3)(B).

Felony destruction of government property is also a crime of violence. For purposes of the bail statute, as relevant to these offenses, a crime of violence is defined as "an offense that has an element of the use, attempted use, or threatened use of physical force against the person or property of another," if that crime is punishable by ten years or more in prison. *See* 18 U.S.C. § 3142(f)(1)(A) & 16. Section 1361 of Title 18 of the U.S. Code meets those requirements. It is punishable by ten years if the property damage was greater than $1,000, and its elements include the use of physical force against the property of another. *See United States v. Khatallah*, 316 F. Supp. 2d 207, 213 (D.D.C. 2018) (Cooper, J.) (holding that destruction of government property

under a substantially similar statute, 18 U.S.C. § 1363, satisfies a substantially similar elements-clause statute to qualify as a crime of violence).[6]

Assault on a Federal Officer in violation of 18 U.S.C. § 111(b) is also a crime of violence, and the defendant is charged with three counts of it.  Although he does not concede that § 111(b) is in fact a crime of violence, he makes no attempt to argue why it is not, or to distinguish this Court's reasoning in holding that violations of § 111(b) are in fact crimes of violence.  *See* Mot. at 9-10; *United States v. Sabol*, No. 21-cr-35 (EGS), ECF No. 56 at 17-20.  As this Court noted in so holding, many other courts have concluded that a violation of § 111(b) is a crime of violence:

> In consideration of the elements of these offenses, Section 3156(a)(4)'s definition of a crime of violence, and the relevant case law, the Court concurs with numerous other courts in holding that a defendant charged under 18 U.S.C. §§ 111(a)(1) and (b) is charged with a crime of violence.7 *See Gray [v. United States]*, 980 F.3d [264] at 266 [(2d. Cir. 2020)] ("[W]e hold that a § 111(b) offense is a categorical crime of violence."); United States v. Kendall, 876 F.3d 1264, 1270 (10th Cir. 2017) ("To determine if every violation of § 111(b) is a crime of violence, then, we need only determine whether both an assault that causes bodily injury and an assault with a deadly weapon involve the use, threatened use, or attempted use of violent physical force. They both do."); United States v. Taylor, 848 F.3d 476, 492-493 (1st Cir. 2017) ("In assessing whether the enhanced versions of § 111(b) are crimes of violence, we do not write on a clean slate. In fact, every court we are aware of that has considered the issue has found that it is because the elements of the enhanced offense require the use, attempted use, or threatened use of force capable of causing pain or injury."); United States v. Juvenile Female, 566 F.3d 943, 948 (9th Cir. 2009) (holding that an assault involving a deadly or dangerous weapon under Section 111 "is, categorically, a crime of violence"). A judicial colleague in this district, Judge John D. Bates, recently reached the same conclusion. See United States v. Klein, No. CR 21-236, ECF No. 29 at 7-12 (D.D.C. Apr. 12, 2021).

---

[6]      Some judges in this Courthouse have questioned whether 18 U.S.C. § 1361 is in fact a crime of violence under the elements test.  *See United States v. Pezzola*, No. 21-cr-52 (TJK), ECF No. 25 at 14-15 n.4 (Kelly, J.) (citing to a question posed by Judge Mehta in a different case).  To the extent the Court has any doubts as to whether 18 U.S.C. § 1361 qualifies as a crime of violence, the government submits that the Court does not have to reach that question to decide this motion, as violations of § 111(b) are crimes of violence regardless, as discussed below.

*Id.* at 19-20.

The nature and circumstances of the charges the defendant faces—he is charged with one count of a federal crime of terrorism and at least three crimes of violence—cannot be overstated. As another judge in this court has opined, the goal of the rioters was "effectively to steal one of our Nation's crown jewels: the peaceful transfer of power." *See United States v. Pezzola*, No. 21-cr-52 (TJK), ECF No. 25 at 15 (Kelly, J.)  The grand jury has found probable cause to believe that this particular defendant obstructed the Congressional proceeding taking place on January 6, 2021, and that he assaulted three officers with a dangerous weapon and aided and abetted the destruction of a window to the Capitol in the process.

      b.   The Charges and Defendant's Actions Are Serious.

Of course, despite the extremely serious nature of the riot at the Capitol on January 6, 2021, not every defendant who participated in that riot is eligible for pretrial detention.  To detain this defendant pending trial, the Court must consider whether the defendant "pose[s] an articulable threat to the community in view of [his] conduct on January 6, and the particular circumstances of January 6." *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021).  This Court has previously found the "guideposts" articulated by Chief Judge Howell persuasive in assessing the comparative culpability of a given defendant in relation to other rioters.  *See Sabol*, No. 21-cr-35 (EGS), ECF No. 56 at 28.  Those factors are (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, "for example, by obtaining weapons or tactical gear"; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's "words

and movements during the riot"—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, attempted to injure, or threatened to injure others." *Id.*; *United States v. Chrestman*, 2021 WL 765662 (D.D.C. 2021, Howell, C.J.) at *7. All the *Chrestman* factors favor detention here.

### i. The defendant is charged with felony offenses

Mr. Gieswein is charged with six counts, all of which are felonies. The defendant concedes that the charges he faces are "undoubtedly serious" and that he is exposed to "significant imprisonment if found guilty." Mot. at 16. As noted above, multiple of the charges that the defendant faces are crimes of violence, and one is a federal crime of terrorism.

### ii. The Defendant's Actions Show Pre-Planning

The defendant came to the Capitol grounds on January 6 in a full paramilitary kit, with a helmet, camouflage, goggles, and a tactical vest. These are items that one wears if one is expecting to engage in physical violence. The goggles in particular show that one is expecting to be in an area where pepper spray (or something close thereto) is used—whether by the police, by other protesters, or by him. His planning to protect himself from pepper spray, while he carried offensive weapons in the form of the bat and his own aerosol chemical irritant, evince an intent to use violence, as well as an intent to protect himself from the consequences of that use of violence. Mr. Gieswein participated in a march with members of the Proud Boys while holding the bat at the ready, and had it and the aerosol spray out and ready to use for much of the time he was within the restricted area of the Capitol grounds and inside the Capitol.

The defendant's actions serve to underscore the government's view of his intentions on January 6. On at least three occasions, he sprayed the irritant at police officers who were struggling to control the Capitol. There is no evidence that "Antifa" was even present at the times the

defendant deployed his spray, much less that they were the target, as the defendant insinuates.  *See* Mot. at 23 ("Moreover, it has been widely documented that many Trump supporters who traveled to the District anticipated that they would be the subjects of violence from Antifa or other leftwing counter-protestors.   And Mr. Gieswein's comments on January 5th are consistent with an expectation that those who opposed the former President could be violent, and with the hope that his presence would help deter violence").  Even if the Court were to conclude that the defendant actually planned to use the baseball bat and spray on "Antifa" or other counter-protesters, "whether [Mr. Gieswein] arrived prepared to engage in violence against the government or against counter-protesters is a distinction that is of little significance when evaluating the danger he poses to the community."  *Sabol*, No. 21-cr-35 (EGS), ECF No. 56 at 30 n.10.

iii.     The Defendant Used and Carried a Dangerous Weapon

The third *Chrestman* factor is whether the defendant used or carried a dangerous weapon. This factor weighs squarely in favor of detention—the defendant not only carried two dangerous weapons, he used one of them three times and had the other at the ready most of the time.  The evidence that the defendant used his spray and openly carried a baseball bat is laid out above, so the government will not repeat it here.  The defendant moreover concedes that he carried the bat and used the aerosol spray (Mot. at 12-13).  In his motion papers, the defendant does not seriously contest the government's recitation of what he *did* on January 6 as alleged in the complaint.  He instead contests whether a baseball bat carried openly in a crowd or a chemical irritant spray deployed in a crowd constitute "dangerous weapons."  *See* Mot. at 12-14.  Under any definition used, the defendant's baseball bat and aerosol spray count as dangerous weapons.

On three separate occasions, the defendant is charged with having deployed a chemical irritant from an aerosol can in the direction of police officers.  Each time he did so, he was in an

area crowded with other rioters, and he aimed the spray at police.  On two occasions, he was indoors, and on the third, he was outdoors, but in a crowded stairwell covered by the scaffolding. "As used in [Title 18, United States Code,] Sections 111 and 113, courts have consistently defined 'dangerous weapon' as an object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm.  *United States v. Chansley*, 2021 WL 861079 (D.D.C. 2021, Lamberth, J.) at *7.[7]  The defendant then argues that his use of the spray "is not proof that the aerosol spray was designed to cause great bodily injury, or that it did in this case." Mot. at 13.  The defendant's reliance on both the design of the spray and any lack of injury are misplaced.  The proper test, as articulated by Judge Lamberth, is whether an object is used in a way that is *likely* to endanger life or inflict great bodily harm, not whether it in fact did so.

One of the officers sprayed by Gieswein said that he was hit in the eyes and described the substance sprayed as something like an OC-type spray, commonly referred to as pepper spray. The defendant's spray left a burning sensation in the officer's eyes, and it caused him to cough and his eyes to water.  A copy of the FD-302 from this officer's interview is attached hereto as Exhibit 2, and the defendant is referred to in that 302 as "UNSUB 3."  The officer also noted the defendant's bat—which was at that point in his backpack—and being concerned about the potential that Mr. Gieswein would use the bat.  After this spraying incident, the Capitol police tried

---

[7]     The defendant also cites to a test articulated in *United States v. Broadie*, 452 F.3d 875, 881-82 (D.C. Cir. 2006).  That test is substantially similar to that recited by Judge Lamberth in *Chansley*, but the government notes that in *Broadie*, the D.C. Circuit was stating the definition of dangerous weapon under the D.C. Code, not the U.S. Code.  *Broadie*, 452 F.3d at 881 (noting that the statute in question was carrying a dangerous weapon in violation of D.C. Code § 22-4504(a)).

to arrest the defendant, and he actively resisted arrest by taking swings at the officers, and he and the officers wound up on the ground before he was rescued by other rioters.  Exhibit 2 at 2.[8]

There is little doubt that pepper spray used in the manner the defendant used it is capable of causing death or serious bodily injury.  *See United States v. Neill*, 166 F.3d 943, 949 (9th Cir. 1998) (pepper spray is a dangerous weapon as contemplated by the U.S. Sentencing Guidelines); *United States v. Bartolotta* (same), 153 F.3d 875, 879 (8th Cir. 1998); *United States v. Dukovich*, 11 F.3d 140, 142 (11th Cir. 1994) (same); *see also United States v. Brown*, 508 F.2d 427, 430 (8th Cir. 1974) (tear gas gun constituted a "dangerous weapon" under terms of statute prohibiting carrying dangerous weapons on aircraft).  *But see United States v. Harris*, 44 F.3d 1206, 1216 (3d Cir. 1995) (government had not proven that a particular brand of mace was a dangerous weapon for purposes of the U.S. Sentencing Guidelines).

The defendant's bat is similarly capable of causing death or serious bodily injury.   As the Third Circuit has observed, "[a] baseball bat, carried onto the baseball diamond, is clearly a sport implement and not a dangerous weapon. Likewise, a sledgehammer, properly employed on a construction site, is clearly a tool. But when these items are carried into the scene of a robbery, and employed to threaten bystanders, they just as clearly become dangerous weapons." *United States v. Johnson*, 199 F.3d 123, 126 (3d Cir. 1999).  The defendant here carried the bat to a crowded protest that later turned into a crowded riot where many people injured and threatened to injure the police.  For much of the time, the defendant carried that bat out in the open, ready to use it at any point.  Two examples are below:

---

[8]      The portion of the encounter where the defendant and Capitol Police officers are on the ground is partially captured by Capitol surveillance video, but the incident where he sprays the officers is not, at least not on any video undersigned counsel has located to date.





The fact that the bat was on display and ready to use—even if the defendant did not strike anyone

with it—was exactly the type of escalation Chief Judge Howell had in mind when fashioning the

guideposts in *Chrestman*.  As she noted, "a defendant's *carrying or use* during the riot of a

21

dangerous weapon, whether a firearm, a large pipe, a wooden club, an axe handle, or other offensive-use implement, indicates at least some degree of preparation for the attack and an expectation that the need to engage in violence against law enforcement or, indeed, the Legislative branch, might arise." *Chrestman*, No. 21-mj-218, Doc. 23, at 15 (emphasis added).  The third *Chrestman* factor favors detention.

### iv.  Coordination and Leadership

The fourth and fifth *Chrestman* factors speak to whether the defendant coordinated with others in connection to the riot, and whether he played a leadership role.  The government proffers to the Court that the video evidence shows the defendant marching with Proud Boys on the morning of January 6, 2021, some of whom have since been indicted on conspiracy charges that predate January 6.  We also acknowledge that the defendant has not been indicted on any such conspiracy charge, and the investigation to date has uncovered no evidence of his affiliation with the Proud Boys prior to January 6.

The defendant was at the front line between rioters and police on the West Plaza.  He was also one of the first people up the stairs—he was near the front of the line of rioters when he sprayed his aerosol canister at the Capitol police.  He was the second or third rioter through the window, and just before he entered, he encouraged others who were kicking on a door to go through the window.  He showed no hesitance to take advantage of others' destruction of property to enter the Capitol while carrying the dangerous weapons mentioned above.  After he sprayed the retreating officer under the metal rolling doors, he encouraged other rioters to follow him, and many did.

v.   <u>The defendant's words and movements during the riot favor detention.</u>

The defendant's words and movements from January 6 underscore his dangerousness.  The Grand Jury has charged him not only with obstruction of the Congressional proceeding on January 6, it has indicted him on three counts of assaulting law enforcement with a dangerous weapon during the riot aimed at stopping that proceeding, as well as aiding abetting the destruction of a window that allowed rioters to stream into the building.  The defendant correctly concedes that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 991 F.3d at 1284; Mot. at 17, and certainly not every defendant who falls into this heightened *Munchel* category has been detained.  *See id.*   The defendant's attempts to argue that this sixth factor favors him however, Mot. at 17-20, are unavailing.

On three separate occasions—one outside the Capitol while rioters were advancing—and two inside while police were struggling to control the chaos, the defendant assaulted Capitol Police officers with a dangerous weapon.  "Unlike others who obstructed Congress through their presence alone, the defendant employed violence to obstruct Congress's count. He also targeted law enforcement while the police were struggling to control the Capitol. That conduct contributed to the chaos on Capitol Hill." *United States v. Fairlamb*, No. 21-cr-120 (RCL), ECF No. 31 at 13, citing *Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *9 ("concerted and deliberate efforts to undermine law enforcement" weighs heavily in favor of detention).

Each time the defendant sprayed his pepper spray at police, he risked serious bodily injury to them and to everyone else around.  The defendant took the step ahead of time to try to protect himself by wearing goggles, but his victims were not so lucky.  On the third attempt he physically

fought with the police who tried to arrest him.  He entered the building with the intent to obstruct Congress and actively assaulted law enforcement trying to control the crowd with a dangerous weapon.  The sixth *Chrestman* factor overwhelmingly favors detention.  Even if the Court finds that factors four and five do not weigh in favor of detention, four of the six factors strongly do, which in turn counsels towards the need to detain this defendant.  *See Sabol*, No. 21-cr-35 (EGS), ECF No. 56 at 29 ("Four of the six *Chrestman* factors strongly support a finding that Mr. Sabol's comparative culpability in relation to his fellow rioters is high."

## 2.  The Weight of Evidence Against the Defendant

In assessing whether to detain a defendant pending trial, this Court must also consider the weight of the evidence in assessing the risk of flight and community danger.  18 U.S.C. § 3142(g)(2).  The weight of the evidence against the defendant is substantial, and indeed he acknowledges the government's evidence that he "appeared to spray something from a can in his hand."  Mot. at 13.  The defendant's face and distinctive outfit is clearly visible in numerous videos, which include acts of violence against both law enforcement officers in the line of duty and U.S. Capitol property.

Rather than engage with the defendant's factual conduct on January 6, he attempts to persuade this Court that the strength of the government's evidence is weak—not because he disputes that he assaulted officers with an aerosol spray or obstructed Congress, but because he claims that the Electoral College Vote certification may not qualify as an official proceeding and because the defendant's spray and bat do not qualify as dangerous weapons.  The Court should not be so persuaded.  As an initial matter, the grand jury has found probable cause for each of the charged offenses, including findings that the defendant's aerosol spray and bat qualify as

dangerous weapons and that he aided and abetted the destruction of the Capitol window.  As such, the weight of the evidence is at least probable cause.

The defendant's legal arguments about the strength of the case are also unavailing.  The government addressed whether the defendant's weapons qualify as "dangerous" under law above, and we will not rehash that argument here.  He also contends, in approximately one paragraph, that the phrase "a proceeding before Congress" may not encompass the certification of the Electoral College vote.  Mot. at 11-12.  He cites no case law and makes no substantive argument in support of his conclusory position, which is simply that it is "far from clear" that the government can prove the charge as a matter of law.  *Id.*  The Court should not entertain what is essentially a not-fully-briefed challenge as to whether Count One of the Indictment should be dismissed.[9] Notably, in making his argument that the strength of the evidence on the obstruction charge favors release, Mr. Gieswein does not contest that he possessed the requisite intent to obstruct the proceeding.  *See* Mot. at 11-12.  That intent is much more relevant to the Court's analysis of the defendant's dangerousness than the definition of "official proceeding," and it favors detention.

Mr. Gieswein also contends that the government's evidence underlying the destruction of government property count favors release.  Mot. at 14-15.  As detailed above, according to publicly available video footage, the defendant ran towards the Capitol building after the last police line was breached before personally pounding on windows.  He then moved towards the window that was eventually broken by another rioter.  The videographer then turned toward the door to the Capitol, which a rioter was trying to kick down.  The defendant returned to the frame of the video,

---

[9]    At least one judge in this District has accepted a guilty plea to a violation of 18 U.S.C. § 1512(c)(2) for obstructing Congress' certification of the Electoral College vote.  *United States v. Hodgkins*, No. 21-cr-188 (RDM).  *See* Minute Entry dated June 2, 2021, and ECF Nos. 22 and 23.

and he can be heard saying words to the effect of, "boys, boys, look at this," before pointing to the rioter in the process of breaking the window with a riot shield.  The defendant and the people he had just directed to the window watch as it is broken, and the defendant is then the second or third rioter to pass through that window and enter the Capitol.  Far from mere "presence," Mot. at 15, this evidence establishes that the defendant showed an intent to enter the building, directed others to the window being broken, and then took advantage of the property destruction to enter the building, all captured on video.  The strength government's evidence on Count Five, along with the other counts, weighs in favor of detention.

### 3.  The History and Characteristics of the Defendant

The defendant's history and characteristics likewise support pretrial detention.  The defendant has no criminal convictions of which the government is aware, and he ultimately turned himself in to law enforcement.  The defendant's lack of a criminal record prior to January 6, however, must be weighed next to the strength of the government's evidence that he committed these particular offenses, along with the gravity of those offenses as discussed above.  That strength is underscored by what amounts to a concession by the defendant of involvement in at assaultive conduct on January 6.  *See* Mot. at 13 ("Mr. Gieswein acknowledges evidence suggesting that, at points during January 6th, he appeared to spray something from a can in his hand").  The crimes the defendant committed on January 6, as noted above, include three separate counts of a crime classified by Congress as crimes of violence and one classified by that same body as a federal crime of terrorism.  Congress has moreover prescribed a rebuttable presumption in favor of detention.

Undersigned counsel agrees that he is not aware of any information regarding the defendant's affiliation with the Proud Boys or Oath Keepers, but the government notes that

according to an FBI 302, which the defendant attached as an exhibit to his motion, the defendant is a believer in the QAnon conspiracy theory  ECF No. 18-3 at 1.   QAnon adherents believe that a cabal of Satanic, cannibalistic pedophiles run a global child sex trafficking ring, and that President Trump was planning to have many members of the cabal arrested.[10]  ECF No. 18-3 at 1. The defendant is on tape from the day before the riot, saying that he believes that politicians, including President Biden and Vice President Harris, have "completely destroyed our country and sold them to the Rothschilds and the Rockefellers."[11]

The letters and interviews attached to the defendant's motions—regarding he and his friends being law-abiding, and about the defendant wanting to apply for work as a police officer—do not help his case for release.  Whatever motivated the defendant on January 6, it was strong enough to overcome the respect he appears to have had for law enforcement he had prior to traveling to Washington, D.C., and to cause him to chemically assault officers who were trying to prevent a mob from taking over the Capitol.  The defendant's actions on January 6 show that if he believes the type of force he used on that date is necessary, he will use it—no matter what lawful authority tries to stand in his way, even if that is lawful authority is one he seemed to respect in the past.

---

[10]     *See*, *e.g.*, https://en.wikipedia.org/wiki/QAnon (last visited June 15, 2021).

[11]     As the FBI agent noted in the affidavit in support of a criminal complaint in this case, online and anti-Semitic conspiracy theories hold that shadow forces, including the Rothschild family, secretly control global currency. See, e.g., Anti- Defamation League, Quantifying Hate: A Year of Anti-Semitism on Twitter, available at https://www.adl.org/media/11775/download (last viewed January 16, 2021).

**4.   The Nature and Seriousness of the Danger to Any Person or the Community**

The defendant's conduct on January 6 demonstrates his dangerousness, and the government will not rehash it here after laying it out above.  Judge Lamberth's decision in *United States v. Fairlamb*, a post-*Munchel* case involving an assault on a federal officer, underscores the dangerousness inherent in those who assaulted law enforcement on January 6:

> Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does. The D.C. Circuit's recent detention decision in United States v. Munchel, No. 21-3010, 2021 WL 1149196 (D.C. Cir. Mar. 26, 2021), supports that conclusion. In discussing the events of January 6, *Munchel* held that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id*. at *8 (emphases added). In so holding, *Munchel* drew categorical distinctions between the violent and non-violent January 6 participants explaining that the former are categorically more dangerous. And given his actions on January 6, the defendant fits into *Munchel's* more dangerous category.
>
> *Munchel's* categorical distinction makes sense, given that a defendant's history of violence offers some of the strongest evidence of his future dangerousness. See, e.g., *Maryland v. King*, 569 U.S. 435, 453 (2013) ("[A]n arrestee's past conduct is essential to an assessment of the danger he poses to the public[.]"); *United States v. Tortora*, 922 F.2d 880, 888–89 (1st Cir. 1990); Bradley R. Johnson, *Assessing the Risk of Violence, in Psychiatric Aspects of Violence* 31, 32 (Carl C. Bell ed., 2000) ("The single best predictor of violence is a history of violence."). And *Munchel* recognized that in the detention context, courts may rely on defendants' violent actions undertaken on January 6 in determining their future dangerousness. See 2021 WL 1149196, at *8 (requiring individualized assessment but looking to violent conduct on January 6 as probative of future dangerousness).

*United States v. Fairlamb*, No. 21-cr-120 (RCL), ECF No. 31, at 11-12 (Lamberth, J.).  This Court should take a similar view of the defendant's decision to assault three separate groups of Capitol

Police officers who were engaged in trying to protect the Capitol from a violent mob at the time the assaults took place

It should also be of little comfort to the Court five months after this event, there has not been a similar one (*see Mot.* at 31), given how long the National Guard was required to remain at the Capitol and the spotlight put on these types of actions.[12]  The National Guard presence and the spotlight on extremist violence was in part due to the defendant's actions on January 6.

Moreover, although the defendant claims that location and electronic monitoring will mitigate any danger he may pose to society.  The Court has no guarantee that the defendant will not go to similar lengths in the future, and the defendant has expressed no change in mindset between January 6 and now.  When he was arrested on January 19, 2021, he told the agents that he was turning himself in because he did not do anything wrong.  He also described himself as a "constitutionalist" and mentioned that he basically wanted the military to take the country over and restore the Constitution. The defendant has made it clear that he is willing to play a front-line role in a violent revolt to attempt to stop the certification of an election if he believes—despite absence of evidence to support those beliefs—that doing so will protect the country.  The Court can have no confidence that the defendant will not take similar actions in the future if he feels they are justified, and he clearly still did more than a week after January 6 at the time of his arrest.

The defendant showed perseverance and determination in being at the front lines every step along the way before breaking into the Capitol, and he showed a willingness to disregard the law

---

[12]     According to news reports, the National Guard remained at the Capitol until late May, nearly four months after January 6.  *E.g.*, Main, Alison, Fortisnky, Sarah, and Pellish, Aaron, *National Guard Troops will leave US Capitol on Sunday*, CNN May 23, 2021 (available at https://www.cnn.com/2021/05/23/politics/national-guard-us-capitol-leaving-sunday/index.html, last visited June 15, 2021).

and assault those who attempt to enforce the law in the process.  Given the combination of the defendant's actions on that day, his lack of belief that his actions were wrong, his adherence to the notion that the Constitution must be restored, potentially by force, and in light of the offenses with which the defendant is charged and the presumption in favor of detention, there are simply no conditions nor combinations of conditions of release that can assure the safety of the community or the defendant's return to court if he is released.

### Conclusion

Under the factors set forth in 18 U.S.C. § 3142(g), the government has demonstrated by a clear and convincing evidence that the defendant is a danger to the community and by preponderance of the evidence that he is a flight risk.  For the foregoing reasons, as well as those that the government will demonstrate at any hearing on this matter, the government requests that the Court order the pre-trial detention of the defendant.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793


By:   /s/ *Erik M. Kenerson*
ERIK M. KENERSON
Assistant United States Attorney
Ohio Bar Number 82960
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-252-7201
Email: Erik.Kenerson@usdoj.gov