# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Crim. Action No. 21-24-1 (EGS) |
| v. | Hon. Emmet G. Sullivan |
| ROBERT GIESWEIN, | Hearing: July 29, 2021 |
| Defendant. |  |

## MR. GIESWEIN'S REPLY IN SUPPORT OF MOTION FOR REVOCATION OF DETENTION ORDER

The government does not contend that Mr. Gieswein poses a risk of non-appearance, and has failed to meet its burden to establish that no combination of conditions "will reasonably assure . . . the safety of any other person and the community." *See* 18 U.S.C. § 3142(c)(1)(B). Indeed, the government fails to even address most of the conditions that Mr. Gieswein proposed, or how they would work in combination. *See* Gov't Opp. to Def. Mot. for Hr'g & Rev. of Det. Order ("Gov't Opp."), ECF No. 19 at 29 (addressing only location and electronic monitoring conditions proposed). Moreover, the government attempts to heighten the standard that the Court must apply, by arguing that the conditions Mr. Gieswein proposes cannot "guarantee" that defendant will not repeat conduct charged in indictment. *Id.*

Whether conditions can *guarantee* that Mr. Gieswein does not pose any danger between now and his trial is not the question before the Court. The law does not require that, and with good reason: liberty is among the highest values enshrined in our Constitution and Bill of Rights; the presumption of innocence, and the right to

litigate every element and nuance of every charge in an indictment are as well. *See* U.S. Const., Preamble & Amends. V & VI. Limiting pretrial detention to situations in which the Court is "convinced" that it is "clear" that there is absolutely no combination of conditions that will *reasonably assure* community safety reflects those values. *See* § 3142(f)(2) ("The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence").

But, in any case, as a practical matter, the conditions that Mr. Gieswein has proposed would come very close to guaranteeing that Mr. Gieswein poses no threat while he awaits trial, particularly given that nothing like these conditions were in place before January 6, given Mr. Gieswein's unblemished past, and given that no released January 6 defendant has yet attempted anything like what happened on January 6, notwithstanding the continuing drum beat about the 2020 election from certain politicians and pundits.

For these and the other reasons given below, Mr. Gieswein respectfully renews his request for release.

## I.   This is not a presumption case.

### A.   *The presumption in 18 U.S.C. § 3142(e)(3)(C) does not apply to charges of aiding and abetting.*

The government is wrong that the Court may presume in this case that "no condition or combination of conditions will reasonably assure . . . the safety of the community" pursuant to 18 U.S.C. § 3142(e)(3)(C). The government asserts that the

presumption arises because 18 U.S.C. § 1361 (destruction of government property) is one of the offenses listed in §2332b(g)(5)(B). *See* Gov't Opp., ECF No. 19 at 12, 14. That § 1361 falls within that list is true, and it is true that § 3142(e)(3)(C) provides that detention should be presumed where there is probable cause to believe that the defendant committed "an offense listed in section 2332b(g)(5)(B) . . . for which a maximum term of imprisonment of 10 years or more is prescribed[.]"[1]

However, here, there is not probable cause to believe that Mr. Gieswein committed a violation of § 1361. Here, at most, the grand jury only found probable cause to believe that Mr. Gieswein *aided and abetted* such a violation, Indict., ECF No. 3 at Count V, and the government has never alleged that Mr. Gieswein himself committed a violation of § 1361. *See generally* Aff., ECF No. 1-1; Gov't Opp., ECF No. 19.

Section 2 of Title 18 provides that one who aids and abets is "punishable as a principal," but that does not mean that whoever aids and abets an offense has "committed" that offense, as required by § 3142(e)(3)(C). Had Congress intended to provide for this presumption to apply against both principals and those who are charged with aiding and abetting the offenses listed in § 3142(e)(3), or to anyone charged in a case that "involves" such a charge, Congress would have said so. Instead, Congress limited this provision to those who "committed" the offenses listed. So

---

[1] In cases such as this one involving alleged damage to property of the United States in excess of $1,000, a violation of § 1361 carries a maximum sentence of ten years in prison. 18 U.S.C. § 1361.

should the Court, because "[o]nly the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1737 (2020).

Moreover, other choices Congress made in drafting § 3142, such as in § 3142(e)(2), reinforce that when Congress used "committed" in the text of (e)(3), it meant "committed," and not something broader. In notable contrast with § 3142(e)(3), the presumption provision in § 3142(e)(2) is necessarily triggered by at least some prior offenses in which the defendant was not the principal who "committed" the offense in question. This is because this provision can sometimes apply without regard to what exactly the defendant did, and sometimes apply where cases merely "involve" certain conduct. For example, § 3142 (e)(1)(2) and (f)(1)(A) together provide that a presumption may arise if defendant has previously been convicted of any offense for which the maximum *sentence* was life imprisonment or death, which by its terms can include prior aiding and abetting convictions. Similarly, § 3142 (e)(1)(2) and (f)(1)(E) work together to create a presumption where a defendant has previously been convicted of *any* felony that "*involved*" a minor victim or other facts. Again, this can obviously include prior aiding and abetting convictions.

Section 3142(e)(3) is narrower, and the Court should apply it as such. Thus, here, the Court should find that, because there is no "probable cause to believe that [Mr. Gieswein] committed . . . an offense listed in section 2332b(g)(5)(B) . . .[,]" no presumption applies.[2]

---

[2] The defense has not located any binding authority that holds that probable cause that a person who merely aided or abetted a violation of one of the statutes incorporated by §3142(e)(3) should be presumed too dangerous to release. In 2016,

Even if the Court were to conclude that probable cause that Mr. Gieswein aided or abetted a violation of § 1361 would trigger a presumption of dangerousness under § 3142(e)(3), the Court should find that no presumption applies here. As previously noted, with all due respect to the grand jury, the evidence produced to date does not appear to establish probable cause to believe that Mr. Gieswein even aided and abetted the destruction of the window in question. At most, it shows is that Mr.

---

Judge Jackson did find that the presumption applied where the court found probable cause to conclude that the defendant conspired with his fellow robbers to violate 18 U.S.C. § 924(c) though he himself did not possess any firearm. *United States v. Lee*, 195 F. Supp. 3d 120, 128 (D.D.C. 2016) ("Because the government has established probable cause to believe that that defendant violated section 924(c) by aiding and abetting or conspiring to commit that offense, the Court could find that the rebuttable presumption prescribed in § 3142(e)(3)(B) applies in this case."). However, this is not binding, and the court in *Lee* even noted that the government had "not pointed the Court to authority for the proposition that under the Bail Reform Act, it may rely upon a vicarious liability theory to establish the commission of an offense that gives rise to the rebuttable presumption under section 18 U.S.C § 3142(e)(3)." *Id.*

In addition, *Lee* is not persuasive. To reach the conclusion that aiding and abetting conduct can trigger § 3142(e)(3)(C) in that case, the court relied on Second Circuit cases that had nothing to do with the word "committed" in that provision, and that did not hold that a presumption arises from any vicarious violation of an offense listed in that provision. Instead, the cases considered the meaning of "crime of violence" in § 3142(f)(1), and whether it includes aiding and abetting a crime of violence. Specifically, in *United States v. Ciccone*, the Second Circuit held that the Bail Reform Act "does not require that the defendant himself commit acts of physical violence as a condition precedent to a *detention order*," under § 3142(f)(1)(A). *Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002) (emphasis added). And *United States v. Mitchell* also concerned whether aiding and abetting a crime of violence is itself a "crime of violence" under § 3142(f)(1)(A). *Mitchell*, 23 F.3d 1, 3 (2d Cir. 1994) (holding that defendant's offense of conviction, aiding and abetting an arson, was a "crime of violence," so that he could be detained pursuant to § 3143(a)(2), which incorporates § 3142(f)(1)(A)). These cases are inapposite because, again, though one is *eligible for detention* pursuant to § 3142(f)(1) if his case merely "*involves*" a "crime of violence" (and everything that falls within that term), as in *Ciccone* and *Mitchell*, the text of § 3142(e)(3) only permits one to be *presumed dangerous* if there is probable cause to believe he "*committed*" certain offenses.

Gieswein was present for a destruction of property committed by someone else. *See* Def. Mot., ECF No. 18 at 14-15 (citing publicly-available video relied upon by the government). And the government also fails to make the case, because all it argues is that Mr. Gieswein banged on one window, watched someone else break another, did something to *stop* two rioters from kicking a door, and called to others' attention that someone else was breaking a window. *See* Gov't Opp., ECF No. 19 at 7, 25-26.[3] In short, under any standard of proof, there simply is no reasonable cause to conclude that Mr. Gieswein even aided or abetted the breaking of that window.

### B.   *The evidence defeats any presumption here.*

Where it applies, a presumption is "[s]ubject to rebuttal by the person." 18 U.S.C. § 3142(e)(3). To rebut the presumption, the defendant must produce "some credible evidence contrary to the statutory presumption." *United States v. Taylor*, 289 F. Supp. 3d 55, 63 (D.D.C. 2018) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)).

Once rebutted, the presumption remains relevant as "a factor to be considered among those weighed by the district court." *Taylor*, 289 F. Supp. 3d 63 (internal

---

[3] The government presumably relies on the video it cited in the Affidavit, as well as a video that it produced to the defense for the first time on the evening of June 17.

Mr. Gieswein does not concede that the voice the government attributes to him in its discussion is in fact his.

On that subject, in several places, the government's opposition describes as a "concession" several of defense counsel's decisions to not address a particular element of a charge, or a particular allegation, in Mr. Gieswein's opening motion. These were not concessions to anything other than to page limitations, and the reality that not every issue in a case can be litigated in a bond motion.

citation omitted). But "[t]he defendant's burden . . . is only a burden of production; the burden of persuasion remains with the government throughout the proceeding." *Taylor*, 289 F. Supp. 3d at 63. Thus, even though a presumption applies, ultimately, "the burden of persuasion remains with the government throughout the proceeding." *Id.*

Here, even if the Court finds that probable cause of aiding and abetting destruction of property triggers the presumption, and that the grand jury's finding of probable cause is controlling, Mr. Gieswein has rebutted the presumption. He has done so with the evidence that if he violated the law on January 6, this was an aberration (because he has no criminal history), that he has a history of steady employment, that he has a good reputation among friends, family, and coworkers, that he actually reveres police officers, and everything else cited in his opening motion. Indeed, a court recently found that the man who broke the window in front of Mr. Gieswein, Dominic Pezzola, rebutted the presumption arising from the charge that he destroyed government property with similar evidence. *See United States v. Pezzola*, No. CR 21-52-1 (TJK), 2021 WL 1026125, at *8 (D.D.C. Mar. 16, 2021) (finding that Pezzola's lack of criminal history and demonstrated good character were enough to "rebut the presumption of detention as to his dangerousness that arises from the charges against him").

Moreover, if the Court considers the presumption along with all of the other factors and evidence proffered, the Court should bear in mind that the evidence underlying Count Four is slight at best. Other courts have asserted that a rebuttable

presumption retains weight on the premise that "'Congress has found that' those charged with the specified offenses are likely to pose a danger to the community." *See Taylor*, 289 F. Supp. 3d at 63 (stating that a court should keep this "in mind" when weighing factors relevant to release) (internal citations omitted). But it is implausible that Congress found that people who merely watch others break government windows are so likely to pose a danger to the community that they should be presumed too dangerous to release. Because this is the most that the evidence shows in this case with regard to § 1361, the Court should accord the presumption minimal weight in this case.

Finally, regardless of whether a presumption applies, or whether the Court gives it material weight, when all of the factual circumstances of Mr. Gieswein's conduct and history are considered, there is not clear and convincing evidence establishing that the proposed conditions cannot assure the safety of the community while he awaits trial.

## II.    Several of the charges are not supported by strong evidence.

In determining whether conditions of release can ensure the safety of others, if the evidence is hefty, that should carry the least weight, because the Bail Reform Act "neither requires nor permits a pretrial determination of guilt." *United States v. Gebro*, 948 F.2d 1118, 1121-22 (9th Cir. 1991) (citing *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986)); *accord United States v. Jones*, 566 F. Supp. 2d 288, 292 (S.D.N.Y. 2008).

On the other hand, support for the conclusion that the government may have

overcharged Mr. Gieswein is material to many other factors the Court must consider pursuant to § 3142, including how Mr. Gieswein compares with others at the Capitol on January 6, how much time Mr. Gieswein is realistically facing, and the Court's overall view of his case.

For example, in its opposition, the government causally attributes to Mr. Gieswein a "federal crime of terrorism," pointing to the fact that § 1361 falls within 18 U.S.C. § 2332(g)(5). *See* Gov't Opp., ECF No. 19 at 16. The government also contends that § 1361 qualifies as a crime of violence. *See id*. at 15. But a review of the evidence reveals that these incendiary accusations are supported by scant evidence regarding § 1361.[4]

Likewise, in Counts Two through Four, and Six, the government has alleged that Mr. Gieswein committed an aggravated form of assault of federal officers, and an aggravated form trespass, because he carried "dangerous weapons." Indict., ECF No. 3. But the government fails to meet its burden to establish that it has weighty

---

[4] The government does not offer a citation to support its assertion that § 1361 qualifies as a "crime of violence," and it notes authority to contrary. *See* Gov't Opp., ECF No. 19 at 15, n. 6. In fact, there is a significant body of controlling case law that suggests that depredation of property does not categorically qualify as a crime of violence. *See, e.g., Stokeling v. United States*, 139 S. Ct. 544, 555 (2019) (reiterating that for categorical determinations of crimes of violence, "'physical force,' or 'force capable of causing physical pain or injury,' [...] includes the amount of force necessary to overcome a victim's resistance[,]" and thereby suggesting that "crime of violence" denotes some human harm, not mere depredation of property).

A "Federal Act of terrorism," includes only violations of § 1361 that are "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The indictment does not allege those elements, and the government has not offered proof that it could prove them here.

evidence to prove the aggravating element, even though these charges are central to the government's arguments that Mr. Gieswein should remain detained.

It appears that the parties essentially agree on the definition of "dangerous weapon" for purposes of 18 U.S.C. § 111(b), as an object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm. *See* Def. Mot., ECF No. 18 at 12-13; Gov't. Opp., ECF No. 19 at 18-19. But the government fails to establish that any spray that Mr. Gieswein possessed was capable of causing sufficient injury to meet this definition.

The government does not argue that the spray it charges Mr. Gieswein with using was inherently dangerous. And the government has elsewhere agreed that to prove that a non-inherently dangerous object is a dangerous weapon, the government must prove that it was likely to endanger life or inflict an injury that creates "(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1365(h)(3); *see also* 18 U.S.C. § 2246(4); *see also* § 18 U.S.C. 113(b)(2); *United States v. Owens*, No. 21-CR-286 (BAH), 2021 WL 2188144, at *7 (D.D.C. May 28, 2021) ("As for the definition of 'bodily injury,' the government employs the definition of 'serious bodily injury' in 18 U.S.C. § 113(b)(2), which defines the term[] by way of § 1365").[5]

---

[5] By contrast, a mere "bodily injury" is one that includes "(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of the function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary." 18 U.S.C. § 1365(h)(3).

But the government has yet to proffer evidence that a spray allegedly used by Mr. Gieswein could have or did produce any such injury. Indeed, even the police reports that the government disclosed after the defense filed the bond motion recites mild symptoms: watery eyes, coughing, and a burning sensation. Govt. Opp., Ex. 2 at 1. In fact, the officer's reported injuries were so minimal that he was not even deterred. *Id.* (noting that he reacted by letting go of another subject and moved to grab Mr. Gieswein).[6]

The cases the government cites for the proposition that it will be able to prove beyond a reasonable doubt that any spray can in Mr. Gieswein's hands is a dangerous weapon concern situations in which the type of spray at issue was established (which is not the case here), and they concern Sentencing Guidelines enhancements (which are subject to a much lower burden of proof than the government will be at trial). *See* Gov't Opp., ECF No. 19 at 20-21. As such, they are inapposite.

Likewise, the government fails to refute the doubt that it can prove that Mr. Gieswein disrupted an "official proceeding," as charged in Count One. *See* Indictment, ECF No. 3. Indeed, the government chastised the defense for not briefing in full why the ceremonial counting of Electoral votes was not an official proceeding. Gov't Opp.,

---

[6] The officer report relied on in the government's opposition also alleges that Mr. Gieswein "actively resist[ed] arrest" and took "swings" at the officer. Gov't Opp., ECF No. 19 at 19-20 & Ex. 2 at 1. This is irrelevant to the question of whether the government can prove the charges in the indictment, which all allege assault by aerosol spray, not by punches. Further, though this report was made before the government indicted Mr. Gieswein, either the government or the grand jury determined that it was not enough to support a charge, and it is not corroborated. Accordingly, the Court should disregard it.

ECF No. 19 at 25. But though it is the party with the burden of persuasion in this proceeding, the only support that the government offers for the contrary position is the fact that one January 6 defendant has pled guilty to this charge. *Id.* at 25 n.9.[7] The government has thus failed to provide the Court with any legal argument that it can prove this charge.

In sum, there may be significant gaps in the government's case against Mr. Gieswein, and this weighs in favor of release.

## III.     The Court must consider distinctions among assault cases.

Section 3142(g)(1) directs the Court to consider whether the defendant is charged with "crimes of violence." Again, Mr. Gieswein disagrees that any of his charges are crimes of violence.[8] But more importantly, categorical labels are less significant to the determination of whether Mr. Gieswein presents a continuing threat than is a close analysis of what the government says that Mr. Gieswein actually did.

Notwithstanding the fact that Mr. Gieswein does not in any way concede his

---

[7] On information and belief, several defendants have filed motions to dismiss charges under 18 U.S.C. § 1512 on the ground Mr. Gieswein has asserted. *See, e.g.*, Mot. to Dismiss, *United States v. Brady Knowlton*, 21-CR-46, ECF No. 39 (D.D.C. June 18, 2021).

[8] Again, Mr. Gieswein's position is that assault with a dangerous weapon, 18 U.S.C. § 111(b), is not categorically a crime of violence. However, he acknowledged in his opening motion that his position was stated and rejected in this Court's decision in *United States v. Sabol. See* Def. Mot., ECF No. 18 at 9-10; 16 (acknowledging *Sabol* ruling with an objection). He also does not agree that destruction of government property under § 1361 is a crime of violence, as the government argues, Gov't Opp., ECF No. 19 at 15 & n.16, for the reasons the defense offered in note 4, *supra*.

guilt, and his arguments that, at the very least, he may have been overcharged in several respects, the defense has never disputed that what Mr. Gieswein is accused of doing is very serious, or that the evidence is not concerning. But as serious as the charges of assault against Mr. Gieswein are, others are accused of doing far worse than he on January 6, or raised concerns for other reasons that he does not.

Indeed, whether one does or does not deem a particular spray a "dangerous weapon," use of it against an officer or group of officers would be concerning. But it would not begin to compare to using a makeshift spear to attack an officer (*Chansley*, No. 21-CR-3 (RCL), 2021 WL 861079), or tossing an officer to an angry crowd (*United States v. Whitton*, No. CR 21-35-5 (EGS), 2021 WL 1546931, at *2 (D.D.C. Apr. 20, 2021)), or pummeling an officer trapped on the ground with a hockey stick (*United States v. Foy*, 21-CR-108-1 (D.D.C.)), or trapping an officer with a police baton (*Sabol*, No. CR 21-35-1 (EGS), 2021 WL 1405945), or stalking officers and punching one without any provocation (*United States v. Fairlamb*, No. 1:21-CR-120-RCL, 2021 WL 1614821 (D.D.C. Apr. 26, 2021)). These actions indicate actual intent to cause lasting pain and injury, and an especially high tolerance for risk, which spraying an irritant in an open area, from afar, simply does not.

Likewise, no matter what terms can incorporate a baseball bat under certain circumstances, the government has not alleged that Mr. Gieswein used a bat to threaten or harm anyone; indeed, images from inside the Capitol show that he put it in his backpack at some point while still in the building. The Court must contrast these facts with those concerning defendants accused of beating officers with their

own batons, as in *Sabol*. *Sabol*, No. CR 21-35-1 (EGS), 2021 WL 1405945.

Some of the people described above have been released, as the defense noted in the opening motion. But, even the cases concerning people who have not been released highlight that not everyone charged with § 111, or even § 111(b), is the same. As the defense has already argued, the"[*Munchel*] dichotomy is useful" but this Court must "probe the precise nature of defendant's actions – including the type of any force employed – when assessing" a defendant's dangerousness. *See, e.g., United States v. Padilla,* No. 1:21-214 (JDB), 2021 LEXIS 84859 at *19 n.4 (D.D.C. May 4, 2021). And to ensure that *Munchel* does not collapse into a rule that those charged with aggravated assault will be detained, one must compare Mr. Gieswein's alleged assaultive conduct to that of others. The government refuses to do that. But the Court must, and when it does, the defense respectfully suggests that the Court will conclude that Mr. Gieswein's alleged assaults do not suggest that he poses the same risk as do many others who face similar charges.

## IV.     The government has not established that Mr. Gieswein came to the District with a plan to engage in violence.

The government claims that Mr. Gieswein's attire on January 6 suggested "pre-planning" for an assault, saying his helmet, camouflage, goggles, and a tactical vest are "are items one wears if one is expecting to engage in physical violence." Gov't Opp., ECF No. 19 at 17.

But there is a difference between hoping to deter violence and preparing to defend oneself against anticipated unlawful attacks, on the one hand, and preparing

14

to be an aggressor, on the other. The government has not established that Mr. Gieswein's attire established the latter. To the contrary, the items that the government focuses on as evidence of planning are just as often deterrent or defensive as they are offensive, or even more often so.

For example, it is implausible that Mr. Gieswein donned green and khaki camouflage to help him slyly infiltrate the Capitol in the middle of the city of Washington, D.C. It is far more plausible that he wore it to signal strength in order deter others from attacking him or others. Likewise, his other "gear" does not suggest that he came to the city with anything other than a plan to engage in peaceful protest. Peaceful protestors of all stripes, and all over the country, anticipate being tear-gassed or pepper-sprayed, shot with rubber bullets, or worse, by police. Indeed, even left-leaning protestors have complained of police officers overusing these tactics in countless protests, and various guides caution protestors to wear helmets and goggles.[9] Plate carriers, too, are obviously defensive, and also are used by protestors

---

[9] *See, e.g.*, R. Kurzius, "Black Lives Matter D.C. Sues Trump And Barr Over Tear Gas At Lafayette Square," *NPR.org* (June 5, 2020) ("Black Lives Matter D.C. and a number of local residents, including a nine-year-old, who were at Lafayette Square to protest the killing of George Floyd say they were given no warning before federal law enforcement used tear gas, pepper spray capsules, rubber bullets and flash bombs to clear the public space"); *id.* (featuring picture of protestor wearing goggles); D. Hinkel, "Protesters allege rampant physical and verbal abuse by Chicago police at recent demonstrations," *Chicago Tribune* (Aug. 19, 2020) (reporting that Chicago activist, including several who had participated in protests near a Christopher Columbus statue, aired allegations "that officers have responded to recent protests by beating peaceful demonstrators, blinding them with pepper spray, making homophobic comments, damaging bikes and attacking medics"); M. Chan, "'My Faith in this World is Gone,' For Protestors Injured by Police, There's No Real Recovery," *Time* (Oct. 9, 2020) (describing 51-year-old woman donning a helmet, goggles, and a respirator "to link arms with hundreds of other mothers demanding

in fear of overaggressive police or counterprotestors.[10]

As for the evidence that Mr. Gieswein possessed a bat and spray at the Capitol, that also does not establish that he "came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process mandated under the U.S. Constitution, of counting and certifying Electoral College votes," as this *Chrestman* factor contemplates. *Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662 at *8. First, the government has not offered any evidence that Mr. Gieswein brought these with him from Colorado to the city, which in itself defeats the suggestion. Second, carrying both of these could just as easily have been meant to *deter* others, including Antifa, from committing violence upon Mr. Gieswein, or others.[11]

---

justice for George Floyd"); S. Gutierrez, "What to do if you're exposed to tear gas: From protecting yourself to protecting others: everything you need to know," *Popular Science* (Nov. 19, 2019) ("Anyone who has ever followed the news knows peaceful protests and demonstrations can quickly turn into dangerous affairs. When this happens, the result is nearly always the same: protesters get stuck in a thick, choking cloud of tear gas. . . Cover your head . . . Always wear goggles").

[10] *See, e.g.*, L. Sherriff, "Supplies of bulletproof vests run out in protest-hit Portland," *The National News* (Nov. 6, 2020) ("'I wear a vest because I don't trust the cops,'" said Ciara, a 25-year-old who has been marching in Portland with the Black Lives Matter group. 'They're violent, they're not afraid to use force against us").

[11] The government misconstrued the defense's point about people anticipating that Antifa would be at these protests when it retorted that even a plan to use violence against Antifa would be a plan to use violence. Gov't Opp., ECF No. 19 at 18, *citing Sabol*, No. CR 21-35-1 (EGS), 2021 WL 1405945. The defense's view is that Mr. Gieswein's comments on January 5 suggested only that he anticipated that *others* could be violent, and that he hoped his presence would contribute to "both sides *stay[ing] peaceful*." *See* Def. Mot., ECF No. 18 at 2-4 & nn. 2-4 (emphasis added). The defense's point is that his comments and gear are more consistent with a plan was to *deter* violence and avoid injury at the hands of others, as opposed to a plan to *instigate* in violence. *See id.* at 23 (arguing same, and noting that he is not accused of any violence on January 5, when he was wearing the same gear).

The defense understands that the government aims to prove in this case that Mr. Gieswein ultimately did instigate assaults with the spray, but even proving that beyond a reasonable doubt would not transform evidence that he carried spray, or a baseball bat, on January 6 into evidence that he arrived with a *plan* to assault anyone, or breach the Capitol, or anything else he is accused of ultimately doing.

In sum, the government has failed to establish that this *Chrestman* factor weighs against release.

## V.     The government has not established leadership or coordination by Mr. Gieswein.

The government's proffer that Mr. Gieswein was one of the first to enter, that he did not hesitate to go in the window, and that he encouraged other rioters who were walking behind him to keep going where they were headed does not establish that Mr. Gieswein played a leadership role. This Court has previously given such evidence little weight, and should here as well. *Sabol*, No. 1:21-cr-00035-EGS, 2021 WL 1405945, at *13 ("[T]he government has not proffered any evidence that suggests Mr. Sabol urged other rioters to advance on the U.S. Capitol or attack law enforcement, other than his conduct, which arguably was leading by example").

Likewise, the government has not established that Mr. Gieswein coordinated with anyone. The government concedes it has no evidence that Mr. Gieswein was associated with the Proud Boys before January 6, and only notes that photographs show Mr. Gieswein marching with Proud Boys on that day. Gov't Opp., ECF No. 19 at 4. But so too did many other non-Proud Boys, and walking next to people or talking

17

to them does not establish coordination with them.

Finally, the government does not proffer any evidence that Mr. Gieswein coordinated with anyone after January 6, or that he committed any further violence or anti-democratic acts after January 6 and before being arrested.

## VI.     Mr. Gieswein's history and characteristics, and the proposed conditions, will reasonably assure the safety of the community.

The government attempts to establish that Mr. Gieswein poses a continuing risk by noting that one friend apparently told an agent that Mr. Gieswein is a believer in the "QAnon conspiracy theory," and claiming that he expressed a desire for the military (not himself) to take some action. Gov't Opp., ECF No. 19 at 27, 29. But the evidence on these claims is thin. More importantly, there is nothing in the Bail Reform Act that would authorize jailing a person for believing something – conspiracy or not.

In a similar vein, the government attempts to make an issue of Mr. Gieswein's not having "expressed any change in mindset." *Id.* at 29. But, of course, the government has no insight into Mr. Gieswein's current mindset, he has a privilege to remain silent, and the Bail Reform Act does not require a defendant to say anything in order to obtain release pursuant to satisfactory conditions.

The question before the Court is not whether Mr. Gieswein may continue to have beliefs with which the government disagrees; it is whether conditions can reasonably assure against Mr. Gieswein committing violence while he awaits trial. Here, that is the case, given everything discussed already, Mr. Gieswein's

characteristics, the events since January 6, and the nature of the conditions proposed.

Again, Mr. Gieswein's background and reputation amount to overwhelming evidence that whatever offensive conduct Mr. Gieswein participated in on January 6 was an aberration. "[A] defendant's past conduct is important evidence—perhaps the most important—in predicting his probable future conduct." *Pope v. United States*, 739 A.2d 819, 827 (D.C. App. 1999) (quoting *Cruz-Foster v. Foster*, 597 A.2d 927, 930 (D.C.1991)); *see also United States v. Anderson*, 177 F. Supp. 3d 458, 463–64 (D.D.C. 2016) ("[T]he Bail Reform Act focuses on the number of criminal episodes [. . .] because the former is determinative of future dangerousness and risk of recidivism, which is deserving of a greater deprivation of liberty"); *United States v. Chimureng*, No. 84 CR. 818 (RLC), 1984 WL 1156, at *3 (S.D.N.Y. Nov. 5, 1984) ("[Detention under the Bail Reform Act] is meant to be applied to a small but identifiable group of particularly dangerous defendants who show a strong probability of committing additional serious crimes if released").

Further, recent history demonstrates that the unique circumstances at play on January 6 at the Capitol were integral to what happened that day, and that even those who are charged with violating the law that day are not likely to try anything like it again. Specifically, many of those who were there have been at liberty since January 6. This includes people who have been released, as well as true leaders and coordinators, who only recently have been arrested:

- *United States v. Dolan*, No. 1:21-cr-28-APM. Dolan was a principal in the destruction of government property, triggering the rebuttable presumption for detention. *See* Gov't Mot. to Revoke Release, ECF

No. 227 at 4 (D.D.C. June 8, 2021). He was an active member of the Oath Keepers and recruited heavily in advance of January 6. *See id.* at 1. Specifically, he posted a recruitment Youtube video ("Fight for America") and held over 10 virtual meetings leading up to January 6. *Id.* at 15. At least one of those meetings was expressly for "DC planning." *Id.* He brought guns to the greater DC area and lingered outside of Speaker Pelosi's office with his co-conspirator, who sent violent text messages about the Speaker. *See id.* at 6-8, 15-19. Even so, his release was affirmed on June 11. Minute Entry, *United States v. Dolan*, No. 1:21-cr-28-APM (D.D.C. June 11, 2021).

- *United States v. Taylor*, No. 1:21-cr-392-RCL. Taylor is a board member of the far-right extremist group, American Phoenix. *See* Gov't Mot. to Revoke Release, ECF No. 11 at 4 (D.D.C. June 15, 2021). The group's leader had previously called for "execution" and "punishment" over the election results. *Id.* Taylor actively recruited an organized a group of Californians who were willing to travel to DC for the events of January 6. *See id.* at 1. He set up lines of communication among the participants and gave the group advice about what types of weapons they should bring to the District. *See id.* at 2-4. He referred to the events as "war." *Id.* at 5. He had his co-conspirator drive his firearms to Virginia and photographed his weapons upon his arrival in the area: he brought two hatchets, a knife, a stun baton, and various other paramilitary gear. *See id.* at 6. On January 5, Taylor gave a speech to a large crowd where he said "we will not return to our peaceful way of life until this election is made right," and after the events on January 6, he took credit for "storming the Capitol." *Id.* at 5, 9. Even so, he was ordered released by Magistrate McCormick on June 11 following his initial appearance. *Id.* at 11.

Nevertheless, there has been no repeat of January 6, or anything like it. While the assessment of future conduct mandates individualized study, the contextual circumstances of January 6 are shared, and as such, the conduct of other defendants who have been at liberty should inform the forecast for Mr. Gieswein, too. In short, the pattern strongly suggests that Mr. Gieswein is unlikely to pose the same danger upon release that the government argues he posed on January 6.

Finally, the nature of the conditions proposed will provide reasonable

assurance that Mr. Gieswein will not pose a danger if released. The government argues that location and electronic monitoring are no "guarantee that [Mr. Gieswein] will not go to similar lengths in the future." Gov't Opp., ECF No. 19 at 29. Again, the law demands no guarantee, but more fundamentally, Mr. Gieswein did not go to any great lengths on January 6. He simply got in his car, drove to the District, joined an enormous crowd, walked up to the Capitol, and encountered what most agree was a very light, unprepared, and possibly surprised police presence at the Capitol facing the same crowd, many of them riled up by the Commander-in-Chief, and all of them undoubtedly riled up by each other.

On January 6, Mr. Gieswein did not have to overcome anything like the kinds of barriers to illegal conduct that the defense has proposed that the Court impose here. Under the conditions proposed, and the high intensity supervision program, Mr. Gieswein's supervising pretrial officer can track whether he is visiting websites advocating interference with the government, illegal protest methods, or violence of any kind. His pretrial officer will also be able to monitor if he is booking hotels, or otherwise engaged in similar planning. He or she will be able to bar Mr. Gieswein from using social media, and bar him from leaving his residence for any event that raises red flags. Location monitoring will ensure that the officer knows where Mr. Gieswein is at all times (or whether he has removed the monitor). Not only would these conditions make it very difficult for Mr. Gieswein to pose a danger, the environment of the third-party custodian's home will give him more than the usual incentive to comply with Court rules and the law. Specifically, he would understand

that failing to abide by conditions would put his own godmother, and his admired "uncle," at risk for sanction (in addition to worsening his own situation). Moreover, in the custody of his godmother, Mr. Gieswein will be out of the environment he was in leading up to January 6, and in the custody of law-abiding individuals. The proposed third-party custodian is a nurse and risk management officer, and her husband is a police officer whom Mr. Gieswein respects. They most certainly do not approve of assaulting police officers, illegal protest methods, or violating court orders. It is simply not realistic to conclude that Mr. Gieswein will pose a danger to the community if the Court releases him to their custody, and pursuant to the other conditions proposed.

## CONCLUSION

For these reasons, those stated in his opening motion, and such others as may be offered at the hearing the Court has scheduled for June 29, Mr. Gieswein respectfully requests release.

Respectfully submitted on June 19, 2021.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender

by:_____s/_____
Ann Mason Rigby
DC Bar No. 491902
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0869

Facsimile: (703) 600-0880
ann_rigby@fd.org