**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.                                                    Crim. Action No. 21-24 (EGS)

ROBERT GIESWEIN,

          Defendant.

<u>**MEMORANDUM OPINION**</u>

    Defendant Robert Gieswein ("Mr. Gieswein") has been charged in a federal indictment with six serious felony offenses arising from his participation in the events at the U.S. Capitol on January 6, 2021. *See* Indictment, ECF No. 3.[1] Following Mr. Gieswein's arrest in Colorado, a magistrate judge in the District of Colorado ordered Mr. Gieswein detained pending trial, and he was transported to this District. *See* Rule 5(c)(3) Documents, ECF No. 5 at 21; *see also* Ex. 1 to Gov't's Opp'n to Def.'s Mot. Hearing & Revocation Detention Order ("Gov't's Opp'n"), ECF No. 19-1. Pending before the Court is Mr. Gieswein's Motion for Hearing and Revocation of Detention Order, which seeks his release from detention to the custody of a third-party custodian in Oklahoma. *See* Mot. Hearing & Revocation Order ("Def.'s Mot."), ECF No. 18. Upon careful consideration of

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

the motion, opposition, reply, and surreply thereto, the
arguments set forth at the July 1, 2021 hearing, the applicable
law, and the entire record herein, Mr. Gieswein's motion is
**DENIED**.

## I. Background

Mr. Gieswein is alleged to have forcibly assaulted,
resisted, opposed, impeded, intimidated, or interfered with U.S.
Capitol Police officers attempting to maintain the security of
the U.S. Capitol on January 6, 2021. *See* Indictment, ECF No. 3
at 2-3. The six-count indictment, filed January 27, 2021,
charges Mr. Gieswein with the following offenses: (1)
Obstruction of an Official Proceeding, in violation of 18 U.S.C.
§ 1512(c)(2); (2) three counts of Assaulting, Resisting, or
Impeding Certain Officers Using a Dangerous Weapon, in violation
of 18 U.S.C. § 111(a)(1) and (b); (3) Destruction of Government
Property, in violation of 18 U.S.C. §§ 1361, 2; and (4) Entering
and Remaining in a Restricted Building or Grounds with a Deadly
or Dangerous Weapon, in violation of 18 U.SC. § 1752(a)(1) and
(b)(1)(A). Indictment, ECF No. 3 at 1-4.

The Court sets out below the evidence proffered by the parties in support of their briefing,[2] as well as an overview of the procedural history of this case.

**A. Mr. Gieswein's Conduct on January 6, 2021**

In the days leading up to January 6, 2021, Mr. Gieswein traveled alone to Washington, D.C. to attend the demonstrations in support of then-President Donald J. Trump. *See* Def.'s Mot., ECF No. 18 at 2. Mr. Gieswein is a 24-year-old resident of Woodland Park, Colorado, and has no criminal record. *See id.* at 1, 3. According to letters submitted by Mr. Gieswein's family and friends, although they were aware that Mr. Gieswein supported then-President Trump, Mr. Gieswein never indicated to them that he intended to engage in any violence or illegal activity during his trip to Washington. *Id.* at 2. However, regardless of Mr. Gieswein's stated intentions regarding his plans in Washington, video and photographic evidence submitted by the government show that Mr. Gieswein's conduct on January 6, 2021 involved violent acts against U.S. Capitol Police during the riot that disrupted the joint session of the U.S. Congress, which was convening to certify the vote count of the Electoral

---

[2] At a detention hearing, both parties may present evidence by way of a proffer. *See* 18 U.S.C. § 3142(f); *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

College of the 2020 Presidential Election. *See* Gov't's Opp'n,
ECF No. 19 at 3-11.

On January 5, 2021, Mr. Gieswein joined supporters of then-
President Trump at Freedom Plaza in Washington, D.C. Def.'s
Mot., ECF No. 18 at 2. According to Mr. Gieswein, "[h]e had just
smoked a significant amount of marijuana, and his intoxication
[was] palpable in his dilated pupils and grin, and in the
rambling comments that ensued." *Id.* An individual approached Mr.
Gieswein and proceeded to ask him questions regarding his
presence at the rally. *Id.* During the interview, Mr. Gieswein
stated that he was there "to keep President Trump in," though he
described no plans to do so, and that he wished for "both sides
[to] stay peaceful." *Id.* at 2-3. In addition, Mr. Gieswein
stated that he believed that "politicians, including President
Biden and Vice President Harris, ha[d] 'completely destroyed our
country and sold them to the Rothschilds and the Rockefellers.'"[3]
Gov't's Opp'n, ECF No. 19 at 27; *see also* Aff. Supp. Crim.
Compl. ("Aff."), ECF No. 1-1 at 11 (describing Mr. Gieswein as
saying that his message to Congress was "[t]hat they need to get
the corrupt politicians out of office. Pelosi, the Clintons, all
of . . . every single one of them, Biden, Kamala . . . they have

---

[3] According to the government, "online and anti-Semitic
conspiracy theories hold that shadow forces, including the
Rothschild family, secretly control global currency." Gov't's
Opp'n, ECF No. 19 at 27 n.11.

completely destroyed our country and sold them to the Rothschilds and Rockefellers"). The Federal Bureau of Investigation ("FBI") affidavit attached to the criminal complaint filed January 16, 2021, further asserts that the same video evidence shows Mr. Gieswein stating: "What we need to do, is we need to get the corrupt politicians that have been in office for 50-60 years, that have been destroying our country and selling it to the Middle East and Israel out of office and they need to be imprisoned." Aff., ECF No. 1-1 at 11.

The following day, on January 6, 2021, Mr. Gieswein arrived on the Capitol grounds wearing camouflage fatigues, a tactical vest, and a helmet. Gov't's Opp'n, ECF No. 19 at 3. Photographic and video evidence proffered by the government also capture Mr. Gieswein with goggles and carrying a baseball bat and an aerosol spray can containing unknown chemicals. *See id.* at 3-9; *see also id.* at 3, Figure 1; *id.* at 21, Figure 10.

After participating in a march with members of the Proud Boys[4] that morning,[5] photographic evidence places Mr. Gieswein in

---

[4] The government describes the Proud Boys as "an organization that bills itself as 'Western chauvinist' and 'nationalist,'" and notes that "multiple [members] have been charged in conspiracy indictments that allege a conspiracy that predates January 6." Gov't's Opp'n, ECF No. 19 at 4.

[5] According to the government, "the investigation to date has uncovered no evidence of [Mr. Gieswein's] affiliation with the Proud Boys prior to January 6." Gov't's Opp'n, ECF No. 19 at 22; *see also id.* at 26.

the plaza to the west of the Capitol building ("West Plaza") shortly before 1:00 p.m., while then-President Trump was still speaking to supporters from the Ellipse, near the White House. *Id.* at 4. According to the government, at this point in the day, rioters had already breached two sets of police barricades—one at a pedestrian entrance near the Peace Monument, and another set closer to the Capitol—resulting in hundreds of rioters, including Mr. Gieswein, flowing into the West Plaza. *Id.* Mr. Gieswein then positioned himself close to the front line of the rioters standing in front of the line of law enforcement officers. *Id.* at 4-5. At approximately 1:34 p.m., body-camera footage submitted by the government shows Mr. Gieswein, along with other rioters, forcefully pushing a metal police barricade directly into the bodies of law enforcement officers attempting to keep the rioters from reaching the Capitol, as other law enforcement officers throw tear gas into the mob. *See* Hr'g Video Ex. 3, at 01:25 to 01:45; Hr'g Video Ex. 4, at 00:06 to 00:15, 01:07 to 01:11.

At approximately 1:48 p.m., rioters and Capitol Police guarding a set of stairs that led from underneath the Inauguration scaffolding and up to the Capitol itself engaged in a violent fight, in which both sides deployed pepper spray against each other and used the metal police barriers as weapons. Gov't's Opp'n, ECF No. 19 at 5. Approximately one

flight of stairs above that fight, Mr. Gieswein stood among
other rioters facing another line of Capitol Police officers.
*Id.* at 6. Video evidence shows rioters pulling a police
barricade down the staircase, which other rioters and Mr.
Gieswein, with baseball bat in hand, then grabbed and began to
push forward again up toward the officers. *See* Hr'g Video Ex. 1,
at 00:01 to 00:43. With the barricade largely dividing the
rioters from law enforcement at the top of the staircase, the
video shows Mr. Gieswein deploying his aerosol spray can in the
direction of the law enforcement officers. Gov't's Opp'n, ECF
No. 19 at 6-7, 19, Figure 5; *see also* Hr'g Video Ex. 1 at 02:19
to 02:25; 03:15 to 03:20. Despite law enforcement officers
deploying pepper spray and using their batons against the
rioters, the rioters continued attempting to push law
enforcement out of the way with the metal barricade. *Id.* at
03:50 to 04:20. It is unclear whether the rioters were
successful in pushing the barricade through the makeshift
doorframe at the top of the staircase or whether law enforcement
chose to stand back, but the barricade was eventually pushed up
and to the side and law enforcement fell back, which allowed
rioters to continue to make their way toward the Capitol
building. *Id.* As rioters slowly moved up the staircase and out
toward the Capitol building, video evidence shows Mr. Gieswein
raising his fist and yelling. *Id.* at 04:45 to 04:50.

Mr. Gieswein is then captured on video running toward the
Capitol building, with a baseball bat in one hand and aerosol
spray can in the other. Gov't's Opp'n, ECF No. 19 at 7; *see also*
Hr'g Video Ex. 2 at 00:01 to 00:10. Once he reached the
building, he began banging on one of the windows with his hand.
*Id.* at 00:12 to 00:15. He then moved to another window in the
same alcove where another rioter was using a long wooden board
to smash through the window. *Id.* at 00:23 to 00:28. As the
rioters were in the process of breaking that window, Mr.
Gieswein got the attention of others attempting to kick open a
door to the Capitol, and he pointed back toward the window. *Id.*
at 00:38 to 00:40. After he pointed to the window, two rioters
moved toward the window, and one of those rioters grabbed the
long wooden board and smashed it through the window. *Id.* 00:40
to 00:50. The government alleges that once the windows were
broken, Mr. Gieswein was either the second or third rioter to
enter the Capitol building at approximately 2:14 p.m. *Id.* at
00:56 to 01:12; Gov't's Opp'n, ECF No. 19 at 7.

Once inside the building, the government alleges that Mr.
Gieswein and other rioters began walking up the internal
staircase toward the still-occupied Senate Chamber. Gov't's
Opp'n, ECF No. 19 at 8. Photographic evidence shows that Mr.
Gieswein continued to carry the baseball bat and aerosol spray
while inside the Capitol. *Id.* at 7-8.

By approximately 2:29 p.m., Mr. Gieswein was in the Capitol crypt on the lower level of the building, where the government asserts that multiple fights between law enforcement and rioters had broken out. *Id.* at 8. Video footage from surveillance cameras capture Capitol Police officers running away from the crypt toward a set of metal doors—which could be rolled down from the ceiling to the floor—in the Capitol tunnels. *Id.* According to the government, rioters began placing chairs and trash cans under the doors to stop them from closing to the ground, and, once the doors stopped closing, the rioters began throwing those same chairs and trash cans toward the officers. *Id.* at 9. During this incident, video surveillance footage captures Mr. Gieswein deploying his aerosol spray can in the direction of officers. *Id.*; *see also id.*, Figure 7. The government asserts that video footage also shows Mr. Gieswein waving his arm to encourage other rioters to join the advance on police. *Id.*; *see also id.*, Figure 8.

Mr. Gieswein next made his way to the Capitol Visitor Center. *Id.* at 10. Although there is no video evidence of Mr. Gieswein's actions within the Capitol Visitor Center, the government alleges that a rioter fitting Mr. Gieswein's description[6] sprayed a group of officers with his aerosol spray

---

[6] The Capitol Police officer described the individual as follows: "White male; approximately 5'8 or a little taller, in his 30's

can, which one of the officers described as an "oleoresin
capsicum (OC) type spray" that caused eye irritation. *Id.* at 10;
Ex. 2 to Gov't's Opp'n, ECF No. 19-2 at 2. According to the
government, when law enforcement grabbed Mr. Gieswein to arrest
him, Mr. Gieswein resisted arrest and tried to punch a U.S.
Capitol Police officer.[7] Gov't's Opp'n, ECF No. 19 at 10; Ex. 2
to Gov't's Opp'n, ECF No. 19-2 at 2. After the officers and Mr.
Gieswein fell to the ground during the struggle to arrest him,
the surrounding crowd grabbed Mr. Gieswein and pulled him free
of the officers. Gov't's Opp'n, ECF No. 19 at 10; Ex. 2 to
Gov't's Opp'n, ECF No. 19-2 at 2. Mr. Gieswein then fled the
area. Gov't's Opp'n, ECF No. 19 at 10; Ex. 2 to Gov't's Opp'n,
ECF No. 19-2 at 2. During this struggle, Mr. Gieswein's baseball
bat was stored in his backpack, though it was visible to others.
Ex. 2 to Gov't's Opp'n, ECF No. 19-2 at 2 (reporting that the
law enforcement officer in the Capitol Visitor Center noticed
the baseball bat in the backpack, and was "concerned" about Mr.
Gieswein using it). According to the government, a portion of

---

[sic], wearing goggles, a green in color newer style military
helmet with a rail system on the front, wearing full military
'garb', and had a ceramic like breast plate on with an unknown
object near the bottom of the vest or stomach area." Ex. 2 to
Gov't's Opp'n, ECF No. 19-2 at 2. The officer also stated that
the individual had a baseball bat in his backpack, which "stuck
out because he was concerned about [the individual] using the
bat." *Id.*
[7] Mr. Gieswein has not been charged with an offense in connection
with the alleged attempt to punch an officer or resist arrest.

this incident is captured on surveillance video, including video
showing Mr. Gieswein and Capitol Police officers on the ground
and Mr. Gieswein subsequently fleeing the area. Gov't's Opp'n,
ECF No. 19 at 10; Ex. 2 to Gov't's Opp'n, ECF No. 19-2 at 2.

**B. Mr. Gieswein's Conduct Between January 6, 2021 and His
Self-Surrender on January 18, 2021**

Mr. Gieswein returned home to Woodland Park, Colorado
following the events of January 6, 2021. Def.'s Mot., ECF No. 18
at 3.

On January 16, 2021, the FBI executed a search warrant at
Mr. Gieswein's residence. Gov't's Opp'n, ECF No. 19 at 10. Mr.
Gieswein was not present at the time of the search. *Id.* During
the search, FBI agents did not locate the items of clothing Mr.
Gieswein wore on January 6, 2021, nor the baseball bat he
carried that day. *Id.* The FBI also did not locate Mr. Gieswein's
phone during that search or the subsequent search incident to
arrest. *Id.* at 10-11. According to AT&T phone records, however,
Mr. Gieswein's phone had been in use up to and including January
16, 2021. *Id.*

Mr. Gieswein voluntarily turned himself in to local
authorities on January 18, 2021. Def.'s Mot., ECF No. 18 at 3.
Because he invoked his right to counsel, he was not interviewed
about the events of January 6, 2021. Gov't's Opp'n, ECF No. 19
at 11. However, according to the government, he made unsolicited

statements to the agents transporting him to Denver for his
initial appearance in the District of Colorado, including that,
"although he was present at the Capitol on January 6, he did
nothing wrong, and that is why he turned himself in." *Id.* In
addition, the government alleges that he "described himself as a
'constitutionalist' who wants the military to take back over the
country and restore the Constitution." *Id.*

### C. Procedural History

Mr. Gieswein was first charged by criminal complaint on
January 16, 2021. *See* Criminal Compl., ECF No. 1. Mr. Gieswein
turned himself in to the Teller County Jail on January 18, 2021,
and he had his initial appearance before a magistrate judge on
the United States District Court for the District of Colorado.
*See* Rule 5(c)(3) Documents, ECF No. 5. On January 22, 2021, the
magistrate judge ordered Mr. Gieswein detained pending trial and
transported to this District. *See* Ex. 1 to Gov't's Opp'n, ECF
No. 19-1. Mr. Gieswein made his initial appearance in this
District on March 29, 2021. *See* Min. Entry (Mar. 29, 2021).

On June 8, 2021, Mr. Gieswein filed a motion for release
from custody. *See* Def.'s Mot., ECF No. 18. The government filed
its response on June 15, 2021, *see* Gov't's Opp'n, ECF No. 19;
and Mr. Gieswein filed his reply on June 22, 2021, *see* Def.'s
Reply, ECF No. 21. In response to an Order from the Court, *see*
Min. Order (June 23, 2021); the government filed a surreply on

June 25, 2021, *see* Gov't's Surreply, ECF No. 22. The Court held a hearing on Mr. Gieswein's motion on July 1, 2021. *See* Min. Entry (July 1, 2021). For the hearing and after the completion of briefing on Mr. Gieswein's motion, the government submitted four videoclips as additional exhibits. *See* Notice, ECF No. 24. Mr. Gieswein's motion is now ripe for adjudication.

## II. Legal Standard

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, provides that a hearing shall be held to determine whether a defendant should be detained pretrial upon a motion by the government if the defendant is charged with an offense falling in one of five enumerated categories. 18 U.S.C. § 3142(f)(1)(A)-(E). As relevant here, a detention hearing shall be held pursuant to Section 3142(f)(1)(A) if a defendant is charged with a "crime of violence," or pursuant to Section 3142(f)(1)(E) if a defendant is charged with any felony that is not otherwise a crime of violence that involves the possession or use of any dangerous weapon. 18 U.S.C. § 3142(f).

If a detention hearing is held pursuant to Section 3142(f), a judicial officer may detain a defendant pending trial if the judicial officer determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(e). "In common parlance, the relevant

13

inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (quoting *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)). When the basis for pretrial detention is the defendant's danger to the community, the government is required to demonstrate the appropriateness of detention pursuant to subsection (e) by clear and convincing evidence. 18 U.S.C. § 3142(f).

Certain conditions and charged offenses trigger a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any person and the community. 18 U.S.C. § 3142(e)(2)-(3). As relevant here, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" an "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." *Id.* § 3142(e)(3)(C).[8]

---

[8] The full subset of offenses triggering a rebuttable presumption under subsection (e)(3) include the following: "(A) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act . . . the Controlled Substances Import and Export Act . . ., or chapter 705 of title 46; (B) an offense under section 924(c), 956(a), or 2332b of

Once this presumption is triggered, "it imposes a burden of production on the defendant 'to offer some credible evidence contrary to the statutory presumption.'" *United States v. Cherry*, 221 F. Supp. 3d 26, 32 (D.D.C. 2016) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)). "While the burden of production may not be heavy," *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (citations omitted); the defendant must proffer "at least some evidence" or basis to conclude that the case falls "outside 'the congressional paradigm'" giving rise to the presumption. *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2020) (quoting *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985)); *see also United States v. Klein*, No. 21-23 (RDM), 2021 WL 1751056, at *3 (D.D.C. May 4, 2021). In other words, to rebut the presumption, the defendant must "offer some credible evidence" that he will not endanger the community or flee if released. *Id.* at 32. If the defendant meets his burden of production, the presumption "does not disappear entirely, but remains a factor to be

---

this title; (C) an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed; (D) an offense under chapter 77 of this title for which a maximum term of imprisonment of 20 years or more is prescribed; or (E) an offense involving a minor victim under section 1201, 1591, 2241, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title." 18 U.S.C. § 3142(e)(3)(A)-(E).

considered among those weighed by the district court." *United States v. Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017) (citing *United States v. Ali*, 793 F. Supp. 2d 386, 388 (D.D.C. 2001)). Although the burden of production may shift, the burden of persuasion remains with the government throughout. *Cherry*, 221 F. Supp. 3d at 32.

In cases that do not involve the conditions and charged offenses that trigger a rebuttable presumption of detention, the Court considers the following factors to determine whether detention is required to ensure the appearance of the person and the safety of any other person and the community:

> 1. The nature and circumstances of the offense charged, including whether the offense is a crime of violence;
> 2. The weight of the evidence;
> 3. The history and characteristics of the person, including
>> A. The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>> B. Whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release; and
> 4. The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see also Munchel*, 991 F.3d at 1279-80.

Although the Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") has not squarely decided the issue of what standard of review a district court should apply to review of a magistrate's detention or release order, *see Munchel*, 991 F.3d at 1280-81; courts in this District have held that such detention decisions are reviewed *de novo*. *See Hunt*, 240 F. Supp. 3d at 132-33; *United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 WL 765662, at *5-6 (D.D.C. Feb. 26, 2021). Accordingly, the Court will review the decision to detain Mr. Gieswein *de novo*.

## III. Analysis

### A. Mr. Gieswein Has Rebutted Any Presumption in Favor of Detention

Pursuant to the Bail Reform Act, if there is probable cause to believe the defendant has committed an offense for which a maximum term of imprisonment of ten years or more is prescribed under an offense listed in 18 U.S.C. § 2332b(g)(5)(B), a rebuttable presumption arises that no pretrial release condition or combination of conditions may be imposed to reasonably assure the appearance of the person or the safety of the community if he were released. *See* 18 U.S.C. § 3142(e)(3). Here, the government contends that the rebuttable presumption applies because Mr. Gieswein is charged with Destruction of Government Property, in violation of 18 U.S.C. § 1361, which is

17

specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B) and carries a maximum sentence of ten years in prison. Gov't's Opp'n, ECF No. 19 at 12-13. The Court agrees.

First, the D.C. Circuit has explained that an "indictment alone [is] enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community." *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); *see also United States v. Little*, 235 F. Supp. 3d 272, 277 (D.D.C. 2017). Here, a grand jury found probable cause to believe that Mr. Gieswein committed the offense of Destruction of Government Property, in violation of 18 U.S.C. §§ 1361, 2. *See* Indictment, ECF No. 3 at 2. This charge carries a maximum sentence of 10 years. *See* 18 U.S.C. § 1361. And given the evidence proffered by the government, as described below in Section III, Part C.2, the Court has no reason to second guess the grand jury's determination. Thus, based on the indictment, the Court would have cause to find that a rebuttal presumption applies in this case.

Second, although there is not a wealth of case law on the issue within this Circuit, other courts interpreting a different section of the Bail Reform Act have concluded that "a conspiracy to commit a crime of violence is itself a crime of violence," *United States v. Mitchell*, 23 F.3d 1, 3 (1st Cir. 1994); and that the Bail Reform Act "does not require that the defendant

himself commit acts of physical violence as a condition precedent to a detention order," *United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002). Another court in this District has relied upon such case law in addressing whether the presumption of dangerousness attaches when there is probable cause to believe the defendant was an aider and abettor or co-conspirator for an alleged violation of Section 924(c). *See United States v. Lee*, 195 F. Supp. 3d 120, 128 (D.D.C. 2016). In *Lee*, the court found the out-of-Circuit case law persuasive, and concluded that "[b]ecause the government ha[d] established probable cause to believe that the defendant violated [S]ection 924(c) by aiding and abetting or conspiring to commit that offense," the court "could find that the rebuttable presumption prescribed in § 3142(e)(3)(B) applie[d] in th[e] case." *Id*. This Court similarly finds the out-of-Circuit cases to be persuasive, particularly in view of the well-established precedent explaining that "[u]nder [18 U.S.C. § 2], the acts of the perpetrator become the acts of the aider and abettor and the latter can be charged with having done the acts himself." *United States v. Kegler*, 724 F.2d 190, 200-01 (D.C. Cir. 1983); *see also Rosemond v. United States*, 572 U.S. 65, 71 (2014); *In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016). And indeed, here, Mr. Gieswein has been charged with violating Section 1361. *See* Indictment, ECF No. 3 at 2.

Third, the Court is not persuaded by Mr. Gieswein's argument that the text of the statute supports a finding that a rebuttable presumption cannot apply in this case. Mr. Gieswein argues that the text of Section 3142(e)(3) is narrower than the language used in neighboring Sections 3142(e)(1)-(2) and 3142(f)(1)(A), (E). Def.'s Mot., ECF No. 21 at 4. In those subsections, a presumption is created where a defendant is "involved" in certain conduct, which could include an aiding and abetting claim. *Id.* However, the Court finds that this language merely indicates that a broader range of activity as a whole is contemplated, such as all "crimes of violence" or any offense for which the maximum sentence is life imprisonment or death. 18 U.S.C. § 3142(f)(1). Section 3142(e)(3), on the other hand, refers to specific offenses, as listed within the U.S. Code.

Thus, based on the above, the Court could presume that no condition or combination of conditions of release will reasonably assure Mr. Gieswein's appearance as required or the safety of the community. *See* 18 U.S.C. § 3142(e)(3). To rebut this presumption, Mr. Gieswein must "offer some credible evidence" that he will not endanger the community or flee if released. *Cherry*, 221 F. Supp. 3d at 32. Here, Mr. Gieswein is 24 years old and does not have a criminal record. Def.'s Mot., ECF No. 18 at 29. He also appears to have strong ties to his community, as he received supportive letters and signed

declarations from family and friends who largely describe him as loving, honest, and hardworking. Furthermore, Mr. Gieswein has had steady employment since he was 14 years old, until he recently lost his job in the fall of 2020 for reasons related to the COVID-19 pandemic. Def.'s Mot., ECF No. 18 at 29.

Assuming that Mr. Gieswein has come forward with some credible evidence to counter the presumption, the Court next must consider all of the factors set forth in Section 3142(g). *See Hunt*, 240 F. Supp. 3d at 132-33.

### B. Mr. Gieswein Is Eligible for Pretrial Detention Pursuant to 18 U.S.C. § 3142(f)(1)(A)

Even if the rebuttable presumption in favor of detention does not apply in this case, Mr. Gieswein is eligible for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A). Under the Bail Reform Act, unless a defendant poses a serious risk of flight or of attempting to obstruct justice, he is only eligible for pretrial detention if he is charged with an offense listed in one of the five enumerated categories of Section 3142(f)(1)— *i.e.*, "the most serious" crimes. *See* 18 U.S.C. § 3142(f)(1)(A)-(B), (f)(2); *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) ("Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal

offenses." (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987))).

Mr. Gieswein is charged under 18 U.S.C. § 111(a)(1) and (b) with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon. *See* Indictment, ECF No. 3 at 2-3. For the reasons the Court set out in its Memorandum Opinion regarding Mr. Jeffrey Sabol's request for pretrial release, *United States v. Sabol*, No. 21-35-1 (EGS), 2021 WL 1405945, at *6-7 (D.D.C. Apr. 14, 2021); a defendant charged under 18 U.S.C. § 111(a)(1) and (b) is charged with a crime of violence, *see United States v. Kendall*, 876 F.3d 1264, 1270 (10th Cir. 2017); *United States v. Taylor*, 848 F.3d 476, 492-493 (1st Cir. 2017); *United States v. Juvenile Female*, 566 F.3d 943, 948 (9th Cir. 2009). Moreover, the D.C. Circuit, in an unpublished order, recently affirmed that a defendant charged with violating 18 U.S.C. § 111(b) is charged with a crime of violence. J. at 2, *United States v. Quaglin*, No. 21-3028 (D.C. Cir. June 24, 2021) (unpublished). Because using a deadly or dangerous weapon while assaulting a federal officer is a crime of violence, Mr. Gieswein is eligible for pretrial detention under 18 U.S.C. § 3142(f)(1)(A).[9]

---

[9] The government also argues that Mr. Gieswein is eligible for detention because Felony Destruction of Property, in violation of 18 U.S.C. § 1361, is both a crime of terrorism and a crime of violence. Gov't's Opp'n, ECF No. 19 at 13-14. The Court need not address this argument because the Court finds that Mr. Gieswein

### C. No Condition or Combination of Conditions Will Reasonably Assure the Safety of Any Other Person and the Community

Having found both that Mr. Gieswein is eligible for pretrial detention under 18 U.S.C. § 3142(f)(1)(A) and that he has met his burden of production if a rebuttable presumption applies, the Court must determine whether any "condition or combination of conditions will reasonably assure the appearance of [Mr. Gieswein] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government does not argue that Mr. Gieswein is a flight risk, so the Court will focus its inquiry on whether Mr. Gieswein is a danger to any other person and the community. For this inquiry, the Court "must identify an articulable threat posed by the defendant to an individual or the community," though "[t]he threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'" *Munchel*, 2021 WL 1149196, at *7 (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)). "The threat must also be considered in context," and "[t]he inquiry is factbound." *Id.* (citing *United States v. Tortora*, 922 F.2d 880, 888 (1st Cir. 1990)).

In determining whether Mr. Gieswein is a danger to the community, the Court considers the 18 U.S.C. § 3142(g) factors,

---

is eligible for detention pursuant to 18 U.S.C. § 3142(f)(1)(A) for a "crime of violence."

including: (1) "the nature and circumstances of the offense
charged"; (2) "the weight of the evidence"; (3) "the history and
characteristics" of the defendant; and (4) "the nature and
seriousness of the danger to any person or the community that
would be posed by the [defendant's] release." 18 U.S.C. §
3142(g).

In consideration of these requisite factors, as set forth
below, the Court concludes that clear and convincing evidence
supports a finding that no condition or combination of
conditions, including those proposed by Mr. Gieswein, will
reasonably assure the safety of the community. Accordingly, the
Court orders that Mr. Gieswein remain detained pending trial.

### 1. Nature and Circumstances of the Offense

The first factor the Court must consider is the nature and
circumstances of the offense charged, "including whether the
offense is a crime of violence." 18 U.S.C. § 3142(g)(1).

Despite the serious and unsettling nature of the events
that transpired at the U.S. Capitol on January 6, 2021, the D.C.
Circuit has made clear that detention is not appropriate in all
cases involving defendants who participated in the events
("Capitol Riot defendants"). *See Munchel*, 2021 WL 1149196, at
*8. The Court therefore considers the nature and circumstances
of the specific offenses and underlying conduct with which each
defendant is charged. *Chrestman*, 2021 WL 765662, at *7. The

24

Court must "adequately demonstrate that it considered whether [Mr. Gieswein] pose[s] an articulable threat to the community in view of [his] conduct on January 6, and the particular circumstances of January 6." *Munchel*, 2021 WL 1149196, at *8.

To aid in this consideration, Chief Judge Howell has articulated "guideposts" for assessing "the comparative culpability of a given defendant in relation to fellow rioters." *Chrestman*, 2021 WL 765662, at *7-8. The Court finds these guideposts persuasive for the purpose of differentiating among Capitol Riot defendants: (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant assumed a formal or de facto leadership role in the events of January 6, 2021, for example "by encouraging other rioters' misconduct" "to confront law enforcement"; and (6) the defendant's "words and movements during the riot"—*e.g.*, whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, attempted to injure, or threatened to injure others." *Id*. These factors, "[t]aken together, as applied to a given defendant, . . . are probative of 'the nature and circumstances of the offense charged,' 18 U.S.C. § 3142(g)(1),

25

and, in turn, of the danger posed by the defendant," as relevant to the fourth Section 3142(g) factor. *Id.* at *9.

At least four of the six *Chrestman* factors strongly support a finding that Mr. Gieswein's comparative culpability in relation to his fellow rioters is high.

First, regarding whether the defendant has been charged with felony or misdemeanor offenses, Mr. Gieswein has been charged with multiple felonies. *See* Indictment, ECF No. 3. "Felony charges are by definition more serious than misdemeanor charges; the nature of a felony offense is therefore substantially more likely to weigh in favor of pretrial detention than the nature of a misdemeanor offense." *Chrestman*, 2021 WL 765662, at *7. Moreover, Section 3142(g)(1) specifically directs the Court to consider whether a defendant has been charged with a crime of violence, and at least three of the charged felonies—using a deadly weapon while assaulting federal officers protecting the U.S. Capitol—are crimes of violence. *See supra* Section III, Part B.

The second *Chrestman* factor—the extent of the defendant's prior planning, "for example, by obtaining weapons or tactical gear," *Chrestman*, 2021 WL 765662, at *2—also weighs in favor of continued pretrial detention. On the one hand, the government has not proffered any evidence suggesting that Mr. Gieswein privately or publicly expressed any prior intent to attack or

engage in violence at the Capitol building. *See* Def.'s Mot., ECF
No. 18 at 23-24. And while Mr. Gieswein was recorded on January
5, 2021 as stating that, among other things, "we need to get the
corrupt politicians . . . out of office and they need to be
imprisoned," he also stated that he wished for "both sides [to]
stay peaceful." *Id.* at 2-3, 22.

On the other hand, however, Mr. Gieswein arrived at the
Capitol on January 6, 2021 wearing camouflage fatigues, a
tactical vest, and a helmet. Gov't's Opp'n, ECF No. 19 at 17.
And though Mr. Gieswein attempts to characterize this gear as
"defensive" in nature, Def.'s Reply, ECF No. 21 at 14-15; Mr.
Gieswein also prepared by arming himself with a baseball bat and
a chemical spray, while also wearing goggles designed to prevent
the spray from harming his own eyes. *Id.* Even if Mr. Gieswein
did not purchase such items until he arrived in Washington, his
decision to arrive at the Capitol on January 6, 2021 wearing
specialized gear and carrying weapons "suggests that he was not
just caught up in the frenzy of the crowd, but instead came to
Washington, D.C. with the intention of causing mayhem and
disrupting the democratic process." *Chrestman*, 2021 WL 765662,
at *8; *see also Sabol*, 2021 WL 1405945, at *10 (rejecting
defendant's "argument that he did not plan to commit violence"
when he "brought tactical gear, including a helmet, steel-toe
boots, zip ties, a radio and an ear piece" to the rally); *United*

*States v. Caldwell*, 2021 WL 2036667, at *7 (D.D.C. May 21, 2021) (finding that the defendant's decision to carry and use a chemical spray on "law enforcement officers donned in riot gear" was evidence of prior planning).

Mr. Gieswein argues, however, that the baseball bat and chemical spray were "*defensive*, not aggressive" weapons. Def.'s Mot., ECF No. 18 at 23. He further contends that his comments to the interviewer on January 5 "are consistent with an expectation that those who opposed the former President"—such as Antifa or "other leftwing counter-protestors"—"could be violent" and that he "hope[d] that his presence would help deter violence." *Id.* Moreover, he states that he had previously worn the same tactical gear on January 5 without incident, and letters from friends in support of his release noted that "he often wore his plate carrier, even around his hometown." *Id.* at 23-25. The Court is not persuaded. The government's evidence captures Mr. Gieswein, with a baseball bat and an aerosol spray can in his hands, forcefully advancing on law enforcement officers—who were greatly outnumbered by rioters and clearly in a defensive position—at multiple moments on January 6, 2021. *See, e.g.*, Gov't's Opp'n, ECF No. 19 at 6-10. Among other things, the government has proffered evidence that Mr. Gieswein deployed his chemical spray in the direction of officers on three separate occasions, and that he joined other rioters in shoving a metal

police barricade against officers in an apparent effort to breach the police line guarding the Capitol. *Id.; see also* Hr'g Video Ex. 3, at 01:25 to 01:45; Hr'g Video Ex. 4, at 00:06 to 00:15. In view of this evidence, the Court is not persuaded that Mr. Gieswein brought the tactical gear and weapons in a hope to "deter violence and avoid injury at the hands of others." Def.'s Reply, ECF No. 21 at 16 n.11. Rather, Mr. Gieswein's actions "indicate[] at least some degree of preparation for the attack and an expectation that the need to engage in violence against law enforcement or, indeed, the Legislative branch, might arise." *Chrestman*, 2021 WL 765662, at *2.

The third *Chrestman* factor—whether the defendant used a dangerous weapon—also weighs in favor of pretrial detention. Evidence proffered by the government shows that, in the middle of a violent riot against law enforcement officers struggling to protect the Capitol building, Mr. Gieswein openly carried a baseball bat and carried and *used* a chemical spray on law enforcement officers. *See* Gov't's Opp'n, ECF No. 19 at 3-10; *see also United States v. Padilla*, 2021 WL 1751054, at *6 (D.D.C. May 4, 2021) (finding that the nature and circumstances of the offense weighed in favor of detention where, among other things, defendant threw a pole at police officers and "forcefully pushed a metal barricade—designed to protect police officers—directly into their bodies, and, then, minutes later, helped to

successfully knock down that barricade with a large metal
sign"); *Sabol*, 2021 WL 1405945, at *11 (finding that, though
defendant did not use a police baton he took from an officer on
January 6, 2021, "the fact that he took the weapon from a
vulnerable MPD officer and subsequently wielded it while helping
drag another officer into the violent mob" was sufficient to
find that the third *Chrestman* factor weighed in favor of
detention).

The fourth *Chrestman* factor—evidence of coordination with
other protestors before, during, or after the riot—is not
strongly implicated in this case. Although the government's
evidence captures Mr. Gieswein marching with the Proud Boys on
the morning of January 6, 2021, the government concedes that
there is no evidence that he was affiliated with the group prior
to that date or was in radio communication with anyone on
January 6, 2021. Gov't's Opp'n, ECF No. 19 at 22. Mr. Gieswein
also has not been charged with any conspiracy offense. *Id.*
Further, the government does not argue that Mr. Gieswein's
affiliation with a group called the Woodland Wild Dogs—which Mr.
Gieswein described on January 5 as a "militia," but described in
his motion briefing as a "group of friends who like to shoot
guns, pretend to be in battles, and go camping to practice
survival skills"—had anything to do with his decision to travel
to Washington, D.C. *See* Def.'s Mot., ECF No. 18 at 18. And, as

Mr. Gieswein points out, his connection with the Three
Percenters[10] had ended long before the events of January 6. *Id.*
at 25.

The fifth *Chrestman* factor—whether the defendant assumed a
formal or de facto leadership role in the events of January 6,
2021—is a close call, but on balance weighs in favor of Mr.
Gieswein's release. The government argues that evidence shows
Mr. Gieswein on the "front line" of the fight between rioters
and police on the West Plaza, and that he was either "the second
or third rioter through the window" of the Capitol building.
Gov't's Opp'n, ECF No. 19 at 22. Furthermore, video evidence
proffered by the government appears to capture Mr. Gieswein
encouraging rioters to enter through the Capitol window by
pointing to others attempting to break through, and then later
appearing to urge the mob to advance on retreating law
enforcement officers near the Capitol crypt by waving his arms
forward. *Id.* But despite these actions, Mr. Gieswein does not
appear to have been an instigator. To be sure, Mr. Gieswein does
appear to encourage other rioters to act, but viewed in context,

---

[10] The Three Percenters are "a domestic militia that advocates
for resistance to the U.S. federal government polic[i]es it
considers to infringe on personal, local, and gun ownership
rights. This group is loosely allied with the Oath Keepers,
another anti-government militia, and has provided security
services for various right-wing protests and movements." Aff.
Supp. Criminal Compl., ECF No. 1-1 at 5.

such actions do not establish that he was a formal or de facto leader of the mob. *See Sabol*, 2021 WL 1405945, at *13 (finding that seeking to be on the "front line of the 'battle'" was not sufficient evidence of leadership).

Finally, the sixth *Chrestman* factor weighs strongly in favor of continued detention. Mr. Gieswein's words and movements during the riot indicate he acted deliberately and dangerously. For purposes of evaluating a Capitol Riot defendant's dangerousness, the D.C. Circuit has said that "those [rioters] who actually assaulted police officers and . . . those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 991 F.3d at 1284. Here, grave concerns are implicated by Mr. Gieswein's conduct, which included: (1) forcefully pushing a metal police barricade against a line of law enforcement officers attempting to keep rioters from advancing on the Capitol, Hr'g Video Ex. 3, at 01:25 to 01:45; Hr'g Video Ex. 4, at 00:06 to 00:15; (2) spraying an aerosol spray in the direction of law enforcement officers—and in the midst of a large crowd of other rioters—at the top of a staircase leading toward the Capitol, Gov't's Opp'n, ECF No. 19 at 6-7, 19, Figure 5; Hr'g Video Ex. 1 at 02:19 to 02:25; 03:15 to 03:20; (3) banging on a window of the Capitol building and

appearing to encourage other rioters to break or enter through a window, before he enters the Capitol himself through a smashed window, Hr'g Video Ex. 2 at 00:12 to 00:15, 00:38 to 01:12; (4) spraying a chemical spray in the direction of law enforcement officers while inside the Capitol building and surrounded by other rioters, Gov't's Opp'n, ECF No. 19 at 9; (5) spraying a chemical spray while inside the Capitol building, which allegedly hit an officer in the eyes, *id.* at 10; and (6) actively resisting arrest,[11] *id.; see also Chrestman*, 2021 WL 765662, at *8 ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement" because such conduct demonstrates "disregard for the institutions of government and the rule of law[.]"). His actions and words reflect a contempt for the rule of law and law enforcement, a disturbing disregard for the safety of others, and a willingness to engage in violence. These are qualities that bear on the seriousness of the offensive conduct and the ultimate inquiry of whether Mr. Gieswein will comply with conditions of release meant to ensure the safety of the community. *See Chrestman*, 2021 WL 765662, at *8.

---

[11] While the government argues that Mr. Gieswein actively resisted arrest by taking swings at an officer, the Court notes that the government has conceded that Capitol surveillance video only shows "the defendant and Capitol police on the ground, and the defendant fleeing." Gov't's Opp'n, ECF No. 19 at 10.

Thus, the first 18 U.S.C. § 3142(g) factor weighs heavily in favor of detention on the basis that no condition or combination of conditions will reasonably assure the safety of the community. 18 U.S.C. § 3142(e)(1), (g)(1).

### 2. Weight of the Evidence Against the Defendant

The second factor the Court must consider is the weight of the evidence against Mr. Gieswein. 18 U.S.C. § 3142(g)(2).

The Court finds that the weight of the evidence against Mr. Gieswein tips slightly in favor of continued detention. Mr. Gieswein was indisputably present at the U.S. Capitol on January 6, 2021, and videoclips and photographs from the day show Mr. Gieswein, in his distinctive outfit, carrying a baseball bat and a chemical spray on the Capitol grounds and inside the Capitol building itself. *See* Def.'s Mot., ECF No. 18 at 13; Gov't's Opp'n, ECF No. 19 at 3-10. Evidence further places Mr. Gieswein, in the midst of an angry crowd gathered on a staircase, spraying a chemical spray in the direction of law enforcement officers and raising his fist and yelling as rioters advanced past the officers and made their way toward the Capitol. *See* Hr'g Video Ex. 1, at 02:19 to 02:25, 03:15 to 03:20, 04:45 to 04:50; Gov't's Opp'n, ECF No. 19 at 6-7. Mr. Gieswein is captured on video running toward the Capitol, banging on a Capitol window with his fist, and then appearing to encourage other rioters to go toward a window that was in the process of being smashed

34

open. Gov't's Opp'n, ECF No. 19 at 7; *see also* Hr'g Video Ex. 2 at 00:01 to 00:10, 00:38 to 01:12. Once he entered the Capitol through the broken window, evidence also shows that Mr. Gieswein deployed his chemical spray in the direction of law enforcement a second time while near the Capitol crypt, and appeared to wave his arms to encourage others to continue to advance on the officers. *See* Gov't's Opp'n, ECF No. 19 at 9. While there is no video or photographic evidence of the third incident in which the government alleges Mr. Gieswein sprayed and hit an officer with his chemical spray while in the Capitol Visitor Center, the government provides as evidence a U.S. Capitol Police officer's statement to the FBI, and represents that video surveillance captures the "aftermath" of the incident. *Id.* at 10.

Though Mr. Gieswein does not dispute that he took the actions shown in the video and photographic evidence, he nonetheless argues that the government's evidence on each charge is weak.

First, regarding Count One—Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2)—Mr. Gieswein argues that the government likely will not be able to show that the Electoral College vote certification constitutes an "official proceeding" within the meaning of the statute. Def.'s Mot., ECF No. 18 at 11. Under Section 1512(c)(2), whoever "obstructs, influences or impedes *any official proceeding*, or

attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1512(c)(2) (emphasis added). Section 1515 then defines "official proceeding" as, among other things, "a proceeding before the Congress." *Id.* § 1515(a)(1). Mr. Gieswein contends that, under these definitions, he is "not aware of any case in which" the phrase "official proceeding" has been "interpreted" to include a session such as the "ceremonial certification of the Electoral College vote." Def.'s Mot., ECF No. 18 at 11-12. Thus, in Mr. Gieswein's view, it is "far from clear that the government can prove this charge." Def.'s Mot., ECF No. 18 at 11-12.

The Court does not doubt that the case law regarding the parameters of the definition of "official proceeding" is sparse. However, this argument has not been fully briefed by the parties, and Mr. Gieswein offers no substantive argument or any citations regarding why the Joint Session of Congress convening to certify the Electoral College vote would not constitute a "proceeding before Congress" and, therefore, an "official proceeding" under Section 1512(c)(2). *See id.* at 11-12. Accordingly, the Court is not convinced at this stage of the litigation that the government's evidence underlying the charge is weak, particularly in view of the plain language of the statute.

Second, Mr. Gieswein argues that the government likely cannot meet its burden of proving that the baseball bat and chemical spray qualify as a "dangerous weapon" with regard to Counts Two through Four and Count Six—Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); and Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A). Def.'s Mot., ECF No. 18 at 12-14, 25.

To violate Section 111(b), a defendant "must have committed one of the acts described in § 111(a), i.e., 'forcibly assault[ed], resist[ed], oppose[d], impede[d], intimidate[d], or interfere[d] with' a [federal officer] in specified circumstances;" and "in committing the act," either (1) "use[d] a deadly or dangerous weapon" or (2) "inflict[ed] bodily injury." *United States v. Klein*, No. 21-236 (JDB), 2021 WL 1377128, at *6 (D.D.C. Apr. 12, 2021) (citation omitted). A "deadly or dangerous weapon" is "any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person." *United States v. Sanchez*, 914 F.2d 1355, 1358 (9th Cir. 1990); *see also United States v. Chansley*, No. 21-cr-3 (RCL), 2021 WL 861079, at *7 (D.D.C. Mar. 8, 2021) (defining "dangerous weapon" as "an object that is either inherently dangerous or is used in a way that is likely to

endanger life or inflict great bodily harm"). "Whether something is a 'dangerous' weapon depends on how it is used." *Gray v. United States*, 980 F.3d 264, 267 (2d Cir. 2020). Thus, "'objects that have perfectly peaceful purposes may be turned into dangerous weapons' when used in a manner likely to cause bodily harm." *Chansley*, 2021 WL 861079, at *7 (quoting *United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) (en banc)).

"A defendant who acts forcibly using a deadly or dangerous weapon under § 111(b) must have used force by making physical contact with the federal employee, or at least threatened the employee, with an object that, as used, is capable of causing great bodily harm." *Gray*, 980 F.3d at 266-67 (citation omitted); *see United States v. Taylor*, 848 F.3d 476, 492-93 (1st Cir. 2017) (same); *United States v. Bullock*, 970 F.3d 210, 215 (3d Cir. 2020) (same)*; United States v. Duran*, 96 F.3d 1495, 1509-11 (D.C. Cir. 1996). "Th[e] first means of violating § 111(b) therefore necessarily requires the use or threat of force capable of causing physical pain or injury to another." *Klein*, 2021 WL 1377128, at *6 (quoting *Taylor*, 848 F.3d at 494) (quotation marks omitted). "The second scenario under § 111(b) is even more straightforward given that a defendant who acts 'forcibly' and *actually* 'inflicts bodily injury' by definition uses 'force capable of causing . . . injury' to another." *Id.*

(citing *Bullock*, 970 F.3d at 216; *Gray*, 980 F.3d at 267; *Taylor*, 848 F.3d at 494).

Mr. Gieswein argues that neither the aerosol spray nor the baseball bat is a dangerous weapon because (1) there is no evidence that the aerosol spray can was designed to cause great bodily injury or that it in fact caused great bodily injury; and (2) Mr. Gieswein merely held the baseball bat throughout the day, and did not brandish it or use it. Def.'s Mot., ECF 18 at 13. Mr. Gieswein further asks the Court to adopt a definition of "bodily injury" that he asserts the government "agreed" to use in a different case. *Id.* According to Mr. Gieswein, based on the government's position in the other case, "to prove that a non-inherently dangerous object is a dangerous weapon, the government must prove that it was likely to endanger life or inflict an injury" that meets the definition of "serious bodily injury" provided in 18 U.S.C. § 1365(h)(3), which defines the term as used in 18 U.S.C. § 113(b)(2). Def.'s Reply, ECF No. 21 at 10. Section 1365(h)(3) defines "serious bodily injury" as bodily injury that involves: "(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1365(h)(3).

Here, the strength of the evidence as to whether the chemical spray and baseball bat are dangerous weapons is mixed. Regarding the chemical spray, the government's evidence includes photos and video footage clearly showing Mr. Gieswein deploying the spray in the direction of law enforcement officers on two separate occasions. *See* Gov't's Opp'n, ECF No. 19 at 6-8, 19; Hr'g Video Ex. 1 at 02:19 to 02:25; 03:15 to 03:20. And contrary to Mr. Gieswein's argument, there is no requirement in 18 U.S.C. § 111(b) that the defendant's use of a dangerous weapon must actually injure another person. *See* 18 U.S.C. § 111(b) (increasing the maximum penalty for anyone who "uses a deadly or dangerous weapon . . . *or* inflicts bodily injury" (emphasis added)). It is enough that Mr. Gieswein forcefully used the chemical spray in a manner that was threatening to a federal officer. *See Duran*, 96 F.3d 1495, 1509-11 (D.C. Cir. 1996) (holding that "the act of using a deadly weapon with the purpose of causing Secret Service agents to fear imminent serious bodily injury" constituted a crime under § 111(b)). Furthermore, according to the government's evidence, one of the officers that Mr. Gieswein allegedly sprayed within the Capitol Visitor Center likened the chemical to an OC spray, Gov't's Opp'n, ECF No. 19 at 10; which is generally understood to be capable of causing "extreme physical pain" and "protracted" impairment of a bodily organ, such as coughing, choking, burning sensations of the eyes

and nose, and exacerbation of pre-existing conditions such as asthma. *See, e.g.*, *United States v. Neill*, 166 F.3d 943, 949-50 (9th Cir. 1999); *United States v. Bartolotta*, 153 F.3d 875, 879 (8th Cir. 1998); *cf. Munchel*, 991 F.3d at 1281 n.5 ("While the record contains no evidence or proffer as to how Munchel's taser operates, a taser is commonly understood as a device designed to expel a projectile capable of causing injury to individuals. . . . Thus, at this stage, the evidence sufficiently demonstrates that Munchel's taser is a dangerous weapon under the statute."). Thus, even under the heightened definition of "serious bodily injury" that Mr. Gieswein proposes the Court use, there is evidence that would support a finding that the chemical spray was "dangerous." *See* Aff., ECF No. 19-1 at 2 (describing the spray as causing watering eyes, coughing, and a burning sensation). To be sure, the weight of the government's evidence is mitigated by the lack of information regarding the specific type of chemical spray at issue. But while Mr. Gieswein argues that the chemical spray only caused "mild symptoms," the Court is not convinced that the fortuitous fact that the officer was not more seriously injured makes a chemical spray any less a dangerous weapon. *See United States v. Loman*, 551 F.2d 164, 169 (7th Cir. 1977) (finding that a walking stick that the defendant brought down on the victim's head constituted a dangerous weapon, though the stick did not cause serious injury).

The evidence regarding whether the baseball bat is a dangerous weapon is relatively weaker, however. As stated above, what constitutes a dangerous weapon depends not on the nature of the object itself but on its capacity, given the manner of its use, to "endanger the life of or inflict great bodily harm on a person." *Taylor*, 848 F.3d at 494. "[T]he 'use' of a dangerous weapon in the course of a § 111(b) assault or battery constitutes the 'use, attempted use, or threatened use of physical force against the person . . . of another,'" *Gray*, 980 F.3d at 267. In addition, "[a] defendant who acts 'forcibly' using a deadly or dangerous weapon under § 111(b) must have used force by making physical contact with the federal employee, or at least threatened the employee," with the dangerous weapon. *Id.* Here, the government's evidence captures Mr. Gieswein openly holding a baseball bat on Capitol grounds and within the Capitol building itself. Gov't's Opp'n, ECF No. 19 at 3. The parties do not dispute that a baseball bat is capable of causing death or serious bodily injury when used violently against another person. Moreover, the Court does not doubt that a baseball bat in the hands of a rioter in the midst of a violent mob, in which "many people injured and threatened to injure the police," Gov't's Opp'n, ECF No. 19 at 20, incites fear in others. But, as Mr. Gieswein points out, the government has not provided evidence of Mr. Gieswein "'brandishing' it in front of officers"

in a threatening manner, let alone swinging it at or hitting others with it. Def.'s Mot., ECF No. 18 at 14. And though a U.S. Capitol Police Officer reported being "concerned" about Mr. Gieswein "using the bat" while they were allegedly engaged in a struggle in the Capitol Visitor Center, the officer also noted that the bat was in Mr. Gieswein's backpack at the time. Aff., ECF No. 19-1 at 2. Thus, though there is evidence of Mr. Gieswein holding the baseball bat and storing it in his backpack, the government has not provided evidence that Mr. Gieswein used, attempted to use, or threatened to use the baseball bat against another during the events of January 6, 2021.

Finally, regarding Count Five—Destruction of Government Property, in violation of 18 U.S.C. §§ 1361, 2—Mr. Gieswein argues that the government's evidence is weak. Def.'s Mot., ECF No. 18 at 14-15. He argues that the affidavit attached to the criminal complaint "fails to specify how Mr. Gieswein encourage[d] others" to break the Capitol window, and that "though there are voices seeming to encourage those actually working to break the window, the government has offered no evidence that Mr. Gieswein is among them." *Id.*

The Court agrees that it is unclear whether the voice on the videoclip yelling words to the effect of "guys, it's busted over here, get through" and "boys, boys, look at this" belongs

43

to Mr. Gieswein. *See* Hr'g Video Ex. 2, at 00:32 to 00:35, 00:38 to 00:41. In addition, beyond banging on one of the windows with his fist, Mr. Gieswein does not directly attempt to break the second window in the alcove himself. However, the videoclip does capture Mr. Gieswein getting the attention of other rioters attempting to break in a set of doors in the alcove; pointing them in the direction of a window in the process of being smashed in; and then one of those rioters moves over to the window, grabs a wooden beam, and smashes the window open. *Id.* at 00:38 to 00:54. Mr. Gieswein then enters the Capitol building through that same window. *Id.* at 01:04 to 01:11. These actions are consistent with the grand jury's determination that Mr. Gieswein aided and abetted the destruction of federal property.

Thus, in consideration of the strength of the government's evidence against Mr. Gieswein, the Court finds that the second 18 U.S.C. § 3142(g) factor weighs slightly in favor of his continued pretrial detention, although it "is the least important" factor. *Padilla*, 2021 WL 175054, at *7 (quoting *United States v. Gebro*, 948 F.2d 1118, 1121-22 (9th Cir. 1991)).

### 3. History and Characteristics of the Defendant

Under the third factor, the Court must consider Mr. Gieswein's history and characteristics. 18 U.S.C. § 3142(g)(3). The Court considers Mr. Gieswein's "character, physical and mental condition, family ties, employment, financial resources,

length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," *id.* § 3142(g)(3)(A); and "whether, at the time of the current offense or arrest, [Mr. Gieswein] was on probation, on parole, or on other release," *id.* § 3142(g)(3)(B).

Here, there are several factors in Mr. Gieswein's favor. He is 24 years old and has no criminal history. Def.'s Mot., ECF No. 18 at 29. He has also received support from friends and family, who have either sent in letters or have signed declarations under penalty of perjury on Mr. Gieswein's behalf. *See* Rockel Decl., ECF No. 18-1; Fellhauer Decl., ECF No. 18-2; Character Letters, ECF No. 18-4. The letters and declarations describe Mr. Gieswein as a nonviolent supporter of law enforcement and the military, *see* Rockel Decl., ECF No. 18-1 at 2; Fellhauer Decl., ECF No. 18-2 at 2; who is "loving, honest, caring, and hard[-]working," Character Letters, ECF No. 18-4 at 1; *see also id.* at 6-7; and who acts as a mentor figure to his younger sister, *see id.* at 4. Mr. Gieswein has also had steady employment since he was 14, until he recently lost his job in the fall of 2020 for reasons related to the COVID-19 pandemic. Def.'s Mot., ECF No. 18 at 29.

The government acknowledges that Mr. Gieswein does not have a criminal history and that he voluntarily turned himself in to

local authorities in connection with this case. Gov't's Opp'n,
ECF No. 19 at 26. The government also acknowledges that there is
no evidence indicating that Mr. Gieswein is connected with the
Proud Boys or Oath Keepers. *Id.* But the government returns to
Mr. Gieswein's actions on January 6, 2021, which resulted in Mr.
Gieswein being charged with what the government characterizes as
"three separate counts of a crime classified by Congress as
crimes of violence and one classified by that same body as a
federal crime of terrorism." *Id.* In the government's view,
"[w]hatever motivated the defendant on January 6, it was strong
enough to overcome the respect he appears to have had for law
enforcement prior to traveling to Washington, D.C., and to cause
him to chemically assault officers who were trying to prevent a
mob from taking over the Capitol." *Id.* at 27. The government
also points out that according to an FBI report of an interview
with a "character witness," Mr. Gieswein subscribes to the QAnon
conspiracy theory, which includes a belief that "a cabal of
Satanic, cannibalistic pedophiles run a global sex trafficking
ring, and that President Trump was planning to have many members
of the cabal arrested." *Id.* In addition, the government argues
that Mr. Gieswein's statements on January 5—including that he
believed that certain politicians have "completely destroyed our
country and sold them to the Rothschilds and the Rockefellers"—
indicated a belief in an "anti-Semitic conspiracy theor[y] . . .

that shadow forces . . . secretly control global currency." *Id.*
at 27 & n.11.

The Court agrees that Mr. Gieswein's decisions on January
6, 2021 "show that he is willing to allow his own personal
beliefs to override the rule of law, which reflects poorly on
his character." *Klein*, 2021 WL 1377128, at *10 (quotation
omitted); *see also Sabol*, 2021 WL 1405945, at *15 ("That [the
defendant] acted violently against law enforcement protecting
the peaceful transition of power based on a belief that the 2020
Presidential Election was stolen is also very alarming [and]
indeed raises concerns about [his] character and the danger [he]
may present to the community if he were released."). In
addition, Mr. Gieswein's alleged belief in conspiracy theories
is concerning when considered in the context of this case—a
political protest that turned into a violent riot at the
Capitol. However, the Court ultimately finds that Mr. Gieswein's
history and characteristics reflect an ability to abide by the
law. It is true that Mr. Gieswein's actions on January 6, 2021
stand in direct conflict with his history and the substance of
the letters submitted on his behalf. But Mr. Gieswein's age,
lack of criminal history, family and community ties, and history
of steady employment overall weigh in favor of his pretrial
release. *See United States v. Cua*, No. 21-107 (RDM), 2021 WL
918255, at *4-5 (D.D.C. Mar. 10, 2021) (finding that, despite

47

the defendant's criminal history, his "young age, family and community ties, expressed remorse, and lack of a significant criminal history weigh in favor of his pretrial release").

### 4. Nature and Seriousness of the Danger Posed by the Defendant's Release

The final factor the Court must consider is the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4).

For many of the reasons already addressed above, the Court finds that this factor also weighs against Mr. Gieswein and in favor of his continued pretrial detention. "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," requiring an "open-ended assessment of the 'seriousness' of the risk to public safety." *Cua*, 2021 WL 918255, at *5 (quoting *United States v. Taylor*, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)). "Because this factor substantially overlaps with the ultimate question whether any conditions of release 'will reasonably assure [the appearance of the person as required] and the safety of any other person and the community,' 18 U.S.C. § 3142(e), it bears heavily on the Court's analysis." *Id.*

As discussed above, the nature and circumstances of Mr. Gieswein's offenses evince a clear disregard for the safety of others, and of law enforcement in particular. *See supra* Section

III, Part C.1; *see also Chrestman*, 2021 WL 765662, at *9. The
government has shown that Mr. Gieswein intentionally deployed
chemical spray against multiple Capitol Police officers
throughout the day on January 6, 2021. And though Mr. Gieswein
argues that deploying a chemical spray does not "indicate actual
intent to cause lasting pain and injury [or] an especially high
tolerance for risk," Def.'s Reply, ECF No. 21 at 13 (citing
cases); the Court disagrees, *see Fairlamb*, 2021 WL 1614821, at
*8 ("[T]he defendant's willingness to assault a police officer
on January 6—in the full view of other officers, scores of
bystanders, and many cameras—confirms that, when enraged, he
poses a danger to the community."). As another judge in this
District has put it, "[p]epper spray would hardly serve its
purpose if it did not cause the sprayee pain." *United States v.
Moore*, 149 F. Supp. 3d 177, 182 (D.D.C. 2016). Furthermore,
during at least one of the instances in which Mr. Gieswein
deployed his chemical spray in the direction of law enforcement
officers, Mr. Gieswein was surrounded by individuals—including
one person with red, watery eyes, calling out for water—clearly
in distress after being hit with a chemical spray. *See* Hr'g
Video Ex. 1 at 02:30 to 02:57. The Court also is not persuaded
that choosing to spray a chemical substance directly at police
does not show a "high tolerance for risk." Def.'s Reply, ECF No.
21 at 13. There is evidence that, rather than being carried away

49

in the excitement of the moment, Mr. Gieswein instead arrived at the Capitol on January 6, 2021 prepared to engage in such behavior by bringing the chemical spray with him, along with goggles to keep the spray from getting into his own eyes. *See* Gov't's Opp'n, ECF No. 19 at 3, Figure 1; *id.* at 21, Figure 10.

Mr. Gieswein was also equipped with a baseball bat, helmet, tactical vest, and camouflage fatigues, and is pictured standing near the front line of protestors confronting police officers both on the West Plaza and on the staircase leading up to the Capitol. *Id.* at 4-5. Videoclips capture Mr. Gieswein using his body to shove a metal police barricade against police officers who were trying to keep the rioters at bay, Hr'g Video Ex. 3, at 01:25 to 01:45; Hr'g Video Ex. 4, at 00:06 to 00:15; and he is one of the first rioters to enter the Capitol through a smashed window, with the baseball bat and chemical spray, after appearing to encourage others to enter the Capitol through the same window, Hr'g Video Ex. 2, at 00:56 to 01:12; Gov't's Opp'n, ECF No. 19 at 7. Altogether, "[t]his evidence suggests that [Mr. Geiswein] was not a passive observer, but an active aggressor." *United States v. Caldwell*, No. 21-181, 2021 WL 2036667, at *10 (D.D.C. May 21, 2021).

Mr. Gieswein's statements also demonstrate that a willingness to "take matters into his own hands to defend the country against perceived corruption in democratic

institutions." *United States v. DeGrave*, No. 21-90, 2021 WL
1940536, at *17 (D.D.C. May 14, 2021). On January 5, 2021, the
government represents that Mr. Gieswein is recorded as saying
that Congress "need[ed] to get the corrupt politicians out of
office. Pelosi, the Clintons, all of . . . every single one of
them, Biden, Kamala . . . they have completely destroyed our
country and sold them to the Rothschilds and Rockefellers."
Gov't's Opp'n, ECF No. 19 at 27; *see also* Aff., ECF No. 1-1 at
11. He is also reported as saying: "What we need to do, is we
need to get the corrupt politicians that have been in office for
50-60 years, that have been destroying our country and selling
it to the Middle East and Israel out of office and they need to
be imprisoned." Aff., ECF No. 1-1 at 11. And, as described
above, Mr. Gieswein "did not simply hold these misguided
beliefs; he acted on them." *Sabol*, 2021 WL 1405945, at *17. The
Court does acknowledge Mr. Gieswein's lack of a criminal record
and the supportive letters friends and family submitted on his
behalf. Def.'s Mot., ECF No. 18 at 29; *See* Rockel Decl., ECF No.
18-1; Fellhauer Decl., ECF No. 18-2; Character Letters, ECF No.
18-4. The Court also acknowledges Mr. Gieswein's statement on
January 5 that he wished for "both sides [to] stay peaceful."
*Id.* at 2-3. Nonetheless, his history and wish for peace did not
prevent him from committing acts of violence against police
officers, nor from actively resisting arrest and fleeing the

scene,[12] and they do little to dissuade the Court from finding
that Mr. Gieswein poses a serious danger to his community.

The Court is similarly unpersuaded by Mr. Gieswein's
argument that he does not pose a danger to anyone in the
community because there have not been any similar events carried
out by former President Trump supporters since January 6, 2021.
Def.'s Mot., ECF No. 18 at 31. "While the circumstances of
January 6, 2021 were unique, and the day has passed, it cannot
be said that every Capitol Riot defendant is no longer a danger
because those exact circumstances are unlikely to arise again."
*Sabol*, 2021 WL 1405945, at *18. And as this Court stated in
*Whitton*, "even if the exact circumstances of the January 6
attacks are not 'continuing in nature' or 'likely to be repeated
in the future,' the violent offenses [the defendant] committed
that day are serious enough on their own to militate against
pretrial release." *Whitton*, 2021 WL 1546931, at *9. The Court is
further troubled by Mr. Gieswein's unsolicited statement to
police—made several days after the events of January 6, 2021
unfolded—that he had turned himself in because he believed he
"did nothing wrong." Gov't's Opp'n, ECF No. 19 at 11; *see also*

---

[12] As stated above, while the entire incident within the Capitol
Visitor Center is not captured on video or photographic
evidence, the government has represented that video surveillance
shows Mr. Gieswein and officers on the ground, and Mr. Gieswein
"fleeing." Gov't's Opp'n, ECF No. 19 at 10.

*id.* (alleging that Mr. Gieswein "described himself as a 'constitutionalist' who wants the military to take back over the country and restore the Constitution"). Like Mr. Whitton, Mr. Gieswein is thus "distinguishable from other Capitol Riot defendants who displayed a dangerous distain for democracy and the rule of law on January 6, 2021, but who did not engage in violence, *see, e.g.*, *Munchel*, 991 F.3d at 1283-84, or who did not direct their 'forceful conduct' toward inflicting injury, *see United States v. Klein*, No. CR 21-236 (JDB), ECF No. 29 at 24, (D.D.C. Apr. 12, 2021)." *Whitton*, 2021 WL 1546931, at *12.

In consideration of these factors and noting the D.C. Circuit's observation that "[i]t cannot be gainsaid that the violent breach of the [U.S.] Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community," *Munchel*, 991 F.3d at 1284-85; the Court is persuaded that Mr. Gieswein poses a danger to his community and the broader community of American citizens if he were to be released pending trial, and he "cannot be trusted to abide by any conditions of release that might be imposed instead of pretrial detention." *Chrestman*, 2021 WL 765662, at *16.

## IV. Conclusion

After considering the factors set forth in 18 U.S.C. § 3142(g), the Court finds, by clear and convincing evidence, that

no condition or combination of conditions will reasonably assure the safety of any other person and the community were Mr. Gieswein to be released pending trial. 18 U.S.C. § 3142(e)(1). Accordingly, Mr. Gieswein's motion is **DENIED.** Mr. Gieswein shall be detained pending trial. An appropriate Order accompanies this Memorandum Opinion.

      **SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
              **United States District Judge**
              **July 27, 2021**