# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 21-cr-00024 (EGS)** |
| | : | |
| **ROBERT GIESWEIN** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' REPLY TO DEFENDANT'S OPPOSITION TO MOTION TO EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT

At a status hearing in the above-captioned case held on July 29, 2021, the United States requested a continuance of the above-captioned proceeding for at least thirty days in order to provide discovery in this case, and further to exclude the time within which a trial must commence under the Speedy Trial Act ("STA"), 18 U.S.C. § 3161 *et seq*., on the basis that the ends of justice served by taking such actions outweigh the best interest of the public and the defendant in a speedy trial.[1]  The government made its request to assure that both parties are accorded the reasonable time necessary for effective trial preparation, given the government's unprecedented discovery obligations and the due diligence the United States is exercising to comply with those obligations.  It is important to note that the government is taking a very expansive view of what may be exculpatory and thus discoverable in these Capitol Breach matters.  It is the government's commitment to ensuring that all arguably exculpatory materials are produced in a comprehensive, accessible, and useable format that, in the main, underlies the government's request to toll the STA.

---

[1] *See* 18 U.S.C. § 3161(h)(7).

After the defendant objected to the government's ends-of-justice continuance request, the Court set a briefing schedule and suggested the parties confer about a potential trial date no earlier than January 2022. On August 2, 2021, the defendant filed a written objection to further tolling of his "constitutional and statutory rights to a speedy trial" (ECF No. 30 at 1).   The defendant's opposition is without merit.  Based on the information provided in the United States' July 19, 2021 memorandum (ECF No. 26) (the "Discovery Status Memorandum"), incorporated herein by reference, and for the reasons set forth below, the government has established that an ends-of-justice continuance under the STA is warranted.  Further, the defendant's bond status is not a factor that this Court should consider in evaluating the government's motion.[2]

I.      **An Ends-of Justice Tolling of the Speedy Trial Act is Warranted.**

As set forth in detail in the Discovery Status Memorandum, the United States has exercised and continues to exercise due diligence: (1) to obtain potentially discoverable materials from multiple sources; (2) to review those materials for discoverability; (3) to process discoverable materials into loadable, searchable formats that are accessible and useable for  the defense and consistent with industry-wide standards; (4) to organize productions in a manner that will be meaningful to the defense; and (5) to ensure that any materials produced are subject to adequate protections and/or redactions.  We address the defendant's arguments in the order in which they were advanced.

In questioning the government's diligence, the defendant raises a number of questions as to when the Capitol Breach Discovery Team was established, began drafting the statement of

---

[2] To the extent the defendant also argues that the reimposition of a mask mandate is not a ground to toll the STA, the government does not address that argument, as it is premature. The United States understood the Court as merely noting that that the continuing pandemic may, at some point, also affect the trial schedule.

work that was used to solicit litigation technology vendors, and began soliciting and accepting bids.  Further, the defendant seeks information as to when the government began transferring data to Deloitte Financial Advisory Services, LLP ("Deloitte"), and when that process will be completed.  Finally, the defendant requests information about "the number of people [the government] has devoted to this project" (ECF No. 30 at 6-7).

While responses to the defendant's questions are unnecessary to establish the government's due diligence, the government nevertheless hereby informs the Court as follows. From the outset, the government has understood the magnitude and complexity of the discovery project presented by the January 6 attack on the Capitol.  Accordingly, a Capitol Breach Discovery Coordinator was appointed on or about January 27, 2021, to manage and organize this project.  The coordinator began to quickly assemble the core Discovery Team described in the Discovery Status Memorandum (ECF No. 26 at 5-6).  The Discovery Team has augmented its staff as needed using full-time employees, contractors, and agents to perform a wide variety of functions, e.g., receiving, tracking, processing, redacting, and producing discovery in individual cases, drafting and implementing protocols and procedures that will allow for the same with respect to voluminous data, managing filter reviews, training agents and attorneys, collecting potentially discoverable materials from a wide variety of sources including multiple law enforcement agencies, and responding to discovery-related litigation.  It continues to add staff as required, e.g., to conduct *Brady*[3] reviews of voluminous documents.

The initial draft of a Statement of Work was completed no later than February 1, 2021. This investigation is unprecedented in size and scope, and as more information was been learned about the scope of the evidence, the Statement of Work necessarily was revised; it was also

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

reviewed multiple times at various levels of the Department of Justice before it was approved for publication on April 19, 2021.  Final bids were received on or about May 10, 2021, and after careful consideration, Deloitte was retained on or about May 28, 2021.  The government began transferring data to Deloitte the week of June 8, 2021.

As explained in our Discovery Status Memorandum, "processing, hosting, and production of the voluminous and varied materials described [in the memo], to include the preservation of significant metadata, involves highly technical considerations of the document's source, nature, and format" (ECF No. 26 at 9).  As each category of data may present a unique challenge, the government cannot state with certainty when the transfer of the bulk of material to Deloitte will be complete.  However, the government is prioritizing the materials that are likely to be most relevant to the Capitol Breach defendants, i.e., Capitol surveillance footage, body-worn-camera footage, and other materials from responding law enforcement agencies, with a *goal* of approximately four to six weeks for completing the transfer of these items to Deloitte. Processing these materials is particularly complex because of the varied formats in which they are stored.  As one example, Capitol surveillance footage comprising thousands of hours is stored in a proprietary format that would be extremely burdensome for defense counsel to search and review.  Deloitte engineers are analyzing the Capitol surveillance footage and body-worn-camera footage to determine the optimal way to process and provide this extremely voluminous material to best allow the defense to search and review it in a meaningful and efficient manner. Taking the time to do this now will likely save the defense countless hours it would otherwise expend performing burdensome and time-consuming searches once it receives the footage.

We recognize that the results of searches of thousands of devices and Stored Communication Act ("SCA") accounts are of equal importance and are working with the Federal

Bureau of Investigation ("FBI") to ensure that scoped search results are provided to Deloitte for processing. Given the number and diversity of accounts and devices seized in these cases, and the variety of tools employed by law enforcement to scope such materials, they also present a host of complex technological challenges from a processing perspective. We are working with the FBI, Deloitte and the Federal Public Defender for the District of Columbia ("FPD") to ensure that such materials are transferred and processed in a manner that will optimize the defense's use of them.

The defendant's concerns about the effect of Chief Judge Howell's decision concerning disclosure of materials protected by Federal Rule of Criminal Procedure 6(e) ("Rule 6(e)")[4] on the government's ability to utilize Deloitte, ECF No. 30 at 7-8, are misplaced. The majority of the material collected in the Capitol Breach cases is not protected by Rule 6(e), and certainly not the material that is most likely to be relevant to this defendant.[5] Moreover, while the government would have preferred to use Deloitte to manage all of the discovery materials, at this time we anticipate that we will be able to process and produce such materials without Deloitte's aid.

The defendant's assertion that "the government has failed to identify what, if any, steps it is taking to prioritize the production of evidence to those who are detained in connection with January 6 charges," (ECF No. 30 at 8), is wrong. In this case, the government has already provided the materials that are most relevant to the pending charges, and it has prioritized the

---

[4] See *In re Capitol Breach Grand Jury Investigations Within the District of Columbia,* Grand Jury Action No. 21-GJ-00020 (Chief Judge Beryl A. Howell), Order denying Motion to Authorize the Disclosure of Grand Jury Materials (July 16, 2021)(ECF No. 5).

[5] Any grand jury transcripts relevant to the charges here will be provided directly to the defendant by the assigned prosecutor and do not require processing by Deloitte.

provision of discovery to this defendant specifically because he has been detained pretrial. The defendant's initial appearance in this Court occurred on March 29, 2021. The very next day, the government sent a proposed protective order to defense. The parties agreed upon final wording on April 14, 2021, and this Court entered the protective order on April 15, 2021. The government made its first production of discovery on April 19, 2021. Prior to the entry of the protective order, the government provided all videos referenced in the affidavit in support of the complaint. Since the entry of the protective order, the government has provided discovery including law enforcement memoranda directly relevant to the defendant, associated officer notes, copies of the defendant's social media accounts, tips about the defendant provided to law enforcement, videos and photographs taken by law enforcement during the riot that depict the defendant on the plaza to the west of the Capitol, and video from both body-worn cameras and Capitol surveillance footage that captures the defendant.[6]  We also arranged for defense counsel and an investigator to walk through the crime scene and understand that defense counsel has already done so.

To the extent that the defendant complains that the government has failed to specify whether any additional evidence relating to the defendant has been identified in the universe of data the Discovery Status Memorandum describes (apart from what the government has already produced to the defense without the benefit of the Deloitte database in several productions through June 17), the defendant assumes too much. The government is still populating the database with information. That being said, using tools accessible to the FBI, the government has performed searches of some categories of voluminous data identified in its Discovery Status Memorandum, including data from the extensive Capitol CCTV system, and additional manual

---

[6] None of the defendant's devices were recovered.

reviews of body-worn camera from the Metropolitan Police Department.  Ultimately, the defendant's question raises the very point the government is addressing through its approach to discovery here – the volume of material may make it impossible for the government to review every potentially discoverable item and determine its materiality to the defense.  Thus, consistent with the *Recommendations for Electronically Stored Information (ESI) Discovery Production* developed by the Department of Justice and Administrative Office of the U.S. Courts Joint Working Group on Electronic Technology in the Criminal Justice System,[7] we are providing the defense with voluminous data that may contain material information, but in a manner that will facilitate search, retrieval, sorting, and management of that information.

The defendant's assertion that redactions "seem superfluous" given the existence of a protective order (ECF No. 30 at 9) incorrectly assumes that a sensitivity designation alone will be sufficient to protect all types of information (e.g., even the identities of victims, confidential sources, tipsters, and witnesses with security concerns).  Given the high-profile nature of this investigation, it is entirely possible that such individuals would be subjected to threats or harassment from the public, should their identities become known.  The defendant's claim rings especially hollow in this case, where based on his conduct on January 6, 2021, the defendant could certainly be perceived by such individuals as posing a risk to their security.[8]

---

[7] *See https://www.justice.gov/archives/dag/page/file/913236/download.*

[8] *See* Memorandum Opinion in support of Order denying release from custody, ECF No. 29 at 3 ("video and photographic evidence submitted by the government show that Mr. Gieswein's conduct on January 6, 2021 involved violent acts against U.S. Capitol Police during the riot"; at 5 ("Photographic and video evidence proffered by the government also capture Mr. Gieswein with goggles and carrying a baseball bat and an aerosol spray can containing unknown chemicals"); at 6 ("body-camera footage submitted by the government shows Mr. Gieswein, along with other rioters, forcefully pushing a metal police barricade directly into the bodies of law enforcement officers attempting to keep the rioters from reaching the Capitol, as other law enforcement officers throw tear gas into the mob"); at 7 ("Video evidence shows rioters pulling a

The defendant complains that the government's Discovery Status Memorandum fails to project when it will solve its "discovery problems" (ECF No. 30 at 10).  As an initial matter, the United States is not experiencing discovery "problems."  The United States is managing the ingestion, review, processing, and production of an unprecedented volume of materials generated by an extraordinary crime.  These materials come from a wide range of sources and vary in format.  The steps the government is undertaking are designed to ensure the defense can receive such evidence in loadable, searchable formats that are consistent with industry-wide standards. Processing takes time but the government is taking all appropriate measures to expedite this process.  Ultimately this process will significantly benefit the defense in terms of its ability to review the information produced.  Any other production method would make defense review of the materials incredibly burdensome and time-consuming, given the nature and volume of the materials involved, as described earlier.

While it is correct the government has not yet projected a time for completing discovery, the government is committed to making progress as quickly as possible – which is why we have already provided the discovery most relevant to the charges here, filed the Discovery Status

---

police barricade down the staircase, which other rioters and Mr. Gieswein, with baseball bat in hand, then grabbed and began to push forward again up toward the officers"); at 9 ("video surveillance footage captures Mr. Gieswein deploying his aerosol spray can in the direction of officers"); at 10 ("According to the government, when law enforcement grabbed Mr. Gieswein to arrest him, Mr. Gieswein resisted arrest and tried to punch a U.S. Capitol Police officer"); at 48 ("As discussed above, the nature and circumstances of Mr. Gieswein's offenses evince a clear disregard for the safety of others, and of law enforcement in particular"); at 50-51 ("Mr. Gieswein's statements also demonstrate that a willingness to take matters into his own hands to defend the country against perceived corruption in democratic institutions")(internal citations omitted); and at 53 ("the Court is persuaded that Mr. Gieswein poses a danger to his community and the broader community of American citizens if he were to be released pending trial, and he cannot be trusted to abide by any conditions of release that might be imposed instead of pretrial detention")(internal citations omitted).

Memorandum regarding our progress with respect to voluminous data, and proposed setting an interim status hearing to inform the Court as to our continued progress. Moreover, the defendant's complaints about our progress cannot be viewed in a vacuum. Even if all the voluminous materials were available for production today, we do not believe the defendant is prepared to receive them in a manner that provides for searches across broad swaths of data using sophisticated software tools (e.g., keyword searches, facial recognition, object recognition, or audio recognition) that make such review meaningful and efficient. The government, however, is working closely with FPD to ensure they have the information they need to establish a receiving database that could be made available to Federal Public Defender offices nationwide, including the office of defendant's attorney.

The defendant's assertion that "many of the problems [the government] identifies are of its own making" (ECF No. 30 at 10) is incredible. First, as noted above, the government is addressing a challenging discovery project, and there are no "problems." Second, and more importantly, such a statement ignores reality: The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[9] Accordingly, the government appropriately immediately began to investigate and charge those responsible for the attack. And when thousands of individuals, including the defendant, collectively participate in such an attack at a heavily surveilled location, further choose to record

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

their actions on their own digital devices, and subsequently post evidence of their criminal conduct on social media, those individuals and not the government are responsible for the volume of relevant discovery in each case.  Third, the defendant's assumption that the volume of data results from the government's decision to charge so many cases fails to take into account that a large portion of the most relevant voluminous materials (surveillance footage, body-worn-camera footage, radio transmissions, location history data, cell tower data, and social media posts) were created on the day of the attack, and not as the result of subsequent investigations into individual rioters.  Moreover, given the overt nature of this investigation, had we failed to move quickly to accumulate data from individual SCA accounts and devices that we intend to turn over, we would surely have risked the loss or destruction of such evidence.  Fourth, the defendant's complaints regarding the government's plea offers or lack thereof are inapposite to his particular case.  The government and the defendant are engaged in ongoing plea negotiations, and to the extent such negotiations have not yet been successful, it is not because of the discovery challenges faced in this case or in the investigation as a whole.

The defendant's argument that "the government continues to ask the Court to elevate its prosecutorial preference for bringing a multitude of cases over individual constitutional speedy trial and evidentiary rights" completely mischaracterizes what the government is doing, which *is*, as the defendant requests, "what is necessary to ensure that Mr. Gieswein is both provided with the discovery he is due and brought to trial within a reasonably speedy time-frame" (ECF No. 30 at 12).  Notably, the defendant has failed to cite a single case, statutory provision, or rule consistent with his argument that "the Constitution, the Speedy Trial Act, and Rules of Criminal Procedure" may require the Court to consider a dismissal (ECF No. 30 at 12).

Contrary to the defendant's allegations, the government's approach to discovery is designed to ensure that the defendant's rights are observed, including ensuring he has meaningful access to voluminous information that may contain exculpatory material, and that we do not overproduce or produce in a disorganized manner. *Brady v. Maryland*, 373 U.S. 83 (1963), imposes a constitutional obligation on the government to disclose information favorable to the defendant where it is material to either guilt or punishment. *Id.* at 87.

As the information heretofore provided by the government is beyond sufficient to allow the Court to make the necessary ends-of-justice findings here, there is no basis for the Court to consider dismissal based on an STA violation, as the defendant suggests (ECF No. 30 at 12).  As the Supreme Court has observed, the STA "recognizes that criminal cases vary widely and that there are valid reasons for greater delay in particular cases." *Zedner v. United States,* 547 U.S. 489, 497 (2006).  "Much of the Act's flexibility is furnished by § 3161(h)([7]), which governs ends-of-justice continuances." *Id.* at 498.  "Congress clearly meant to give district judges a measure of flexibility in accommodating unusual, complex, and difficult cases." *Id.* at 508.  And it knew "that the many sound grounds for granting ends-of-justice continuances could not be rigidly structured." *Id.*

The need for reasonable time to address discovery obligations is among multiple pretrial preparation grounds that Courts of Appeals, including our circuit, have routinely held sufficient to grant continuances and exclude time under the STA – and in cases involving far less complexity in terms of the volume and nature of data, and the number of defendants entitled to discoverable materials. *See, e.g., United States v. Bikundi*, 926 F.3d 761, 777-78 (D.C. Cir. 2019)(upholding ends-of-justice continuances totaling 18 months in two co-defendant health care fraud and money laundering conspiracy case, in part because the District Court found a need to

"permit defense counsel and the government time to both produce discovery and review discovery"); *United States v. Bell*, 925 F.3d 362, 374 (7th Cir. 2019)(upholding two-month ends-of-justice continuance in firearm possession case, over defendant's objection, where five days before trial a superseding indictment with four new counts was returned, "1,000 pages of new discovery materials and eight hours of recordings" were provided, and the government stated that "it needed more than five days to prepare to try [the defendant] on the new counts"); *United States v. Vernon*, 593 F. App'x 883, 886 (11th Cir. 2014) (District court did not abuse its broad discretion in case involving conspiracy to commit wire and mail fraud by granting two ends-of-justice continuances due to voluminous discovery); *United States v. Gordon*, 710 F.3d 1124, 1157-58 (10th Cir. 2013)(upholding ends-of-justice continuance of ten months and twenty-four days in case involving violation of federal securities laws, where discovery included "documents detailing the hundreds financial transactions that formed the basis for the charges" and "hundreds and thousands of documents that needs to be catalogued and separated, so that the parties could identify the relevant ones")(internal quotation marks omitted); *United States v. Lewis*, 611 F.3d 1172, 1177-78 (9th Cir. 2010)(upholding ninety-day ends-of-justice continuance in case involving international conspiracy to smuggle protected wildlife into the United States, where defendant's case was joined with several co-defendants, and there were on-going investigations, voluminous discovery, a large number of counts, and potential witnesses from other countries); *United States v. O'Connor*, 656 F.3d 630, 640 (7th Cir. 2011)(upholding ends-of-justice continuances totaling five months and twenty days in wire fraud case that began with eight charged defendants and ended with a single defendant exercising the right to trial, based on "the complexity of the case, the magnitude of the discovery, and the attorneys' schedules").

Notably, the defendant's lack of consent to the United States' request for an ends-of-justice continuance is irrelevant.  There is no requirement that a defendant personally consent to an ends-of-justice continuance; the only question is whether the district court has complied with the procedural requirements of section 3161(h)(7).  *See United States v. Sobh*, 571 F.3d 600, 603 (6th Cir. 2009)("By its terms, § 3161(h)([7])(A) does not require a defendant's consent to the continuance 'if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.'"); *accord United States v. Jones*, 795 F.3d 791, 798 (8th Cir. 2015); *United States v. Williams*, 753 F.3d 626, 635 (6th Cir. 2014); *United States v. Lynch*, 726 F.3d 346, 355 (2d Cir. 2013); *United States v. Gates*, 709 F.3d 58, 65-66 (1st Cir. 2013)("We hold  .  .  .  that in the ordinary course and within the confines of the STA exclusion provisions, defense counsel has the power to seek an STA continuance without first informing his client or obtaining his client's personal consent."); *United States v. Herbst*, 666 F.3d 504, 510 (8th Cir. 2012)("Herbst's opposition to his counsel's request for a continuance does not prevent that time from being excluded from the speedy trial calculation."); *United States v. Stewart*, 628 F.3d 246, 254 (6th Cir. 2010)("[W]here an attorney seeks a continuance without the client's approval, this court has held that the Speedy Trial Act 'does not require a defendant's consent to the continuance' in order for a judge to be able to grant a motion in furtherance of the ends of justice.").  *See also United States v. Stoddard*, 74 F. Supp. 3d 332, 341–42 (D.D.C. 2014)("Even assuming *arguendo* that Stoddard was not advised of his statutory Speedy Trial rights by his counsel and that his counsel consented to the tolling of the time without Stoddard's consent, Stoddard was not prejudiced by this error. The Court tolled the time under the Speedy Trial Act pursuant to 18 U.S.C. §§ 3161(h)(8)(A), (B)(i), (B)(ii) & B(iv)(2004). None of those provisions require the

consent of the defendant."); *cf. Zedner*, 547 U.S. at 500-01 (holding the STA cannot be tolled by virtue of a defendant's waiver of its application).

There is also no basis for the Court to consider dismissal any time in the foreseeable future based on a violation of the defendant's Sixth Amendment speedy trial rights. "The absence of a Speedy Trial Act violation does not *ipso facto* defeat a Sixth Amendment speedy trial claim. *See* 18 U.S.C. § 3173. But as a number of courts have noted, it will be an 'unusual case' in which the Act is followed but the Constitution violated." *United States v. Rice*, 746 F.3d 1074, 1081 (D.C. Cir. 2014).

In order to determine whether a defendant's Sixth Amendment right to a speedy trial has been violated, the Court must consider four factors: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo,* 407 U.S. 514, 530 (1972). Under the first factor, the defendant must make a threshold showing that the delay between the accusation and the trial was presumptively prejudicial in order for the claim to proceed. *Id.* If that threshold requirement is met, then the Court must consider the length of the delay "as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett v. United States*, 505 U.S. 647, 652 (1992).

Here, where the Court has asked the parties to consider a trial date in January of 2022, and the defendant has been detained since his arrest on January 19, 2021, any claim related to the alleged constitutional violation of his speedy trial rights under the Sixth Amendment is highly premature and must fail. First, there is no presumption of prejudice here and so the defendant cannot even make a threshold showing that his claim should proceed. The determination as to whether a delay is presumptively prejudicial is dependent upon the peculiar circumstances of the

case.  *Barker*, 407 U.S. at 530-31; *United States v. Marshall*, 669 F.3d 288, 295–96 (D.C. Cir.

2011) (requiring the district court to make factual findings regarding defendant's allegation that

the government did not overcome the presumption of prejudice for delays over one year); *United*

*States v. Taylor*, 497 F.3d 673, 677 (D.C. Cir. 2007)(assuming without deciding that a delay

barely over one year between the indictment and trial was presumptively prejudicial).

       Even assuming a *Doggett* inquiry were appropriate, a presumption of prejudice is

rebuttable.  A delay of more than one year this case, which involves unprecedented complex

discovery issues that affect hundreds of defendants, would pass constitutional muster.  "[T]he

delay that can be tolerated for an ordinary street crime is considerably less than for a serious,

complex conspiracy charge." *Barker*, 407 U.S. at 530-31.  *See, e.g., Bikundi,* 926 F.3d at 780

(Although the delay of approximately 18 months in defendant's prosecution for health care

fraud, conspiracy to commit health care fraud, money laundering, and conspiracy to commit

money laundering triggered inquiry into whether she was deprived of her constitutional speedy

trial right, factors of the length of the delay and the reason for the delay weighed in favor of

government; defendant's case involved complex conspiracy charges with complicated evidence

and multiple defendants, requiring voluminous discovery, defendant had herself filed multiple

pretrial motions which contributed to the length of the proceedings, as well as an interlocutory

appeal, and she consented to two of the continuances that were granted); *United States v.*

*Lopesierra–Gutierrez*, 708 F.3d 193, 202–03 (D.C. Cir) (2013)(42-month delay not prejudicial

because complex conspiracy charge involved executing 15 extraditions, fairly treating 15

codefendants, collecting and deciphering foreign evidence, and coordinating with foreign

witnesses); *United States v. Tchibassa*, 452 F.3d 918 (D.C. Cir. 2006)(no violation despite

eleven-year delay between indictment and arrest).

## II.    The Defendant's Bond Status is Not Relevant to a Ruling on the Government's Motion to Continue.

The defendant improperly requests the Court consider the fact that he is detained in determining whether a continuance is warranted under the STA and his Sixth Amendment speedy trial rights.  Pursuant to 18 U.S.C. § 3164:

(a) The trial or other disposition of cases involving—

    (1) a detained person who is being held in detention solely because he is awaiting trial, and

    (2) a released person who is awaiting trial and has been designated by the attorney for the Government as being of high risk,

shall be accorded priority.

(b) The trial of any person described in subsection (a)(1) or (a)(2) of this section shall commence not later than ninety days following the beginning of such continuous detention or designation of high risk by the attorney for the Government. **The periods of delay enumerated in section 3161(h) are excluded in computing the time limitation specified in this section.**

18 U.S.C. § 3164 [emphasis added].  At the same time that the STA requires the trial of a person who is being detained to commence within ninety days, it also categorically excludes from this computation of time periods of delay enumerated in section 3161(h), including a judicial finding under section 3161(h)(7) that an ends-of-justice continuance is warranted.  So long as the court's findings are warranted and "seriously weigh the benefits of granting the continuance against the strong public and private interests served by speedy trials," *United States v. Bryant*, 523 F.3d 349, 361 (D.C. Cir. 2008), the excluded periods must be omitted from the computation of ninety-day time limitation for bringing a detained defendant to trial.

The defendant's pretrial incarceration is also irrelevant to the determination of whether his Sixth Amendment speedy trial rights have been violated. As noted above, any constitutional speedy trial claim is highly premature. But even if a *Doggett* inquiry were appropriate, the defendant has not alleged any prejudice arising from that incarceration. Notably, the D.C. Circuit has previously found no Sixth Amendment violation despite lengthy periods of pretrial incarceration. *See, e.g., Rice,* 746 F.3d at 1082 ("although Rice suffered lengthy [twenty-six month] 'pretrial incarceration' and 'anxiety and concern,' he does not even attempt to argue that he suffered 'the most serious' form of prejudice: the impairment of his defense. [*Barker*, 407 U.S. at 532]."); *Lopesierra-Gutierrez*, 708 F.3d at 203 (three-and-one-half years of pretrial detention not a violation). In addition, in *United States v. Taylor*, No. 18-198 (JEB), 2020 WL 7264070 (D.D.C. Dec. 10, 2020), Judge Boasberg recently denied a defendant's motion to dismiss for a speedy trial violation, finding that his Sixth Amendment right had not been infringed notwithstanding the fact that the defendant had at that point been detained pending trial for 28 months.

**CONCLUSION**

For the reasons described above, and any others that may be offered at a hearing on this matter, the government requests the Court grant its motion for a continuance of the above-captioned proceeding for at least thirty days in order to provide discovery in this case, and further to exclude the time within which a trial must commence under the STA on the basis that the ends of justice served by taking such actions outweigh the best interest of the public and the defendant in a speedy trial.

<div style="margin-left: 40%;">

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

</div>

| | | | |
|---|---|---|---|
| By: | _____/s/ *Emily A. Miller*_____ | By: | _____/s/ *Erik M. Kenerson*_____ |
| | EMILY A. MILLER | | ERIK M. KENERSON |
| | Capitol Breach Discovery Coordinator | | Assistant United States Attorney |
| | DC Bar No. 462077 | | OH Bar No. 82960 |
| | 555 Fourth Street, N.W., Room 5826 | | 555 Fourth Street, N.W., Room 11-909 |
| | Washington, DC 20530 | | Washington, DC 20530 |
| | Emily.Miller2@usdoj.gov | | Erik.Kenerson@usdoj.gov |
| | (202) 252-6988 | | (202) 252-7201 |