## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 21-24-1 (EGS) |
| ROBERT GIESWEIN, | |
| Defendant. | |

### MR. GIESWEIN'S MOTION TO REOPEN DETENTION HEARING

Robert Gieswein, through undersigned counsel, hereby respectfully requests that the Court reopen his detention hearing, and reconsider releasing him pursuant to the strict conditions previously proposed, and any other conditions that the Court requires. The grounds for these requests follow.

## I.   There are grounds to reconsider detention.

Section 3142(f)(2) of Title 18 provides that a court may reopen a detention hearing "at any time before trial if" the court "finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." As Judge Jackson recently observed, although this text explicitly permits a court to reopen a hearing upon finding new information, it does not state that this is the *only* circumstance under which a court may reopen a detention hearing. Transcript of Oct. 26, 2021 Bond Motion Hearing in *United States v. Sibick*,

21-cr-291-1-ABJ), at 3-10, 30 (ultimately finding that there was new information that indisputably gave the court authority to review detention).[1] Indeed, Judge Jackson observed that it did not "sit well" with the court that "a court would never have the authority to review the justification for someone to be locked up." *Id*. at 10.

The Court need not reach that issue to reopen this case, however, because there is new information of the type explicitly identified in Section 3142(f)(2). Specifically, recent widely-publicized reports raise new concerns about Mr. Gieswein's environment, and the combination of those reports and Mr. Gieswein's own letter to the Court establish that releasing him would promote public safety rather than hinder it.

First, inspections by the United States Marshals Service of the D.C. Jail between October 18 and 22 raised grave concerns about the physical safety of all inmates at both Central Detention Facility and Central Treatment Facility (where Mr. Gieswein is housed). The Court, as a recipient of Acting U.S. Marshal Ruffin's November 1 letter noting key findings from the inspection, is familiar with the findings.[2] It is true that the letter summarizing the findings of the inspection focused primarily on atrocious conditions at the CDF, and stated that "'[c]onditions at the

---

[1] Exhibit 1 is an excerpt of this transcript.

[2] Ex. 2 (November 1 Letter from Lamont J. Ruffin, Acting United States Marshal, to Quincy Booth, Director, District of Columbia – Department of Corrections). A U.S. Marshals Service press release about its inspections stated, "The U.S. Marshal's inspection of CTF did not identify conditions that would necessitate the transfer of inmates from that facility *at this time*." Ex. 3 (USMS Press Release) (emphasis added).

Central Treatment Facility (CTF) were observed to be largely appropriate and consistent with federal detention standards."[3] But the letter did not say that conditions at CTF were entirely consistent with federal standards, and the letter promised a more "formal summary" would be forthcoming, which is not yet publicly available. Further, the letter did not just provide examples of physical conditions that were unacceptable; it provided examples of a deeply damaged correctional culture.[4] The same Department of Corrections that runs CDF runs CTF, so it stands to reason that some of the same cultural problems at CDF may exist at CTF.

There are also other signs that detainees are not safe at CTF. For example, Judge Lamberth recently released a detainee out of concern that he was not getting appropriate medical treatment, and that he might be retaliated against.[5] The Marshals recently moved men around within the unit Mr. Gieswein is in due to findings of pervasive mold in the unit (though the mold presumably can still reach

---

[3] *Id.*

[4] *Id.*

[5] J. Fischer, E. Flack, S. Wilson, "Judge orders Proud Boy released from DC Jail over medical issues, fear of retaliation," WUSA9.com (Nov. 3, 2021), at https://www.wusa9.com/article/news/national/capitol-riots/judge-orders-proud-boy-christopher-worrell-released-from-dc-jail-over-medical-issues-fear-of-retaliation-lamberth-samsel-january6-capitol-riot/65-5505fcea-60d9-4bb0-8bac-15ba83e3283d (last visited 11/17/21). ("On Wednesday, however, Lamberth said as a result of the [Marshals'] inspection he had "zero confidence" D.C. corrections officials would ensure Worrell, who has non-Hodgkin's lymphoma, would get the medical care he needs. Lamberth also said he was worried guards at the facility would 'retaliate' against Worrell, whose case helped prompt the inspection.").

them through vents in the unit). And an officer in the jail recently used so much of a spray to subdue one detainee that many others in the unit became ill.

Second, there is new information about the atmosphere in CTF, and Mr. Gieswein, that the Court should take into consideration.

As reported in the press, experts provided with third-hand reports of the atmosphere in Mr. Gieswein's unit have voiced concern that the men there are vulnerable to radicalization due to the particular circumstances of their incarceration.[6] These commentators rely on the fact that most of those detained in connection with January 6-based charges are housed together at the CTF, along with press reports that some men in that pod have developed a name for their group ("the Patriot Wing," or the "J6ers"), share a newsletter, and engage in group activities that experts have characterized as ritualistic.[7]

Further, individuals outside of the unit, and outside of the jail, have also taken to viewing all residents in this unit as one. On the one hand, some prominent individuals in politics hold up everyone in the unit as "political prisoners," and credit

---

[6] T. Owen, "Capitol Rioters in Jail's 'Patriot Wing' Have Their Own Rituals and a Growing Fan Base," Vice.com (Oct. 21, 2021), at https://www.vice.com/en/article/akvwjp/january-6-rioters-jailed-together-forming-rituals-fanbase (last visited 11/17/21).

[7] *See id.*

those in the unit for "standing up to tyranny."[8] On the other hand, some powerful voices describe everyone charged in relation to January 6 as an "insurrectionist."[9]

This all raises a significant concern that Mr. Gieswein, a very young man who came to the District alone, is now trapped in a highly charged environment that could potentially exert undue influence on his thinking, and may eventually create pressure on him to conform, or to allow others' political narratives to drive his thinking and decision-making. It may be that the isolation and supposed echo-chamber that Mr. Gieswein is exposed to in the "J6 pod" will only deepen and harden in some of the detainees the very ideas underpinning the January 6 protests – ideas that this Court has determined to be dangerous when in action. Indeed, other men detained in the same unit have publicly reported feeling pressure to conform due to trends in the unit.[10]

In a letter addressed to the Court, Mr. Gieswein does not report feeling such pressure at this point, and he does not disparage the other detainees in his unit.[11]

---

[8] *See* Rep. Taylor Greene at https://twitter.com/mtgreenee/status/1456704043993243650 (Nov. 5, 2021) (tweeting about her recent visit to the CTF, observing, "[i]t was like they were prisoners of war," and suggesting situation reflects "authoritarianism" and "tyranny," and including video clip in which she described detainees as "political prisoners") (last visited 11/17/21).

[9] *See, e.g.,* C. Carrega and H. Rabinowitz, "Insurrectionists' Jail Complaints Lead to Overdue Reform within DC's Jail System," CNN (Nov. 14, 2021); Matt Stieb, "First Insurrectionist Sent to Prison for Capitol Riot," New York Magazine (July 17, 2021), at https://nymag.com/intelligencer/2021/07/insurrectionist-paul-hodgkins-sent-to-prison-for-1-6-riot.html (last visited 11/17/21).

[10] *See, e.g.,* Ex. 1 at 18-19.

[11] Ex. 4 (Letter from Mr. Gieswein).

But his letter does reflect a concern that his detention naturally limits his perspective.[12]

## II.   Taking the new information into account, the proposed release plan will reasonably assure the safety of the community.

The Court will recall that some of Mr. Gieswein's closest friends did not share his ardent support of President Trump leading up to January 6.[13] It comes as no surprise, then, that Mr. Gieswein values the ability to trade ideas with other people of different perspectives, as his letter to the Court reflects.[14] That is exceedingly difficult for him to accomplish at CTF. But it would be very easy to find in the home of his godparents – a law enforcement officer and risk management professional – who have agreed to act as third party custodians if Mr. Gieswein is released. He already knows that his godparents disagree with much of what took place at the Capitol on January 6, and that they will expose him to others of similar viewpoints.[15]

Mr. Gieswein is right that exposure to a breadth of perspectives is important for everyone – individually, and for the community. That is, putting aside whether commentators raising alarms about this CTF unit in the press are right, there can be little doubt that permitting Mr. Gieswein (or others like him) broad access to different

---

[12] *See id.*

[13] *See* Ex. 5 (Declarations of Mr. Gieswein's friends, filed previously at ECF Nos. 18-1 and 18-2).

[14] Ex. 4.

[15] *See id.*; Transcript of July 1, 2021 Hr'g at 12-13 (proffer by undersigned counsel that proposed third party custodian and husband condemned any assault on officers).

perspectives, delivered by trusted sources, will ultimately lead to a healthier and safer community.

The text of Section 3142(g) does not limit what factors a court must consider in determining whether release pretrial release is appropriate. And it is proper under the BRA for the Court to consider risks that detention presents to Mr. Gieswein and his fellow detainees, particularly those that could spill over into the community. Indeed, there is recent precedent for this, as courts around the country considering pretrial detention after March of 2020 weighed the risk that individual inmates would contract the coronavirus if they were detained pretrial as the pandemic raged.

In untold numbers of cases, courts found that "incarcerating [defendants] while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by" particular defendants' release under particular conditions. *See, e.g., United States v. Harris*, 2020 WL 1482342, at *1 (D.D.C. 2020) (releasing defendant to home confinement on strict conditions); *United States v. Davis*, 449 F. Supp.3d 532, 539 (D. Md., 2020) (finding that government's concern that defendant would return to dealing drugs and selling firearms unlawfully "can be addressed with release conditions," pursuant to which the Court found that defendant's "continued incarceration poses a greater risk to community safety" due to coronavirus "than his release"); *see also United States v. Jaffee*, Crim. No. 19-cr-88 (D.D.C. Mar. 26, 2020) (minute order concluding that release to home confinement on high intensity supervision was appropriate after considering "all of the factors specified in 18 U.S.C. 3142(g), and, in particular, the overall safety of the community"

because "the Court is now convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement."); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) (finding that Ramos's "continued detention poses a risk of danger to himself and others" due to coronavirus), *cited in* Davis, 449 F. Supp 3d at 539.

This Court, too, considered the risk that particular inmates would be infected with coronavirus if detained in weighing requests for release during the height of the pandemic. For instance, the Court found that the risk to a particular inmate actually rose to the level of an "exceptional circumstance" warranting release during the pendency of a motion pursuant to 18 U.S.C. § 2255. *See, e.g., United States v. Khan*, 11-276-01-EGS, ECF 300 (April 21, 2020) (granting emergency temporary release to defendant at CTF awaiting hearing on § 2255 motion seeking release from sentence not due to expire until 2028 due to coronavirus pandemic). And the court weighed the risk in pretrial release cases, and in weighing Section 3142 factors in the compassionate release context. *See, e.g. United States v. Terrell*, 19-cr-00372-EGS, ECF 60 (June 17, 2020) (granting emergency pretrial release to defendant in light of risk presented by coronavirus pandemic given his medical conditions); *see also, e.g., United States v. Boykin*, 2020 WL 6193838, at *5 (D.D.C., 2020) (granting compassionate release and noting, in weighing of section 3142 factors, that defendants many health conditions made "the pandemic very dangerous for him and heightens his need to practice proper social distancing," such that, in that particular

8

instance, defendant's "health concerns outweigh his criminal history," and concluding that, "[a]ccordingly, the Court finds that Mr. Boykin does not present a danger to his community"). In short, the Court took into consideration the fact that detention in itself put both defendants and the community at significant risk while the coronavirus raged. Sometimes, the Court determined that the risk that a particular defendant *could* become infected, and *could* become very ill, and that he *could* spread the disease, coupled with the fact that detention in itself *magnified these risks*, outweighed the other factors in section 3142.

The Court should take the same approach here. Specifically, undersigned counsel requests that the Court consider the evidence that Mr. Gieswein could become ill from exposure to mold or the other unacceptable conditions in the CTF, that he is definitely harmed by having such limited ability to engage with trusted people with a broad set of viewpoints, and that promoting more communication across perspectives will improve public safety.

When weighing the factors in 3142 in this case previously, the Court noted that Mr. Gieswein's "history and characteristics reflect an ability to abide by the law." ECF No. 29 at 47. In the same vein, the Court found that "Mr. Gieswein's age, lack of criminal history, family and community ties, and history of steady employment overall weigh in favor of his pretrial release." *Id.* Ultimately, the Court determined that Mr. Gieswein's alleged conduct on January 6 simply outweighed all of that. *Id.* at 48-53.

But the new information now before the Court is a factor that should tip the balance back toward release, as it highlights the danger that incarceration itself can present in this case, just as the pandemic did in many cases.[16]

The details of Mr. Gieswein's release plan take on greater weight when considered against this risk, and should tip the scale even further toward release. The Court will recall that although Mr. Gieswein is from Colorado, he asked to be released to the custody of his godmother, a risk management officer, and his godfather, a police officer, who live on a large property in Oklahoma.[17] As Mr. Gieswein notes, he believes his godfather's viewpoint, in particular, would provide valuable perspective

---

[16] Moving Mr. Gieswein to another jail is not a solution. Not only would moving him to another jail bring him no closer to trusted sources with different perspectives, but it would also make it impossible for him to prepare for trial. As the Court is aware, he is scheduled to go to trial on February 16, 2022. The government has produced unprecedented amounts of discovery, most of it only recently; it has also projected that more is coming. ECF No. 54. Mr. Gieswein is entitled to review it, to discuss it with counsel to participate in the preparation of his defense. At best, it will be an enormous challenge to accomplish this given CTF's discovery review protocols and the trial date. But, despite its faults and limitations, CTF allows for far *greater* attorney-client contact, and far *greater* ability for detainees to review discovery, than the Alexandria Detention Center or Northern Neck Regional Jail presently do. And undersigned counsel is not aware of any way to accomplish the task with detainees in Bureau of Prison facilities. Mr. Gieswein should be released from CTF, but not at the expense of his ability to adequately prepare for trial.

It would also not help to order Mr. Gieswein to another unit at the jail. Jail staff long ago determined that the January 6 detainees would likely be at risk in other units. Indeed, a long-serving CO recently informed undersigned counsel that, given his long experience at the jail, he agreed that January 6 detainees would not fare well in other units.

[17] *See* ECF No. 18 at 1 (describing proposed conditions); Transcript of July 1, 2021 Hr'g at 18-19 (same).

to him.[18] Mr. Gieswein also proposed to be limited by extensive conditions, and is open to any other condition the Court would propose.[19]

Finally, Mr. Gieswein's letter to the Court should tip the balance completely toward release. His words reinforce the evidence that any violations of law that the government ultimately proves in this case represent, at worst, an aberration. His letter reflects that Mr. Gieswein's is a devoted son and brother, and an intellectually curious young man who wisely recognizes the danger of saturation with only one perspective. Finally, as he himself says, he "will never put [himself] into a situation like" January 6 again, and he personally promises to abide by whatever conditions the Court imposes.[20] Under all of these circumstances, the Court can be confident that it is not necessary to detain Mr. Gieswein pretrial to ensure the safety of the community.

---

[18] Ex. 4 (Letter from Mr. Gieswein).

[19] *See* ECF No. 18 at 1 (describing proposed conditions); Transcript of July 1, 2021 Hr'g at 18-19 (same). A home detention condition would prevent Mr. Gieswein from traveling except for work and related necessities: he could not go to any rally or political event. He also could not sneak to one, given the location monitoring proposed. He proposed to stay off of social media, where such events are typically planned, to minimize the risk that he would even know about events similar to January 6, much less plan to attend them (notwithstanding the lack of evidence that he engaged in any planning with others before January 6). He proposed to let a probation officer monitor his use of any computer, which would provide the officer an opportunity to search for any communications that raised concerns. Finally, though there was no evidence that he lived among negative influences in his hometown in Colorado, he also proposed to live far away from the environment in which he happened to have formed his views.

[20] Ex. 4.

## CONCLUSION

For all of these reasons, those previously given in support of release, and such others as may be advanced at a hearing on this matter, Mr. Gieswein respectfully requests that the Court reopen the detention hearing. Further, he respectfully requests that the Court release him to a third party custodian, pursuant to the conditions proposed and such others as the Court may find appropriate.

Respectfully submitted on November 17, 2021.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____
Ann Mason Rigby
DC Bar No. 491902
Elizabeth A. Mullin
DC Bar No. 484020

Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
ann_rigby@fd.org
elizabeth_mullin@fd.org

**Exhibit 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA            CR No. 1:21-cr-00291-ABJ-1

                                    Washington, D.C.
v.                                  Tuesday, October 26, 2021
                                    9:30 a.m.

THOMAS F. SIBICK,

              Defendant.
- - - - - - - - - - - - - - - - x
_____

     TRANSCRIPT OF BOND MOTION HEARING AND STATUS CONFERENCE
         HELD BEFORE THE HONORABLE AMY BERMAN JACKSON
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:     Cara A. Gardner, Esq.
                           Tara Ravindra, Esq.
                           DOJ-USAO
                           555 4th Street, NW
                           Washington, DC 20001
                           (202) 252-7009


For the Defendant:         Stephen F. Brennwald, Esq.
                           BRENNWALD & ROBERTSON, LLP
                           922 Pennsylvania Avenue, SE
                           Washington, DC 20003
                           (301) 928-7727


Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1            **P R O C E E D I N G S**

2            THE DEPUTY CLERK:  Good morning, Your Honor.

3            This morning, we have Criminal Case No. 21-291-1,

4    the United States of America v. Thomas F. Sibick.

5            Appearing telephonically is our Pretrial Services

6    Agency officer.

7            Would you please identify yourself for the record.

8            THE PROBATION OFFICER:  Good morning, Your Honor.

9    Christine Schuck, Pretrial Services.

10           THE COURT:  Good morning.

11           THE DEPUTY CLERK:  Will counsel for the Government

12   please identify herself and her colleague for the record.

13           MS. GARDNER:  Good morning, Your Honor.  Cara

14   Gardner and Tara Ravindra on behalf of the United States.

15           THE COURT:  Good morning.

16           THE DEPUTY CLERK:  Defense counsel?

17           MR. BRENNWALD:  Good morning, Your Honor.  Stephen

18   Brennwald for Mr. Sibick.

19           THE COURT:  And Mr. Sibick is present.

20           THE DEFENDANT:  Yes, ma'am.

21           THE COURT:  All right.  Good morning, everybody.

22           Mr. Haley, can I just ask you a question.

23           THE DEPUTY CLERK:  Absolutely.

24           (Brief pause.)

25           THE COURT:  Okay.  We're here on a motion asking

1    me to reopen the detention order and the detention hearing

2    in this case.  It's Docket 83.  It was supported by a series

3    of letters, information received from the guards at the

4    Department of Corrections.  A number of these letters were

5    similar to the ones I received in connection with the last

6    motion.  So I'm not going to summarize them all for the

7    record, but I want to assure the defendant and defense

8    counsel and the Government that I read every single one of

9    them, and they're at Docket 84.  The Government filed an

10   opposition at Docket 87, and there was a reply filed under

11   seal at Docket 88.  I don't intend to go into the details or

12   the substance of it, but I may refer to it just in general

13   terms, and I hope that's appropriate.

14          The predicate question that we need to take up is

15   the legal basis for the defendant's motion.  I noted at the

16   last hearing that 18 U.S. Code Section 3142(f) provides that

17   a bond hearing may be reopened, before or after a

18   determination by the judicial officer, at any time before

19   trial if the judicial officer finds that information exists

20   that was not known to the movant at the time of the hearing

21   and that has a material bearing on the issue of whether

22   there are conditions of release that will reasonably assure

23   the appearance of such person as required and the safety of

24   any other person and the community.

25          The D.C. Circuit has held that under that section,

1      Section 3142(f)(2), a court was authorized to open the

2      detention hearing when previously non-existent, material

3      information was brought to light.  That's United States v.

4      Peralta, 849 F.2d 625 at 622 [sic] from the D.C. Circuit in

5      1988.  In that case, the new information was the court's

6      suppression ruling against the defendant, which increased

7      the likelihood of his conviction and that he would flee if

8      not detained and, therefore, someone who was not previously

9      detained was.

10             In United States v. Lee, 451 F. Supp. 3d at -- 1

11     at Page 5 from this District in 2020, a District Court judge

12     quoted the rule and went on to say that, New and material

13     information consists of something other than a defendant's

14     own evaluation of his character or the strength of the case

15     against him; instead, it must consist of truly changed

16     circumstances, something unexpected, or a significant event.

17     And the court got that language from a case out of the

18     Southern District of New York, United States v. Esposito,

19     354 F. Supp. 3d 354, 359, though I don't think the statute

20     has the word "unexpected" in it.

21             The court went on to say, Moreover, and

22     significantly for present purposes, previously unavailable

23     information that has no material bearing on the factors that

24     must be considered to establish the propriety of pretrial

25     detention aren't important unless that new information casts

1    a different light on any of those factors.  And it points

2    out that Black's Law Dictionary defines "material" as having

3    some logical connection with the consequential facts or of

4    such a nature that knowledge of the item would affect a

5    person's decision-making; significant; essential.  And in

6    that case, this was one of the first bond review hearings

7    based on coronavirus and the court found that it was worthy

8    of consideration.

9            The Government has provided a few opinions from

10   other Districts in United States v. Dillon, 938 F.2d 1412,

11   out of the First Circuit; and the Fifth Circuit case, United

12   States v. Hare, 873 F.2d 796, found that letters from

13   supporters in the community weren't really previously

14   non-existent.  And the Government also points to United

15   States v. Martin, 2015 WL 1738362 from the Northern District

16   of California in 2005 [sic], which rejected the notion that

17   the fact that the defendant had completed a course while he

18   was detained would qualify as new evidence that had a

19   material bearing on the decision.  That court said,

20   Defendant's interpretation misunderstands the purpose of the

21   statute, which is to allow parties to present unknown

22   information that increases the chances the defendant appears

23   for their criminal hearing, or decreases the danger the

24   defendant poses to an individual or the community as a

25   whole.  Allowing defendant to reopen detention hearings to

1   present evidence regarding classes he took while in custody

2   doesn't serve this purpose.  Moreover, the court was

3   concerned that anybody could just take a course and then

4   file a motion and said that would lead to judicially

5   inefficient practices and is, therefore, erroneous.

6           I don't think there's any dispute that I may

7   reopen the hearing upon the showing described in subsection

8   (f).  While I was unpersuaded by the arguments about the

9   video at the last hearing that it changed anything, it was

10  because I felt that some of the other information that was

11  being presented to me in connection with the defendant and

12  the last motion called into question the notion that there

13  were no conditions that would protect the community, I

14  invited the parties to address the issue in writing again.

15          What I was not sure about, and what I asked you to

16  brief was, is the converse of Peralta true?  Yes, you can

17  reopen if there's new information.  But am I prohibited from

18  doing so otherwise, particularly if we're talking about

19  releasing a person from detention as opposed to detaining

20  someone who wasn't detained before, as in Peralta?  In other

21  words, does the Court lack the inherent power to review or

22  modify a detention determination in its discretion?  And I'm

23  not sure that either side pointed me to law on that

24  question.  I did find a case from another court in this

25  District that cited a 10th Circuit opinion, United States v.

1    Worrell, W-O-R-R-E-L-L, at 2021 WL 2366934 from June of

2    2021.   The court felt that the defendant's health condition

3    didn't have material bearing on the detention order, and he

4    quoted a case from the 10th Circuit, United States v.

5    Cisneros, 328 F.3d 610 at 614, that said, Reconsideration is

6    permissible under this section only when there is new

7    information that would materially influence the judgment

8    about whether there are conditions of release which will

9    reasonably assure that the defendant will not flee and will

10   not harm any other person or the community.

11        So before we get to whether the information

12   presented constitutes new information and how it bears on

13   the prediction that I'm supposed to make at this point about

14   the defendant, I do want to hear argument on the question

15   about whether I have to make the finding under Section

16   3142(f) to go forward or whether I can review a detention

17   order at any time, given my supervisory powers over this

18   case.

19        So Mr. Brennwald, do you want to address that.

20        MR. BRENNWALD:   Thank you, Your Honor.

21        Two things.   Number one, we would argue that the

22   Court has inherent power as the judicial officer assigned to

23   the case to review material that has come in.   As I argued

24   in my reply, he didn't have a chance to get this letter from

25   Major Moquet before the hearing before Chief Judge Howell on

```
1    March 16.  So we do consider that new evidence.  The other

2    thing that's significant and that I don't know if it's had

3    the impact on the Court that it had on me is the new

4    information -- it -- there's -- I don't think there can be

5    any question that it's new that Mr. Sibick's diagnosis is

6    completely different.

7              THE COURT:  All right.  Mr. Brennwald, I'm not

8    saying I disagree with you about any of that, and I --

9              MR. BRENNWALD:  Okay.

10             THE COURT:  -- am going to hear with you -- from

11   you --

12             MR. BRENNWALD:  Okay.

13             THE COURT:  -- on that.

14             MR. BRENNWALD:  Okay.

15             THE COURT:  I'm just trying to find out right

16   now --

17             MR. BRENNWALD:  Right.  I mean, I --

18             THE COURT:  -- do I have to hang my hat on Section

19   3142(f) or do I have broader authority?  I'm not saying I

20   don't think I can.  I just really want to know, because it

21   was surprising to me how little authority there is out

22   there --

23             MR. BRENNWALD:  Right.

24             THE COURT:  -- and the statute doesn't say "only

25   if."
```

```
 1                  MR. BRENNWALD:  Right.

 2                  THE COURT:  It just says "if."

 3                  MR. BRENNWALD:  Right.

 4                  THE COURT:  So I want to know what your reading of

 5        the law is about just the legal standard that governs us

 6        this morning, and then I will give you ample opportunity to

 7        argue what the facts show this morning.

 8                  MR. BRENNWALD:  Okay.  Thank you.

 9                  I don't have any cases.  The Court cited the cases

10        that it looked at, Cisneros and Worrell, but I think the

11        fact that the language is not "only if" but "if" would imply

12        that the Court has some discretion.  I wish I had something

13        more substantive --

14                  THE COURT:  Okay.

15                  MR. BRENNWALD:  -- to provide to you, but I think

16        that Congress knows how to make things clear when they want

17        to make them clear, you know?  You have languages that say

18        "may" or "must," things like that.  So I would argue to the

19        Court that the Court does have the authority to do that, but

20        I wish I had something --

21                  THE COURT:  All right.

22                  MR. BRENNWALD:  -- substantive.  I did spend time

23        looking for it and, like the Court said, there's --

24                  THE COURT:  It's really not there, I don't think.

25                  MR. BRENNWALD:  Right.  So this might be a case of
```

1    first impression.

2                THE COURT:  Okay.  All right.  Thank you.

3                Does the Government want to address that issue?

4                And, Ms. Ravindra, Mr. Haley informed me that you

5    have a conflict this morning.  If you have to leave, just

6    go.  Don't worry about it.

7                MS. RAVINDRA:  Thank you, Your Honor.

8                THE COURT:  All right.

9                MS. GARDNER:  So Your Honor, the Government's

10   position is that, under the plain language of the statute,

11   Your Honor does need to make a finding under 3142(f)(2).  We

12   hadn't briefed Peralta and Worrell, so I can't necessarily

13   speak to those, but the Government's position is that Your

14   Honor is limited to the plain language of the statute.

15               THE COURT:  All right.  It seems odd to me that a

16   court would never have the authority to review the

17   justification for someone to be locked up.  It just doesn't

18   sit well with me.  I understand your position, and the

19   statute says what it says and the cases have been generally

20   accepting that assumption, though it seems to me that there

21   -- I know, certainly, during the pandemic, I got bond review

22   motion after bond review motion after bond review motion and

23   I'm not sure every one put it under 3142(f).

24               But the next question is, if you assume that the

25   test does apply and we have to satisfy that showing to

1    Warren fan, but his mindset's changed to the point where he

2    had to get out of that unit that he was in.  I don't know if

3    the Court saw this, and I was trying to link an article that

4    I read two weeks ago and I couldn't find it, but there was

5    an article that was written.  I think it was written by

6    Spencer Hsu of the Washington Post -- I'm not sure -- H-S-U

7    -- who described what I've known for months, is that that

8    unit at CTF is radicalizing the people who are there.  And

9    I'm not trying to be overly dramatic, but literally there

10   are people there on their tablets looking at podcasts by the

11   folks one would suspect one would follow if you have that

12   mentality.  And the fact -- I think the Court may have --

13   may know this, but every night at 9:00 o'clock, the Court --

14   the folks there stand up and sing the Star-Spangled Banner.

15   I don't know if the Court's heard that before, but that's

16   what happens --

17             THE COURT:  I heard it in the news.  I hadn't

18   heard it from anybody with personal knowledge.

19             MR. BRENNWALD:  I -- you can -- I have personal

20   knowledge.  I was on the phone with Mr. Sibick a month ago

21   and we talked and, literally in the middle -- a minute -- in

22   the middle of our talk, he said to me, I have to put the

23   phone down.  I'll be right back.  They'll be angry if I

24   don't go over there.  Literally.  It's, like, this herd

25   mentality.  So he put the phone down, and I can hear them

1    all singing and they're shouting, most of them off key, but

2    they're literally singing the song.  It was almost cult-like

3    or, maybe, it was cult-like.  It was pretty scary, frankly.

4    And then he came back and then we got back to our discussion

5    and, you know, he was -- he's trying to get along.  He's

6    going along to get along.  His biggest fear is, If I don't

7    get out, how -- what do I do?  Because he's in the hole.  He

8    doesn't want to go back up there.  He shouldn't have to be

9    in the hole because he's trying to avoid a radical unit.

10          But my point is -- as far as this Court's analysis

11   is, he's not the same person who was there on January 6th

12   deluded by claims of stolen elections and doing whatever,

13   you know, angry, shouting, and in a manic phase.  I mean,

14   he's just not that person anymore.  And so the question is,

15   does that make him less dangerous?  And I get that it's not

16   something that we can analyze scientifically.  Mental health

17   -- I mean, mental health is not just some vapor and smoke

18   floating in the air.  It is actually a chemical process, but

19   it's not like a broken bone where you can look at an MRI and

20   see it.  So people have a hard time accepting medication's

21   changes on a person's mind, but he's definitely a different

22   person, and that to me tells me -- that combined with the

23   political distancing he's trying to achieve by getting out

24   of there -- literally getting out of there -- I mean,

25   getting out --

1    trying to just live his life and do the best he can.

2              THE COURT:   Okay.  Thank you, Mr. Brennwald.

3              The Court of Appeals upheld the trial court's

4    original application of the 3142 factors, and I think

5    everyone needs to understand that I'm not ruling that either

6    the Chief Judge or the Court of Appeals erred in any way.

7    His detention to date was not, as has been asserted

8    publicly, a disgrace to our country.  The alleged attack on

9    Officer Fanone, who was performing his sworn duty as a law

10   enforcement officer guarding the citadel of our democracy,

11   was.  But I find that the record before me now includes

12   information that was not known to the movant at the time of

13   the hearing and that does have a material bearing on the

14   issue that I have to decide and that every judge has to

15   think about every day which is whether there are conditions

16   of release that will reasonably assure the appearance of the

17   person as required and the safety of any other person and

18   the community.  So I'm going to grant the motion.  There

19   will be conditions.

20             Not everything the defense has presented is

21   entirely new.  One fact is that he turned himself in the

22   second time after Judge Howell's order.  She obviously

23   didn't know that at the time she issued her order, but that

24   is the minimal expectation.  And while I do understand from

25   defense counsel that the letters from the community could

**Exhibit 2**



**U.S. Department of Justice**

United States Marshals Service

*District of Columbia*

*Washington, D.C. 20001*

November 1, 2021

MEMORANDUM TO:    Quincy Booth
                         Director
                         District of Columbia – Department of Corrections (D/DOC)

        FROM:      Lamont J. Ruffin
                         Acting United States Marshal
                         District of Columbia (D/DC)

SUBJECT:               D/DC USMS Prisoners Detained by District of Columbia -
                         Department of Corrections

      On October 18, 2021, I directed Deputy United States Marshals (DUSMs) under my command to conduct an unannounced inspection and review of all District of Columbia Department of Corrections (D.C. DOC) facilities housing prisoners remanded to United States Marshals Service custody. I further directed that the inspection team individually review the conditions of confinement for all D/DC USMS prisoners, review jail administrative processes and review the consistency and appropriateness of detention practices at the facility.

      From October 18 – October 22, 2021, an eight deputy D/DC USMS Inspection team inspected the facility, interviewed more than 300 federal detained persons, and spoke with many DOC staff. On October 22, 2021, I visited the facility myself to verify the preliminary information that I had received by my inspection team. Based on the USMS inspection, I believe that there is evidence of systemic failures, in particular at the Central Detention Facility (CDF), that may warrant further examination by the Department of Justice Civil Rights Division.

      While we are preparing a formal summary of the inspection to share with you, some of the specific findings at the CDF were as follows:

- Water and food appeared to be withheld from detainees for punitive reasons

- Inspectors observed large amounts of standing human sewage (urine and feces) in the toilets of multiple occupied cells. The smell of urine and feces was overpowering in many locations.
- The water in many of the cells within South 1 and North 1 had been shut off for days, inhibiting detainees from drinking water, washing hands, or flushing toilets.
- DOC staff confirmed to inspectors that water to cells is routinely shut off for punitive reasons.
- Food delivery and storage is inconsistent with industry standards. Hot meals were observed served cold and congealed.
- Jail entrance screening procedures were inconsistent and sloppy.
- Evidence of drug use was pervasive, and marijuana smoke and odor were widespread, and the facility had a strong smoke and odor of marijuana.
- Detainees had observable injuries with no corresponding medical or incident reports available to inspectors.
- DOC staff were observed antagonizing detainees.
- DOC staff were observed not following COVID-19 mitigation protocols.
- Several DOC staff were observed directing detainees to not cooperate with USMS inspectors. One DOC staffer was observed telling a detainee to "stop snitching".
- Supervisors appeared unaware or uninterested in any of these issues.

Accordingly, I am informing you that I have forwarded the results of my inspection of the DC DOC to the Department of Justice Civil Rights Division for review of potential violations of the Civil Rights of Institutionalized Persons Act at the DC DOC, specifically at the Central Detention Facility (CDF). Conditions at the Central Treatment Facility (CTF) were observed to be largely appropriate and consistent with federal prisoner detention standards.


cc:     Beryl A. Howell, Chief Judge D.C U.S. District Court
        Emmet Sullivan, U.S. District Judge D.C. District Court
        Anthony Dixon, United States Marshal – D.C. Superior Court
        Johnnie Hughes, United States Marshal – District of Maryland
        Channing Phillips, (A) United States Attorney, District of Columbia
        A.J. Kramer, DC Federal Public Defender
        Laura Cowall, Deputy Chief DOJ Civil Rights Division

Exhibit 3

# U.S. Marshals Service

Justice. Integrity. Service.                    U.S. Department of Justice



**For Immediate Release**
November 02, 2021

**Contact:**
U.S. Marshals Office of Public Affairs (703) 740-1699

### Statement by the U.S. Marshals Service
### Re: Recent Inspection of DC Jail Facilities

**Washington, D.C.** – During the week of October 18, the U.S. Marshal for the District of Columbia conducted an unannounced inspection of the District of Columbia Department of Corrections (DC DOC) facilities that house several hundred detainees who are facing charges in the U.S. District Courts for the District of Columbia and Maryland or are awaiting placement in a Federal Bureau of Prisons (BOP) facility to serve their sentence. While the U.S. Marshals Service (USMS) is responsible for the care and custody of these detainees, under an agreement between the federal and DC governments, the DC DOC is responsible for determining where within their corrections facilities the inmates will be housed; maintaining and staffing the physical facilities; and providing for detainees.

The USMS inspection was prompted by recent and historical concerns raised regarding conditions at the DC DOC facilities, including those recently raised by various members of the judiciary.

The inspection encompassed two DC DOC housing facilities - the Central Treatment Facility (CTF) and the Central Detention Facility (CDF). During the unannounced inspection, the U.S. Marshal reviewed both housing facilities and conducted more than 300 voluntary interviews with detainees.

The U.S. Marshal's inspection of CTF did not identify conditions that would necessitate the transfer of inmates from that facility at this time. CTF houses approximately 120 detainees in the custody of the USMS, including all the defendants in pre-trial custody related to alleged offenses stemming from events that took place on January 6 at the U.S. Capitol, as well as other federal detainees. Housing assignments for detainees are determined by the DC DOC.

The U.S. Marshal's inspection of CDF revealed that conditions there do not meet the minimum standards of confinement as prescribed by the Federal Performance-Based Detention Standards. CDF houses approximately 400 detainees in the custody of the USMS.

Based on the results of the unannounced inspection, USMS leadership made the decision to remove from CDF all detainees under the custody of the USMS. Working with the BOP, the USMS will transfer those detainees to USP Lewisburg in Pennsylvania. The Lewisburg BOP facility provides attorney and visitor areas, medical care, and video teleconferencing capabilities. The USMS is committed to ensuring that detainees have adequate access to defense counsel, family support, medical care, and discovery related to their cases while in USMS custody.

The USMS has informed DC DOC of its findings, and the USMS Prisoner Operations Division will work with DC DOC to initiate a corrective action plan.

Additional information about the U.S. Marshals Service can be found at http://www.usmarshals.gov.

#### ####

America's First Federal Law Enforcement Agency

**Exhibit 4**

Dear Judge Sullivan,

I am seeking release pretrial. I'm almost a year into my detainment. My alleged participation in January 6 does not reflect my character. I am a pro-law enforcement, caring and productive person. I would benefit from living with my Godparents as my third party custodians. Kent Cochran, my Godfather has been a law enforcement officer for over two decades. I know I'd benefit from talking to him and others about January 6 to understand people's reaction to it. Kent Cochran will not and does not condone any unlawful activity. Both Kent and Jessica (Godmother) have suggested that I work on their property to pay for my finances and help them with chores. If the court would allow it I would also benefit from having a second job to help support my mother who was widowed in 2018, and my little sister, who became very ill back in March with an autoamnne disorder. Because of my sister's sickness, my mom cannot work, so I could send extra money I made to them. If I was released, I could take care of my two wonderful puppies, Aspen and Timny. I'm not going to make any excuses or justify the tragic events that happened on January 6. Nor talk about my alleged involvment in those events, as my lawyer has asked. The fact is that January 6 was one crazy day with many elements, and I will never put myself into a situation like that again.

I have read the vice article. I am not an expert in anything,

but I do know it's not healthy to spend every day in here like Groundhog's Day, with people with the same viewpoint, in the same situation, especially because we are all portrayed by much of the media as one type of person. It is natural in this environment for the conversation always to turn to January 6, and for us to look to each other for strength.

I do sing the national anthem every night, and I don't think there's anything wrong with that. I do love this country, and I always will, and this helps me remember that. And I am saying nothing against the other men in here. Still, most of us do share a lot of the same veiws, and it's easy to get stuck in your bubble in this environment. That happens out of jail too. But, here, I have no choice in the matter. Outside, I could choose to seek out other perspectives. And not just from news. I try to watch many news sites for perspective, everything from the Warroom to CNN. But it seems like they try to rile everybody up to make money. What I am missing in here is time away from a bubble, and a real chance to talk to real people I trust who may have different perspectives on January 6.

If I'm released, I promise that I will use the time productively, and follow all conditions. Thank you for hearing me out.

Sincerely, Robert Gieswein

**Exhibit 5**

## DECLARATION OF  BENJAMIN DONALD ROCKEL

I, Benjamin Donald Rockel, I am 23 and fully competent to make the following declaration:

1.     I have known Bobby Gieswein since I was a junior in high-school, and we have been close friends since 2018.

2.     Bobby and I wanted a nickname to describe our group of friends who shared interests in camping, shooting, disaster preparedness, and outdoor survival.

3.     At first, we chose the name "Rocky Mountain Oathkeepers," and registered a website URL, rockymountainoathkeeprs.com. I was contacted by a man who said he was a leader in a state Oathkeeper organization, who told us that the word "Oathkeeper" is trademarked, and we needed to either become an Oathkeeper chapter, or change the name. We researched the group because we had not known much about them before. We decided we did not want to join, and chose to change the name. I believe that we were not able to change the name of our group on the registration, but we were able to change the website name. That is when we started calling ourselves the Woodland Wild Dogs.

4.     Nobody was required to go through any initiation, pay any dues, or attend particular events or meetings, follow any rules, or share any ideology to join in Woodland Wild Dog outings. There was no formal hierarchy in our group.

5.     The Woodland Wild Dog included people who were not ardent supporters of former President Trump, including myself. I voted for him, but reluctantly. I believe that other members of the group did not vote for him.

6. The Woodland Wild Dogs were not an anti-government group.

7. The most people that I have ever been with on a Woodland Wild Dog outing with is five or six people.

8. I went camping with some of this group in late 2020, but the last time we got more than four people together for a campout was probably in 2019, or very early 2020.

9. Bobby never told me he was an Oathkeeper, and I never had reason to think he was.

10. Bobby never told me he was a Proud Boy, and I never had reason to think that he was.

11. Bobby and I hung out with some members of a local "Three Percenter" group, but we stopped after a while. The last time we hung out with them was approximately 2018.

12. Bobby never told me he was part of any other group, and I had no reason to think that he was.

13. Bobby told me he was going to Washington, DC for the rally that Trump supporters planned for January 6.

14. Although he invited me to join him, Bobby never tried to recruit me in any plan to get into the Capitol, prevent the counting of electoral votes, or prevent Joe Biden from taking office as President.

15.    Bobby never suggested that he had any plan to get into the Capitol, prevent the counting of electoral votes, or prevent Joe Biden from taking office as President.

16.    I have never seen Bobby threaten violence, let alone actually commit violence against another person.

17.    Bobby frequently wore his plate carrier on camping outings, and even around town.

18.    Bobby wanted to a be a police officer, and also told me that he had spoken with an Army recruiter about joining the Army.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 8, 2021

_____
by:  Benjamin D. Rockel

# DECLARATION OF HENRY WILLIAM FELLHAUER

I, Henry William Fellhauer, am 23, and fully competent to make the following declaration:

1. I have known Bobby Gieswein since approximately 2018.

2. I participated in some Woodland Wild Dogs outings.

3. I considered the Woodland Wild Dogs to be a group of friends with shared interests in camping, shooting, and outdoor survival. I considered the idea of naming us as a bit silly.

4. The most people that I have ever been with on a Woodland Wild Dogs outing is five people. They were all my close friends.

5. I was never required to go through any initiation, pay any dues, attend particular events or meetings, follow any rules, or share any ideology to join in Woodland Wild Dog outings. There was no formal hierarchy in the group.

6. There were people in the group who were not ardent supporters of former President Trump, and who did not even cast their votes for him, including myself.

7. The group was not anti-government.

8. The last time I went camping with this group was probably at the end of 2019.

9. Bobby never told me he was an Oathkeeper and I never had any reason to think he was.

10.     Bobby never told me he was a Proud Boy and I never had any reason to think he was.

11.     Bobby also never told me he was part of any other group, and I had no reason to think that he was.

12.     I know that Bobby hung out at least one person who identified as a "Three Percenter" for a while when we first met, but I have not seen Bobby with this person for years, and Bobby and I never discussed the group.

13.     Bobby told me he was going to Washington, DC for the rally planned in support of former President Trump. Bobby did not ask me to join him.

14.     Bobby never suggested that he had any plan to get into the Capitol, prevent the counting of electoral votes,  or prevent Joe Biden from taking office as President.

15.     I have never seen Bobby threaten violence, let alone actually commit violence against another person.

16.     Bobby frequently wore his plate carrier on camping outings, and even around town.

17.     Bobby talked to me about wanting to a be a police officer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 8, 2021

by:  Henry William Fellhauer