## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 21-24-1 (EGS) |
| ROBERT GIESWEIN, | |
| Defendant. | |

## MR. GIESWEIN'S MOTION TO REOPEN DETENTION HEARING

Robert Gieswein, through undersigned counsel, hereby respectfully requests that the Court reopen his detention hearing, and reconsider releasing him pursuant to the strict conditions previously proposed, and any other conditions that the Court requires. The grounds for these requests follow.

### I.     There are grounds to reconsider detention.

Section 3142(f)(2) of Title 18 provides that a court may reopen a detention hearing "at any time before trial if" the court "finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." As Judge Jackson recently observed, although this text explicitly permits a court to reopen a hearing upon finding new information, it does not state that this is the *only* circumstance under which a court may reopen a detention hearing. Transcript of Oct. 26, 2021 Bond Motion Hearing in *United States v. Sibick*,

21-cr-291-1-ABJ), at 3-10, 30 (ultimately finding that there was new information that indisputably gave the court authority to review detention).[1] Indeed, Judge Jackson observed that it did not "sit well" with the court that "a court would never have the authority to review the justification for someone to be locked up." *Id*. at 10.

The Court need not reach that issue to reopen this case, however, because there is new information of the type explicitly identified in Section 3142(f)(2). Specifically, recent widely-publicized reports raise new concerns about Mr. Gieswein's environment, and the combination of those reports and Mr. Gieswein's own letter to the Court establish that releasing him would promote public safety rather than hinder it.

First, inspections by the United States Marshals Service of the D.C. Jail between October 18 and 22 raised grave concerns about the physical safety of all inmates at both Central Detention Facility and Central Treatment Facility (where Mr. Gieswein is housed). The Court, as a recipient of Acting U.S. Marshal Ruffin's November 1 letter noting key findings from the inspection, is familiar with the findings.[2] It is true that the letter summarizing the findings of the inspection focused primarily on atrocious conditions at the CDF, and stated that "'[c]onditions at the

---

[1] Exhibit 1 is an excerpt of this transcript.

[2] Ex. 2 (November 1 Letter from Lamont J. Ruffin, Acting United States Marshal, to Quincy Booth, Director, District of Columbia – Department of Corrections). A U.S. Marshals Service press release about its inspections stated, "The U.S. Marshal's inspection of CTF did not identify conditions that would necessitate the transfer of inmates from that facility *at this time*." Ex. 3 (USMS Press Release) (emphasis added).

Central Treatment Facility (CTF) were observed to be largely appropriate and consistent with federal detention standards."[3] But the letter did not say that conditions at CTF were entirely consistent with federal standards, and the letter promised a more "formal summary" would be forthcoming, which is not yet publicly available. Further, the letter did not just provide examples of physical conditions that were unacceptable; it provided examples of a deeply damaged correctional culture.[4] The same Department of Corrections that runs CDF runs CTF, so it stands to reason that some of the same cultural problems at CDF may exist at CTF.

There are also other signs that detainees are not safe at CTF. For example, Judge Lamberth recently released a detainee out of concern that he was not getting appropriate medical treatment, and that he might be retaliated against.[5] The Marshals recently moved men around within the unit Mr. Gieswein is in due to findings of pervasive mold in the unit (though the mold presumably can still reach

---

[3] *Id.*

[4] *Id.*

[5] J. Fischer, E. Flack, S. Wilson, "Judge orders Proud Boy released from DC Jail over medical issues, fear of retaliation," WUSA9.com (Nov. 3, 2021), at https://www.wusa9.com/article/news/national/capitol-riots/judge-orders-proud-boy-christopher-worrell-released-from-dc-jail-over-medical-issues-fear-of-retaliation-lamberth-samsel-january6-capitol-riot/65-5505fcea-60d9-4bb0-8bac-15ba83e3283d (last visited 11/17/21). ("On Wednesday, however, Lamberth said as a result of the [Marshals'] inspection he had "zero confidence" D.C. corrections officials would ensure Worrell, who has non-Hodgkin's lymphoma, would get the medical care he needs. Lamberth also said he was worried guards at the facility would 'retaliate' against Worrell, whose case helped prompt the inspection.").

them through vents in the unit). And an officer in the jail recently used so much of a spray to subdue one detainee that many others in the unit became ill.

Second, there is new information about the atmosphere in CTF, and Mr. Gieswein, that the Court should take into consideration.

As reported in the press, experts provided with third-hand reports of the atmosphere in Mr. Gieswein's unit have voiced concern that the men there are vulnerable to radicalization due to the particular circumstances of their incarceration.[6] These commentators rely on the fact that most of those detained in connection with January 6-based charges are housed together at the CTF, along with press reports that some men in that pod have developed a name for their group ("the Patriot Wing," or the "J6ers"), share a newsletter, and engage in group activities that experts have characterized as ritualistic.[7]

Further, individuals outside of the unit, and outside of the jail, have also taken to viewing all residents in this unit as one. On the one hand, some prominent individuals in politics hold up everyone in the unit as "political prisoners," and credit

---

[6] T. Owen, "Capitol Rioters in Jail's 'Patriot Wing' Have Their Own Rituals and a Growing Fan Base," Vice.com (Oct. 21, 2021), at https://www.vice.com/en/article/akvwjp/january-6-rioters-jailed-together-forming-rituals-fanbase (last visited 11/17/21).

[7] *See id.*

those in the unit for "standing up to tyranny."[8] On the other hand, some powerful voices describe everyone charged in relation to January 6 as an "insurrectionist."[9]

This all raises a significant concern that Mr. Gieswein, a very young man who came to the District alone, is now trapped in a highly charged environment that could potentially exert undue influence on his thinking, and may eventually create pressure on him to conform, or to allow others' political narratives to drive his thinking and decision-making. It may be that the isolation and supposed echo-chamber that Mr. Gieswein is exposed to in the "J6 pod" will only deepen and harden in some of the detainees the very ideas underpinning the January 6 protests – ideas that this Court has determined to be dangerous when in action. Indeed, other men detained in the same unit have publicly reported feeling pressure to conform due to trends in the unit.[10]

In a letter addressed to the Court, Mr. Gieswein does not report feeling such pressure at this point, and he does not disparage the other detainees in his unit.[11]

---

[8] *See* Rep. Taylor Greene at https://twitter.com/mtgreenee/status/1456704043993243650 (Nov. 5, 2021) (tweeting about her recent visit to the CTF, observing, "[i]t was like they were prisoners of war," and suggesting situation reflects "authoritarianism" and "tyranny," and including video clip in which she described detainees as "political prisoners") (last visited 11/17/21).

[9] *See, e.g.,* C. Carrega and H. Rabinowitz, "Insurrectionists' Jail Complaints Lead to Overdue Reform within DC's Jail System," CNN (Nov. 14, 2021); Matt Stieb, "First Insurrectionist Sent to Prison for Capitol Riot," New York Magazine (July 17, 2021), at https://nymag.com/intelligencer/2021/07/insurrectionist-paul-hodgkins-sent-to-prison-for-1-6-riot.html (last visited 11/17/21).

[10] *See, e.g.,* Ex. 1 at 18-19.

[11] Ex. 4 (Letter from Mr. Gieswein).

But his letter does reflect a concern that his detention naturally limits his perspective.[12]

## II.   Taking the new information into account, the proposed release plan will reasonably assure the safety of the community.

The Court will recall that some of Mr. Gieswein's closest friends did not share his ardent support of President Trump leading up to January 6.[13] It comes as no surprise, then, that Mr. Gieswein values the ability to trade ideas with other people of different perspectives, as his letter to the Court reflects.[14] That is exceedingly difficult for him to accomplish at CTF. But it would be very easy to find in the home of his godparents – a law enforcement officer and risk management professional – who have agreed to act as third party custodians if Mr. Gieswein is released. He already knows that his godparents disagree with much of what took place at the Capitol on January 6, and that they will expose him to others of similar viewpoints.[15]

Mr. Gieswein is right that exposure to a breadth of perspectives is important for everyone – individually, and for the community. That is, putting aside whether commentators raising alarms about this CTF unit in the press are right, there can be little doubt that permitting Mr. Gieswein (or others like him) broad access to different

---

[12] *See id.*

[13] *See* Ex. 5 (Declarations of Mr. Gieswein's friends, filed previously at ECF Nos. 18-1 and 18-2).

[14] Ex. 4.

[15] *See id.*; Transcript of July 1, 2021 Hr'g at 12-13 (proffer by undersigned counsel that proposed third party custodian and husband condemned any assault on officers).

perspectives, delivered by trusted sources, will ultimately lead to a healthier and safer community.

The text of Section 3142(g) does not limit what factors a court must consider in determining whether release pretrial release is appropriate. And it is proper under the BRA for the Court to consider risks that detention presents to Mr. Gieswein and his fellow detainees, particularly those that could spill over into the community. Indeed, there is recent precedent for this, as courts around the country considering pretrial detention after March of 2020 weighed the risk that individual inmates would contract the coronavirus if they were detained pretrial as the pandemic raged.

In untold numbers of cases, courts found that "incarcerating [defendants] while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by" particular defendants' release under particular conditions. *See, e.g., United States v. Harris*, 2020 WL 1482342, at *1 (D.D.C. 2020) (releasing defendant to home confinement on strict conditions); *United States v. Davis*, 449 F. Supp.3d 532, 539 (D. Md., 2020) (finding that government's concern that defendant would return to dealing drugs and selling firearms unlawfully "can be addressed with release conditions," pursuant to which the Court found that defendant's "continued incarceration poses a greater risk to community safety" due to coronavirus "than his release"); *see also United States v. Jaffee*, Crim. No. 19-cr-88 (D.D.C. Mar. 26, 2020) (minute order concluding that release to home confinement on high intensity supervision was appropriate after considering "all of the factors specified in 18 U.S.C. 3142(g), and, in particular, the overall safety of the community"

because "the Court is now convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement."); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) (finding that Ramos's "continued detention poses a risk of danger to himself and others" due to coronavirus), *cited in* Davis, 449 F. Supp 3d at 539.

This Court, too, considered the risk that particular inmates would be infected with coronavirus if detained in weighing requests for release during the height of the pandemic. For instance, the Court found that the risk to a particular inmate actually rose to the level of an "exceptional circumstance" warranting release during the pendency of a motion pursuant to 18 U.S.C. § 2255. *See, e.g., United States v. Khan*, 11-276-01-EGS, ECF 300 (April 21, 2020) (granting emergency temporary release to defendant at CTF awaiting hearing on § 2255 motion seeking release from sentence not due to expire until 2028 due to coronavirus pandemic). And the court weighed the risk in pretrial release cases, and in weighing Section 3142 factors in the compassionate release context. *See, e.g. United States v. Terrell*, 19-cr-00372-EGS, ECF 60 (June 17, 2020) (granting emergency pretrial release to defendant in light of risk presented by coronavirus pandemic given his medical conditions); *see also, e.g., United States v. Boykin*, 2020 WL 6193838, at *5 (D.D.C., 2020) (granting compassionate release and noting, in weighing of section 3142 factors, that defendants many health conditions made "the pandemic very dangerous for him and heightens his need to practice proper social distancing," such that, in that particular

instance, defendant's "health concerns outweigh his criminal history," and concluding that, "[a]ccordingly, the Court finds that Mr. Boykin does not present a danger to his community"). In short, the Court took into consideration the fact that detention in itself put both defendants and the community at significant risk while the coronavirus raged. Sometimes, the Court determined that the risk that a particular defendant *could* become infected, and *could* become very ill, and that he *could* spread the disease, coupled with the fact that detention in itself *magnified these risks*, outweighed the other factors in section 3142.

The Court should take the same approach here. Specifically, undersigned counsel requests that the Court consider the evidence that Mr. Gieswein could become ill from exposure to mold or the other unacceptable conditions in the CTF, that he is definitely harmed by having such limited ability to engage with trusted people with a broad set of viewpoints, and that promoting more communication across perspectives will improve public safety.

When weighing the factors in 3142 in this case previously, the Court noted that Mr. Gieswein's "history and characteristics reflect an ability to abide by the law." ECF No. 29 at 47. In the same vein, the Court found that "Mr. Gieswein's age, lack of criminal history, family and community ties, and history of steady employment overall weigh in favor of his pretrial release." *Id.* Ultimately, the Court determined that Mr. Gieswein's alleged conduct on January 6 simply outweighed all of that. *Id.* at 48-53.

But the new information now before the Court is a factor that should tip the balance back toward release, as it highlights the danger that incarceration itself can present in this case, just as the pandemic did in many cases.[16]

The details of Mr. Gieswein's release plan take on greater weight when considered against this risk, and should tip the scale even further toward release. The Court will recall that although Mr. Gieswein is from Colorado, he asked to be released to the custody of his godmother, a risk management officer, and his godfather, a police officer, who live on a large property in Oklahoma.[17] As Mr. Gieswein notes, he believes his godfather's viewpoint, in particular, would provide valuable perspective

---

[16] Moving Mr. Gieswein to another jail is not a solution. Not only would moving him to another jail bring him no closer to trusted sources with different perspectives, but it would also make it impossible for him to prepare for trial. As the Court is aware, he is scheduled to go to trial on February 16, 2022. The government has produced unprecedented amounts of discovery, most of it only recently; it has also projected that more is coming. ECF No. 54. Mr. Gieswein is entitled to review it, to discuss it with counsel to participate in the preparation of his defense. At best, it will be an enormous challenge to accomplish this given CTF's discovery review protocols and the trial date. But, despite its faults and limitations, CTF allows for far *greater* attorney-client contact, and far *greater* ability for detainees to review discovery, than the Alexandria Detention Center or Northern Neck Regional Jail presently do. And undersigned counsel is not aware of any way to accomplish the task with detainees in Bureau of Prison facilities. Mr. Gieswein should be released from CTF, but not at the expense of his ability to adequately prepare for trial.

It would also not help to order Mr. Gieswein to another unit at the jail. Jail staff long ago determined that the January 6 detainees would likely be at risk in other units. Indeed, a long-serving CO recently informed undersigned counsel that, given his long experience at the jail, he agreed that January 6 detainees would not fare well in other units.

[17] *See* ECF No. 18 at 1 (describing proposed conditions); Transcript of July 1, 2021 Hr'g at 18-19 (same).

to him.[18] Mr. Gieswein also proposed to be limited by extensive conditions, and is open to any other condition the Court would propose.[19]

Finally, Mr. Gieswein's letter to the Court should tip the balance completely toward release. His words reinforce the evidence that any violations of law that the government ultimately proves in this case represent, at worst, an aberration. His letter reflects that Mr. Gieswein's is a devoted son and brother, and an intellectually curious young man who wisely recognizes the danger of saturation with only one perspective. Finally, as he himself says, he "will never put [himself] into a situation like" January 6 again, and he personally promises to abide by whatever conditions the Court imposes.[20] Under all of these circumstances, the Court can be confident that it is not necessary to detain Mr. Gieswein pretrial to ensure the safety of the community.

---

[18] Ex. 4 (Letter from Mr. Gieswein).

[19] *See* ECF No. 18 at 1 (describing proposed conditions); Transcript of July 1, 2021 Hr'g at 18-19 (same). A home detention condition would prevent Mr. Gieswein from traveling except for work and related necessities: he could not go to any rally or political event. He also could not sneak to one, given the location monitoring proposed. He proposed to stay off of social media, where such events are typically planned, to minimize the risk that he would even know about events similar to January 6, much less plan to attend them (notwithstanding the lack of evidence that he engaged in any planning with others before January 6). He proposed to let a probation officer monitor his use of any computer, which would provide the officer an opportunity to search for any communications that raised concerns. Finally, though there was no evidence that he lived among negative influences in his hometown in Colorado, he also proposed to live far away from the environment in which he happened to have formed his views.

[20] Ex. 4.

11

## CONCLUSION

For all of these reasons, those previously given in support of release, and such others as may be advanced at a hearing on this matter, Mr. Gieswein respectfully requests that the Court reopen the detention hearing. Further, he respectfully requests that the Court release him to a third party custodian, pursuant to the conditions proposed and such others as the Court may find appropriate.

Respectfully submitted on November 17, 2021.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____
Ann Mason Rigby
DC Bar No. 491902
Elizabeth A. Mullin
DC Bar No. 484020

Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
ann_rigby@fd.org
elizabeth_mullin@fd.org