# EXHIBIT 1

<pre>
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,        .
                                       .  Case Number 21-cr-32
 4             Plaintiff,              .
                                       .
 5         vs.                         .
                                       .
 6    GUY WESLEY REFFITT,              .  November 19, 2021
                                       .  10:08 a.m.
 7             Defendant.              .
      - - - - - - - - - - - - - - - - -

 8

 9                     TRANSCRIPT OF MOTION HEARING
                   BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                     UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES:

13    For the United States:      JEFFREY NESTLER, AUSA
                                  RISA BERKOWER, AUSA
14                                United States Attorney's Office
                                  555 Fourth Street Northwest
15                                Washington, D.C. 20530

16    For the Defendant:          WILLIAM WELCH, III, ESQ.
                                  5305 Village Center Drive
17                                Suite 142
                                  Columbia, Maryland 21044

18

19

20

21    Official Court Reporter:    SARA A. WICK, RPR, CRR
                                  333 Constitution Avenue Northwest
22                                U.S. Courthouse, Room 4704-B
                                  Washington, D.C. 20001
23                                202-354-3284

24

      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
</pre>

```
 1                    P R O C E E D I N G S

 2         (All participants present via video conference.)

 3             COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4    Action 21-32, the United States of America versus Guy Reffitt.

 5         If I can have the parties identify themselves for the

 6    record, beginning with the United States.

 7             MR. NESTLER:  Good morning, Your Honor.  Jeff Nestler

 8    on behalf of the United States.

 9             MS. BERKOWER:  Good morning, Your Honor.  Risa

10    Berkower for the United States.

11             MR. WELCH:  Good morning, Your Honor.  My name is

12    William Welch, and I'm representing Guy Reffitt.

13             THE COURT:  Good morning again, everyone.

14         For the record, this is a video conference hearing being

15    conducted pursuant to the Chief Judge's standing order relating

16    to the pandemic, to which Mr. Reffitt has consented.

17         Correct, Mr. Welch?

18             MR. WELCH:  That's correct, Your Honor.

19             THE COURT:  Mr. Welch, this is a continuation of a

20    hearing on your motion.  I will go ahead and let you argue

21    first.

22             MR. WELCH:  Thank you, Your Honor.

23         I want to begin by directly answering the questions that

24    the Court posed recently specifically.  First, yes, Section

25    1512(c)(2)'s prohibition on obstructing, influencing, or
```

1    impeding an official proceeding should be understood in light of

2    Section 1512(c)(1)'s prohibition on evidence foliation.

3        And two, "corruptly" as used in Section 1512(c)(2) is not

4    defined.  And in the government's paper filing yesterday, it

5    conceded that "corruptly" as used in Section 1512(c)(2) is not

6    defined.  That is document 60-1 at pages 9 and 10.

7        Now, the reason that we should understand 15 (c)(2) in

8    terms of what 15 (c)(1) prohibits is that the official

9    proceeding must relate to the administration of justice.  The

10   Electoral College vote certification is ministerial.  It is not

11   an adjudicatory proceeding, because the Constitution does not

12   give Congress adjudicative power to reject certified Electoral

13   College lists.  Vice President Pence said that his duties were

14   largely ceremonial, not adjudicative.

15       The Constitution itself provides that electors shall send

16   certified lists of their votes to the seat of government where

17   the President of the Senate shall, in the presence of the Senate

18   and the House, open them and then count the votes.

19       The Twelfth Amendment provides that once the president has

20   opened all of the certificates, the votes shall then be counted.

21   If there were a deadlock, the House is to immediately choose the

22   next president from the names on the list.

23       Neither the electoral clauses nor the Twelfth Amendment

24   give Congress adjudicative power to reject certified Electoral

25   College lists, nor does the Twelfth Amendment give Congress

power to enact legislation to enforce its provisions.

Contrast that with the Fifteenth Amendment that does.  The necessary and proper clause work to give Congress this power.  There are three ways that the necessary and proper clause gives Congress power.

One would be foregoing powers, but that would not apply here because it refers to the 17 enumerated powers in Article I, Section 8, but the electoral clauses are in Article II.

The second way that the necessary and proper clause provides is all other powers vested into the government.  That would not apply because the electoral clauses impose a duty to count.  It is not the direct discretion implied by the word "power."

The third way would be that all other powers vested in any department or officer would not apply, because Congress is not a department or officer.  And the Supreme Court said so in *Hubbard vs. United States*, 514 U.S. 695 at pincite 700.

History also suggests that the framers intended Congress's role to be ministerial, because they considered the possibility that there might not be a vote if an elector just did not cast their ballot.

Your Honor, each statute in Chapter 73 proscribes obstructive conduct to specific subjects and settings related to the administration of justice.  And courts addressing the scope of 1512 have held that obstructive conduct is proscribed if it

1   affects a proceeding that is judicial in nature, for instance,

2   *Arthur Anderson* or *United States vs. Birch*.

3       The Supreme Court has drawn a formal distinction between

4   Congress's legislative and its investigative powers.  And the

5   Supreme Court did that beginning in *Kilbourn v. Thompson*, 103

6   U.S. 168.

7       In *Ermoian*, the Ninth Circuit said that the term "official

8   proceeding" was not plain and unambiguous.  The dictionary

9   definitions did not conclusively resolve the issue.  Instead,

10  the legal, instead of the lay understanding, was suggested by

11  the descriptor "official" preceding the word "proceeding" and

12  the surrounding words in context.

13      Likewise, the legislative history supports that 1512(c)

14  only applies to proceedings that are judicial in nature, such as

15  if you were obstructing a congressional committee that was

16  investigating potential federal crimes.

17      When Senator Lott introduced what is now 1512(c), he said

18  this section would allow the government to charge obstruction

19  against individuals who acted alone, even if the tampering with

20  evidence took place prior to the issuance of the grand jury

21  subpoena.  Senator Hatch explained that it would close a

22  loophole created in the available obstruction statute by holding

23  criminally liable a person who acting alone destroyed documents.

24          THE COURT:  Mr. Welch, my voice is failing, but I'm

25  going to try to get a question in.

1      If I disagree with you on the official proceeding argument

2   and I find that the official proceeding does cover what Congress

3   is doing here, do you agree that the members of Congress needed

4   to be present for that official proceeding?

5          MR. WELCH:  Yes, they would need to be present.  If

6   they're in some sort of a recess or there was a suspension, then

7   it would not be an official proceeding.

8          THE COURT:  They would need to be physically in the

9   room for this proceeding?  You're just saying they don't play

10   any adjudicatory role, but they do need to be present?

11          MR. WELCH:  They would need to be present.  They would

12   actually have to be in session.  It wouldn't be suspended.  And

13   I believe the problem here is that they're suspended, and

14   there's a case on point for that that basically does so.  I will

15   look for that and get back to you on it.

16          THE COURT:  I'm going to ask the government more about

17   its theory here, but as I understand it, the government's theory

18   is that Mr. Reffitt obstructed or impeded this official

19   proceeding by attempting to take steps that would prevent

20   members of Congress from being present.  Do you think that

21   fairly captures the government's theory here?

22      Can you hear me, Mr. Welch?

23          MR. WELCH:  I'm sorry.  I thought you were directing

24   that question to the government.

25          THE COURT:  No, no.  I'm going to ask them in a moment

1    when it's their turn to clarify their theory of culpability

2    here.

3         But as I understand it, their theory is that the actions

4    that Mr. Reffitt took, he was attempting to obstruct an official

5    proceeding by taking steps to prevent, I think, the members of

6    Congress from being present for this official proceeding.

7         Is that how you understand the government's theory?

8         MR. WELCH:  My understanding is -- I don't know if it

9    was specifically preventing them from being present, but my

10   understanding is their theory is that it was an attempt to

11   disrupt or prevent in some way the tally being for anyone other

12   than Donald Trump.  It's not entirely clear from the charge how

13   that would happen.  It's not entirely clear from their papers.

14   But I glean from what I've read that that's what they intend.

15        THE COURT:  You've not requested a bill of

16   particulars, have you?

17        MR. WELCH:  No, I have not.

18        THE COURT:  I'm going to follow up with Mr. Nestler in

19   a minute.  But let's say the way I've described it is their

20   theory -- let me just move to you, Mr. Nestler.

21        Am I capturing the government's theory correctly?  I know

22   you argue in the alternative, but your main theory is what?  Can

23   you explain it here?

24        MR. NESTLER:  Yes, Judge.  I believe what you're

25   saying is half correct.  One of the ways that we allege

1  Mr. Reffitt was trying to obstruct or attempting to obstruct

2  Congress was by physically preventing the members of Congress,

3  the representatives and the senators, from assembling in order

4  to view and then vote on the ballots.  So that is one way that

5  he was obstructing or attempting to obstruct.

6      The other way goes more towards the word "influence," which

7  is that Mr. Reffitt's actions were trying to influence

8  corruptly -- we can get into what the word "corruptly" means --

9  wrongfully with consciousness of wrongdoing the assembled

10  members of Congress from voting in a way that Mr. Reffitt wanted

11  them to vote, the same way somebody might try to obstruct a

12  juror or a judge in a legal proceeding or an adjudicator in some

13  sort of adjudicative proceeding.

14          THE COURT:  So in other words, almost an intimidation

15  approach?

16          MR. NESTLER:  Yes, and that goes to the word

17  "influence."

18          THE COURT:  Mr. Nestler, this is helpful for me.  It

19  wasn't entirely clear from the indictment and even from your

20  papers exactly what the government's theory is.

21      So even though Mr. Welch hasn't asked for one, I'm inclined

22  to ask that you all do provide a bill of particulars that

23  outlines specifically your theory.  I will give you some time to

24  do that.  But I think it's important for me in both deciding

25  this motion and for Mr. Welch in defending his case to be clear

1   exactly what the government's theory is in terms of how

2   Mr. Reffitt is responsible for obstructing or impeding the

3   official proceeding.

4       All right.  Moving back to you, Mr. Welch, in light of how

5   the government has described its theory, I'm curious, if you

6   look at 1512 -- he is charged with 1512(c).  You say this charge

7   doesn't fit.  But if I disagree with you on this being an

8   official proceeding, are you familiar with 1512(d)?

9           MR. WELCH:  1512(d)?  Let me just pull it up.  I know

10  I referenced it in one of my examples, but I don't remember it

11  off the top of my head.

12          THE COURT:  Let me summarize it for you.  It provides

13  that whoever attempts to intentionally harass another person and

14  thereby delays or prevents a person from attending an official

15  proceeding shall be guilty of the offense.

16          MR. WELCH:  Well, in that situation, it would still

17  need to be someone who was, say, a witness that was going to

18  testify, for instance, or someone who was bringing evidence --

19          THE COURT:  I don't think so.  It says, to quote

20  it, "Whoever intentionally harasses another person," which isn't

21  defined further in the provision, "and thereby hinders, delays,

22  prevents, or dissuades any person from attending or testifying

23  in an official proceeding."

24      So if I disagree with you and I find this is an official

25  proceeding, I don't see "person" restricted to a juror, a judge,

a witness.  In fact, other parts of this statute do cover

proceedings before Congress.  So I think it has to envision a

member of Congress could be a person for purposes of this

statute.

I'm just curious why -- what you would argue there.  It

doesn't have "corruptly" in it.  It just says "intentionally

harasses."

MR. WELCH:  I think it would still need to be -- and

there is no allegation even that Mr. Reffitt prevented any

member from attending.

THE COURT:  This statute specifically includes, this

provision, an attempt to do so.  So the government's theory is

that he physically prevented members from attending an official

proceeding.  He attempted to do so by assaulting federal

officers and whatever else he did.  He was trying to physically

prevent members from going to that official proceeding.

MR. WELCH:  Well, the problem with that is that you

would still need an official proceeding, and the joint session,

even if it was an official proceeding, and I don't concede that

it was because it was ministerial, not adjudicative, but it was

suspended at about 1:15.  And at that time that would have been

about a half an hour before the alleged obstructive acts in this

case.  And it happened because the President of the Senate

ordered the two Houses to withdraw from the joint session as a

result of objections to the Arizona certificate.

1          And the case that I was trying to recall earlier --

2          THE COURT:  Mr. Welch, you can't plausibly argue that

3     this session, this official proceeding was not delayed as a

4     result of what happened on January 6 by Mr. Reffitt's actions or

5     others, whether it was in session at that moment or not.

6          MR. WELCH:  But his actions individually wouldn't have

7     done that.  He never had contact with any member of Congress.

8          THE COURT:  He was -- as alleged.  I don't know what

9     the government's proof in trial will show, but as alleged, he

10    was encouraging others.  He was encouraging a mob; he was a part

11    of a mob.  So he wasn't acting unilaterally.  He took steps

12    alone, but he was very much a part of the large group that was

13    trying to get in and prevent, the government's theory is,

14    prevent members from attending this official proceeding.

15    Whether it was in session or not, you can't plausibly allege

16    that it didn't delay it considerably.

17         MR. WELCH:  But I think *Christoffel v. United States*,

18    338 U.S. 84, says that you have to have an actual competent

19    tribunal, that you can't be in a suspended proceeding, that that

20    wouldn't work.  They would have to be actually, you know -- if

21    they blocked the building and wouldn't let people in the

22    building, well, maybe that argument might work.  But there's

23    no -- there's nothing -- there's no evidence to the effect that

24    Mr. Reffitt blocked anyone from -- any member of Congress from

25    going in the building.

1        THE COURT:  But even though the members were

2    considering objections, and the point is, the session wasn't

3    dissolved, it wasn't over until the count occurred and the

4    result declared.  So it was ongoing throughout the day.

5        MR. WELCH:  Well, that would then indicate that he

6    didn't delay it, because even after it resumed, you know, a

7    formal session, there were objections that continued for hours,

8    into the wee hours of the next morning.

9        THE COURT:  You don't think it delayed attendance at

10   that proceeding when the members were cleared out of the

11   gallery?

12       MR. WELCH:  There is no allegation that Mr. Reffitt

13   did that.  He's charged alone in this.

14       THE COURT:  But attempt.  He took substantial steps

15   towards.

16       MR. WELCH:  Getting into a confrontation with a police

17   officer on the steps of the building, I don't think that even

18   that would rise to the level of an attempt to stop a member from

19   attending.

20       THE COURT:  What was he doing?  Not trying to delay

21   the vote or interfere with the vote?  Why was he trying to get

22   in the Capitol?  To sightsee?

23       MR. WELCH:  To protest, that he felt that the election

24   was being stolen.

25       THE COURT:  But to influence.

```
1              MR. WELCH:  That would potentially here raise another

2    problem, which is, you know -- well, for instance, when Vice

3    President Gore challenged the results of the election that he

4    ultimately conceded, would that then fall under this as well,

5    because he was attempting to influence the outcome?

6         And that would have been his right, and certainly, that

7    would have been the right of the voters who wanted him to win.

8    So I don't know that there is anything that --

9              THE COURT:  He didn't allegedly act in a wrongful way.

10   He was using the judicial process.  He wasn't storming the

11   Capitol.

12             MR. WELCH:  It would be broad enough -- the

13   government's interpretation would be broad enough to cover such

14   a thing.

15             THE COURT:  How is what you're describing wrongful,

16   that you use the courts to challenge an election?

17             MR. WELCH:  Well, because, ultimately, the Supreme

18   Court decided that it would have been a violation of Florida

19   voters' rights, and certainly, I think we can agree that, you

20   know, violating voters' rights is something that's wrong.

21             THE COURT:  Mr. Reffitt, I'm not going to hear from

22   you right now.  Do you need a moment with your attorney?

23             THE DEFENDANT:  Yes, Your Honor, please.

24             THE COURT:  Okay.  Mr. Welch, I will give you a moment

25   in a breakout room.
```

1          (Defense counsel and defendant conferred.)

2               MR. WELCH:  Thank you, Your Honor.  I believe we're

3     ready.  I'm not sure whether my client is back yet.  There he

4     is.

5               THE DEFENDANT:  Present and accounted for.

6               MR. WELCH:  You're muted, Your Honor.

7               THE COURT:  All right.  Mr. Welch, you may continue.

8               MR. WELCH:  Okay.  I don't think that 1512(d) would

9     apply here, Your Honor, because, number 1, it would still have

10     to be an official proceeding.  Number 2, it would need to be in

11     session.  That would be the *Christoffel* case.

12          And still, it would not be an official proceeding because

13     Congress was not there that day to listen to witness testimony

14     under oath in an investigation.  It was not there to receive

15     evidence, whether it's documents, whether it's data files.

16     Congress had a duty to receive the votes and count them.  That

17     was --

18               THE COURT:  And be present to do so, physically

19     present.

20               MR. WELCH:  Well, yes, they would need to be present,

21     but that doesn't make them -- it doesn't make it an official

22     proceeding.

23               THE COURT:  We can agree to disagree on that, but you

24     don't -- again, you don't disagree that they needed to be

25     physically present, they needed to attend that proceeding?

1    MR. WELCH:  Yes, in order for any type of proceeding

2    to happen, they would need to -- you know, members of the

3    Congress would need to attend.  But that would not transform a

4    proceeding involving the Electoral College certification into an

5    official proceeding.  The legislative history supports that.

6        And one of the interesting things about the legislative

7    history is that as 1512 was originally passed, it was largely

8    drawn from the National Commission on Reform of Federal Criminal

9    Laws report that was published in 1971.  The definitions in that

10   confirm that there was an intentional delineation between

11   actions to obstruct official proceedings on the one hand and

12   obstructing investigations prior to the institution of official

13   proceedings on the other.  The Commission report actually

14   defines "official proceedings," and it says a proceeding

15   involving the taking of evidence, a proceeding heard or which

16   may be heard before a government agency or a branch or public

17   servant, and this is key --

18        THE COURT:  Why is that not a proceeding that may be

19   heard before a branch or government agency?

20        MR. WELCH:  Because in this situation it would need to

21   be an investigation.  This was not an investigation.

22        THE COURT:  Okay.

23        MR. WELCH:  If Congress was saying, like it was doing

24   when it held hearings and it was investigating Enron and they

25   subpoenaed people and those witnesses have to come in and,

perhaps, produce documents, if someone had destroyed documents

to prevent Congress from having them, even if they weren't

physical documents, if they were electronic documents, that's

what 1512 is aimed at.  If you prevent a witness from attending,

you try to talk them into changing their stories or just not

showing up, that would be something that 1512 would cover,

because in that situation that would be an official proceeding

before the Congress.  But not everything that Congress does is

an official proceeding under the statute.

THE COURT:  Mr. Welch, again, we can agree to disagree

on that.  I'm not sure you have me with your proceeding point.

But 1512 and surrounding statutes clearly contemplate a

need for certain persons to be in attendance at proceedings, no

matter what their nature is.  You have (a)(1), whoever kills

another person with intent to prevent attendance at an official

proceeding, whoever harasses.

I disagree with you on the definition of "official

proceeding."  It just doesn't follow that some of these

provisions would not apply in the situation where you prevent

someone who has to be at the proceeding from being there.

MR. WELCH:  Because I think what we're -- it's not

just do you obstruct anyone from doing anything.  It's narrower

than that.  I think the Commission's report on which Congress

based its writing of this statute clearly shows that Congress

intended to address both obstruction of justice in official

 1   proceedings at which evidence is taken and in the gathering of

 2   information and evidence in investigations prior to the

 3   institution of an official proceeding.

 4        And when Congress added Section 1512(c) in 2002, it didn't

 5   change that.  It is still limited to actions affecting official

 6   proceedings, and the term maintains its original meaning, and it

 7   would be some sort of --

 8            THE COURT:  Are there any other arguments you want to

 9   make on corruptly or the *Yates* argument?

10            MR. WELCH:  What was the first one you said?  I'm

11   sorry.

12            THE COURT:  On the meaning of "corruptly" or the *Yates*

13   argument.  I want to move away from the official proceeding

14   argument.  I've heard enough on that.

15            MR. WELCH:  Okay.  Your Honor, we agree that

16   "corruptly" as used in Section 1512(c)(2) is not defined.  And

17   for that reason, *Poindexter* would still be the law.  In

18   *Poindexter*, it was held that it's vague and unconstitutional.

19   So nothing has happened, none of the cases that the government

20   has cited has overruled *Poindexter* or changed *Poindexter*.

21   You're still in a position where it is not defined, and it would

22   still for that reason be vague.  A person would not necessarily

23   know what was and wasn't the law based on a vague definition

24   of "corruptly."

25        In addition, if you apply Section 1512(c)(2) to conduct

1     that's unrelated to the availability or integrity of evidence,

2     it then renders surplusage the phrase "otherwise obstruct" in

3     1512(c)(2), the rest of Section 1512, and much of Chapter 73.

4          *Begay* addressed this situation in a similar

5     phrase, "otherwise involves."  And the Supreme Court looked at

6     what was covered and not covered.  It applied canons of Ejusdem

7     generis to say that only similar crimes rather than every crime

8     that would present a serious risk of physical injury to another.

9     Otherwise, in Section 1512(c)(2), it's not grammatically

10    distinct from what was in *Begay*.

11         THE COURT:  It does -- the clauses are separated by a

12    semicolon, and there's a line break, which does make a

13    difference, in *Yates* and *Begay*.

14         MR. WELCH:  But one of the differences is that -- if

15    you're referring to the *Ali* case, there was no list in *Ali*;

16    whereas, there is a list in 1512.

17         So I don't think that that is determinative of the outcome

18    here, and I don't think there's any authority anywhere to say

19    that the presence or absence of a semicolon would make a

20    difference in this case.  *Yates* also --

21         THE COURT:  You don't think Alito's opinion in *Yates*

22    suggests as much?

23         MR. WELCH:  No, I don't think that is determinative of

24    the issue here.  I mean, in *Yates*, the Supreme Court rejected

25    the government's claim that a dead fish qualified as an object.

1          THE COURT:  It was all in the same sentence.

2          MR. WELCH:  But a word is known by the company that it

3    keeps, and this is in an obstruction of justice statute.  So to

4    conclude that 1512(c)(2) has nothing to do with obstruction of

5    justice that basically can cover anyone doing anything that is

6    remotely obstructive in some way would just have the exception

7    here swallow the rule.  That just is not what *Yates* says.

8          And indeed, there is a list in this situation.  And when

9    general words such as "otherwise," you know, follows a list,

10   it's generally understood under Ejusdem generis that it limits

11   the list or it limits the general to the context of the

12   specific.

13         Even still, if the Supreme Court said in *Yates* that if

14   recourse to traditional tools of statutory constructions left

15   any doubt about the meaning of "tangible object," then the

16   Supreme Court would invoke the rule of -- that ambiguity

17   concerning the criminal statute should be resolved in favor of

18   lay, and certainly, the government has conceded that there is no

19   other case out there in which 1512(c)(2) has been applied in the

20   way that it's trying to apply it in this case.

21         Ultimately, Your Honor, I think it leads back to

22   *Poindexter*, and corruptly just ends up being vague in this

23   situation, as well as *Begay* and *Yates* saying you should not have

24   this much surplusage in interpreting a statute.

25         THE COURT:  Mr. Nestler?

1          Are you done, Mr. Welch?  I don't mean to cut you off.

2          MR. WELCH:  No, I'm done for now.  I might have a

3    reply to whatever the government says.

4          THE COURT:  Okay.  All right.  So Mr. Nestler,

5    following up on the theories that you've provided at the outset,

6    I read your briefs to suggest that one alternative actually

7    related to the evidence in some way, but is that not the case?

8    Is that the alternative theory, that Mr. Reffitt allegedly

9    influenced -- attempting to influence the assembled members from

10   voting in the way they wanted to vote?  Is that what you meant

11   by evidence?

12         It was a passing reference to even if the Court interpreted

13   this consistently with (c)(1), 1512(c)(1), that the government

14   could meet that standard.  Is that what you meant in terms of --

15         MR. NESTLER:  That's an additional alternative

16   argument.  The idea that Mr. Welch put forward was that

17   1512(c)(2) has to relate to some sort of document, which we

18   disagree with.  Even if it does relate to some sort of document

19   or have some sort of nexus to a document, the government will be

20   able to satisfy that.

21         THE COURT:  What is your theory for that?

22         MR. NESTLER:  That the proceeding itself involved the

23   constitutional and statutory requirement for examination of

24   original documents.

25         THE COURT:  So the examination of the documents could

1    not occur because members weren't physically present; correct?

2          MR. NESTLER:  Correct.

3          THE COURT:  So it's not a situation -- you're not

4    intending to prove that Mr. Reffitt's actions were an attempt to

5    get ahold of the evidence, the electoral votes, or do anything

6    with the evidence specifically, but, rather, impede the members'

7    ability to do their job in order to examine and object to the

8    electoral votes?  Am I capturing what you're saying?

9          MR. NESTLER:  It's two pieces, Judge.  One is yes

10   related to the individual, so trying to obstruct or influence

11   the people from sitting in the room and looking at the

12   documents.

13      But the other piece of it is the need for Congress to

14   safeguard those pieces of evidence.  And so --

15         THE COURT:  But is your theory that he was trying to

16   get in to destroy or tamper with the evidence?

17         MR. NESTLER:  No, not that he -- we don't intend to

18   prove or attempt to prove that he attempted to destroy the

19   evidence.  We intend to prove that he attempted to obstruct a

20   proceeding, and the proceeding itself involved the need to

21   safeguard such evidence.  It was a proceeding in which original

22   evidence, document, records were --

23         THE COURT:  But whether the members of Congress were

24   physically present or not, there was no risk, was there, that

25   these documents would disappear or not be safe without them

1    present, is there?

2              MR. NESTLER:  There was.  The documents --

3              THE COURT:  You have staff members and other people

4    who are present.  These are not sitting on the Capitol steps.

5              MR. NESTLER:  No, they're sitting in the well of the

6    House when the joint session is meeting, and then they were

7    transported back to the Senate when the two Houses separated to

8    debate the objection.  And they were physically removed from the

9    chamber to prevent rioters from accessing them and tampering

10   with them or destroying them or stealing them.

11             THE COURT:  But again, your theory is -- I'm not

12   trying to limit you in any way.  Is your theory that he was

13   coming in to try to steal it or tamper with the evidence or

14   destroy it?

15        It's not clear to me -- this is why I'm going to request

16   the government provide a bill of particulars, because it's

17   really not clear to me what your theories are and what you think

18   that the facts that you're going to prove support in terms of

19   obstruction.

20             MR. NESTLER:  So we believe that he was intending to

21   obstruct the proceeding.  There is different ways that he could

22   have obstructed the proceeding that he was in motion to do so.

23             THE COURT:  List those for me.  By removing members of

24   Congress, by intimidating them to vote a certain way, and by

25   taking the evidence?

MR. NESTLER:  And by -- well, tampering is the larger word, but by making it such that the evidence was not available to be examined.

So I guess when we're -- when Your Honor is talking about the individuals, so yes, the individuals need to be present in the chamber, but also, the evidence needs to be present in the chamber with those individuals.  We need both halves to make the system work.  So if the defendant is able to prevent the evidence from being present in the chamber, that also would obstruct the proceeding.

THE COURT:  Okay.  So it's absence of members and absence of evidence?

MR. NESTLER:  Correct.  Those are different ways for which the defendant or other rioters could have or were attempting to or intending to obstruct the proceeding.

And just to be --

THE COURT:  Go ahead.  I don't mean to interrupt.

MR. NESTLER:  Just to be clear, the defendant is indicted also under the theory of aiding and abetting.  So the government does not need to prove, though we will discuss our theories, obviously, at the Court's request, that the defendant himself intended to take a ballot box or to burn a ballot box, but the defendant was aiding and abetting others in their obstruction of Congress.

THE COURT:  But again, you're not going to try to

prove that Mr. Reffitt himself or by aiding and abetting others

was trying to remove the evidence?  You're just saying they're

just trying to disrupt thus proceeding as a whole, they're

trying to -- to use an analogous situation, they're trying to

block the doors to the courthouse?

MR. NESTLER:  Right.  But there's another way to go

about that.  If we're thinking about a trial as an example,

Judge --

THE COURT:  Sorry.  If we're thinking about what?

MR. NESTLER:  If a trial is happening, the defendant

could prevent the jurors or the judge or the witnesses from

entering the courthouse or could influence them to make them

leave the courthouse so they couldn't do their job.

But there's another way that the defendant could have

obstructed that court proceeding, which is that there's original

physical evidence that needs to be examined during that trial.

If the defendant had blocked that truck from entering the

building or stolen that evidence on the way to the courthouse or

made it such that -- or burned that evidence or somehow made it

such that that evidence could not be brought into the courtroom,

the defendant also would be obstructing that proceeding by

making it such that the people who were assembled to review the

evidence did not have the evidence they needed to review.

THE COURT:  So your point is, by blocking access to

the courthouse door or here to the congressional proceeding,

1    it's preventing the presence of individuals who need to be

2    there, it's preventing the presence of evidence that needs to be

3    there?

4              MR. NESTLER:  Correct.

5              THE COURT:  So by shutting down the whole proceeding,

6    the defendant, Mr. Reffitt, and others were also indirectly

7    withholding evidence or taking evidence, for lack of a better

8    word?  They're preventing the evidence from being in there, the

9    room?

10             MR. NESTLER:  Correct.  And that is unique to this

11   proceeding.  There are certainly proceedings that could exist

12   that don't involve records or evidence.  This happens to be a

13   situation where the records and evidence are not present because

14   of a subpoena or because of a court order.  They're present

15   because the Constitution requires them to be present.  The

16   original envelopes that have been sealed are then opened by the

17   vice president in the joint session.

18             THE COURT:  Okay.  Let me -- so that's your evidence

19   point, is absence of evidence?

20             MR. NESTLER:  Correct.

21             THE COURT:  Not tampering, not destroying, just

22   blocking the door so evidence can't go in there for the

23   proceeding to happen?

24             MR. NESTLER:  In terms of this defendant's intent,

25   yes, that is the nexus to the evidence, if we ever had to prove

nexus to tangible evidence, which we don't believe we have to do.

THE COURT:  All right.  Let me for a moment put aside the broad definition of "corruptly" that you're saying the Court should apply, and let me focus on the structure of the statute.

When you look at 1512 as a whole, as well as the surrounding provisions such as 1503, 1505, when you look at it as a whole, you see that Congress enacted a number of different provisions that have to deal with people, whether it be judges or jurors or witnesses.  And when it did so, it often used language in addition to "corruptly."

So for example, 1512(b), Congress also used the terms "intimidation, threatens, or corruptly persuades another." Similarly in 1512(d), which I talked to Mr. Welch about, Congress used the term "intentionally harasses another person or harasses."  In 1503 and 1505, Congress said "corruptly or by threats or by force" in both of those statutory provisions.

And it's hard to read the statute as a whole and conclude that Congress intended "corruptly" by itself to apply to actions that prevent a juror or a judge or a witness or in this case a member of Congress from attending a proceeding as opposed to, as the defense argues here, that it means something that undermines the integrity of the process of the truth functioning -- the truth function of the proceeding, whether it's, you know, destroying or tampering with or manipulating evidence or

testimony or corrupting the decisionmaker, the judge or the
juror who is making a decision, as opposed to just removing that
person from the proceeding.

And so it's hard to look at 1512(c), which only
includes "corruptly," and read it to cover all of those things.
It doesn't make sense.  Before this provision was ever enacted,
it doesn't make sense that Congress interpreted "corruptly" that
broadly, or it would not have used all these other terms when it
was talking about preventing attendance at a proceeding.  Again,
words like "intimidating," "threatening," "harassing," those
seem to get at the physical blockage of -- this person isn't
going to be in this proceeding and this person is essential to
this proceeding.

But "corruptly" is not doing that kind of work.  It's more
tied to the integrity of the proceeding and is it being
manipulated and is the truth function being undermined.

So I'm interested in your response to that, and then I have
another structural point to make.  But what is the Court to make
of all of the other terms in all of those other provisions that
apply to analogous situations where people who are essential to
a proceeding aren't present for the proceeding?

MR. NESTLER:  Well, Congress often legislates in
redundancies, and we cited that point in our brief, Your Honor.
That's how the Supreme Court has said in *Connecticut National
Bank v. Germain.*  "Redundancies across statutes are not unusual

1    events in drafting."  And Congress should be interpreted to say

2    in a statute what it means and means in a statute what it says.

3         And so it is a valid interpretation to look at other

4    statutes and see what other language Congress used elsewhere,

5    but we start with what language Congress used here in 1512(c).

6              THE COURT:  But 1512(c) is a part of 1512 that uses

7    all of these other terms, like "intimidation" and "threatens."

8    It was put into that.  It wasn't carved out as its own separate

9    provision.

10         So are you basically -- are you saying that in 1512(b)

11   "intimidation" and "threaten" have no meaning, they're

12   superfluous, there's no need for them to be there?

13             MR. NESTLER:  No, Judge.  First of all, in 1512(b),

14   the phrase is "corruptly persuades," and that phrase does not

15   exist in 1512(c), which is just "corruptly."  And so the corrupt

16   nature in (b) requires a corrupt persuasion of another person.

17         And part of the reason for the introduction of 1512(c) was

18   the lack of the need, and defense counsel even cited this as the

19   legislative history, to persuade another person, that a person

20   can act corruptly by oneself without reference to another

21   person.

22             THE COURT:  And what do you take that to mean, you're

23   corruptly persuading another person?  Is it that you're

24   persuading a witness to testify in a certain way that's false?

25   How do you interpret that phrase?

1          MR. NESTLER:  Well, "corruptly persuades" has been

2    interpreted.  I believe that *Arthur Anderson* talked about the

3    definition in 1512(b) about corruptly persuades.  And that

4    involves again corrupt conduct, wrongful conduct --

5          THE COURT:  Right.  But the way you want me to read

6    (c) is you want me to read (c)(1) in that way, you know,

7    corruptly altering, destroying, mutilating that's interfering

8    with the integrity of the proceeding.  So you want me to read it

9    consistently with 1512(b) when it comes to (c)(1).

10         But when it comes to (c)(2), which also incorporates

11   "corruptly," you want me to read it to include these other

12   terms, right, "intimidating," "blocking," "using force,"

13   whatever these other provisions -- "threats"?  You want me to

14   read all that into "corruptly" in that context of 1512(c)(2)?

15         MR. NESTLER:  Not necessarily.  So 1512(c)(1) can

16   stand on its own.  It does not need to be read in reference to

17   1512(b).

18         THE COURT:  I know, but I mean, there corruptly is

19   clearly being used in a way that's more traditional than it's

20   talking about, you know, the administration of justice and

21   proceeding, the truth-finding function.  That's the traditional

22   definition there, in a way, you know, tampering with evidence.

23   So it's in line with 1512(b) in the same way that tampering with

24   witness testimony might be.  It's a traditional definition.

25         So I'm not saying that you have to read (c)(2) tied

necessarily to (1), but I'm saying -- it seems to me that you're asking me to read "corruptly" in (c)(2) as encompassing all of these things, not just the traditional function of corruptly as it relates to the administration of justice, but these other things, intimidation, threats, force, and the like, to include all of your theories here of why Mr. Reffitt obstructed this proceeding.  Maybe not all of them, but preventing members from attending, that's a different kind than typical corruptly.  It's not -- it just seems different in nature.  It's pulling someone out of the courtroom.  It's pulling someone out of the official proceeding.  It's blocking them from attending.  And when Congress intends to do that, it uses these other words to make that clear, and this is -- (c)(2) is a part of the statute.  It does just that in other provisions.  You have to assume that Congress enacted it with that backdrop.

MR. NESTLER:  We believe what Congress was doing was enacting a broad catchall, and that is something that Congress does across the U.S. Code, which is to specify certain crimes with certain words, and then as Justice Alito has mentioned, Justice Scalia has mentioned in the *Republic of Iraq v. Begay* case, talks about how Congress recognizes that there are situations that it cannot account for.  It did not believe this was going to happen, but it knows there are, quote, known unknowns.  And so it enacts these residual clauses to capture the other conduct that might not neatly fit within one of the

1    more specific provisions that it has enacted.

2        And that's --

3        THE COURT:  But wouldn't you think that Congress would

4    speak more clearly if this is truly a catchall to encompass

5    everything in 1512 and everything in 1503 and 1505?  It

6    eviscerates the need for any other statutory provision.

7        MR. NESTLER:  That's how catchalls work, Your Honor,

8    from our perspective.

9        THE COURT:  And that's how you read this, that there's

10   no need for any of these other provisions, Congress enacted a

11   20-year stat max that includes everything in this statute and

12   surrounding obstruction-type provisions with this one

13   phrase, "otherwise obstructs, influences, or impedes any

14   official proceeding"?

15       MR. NESTLER:  Yes.  Congress enacts the broad residual

16   clauses in order to capture those things that are not specified

17   in the other parts of the provisions.  And the fact that it's a

18   20-year statute, the government believes, does not have any

19   weight here, as we cited in our supplemental pleading.

20       The contempt statute is something similar, and Congress

21   believed that it was up to the judges at the executive branch to

22   decide which -- well, the appropriate punishment to request and

23   the judicial branch to decide the appropriate punishment to

24   impose depending upon the severity of the conduct.

25       The government -- sorry.

1          THE COURT:  The trouble I'm having is there are all

2     these specific provisions, including some you haven't charged,

3     that seem to apply here.  As I've discussed already with

4     Mr. Welch, 1512(d), "whoever intentionally harasses another

5     person and thereby hinders, delays, prevents, or dissuades any

6     person from attending an official proceeding," and it does

7     include a specific -- it includes attempt as well.

8          And there, for that conduct, it's very specific about what

9     Congress is trying to do.  It's a three-year stat max.  But

10    you're saying through this phrase Congress intended to absorb

11    1512(d) in the same statute into this one phrase of a dozen

12    words.

13         MR. NESTLER:  Well, first of all, Judge, I want to be

14    careful about discussing what Congress intended.  We don't

15    believe we need to talk about what Congress intended to do with

16    the statute, because the clearest indication of what Congress

17    intended to do is the language Congress chose.

18         THE COURT:  It chose "corruptly," and this is a vague,

19    undefined word.  To the extent Congress has defined it at all in

20    any of these provisions, it has tied it to the traditional, you

21    know, form of influencing, you know, the integrity of the

22    proceeding and administration of justice and the like.

23         MR. NESTLER:  We don't believe that Congress has so

24    limited the phrase "corruptly" in 1512(c).

25         THE COURT:  No, I get that; I get that.  But when

1    you're looking at such an undefined term that you're

2    interpreting so broadly -- you're basically saying the meaning

3    of "corruptly" is wrongful, which has, you know, no obvious

4    limiting principle when it's divorced from the administration of

5    justice and search for the truth.  You're essentially asking the

6    jury here to make a moral judgment on what's wrongful.

7         MR. NESTLER:  And the Supreme Court in *Arthur*

8    *Anderson,* when looking at the phrase "corruptly," said that

9    corruptly -- that was a 1512(b) case -- said that corruptly

10   should have the everyday meaning, depraves, evil, wrongful.

11        THE COURT:  But that was tied to a proceeding that

12   affected the administration of justice.  It wasn't blocking

13   people, you know, by assaulting law enforcement officers to

14   prevent members of Congress from assembling.  It's a very

15   different kind of use of the word in that context.  You're

16   pulling this into a completely new context that these other

17   provisions suggest Congress didn't intend.

18        MR. NESTLER:  We believe Congress intended the

19   language that it enacted, and that language is a catchall

20   provision which Congress has done time and time again to capture

21   conduct that it has not specifically prohibited in other

22   provisions.

23        And we do believe that there is a limiting principle, if

24   that is the Court's concern.  A limiting principle -- and there

25   are two that we laid out.  One is the nexus to the official

proceeding.  I believe that the colloquy Your Honor had with

Mr. Welch actually proves the government's point there.

Mr. Welch is arguing that there was no official proceeding and

that because the joint session had separated at that point that

Mr. Reffitt entered the Capitol grounds.

We take on the burden as the government to prove beyond a

reasonable doubt to the jury that there was an official

proceeding and that Mr. Reffitt intended to obstruct that

official proceeding, that specific proceeding.  And so if that's

the argument Mr. Welch wants to make to the jury, then that's a

perfectly valid argument.  We take that burden on.

I believe that actually reinforces the idea of why this is

not appropriate Rule 12 dismissal.  That's a factual question

for a --

THE COURT:  Wait, wait.  You're suggesting that his

defense -- we're going to sort this out with jury instructions

ahead of time.  You think a legitimate defense is for him to

argue that this doesn't constitute an official proceeding?

MR. NESTLER:  I think that argument would fail in

front of a jury, but I think he could certainly argue it.

THE COURT:  He would have to argue it consistently

with instructions.

MR. NESTLER:  Right.  And we would have to prove that

the defendant intended to obstruct a specific official

proceeding, and we would have to prove that Congress -- that

1    Congress was intending to assemble in a joint session and that

2    was an official proceeding and that the defendant was aware of

3    that and that he was intending to obstruct that.  And it is the

4    defense's argument that he lacked the mens rea to obstruct that

5    proceeding, the same way that in *Arthur Anderson* the accounting

6    company lacked the intent to obstruct the later investigation.

7    In *Aguilar*, the judge, who was the defendant in that case,

8    lacked the intent to have a false statement repeated to the

9    grand jury.

10        The government has to take on that burden of proving that

11   the defendant had that intent, and that is ultimately the

12   question for the jury because of that nexus requirement.

13        THE COURT:  Your three theories that you've

14   articulated here, one is the physical presence theory.  The

15   other is influencing members to vote a certain way.  Again, that

16   seems more tied to the traditional use of "corruptly."  And

17   maybe your theory about keeping evidence out of the room maybe

18   is, you know, akin to tampering with or destroying the evidence.

19   Again, we're consistent with how corruptly is used.

20        But physically preventing people from entering the room, it

21   just -- it seems like with all of these other provisions, that

22   Congress uses different terminology to cover that kind of

23   conduct.

24        MR. NESTLER:  And we believe that the defendant's

25   actions could be criminalized by 1512(d).  We're not saying that

1    he didn't violate 1512(d).

2         THE COURT:  I don't understand why you didn't charge

3    that one.  It seems like it's an easier lift.

4         MR. NESTLER:  We have taken on a higher burden for

5    ourselves, Your Honor, by proving 1512(c), which is requiring

6    the nexus and requiring a heightened mens rea of corruptly.  The

7    word "corruptly" is not in 1512(d).  He only has to act

8    intentionally.  We have taken on more for ourselves, and that is

9    our discretion to do, to prove that his conduct was not just

10   intentional but it was corrupt, it was evil and wrongful.

11        THE COURT:  But what does that mean?  The jury is to

12   decide what's evil?  That doesn't untether from a proceeding

13   that's a search for the truth and tampering with evidence,

14   tampering with witnesses?  It doesn't have meaning.  It's

15   standardless.

16        MR. NESTLER:  We don't believe it is, Judge.  The

17   Supreme Court said in *Arthur Anderson* that a jury can use the

18   normal meaning of the word "corruptly," and these are the normal

19   definitions of the word "corruptly."  So we're relying and our

20   proposed jury instruction on 1512(c)(2) will rely on what the

21   Supreme Court has said it believes "corruptly" means.

22        THE COURT:  Again, my response to that is that was

23   involving a completely different kind of situation where the

24   context is the administration of justice and the gathering of

25   evidence.

1    Some of the cases that you cite do use the term

2    "wrongfully," but often, they do so with a word like

3    "dishonestly."  And that's omitted here.

4         MR. NESTLER:  That's correct, Judge.  And that's

5    intentional.

6         THE COURT:  Why do you -- you don't explain why this

7    Court should omit a word like "dishonestly" from the definition

8    of "corruptly" and use it with "wrongfully."  You just want

9    wrongfully by itself.

10         MR. NESTLER:  We don't believe dishonestly applies in

11    this situation, and when other courts have used the

12    word "dishonestly" in addition to "wrongfully," they have been

13    usually in the disjunctive.  So we don't believe -- words that

14    are in the disjunctive, we don't believe an additional word like

15    the word "dishonestly" would be necessary in this case.  We

16    wouldn't intend to prove that the defendant was acting

17    dishonestly.  We would use the first word in the disjunctive,

18    which is "wrongfully."

19         The Seventh Circuit's pattern instruction on 1512(c)(2)

20    actually is, we believe, a good definition of what the

21    word "corruptly" means, especially when we compare that with

22    what the Supreme Court said in *Arthur Anderson*.  And it's up to

23    the jury to decide whether the defendant's actions were corrupt

24    on those -- the normal meaning of these terms.

25         THE COURT:  Let me make sure that I understand what

1  the government thinks it has to prove.  It agrees it has to

2  prove that the defendant acted knowingly and intentionally,

3  right, with the specific intent to obstruct, influence, or

4  impede an official proceeding; correct?  Am I right,

5  Mr. Nestler?

6          MR. NESTLER:  Yes.

7          THE COURT:  Then in addition, on top of that, the

8  government needs to prove that the defendant acted wrongfully,

9  and that's it?  Corruptly has no other gloss in the term other

10  than wrongful?  That's all corruptly means?

11          MR. NESTLER:  That's not correct, Judge.  We intend to

12  propose jury instructions that put additional gloss on the

13  term "corruptly."

14          THE COURT:  Tell me, what might those be?

15          MR. NESTLER:  A person acts corruptly if he acts

16  knowingly with intent to obstruct or impede an official

17  proceeding.

18          THE COURT:  But that's -- let's separate.  You say

19  there's two things.  You have to have plainly and intentionally

20  to obstruct an official proceeding.  We can agree that's

21  specific intent.  That's covered.

22      But in addition, wrongfully is something separate from

23  that.

24          MR. NESTLER:  Right.

25          THE COURT:  And what does that mean?

1           MR. NESTLER:  And with consciousness of wrongdoing.

2           THE COURT:  So it means -- "corruptly" means

3    wrongdoing or a consciousness of wrongdoing?

4           MR. NESTLER:  Right, consciousness of wrongdoing.  And

5    taking from the *Arthur Anderson* decision from the Supreme Court,

6    corruptly is normally associated with wrongful, immoral,

7    depraved, or evil.

8           THE COURT:  So a jury -- let's put aside the specific

9    intent to impede or obstruct an official proceeding, which a

10   jury would have to find.  In addition, a jury would have to find

11   that Mr. Reffitt acted corruptly, and that could be wrongfully,

12   immorally.  What other words did you use?

13          MR. NESTLER:  Depraved or evil.

14          THE COURT:  Depraved or evil.  And we just give those

15   terms to the jury?

16          MR. NESTLER:  Yes.  That is what the Supreme Court has

17   said the word "corruptly" means.

18          THE COURT:  I know, but where it said it is in the

19   context where you're dealing with the administration of justice

20   and the gathering of evidence.

21          MR. NESTLER:  Right.  So it's up to a jury to divine

22   whether it's somebody -- or who have called their senator and

23   said, "I don't want you to vote on this bill or I won't support

24   you in the next election."  Then the jury would have to

25   understand that was not corrupt.  Or Vice President Gore to file

1   a legal challenge to the 2000 election was not corrupt.  And so

2   a jury would make that decision that the actors in those cases,

3   they were trying to influence an official proceeding.  They were

4   trying to get the outcome they wanted.  But they weren't doing

5   so corruptly.

6       And we take on for ourselves a higher burden by proving,

7   and we believe we can meet that burden here, that the defendant

8   was acting wrongfully, immorally depraved, or evil at the time

9   he committed the offense.  It wasn't just intentional.  It did

10  have this higher mens rea.

11      THE COURT:  So you started off by mentioning two

12  theories.  There's really three potentially.  The evidence is

13  the third theory.

14      Are there any other theories that you haven't shared?

15      MR. NESTLER:  Of how the defendant violated

16  1512(c)(2)?

17      THE COURT:  Yes.

18      MR. NESTLER:  No, Judge.

19      THE COURT:  Again, I think to avoid undue surprise at

20  trial and in order to help me resolve this motion, I am going to

21  order you to file a bill of particulars.  And given that it

22  sounds like you're pretty settled on your theories, can you do

23  that by November 24th?

24      MR. NESTLER:  That shouldn't be a problem, Judge.

25  Just to be clear, the bill of particulars is our legal theory,

1    not our facts?

2           THE COURT:  I think it's really -- I'm not looking for

3    you to spell out all the evidence you're going to produce at

4    trial, but I take it that you're saying that Mr. Reffitt's

5    assaults, attempted entry, et cetera, the evidence that you will

6    introduce about what he did outside the Capitol are the facts on

7    which you would rely in order to prove that he had the intent,

8    corrupt intent to do these other things; is that right?

9           MR. NESTLER:  Right, and we listed some of those in

10   our pleading, like how we plan to prove the defendant's intent,

11   which of course we have to prove circumstantially based on his

12   words and his actions.

13      And so we do believe we can prove his intent, but that's --

14   just to be clear, our filing will lay out our legal theories by

15   which we believe the defendant intended to obstruct Congress.

16      And given the Thanksgiving holiday, Your Honor, would it be

17   possible to file something the following week, the week of the

18   29th?

19          THE COURT:  I will give you until the 29th.

20      Just to be clear, as you sit here, you don't think that

21   there's another theory?  This is the full scope of the

22   government's --

23          MR. NESTLER:  Yes, Your Honor.  I do need to speak

24   with my colleagues, obviously, before I finalize anything with

25   the Court, but that is generally our theory about how we believe

1    the defendant was intending or attempting to intend to obstruct

2    Congress.

3              THE COURT:  I will put out a minute order later today.

4    I will impose a date of November 29th.

5         Mr. Welch, is there anything more you would like to add?

6              MR. WELCH:  Just a couple of points, Your Honor.

7         The problem with the government's definition of "corrupt"

8    as just wrongful is that that runs head long into *Poindexter* and

9    *North* and also *Reeves*.

10        In *Poindexter*, at page 379, the D.C. Circuit said that

11   words like depraved, evil, immoral, wicked, and improper are no

12   more specific and, indeed, they might even be less specific than

13   the word "corrupt."  In *North*, at page 882, they said, "A

14   corrupt intent means the intent to obtain an improper advantage

15   for oneself or someone else."

16        And in *Reeves*, the Fifth Circuit said that to interpret

17   "corruptly" in an obstruction statute as meaning with an

18   improper motive or bad or evil purpose would raise the potential

19   of overbreadth.

20        So where corruptly is taken to require an intent to secure

21   an unlawful advantage or benefit, the statute does not infringe

22   on First Amendment guarantees, and it's not overbroad.

23        I think it's also important to remember what *Arthur*

24   *Anderson* resolved and what it didn't resolve.  It resolved the

25   question of whether it was erroneous for the Section 1512(b)

jury instructions to exclude consciousness of a wrongdoing

element, but it didn't address the issue of whether corruptly

may be defined as wrongfully in every context consistent with

due process.  It concerned corruptly in the context of legal

proceedings, not congressional proceedings.

And in *North*, Judge Silberman said that finding corruptly

in congressional proceedings means something different from the

term in legal proceedings.

And in addition, there was some talk about *Yates*.  And I

just want to remind the Court that in *Yates* the Supreme Court

said that it is highly improbable that Congress would have

buried a general spoliation statute covering objects of every

kind in a provision targeting fraud in financial recordkeeping.

And the Supreme Court was talking specifically about Section

1512(c)(2) when it said that.

THE COURT:  Okay.  Thank you, Mr. Welch.

Mr. Nestler, in *Arthur Anderson,* the Supreme Court did say

corruptly is normally associated with wrongful, immoral,

depraved, or evil.  What about Mr. Welch's point that it was in

that context that that definition was appropriate, in the

context of, you know, proceedings and the administration of

justice?

MR. NESTLER:  We believe that the word "corruptly"

would have the same definition here.  The Seventh Circuit, in

its pattern jury instructions, uses the phrase "wrongful."  It

1    relies on the jurors there to know what "corruptly"

2    and "wrongful" mean and to apply their everyday definitions.

3         We don't believe that Congress is required to define every

4    word in a statute, and the Supreme Court has certainly said as

5    much in that we rely on jurors to use the common sense

6    definition of these words.

7              THE COURT:  Does it go so far as to extend to include

8    physically preventing members of Congress from attending the

9    official proceeding?  That's the one that seems really far

10   afield here.

11             MR. NESTLER:  We understand Your Honor's concern.  We

12   believe it does.  If the defendant's actions were corrupt or

13   wrongful or evil or depraved, then yes, it would apply, and it's

14   up to a jury to make that decision.

15             THE COURT:  You conclude that it basically means that

16   this one provision swallows all of 1512 and all the surrounding

17   provisions?

18             MR. NESTLER:  We don't believe it swallows the others.

19   We believe it provides the space in the joints.  It provides the

20   catchall to capture the conduct --

21             THE COURT:  It does more than that.  You're saying

22   that it encompasses all of the rest.

23             MR. NESTLER:  We don't believe that it encompasses

24   every other -

25             THE COURT:  What does it not encompass?

1    MR. NESTLER:  Well, we have to go through the

2    different provisions about where they are.  Meaning in 1512(d),

3    we have to prove that there is a harassment that occurs.  And we

4    haven't delved into the meaning of that phrase, Your Honor, but

5    there are other provisions that are more specific, that define a

6    more specific conduct.  Those are the examples that Congress was

7    aware of, had thought of, and therefore specifically prohibited,

8    which is why here Congress enacted the catchall to catch those

9    things that it didn't -- it knew other things existed out there,

10   and it did not know how to proscribe them.  So it enacted a

11   general catchall to capture those conducts.

12   THE COURT:  I get that 1512(d) that includes the

13   word "harasses" is something different than you may have to

14   prove here.  But that doesn't answer my question, which is

15   whether 1512(d) can also -- the substance of what's in there

16   would also be covered by 1512(c)(2).

17   MR. NESTLER:  It may be, and 1512(d) may be a lesser

18   included of 1512(c)(2).  There are courts that have held that

19   1512(d) is a lesser included of 1512(b).

20   THE COURT:  One supplemental filing, when you file the

21   bill of particulars, if you could also -- it doesn't need to

22   have briefing, but can you identify parts of 1512 or surrounding

23   statutes, like 1503, 1505, that you think are not covered by

24   1512(c)(2), if there's any part of the obstruction of justice

25   statutory provisions that aren't captured and, in your words, a

1 lesser included offense of 1512(c)(2).

2    MR. NESTLER:  Yes, Judge.

3  Can I just respond to one additional point Mr. Welch made,

4 which is the way that "otherwise" works with regard to

5 1512(c)(2).  And Mr. Welch used the word that 1512(c)(2) is

6 understood in light of 1512(c)(1).  I just want the Court to be

7 aware, we agree with that.  1512(c)(2) is understood in light of

8 1512(c)(1).  It is just not tethered to 1512(c)(1).

9  And what we mean by that --

10    THE COURT:  But what does that mean, that it's

11 understood in light of that?

12    MR. NESTLER:  Sure.  Because of the word "otherwise,"

13 it has to relate back to what 1512(c)(1) says.  And

14 so "otherwise obstructs, influences, or impedes" means

15 obstructs, influences, or impedes in a way other than altering,

16 destroying, mutilating, or concealing a record.

17    THE COURT:  Does it also mean in a way that impairs

18 the evidence's integrity or availability for use in an official

19 proceeding?

20    MR. NESTLER:  No.  It means other than that.

21    THE COURT:  So it's not even tied to even an object?

22    MR. NESTLER:  Correct.  That is why we believe

23 Congress -- and we're talking why Congress enacted the statute,

24 which we don't believe we should be defining Congress's intent.

25  But the way the statute is phrased, it is understood in

1    light of (c)(1), because we're reading (c)(2) to mean in a way

2    different than or other than the verbs that are in (c)(1).

3           THE COURT:  One way to read this is this is

4    post-Enron, and before these changes, there was a problem

5    prosecuting someone who destroyed a document him- or herself

6    rather than, you know, got someone else to destroy the document.

7           MR. NESTLER:  Right.

8           THE COURT:  So while I don't disagree with you that

9    it's clear that Congress intended to create a catchall, it

10   doesn't necessarily mean that the catchall can relate to

11   anything, including appearance of people in proceedings, as

12   opposed to anything relating to evidence.  It could be a

13   catchall, but a catchall in that context in other ways, still in

14   different ways, but nonetheless still tethered to evidence.

15          MR. NESTLER:  Sure, and Congress could have drafted

16   (c)(2) to relate to evidence, but because it said "otherwise

17   obstructs, influences, or impedes any official proceeding," and

18   it's contrasting in (c)(2) with what it said in (c)(1).  (c)(1)

19   relates to evidence.  (c)(2) says otherwise.  So the most

20   natural reading of (c)(2) is obstructs a proceeding in a way

21   that does not relate to evidence.

22          THE COURT:  But in so doing, with that broad reading,

23   Congress -- well, tell me if I'm wrong, but I think you're going

24   to say Congress incorporated all of the other proceedings -- all

25   the other provisions, rather, into this catchall.  It covers

1    everything, everything it previously enacted.

2          MR. NESTLER:  It could have.  Congress saw there was a

3    need to close a loophole, and that's why it enacts catchalls.

4    So it saw the need for a catchall and especially the uncovered

5    conduct it did not anticipate.

6          And so in many ways, what Congress did when enacting

7    1512(c)(2) is to capture those things that it knew could be out

8    there, there could be depraved, evil conduct, wrongful conduct

9    that people could engage in that Congress didn't know how to

10   legislate against and proscribe specifically in advance, and

11   that's why this statute is here.

12         THE COURT:  What counsels against that or counsels

13   narrowing this interpretation you're giving, is at every other

14   time historically Congress used the word "corruptly," it was in

15   a different way.  It wasn't in, you know, blocking people from

16   entering the courthouse.  Congress used other language, and I

17   can't buy, you know, the interpretation of, say, 1512(b) that

18   Congress put intimidation and threaten in there on top of

19   corruptly but there was no need to put them in there because

20   corruptly covered it.  That doesn't make sense to me.

21         So if Congress had said whoever corruptly or uses

22   intimidation, threats, use of force, harassment, obstruct,

23   influence, impede an official proceeding, I would be more

24   inclined to accept what you're saying.

25         But Congress used one word and one word only, and the only

place Congress has ever defined that word is in connection with the administration of justice.

So it's hard to make a leap that by just having that one term, that Congress intended to open this provision up to include other provisions that Congress had previously enacted that involved use of force, threats, intimidation, and the like.

It seems that Congress would have maybe not announced to everyone hey, this is a catchall, this, you know, incorporates every other proceeding in the code relating to obstruction of proceedings.  It might not do that, but you would think that Congress would include some of the other language to make sure courts didn't interpret this more narrowly than Congress intended.  And the way they could do that is they could look at all these other provisions and say oh, we want to cover those provisions that also use force and threats, so we really are creating a big catchall.

Instead, Congress put this in a section dealing with evidence, and it's not its own separate statute.  It's in a statute that has these other more detailed provisions.  It can't be at the time they were enacted they weren't superfluous, these terms that Congress used.  They had meaning.  And so it really suggests that this isn't a super large catchall that the government says it is.

MR. NESTLER:  And just to be clear, we are not arguing it's a super large catchall that captures every other part of

1    Chapter 73.  In fact, I tend to agree with Your Honor that if

2    Congress had used the phrase "corruptly or by force or

3    intimidation or threats does the following things," that would

4    more capture some of the defendant's conduct.

5        We are taking upon ourselves to prove that the defendant's

6    conduct was corrupt without resorting to having a jury

7    instruction that says intimidation or threats.

8            THE COURT:  But here's the thing.  If in other

9    provisions you would have to prove harassing conduct or

10   intimidation or threats, if that would be required to prove

11   these other provisions, but here, you don't have to prove it.

12   You just have this word "corruptly," which means wrongfully or

13   evil.

14       It's not putting the government to a higher standard of

15   proof.  It's putting the government to a lower standard of

16   proof, if that's how we're going to define "corruptly."  I agree

17   it puts you at a higher standard if you define "corruptly," you

18   know, in some way tethered to the administration of justice.  It

19   does, because you're going to have to show that he, you know,

20   intended to impede and in doing so he was trying to impede, you

21   know, influence the members of Congress to vote another way or

22   effectively destroy the evidence.

23       If I prepare a jury instruction that says that, you do have

24   a higher standard of proof.  If I don't, you have a lower

25   standard of proof than you have in all these other provisions.

1    But if I don't put something more on corruptly other than

2    wrongful or evil or depraved, it's kind of standardless, but

3    it's divorced from the administration of justice, as it's always

4    been in *Anderson* and every other context.

5              MR. NESTLER:  We agree we are in a unique context

6    because it was a congressional proceeding and not a court

7    proceeding.  But regardless, Congress specified in the statute

8    at 1515(a)(1)(B) that a proceeding before the Congress counts as

9    an official proceeding.

10             THE COURT:  I buy your argument there.  My point is,

11   if you are going to charge somebody, you know, with blocking the

12   courthouse doors, you wouldn't just use the word "corruptly."

13   You would be bringing the case under one of these provisions

14   that's talking about intimidation or threats or use of force.

15   You wouldn't just be lumping it into the corruptly mens rea.

16             MR. NESTLER:  Probably because in those situations

17   there's a more easily provable offense, which is why Congress

18   has these specific provisions.

19             THE COURT:  The more easily provable offense here is

20   1512(d), attempting to harass people and prevent them from

21   attending an official proceeding.

22             MR. NESTLER:  And we would agree that the defendant's

23   conduct would satisfy 1512(d).

24             THE COURT:  And that's a felony offense with a

25   three-year max.  That goes to the same guideline, the same

obstruction guideline as this one.  It's more specific, and it's more tied to what the alleged conduct is.

MR. NESTLER:  And we believe if the defendant is ultimately convicted of 1512(c), then that would be an appropriate consideration for the defense to raise or for the Court to rely on in terms of how severe to sentence the defendant, because Your Honor is looking at comparisons.  That would be the appropriate time to look at that.  There's no restriction on what the statute --

THE COURT:  But that provision, which seems to fit the alleged facts here so much better, doesn't have "corruptly" anywhere in it.  It says "harasses."  The other provisions do have corruptly, but they also have intimidation, threats.

So it just -- it makes it difficult to conclude that this (c)(2) provision includes all the rest when Congress delineated, you know, other terms to cover that kind of conduct that didn't relate to document destruction or witness tampering or juror tampering, but keeping people out of the room.

MR. NESTLER:  Right.  What the defendant was doing, and we can explain this more, it's not just keeping people out of the room.  Of course, we talked about influencing to vote a certain way.  But it was to make it such that the proceeding would not go forward at the time that the defendant didn't want it to go forward and to reach the result that the defendant wanted to breach.

1     So it's not just blocking a court's door.  There are other

2  things happening related to the proceeding that was going on on

3  January 6 and what it was doing in terms of declaring the winner

4  of the presidential election, that the defendant was trying to

5  accomplish his goal by preventing the proceeding itself from

6  occurring, not just having the door being blocked, not just

7  preventing a certain person from going in, but the proceeding

8  itself from actually --

9     THE COURT:  The same would hold true with a criminal

10  trial.  If you prevented the judge who was trying the case from

11  coming into the courthouse, you're preventing evidence from

12  being produced.  You're preventing the process from going on.

13     But in those instances, I think the defendant doing that is

14  going to be using, you know, force, threat, harassment,

15  something other than corruptly.

16     MR. NESTLER:  But in this situation, the delay of the

17  proceeding itself is the end.  So in a situation where blocking

18  the courthouse doors the courthouse was going to reopen the next

19  day, that is a lower ultimate harm.  It is illegal, and we

20  believe it will be covered by the other provisions of the

21  statute or by (c)(2).

22     But the ultimate harm that the defendant is trying to

23  obtain there is lower.  Here, the defendant is trying to obtain

24  a specific harm to the country, to Congress, to our

25  constitutional order, which is preventing the proceeding from

happening at the exact time it's supposed to happen, because all
of these other pieces for our system of constitutional democracy
require that Congress meet at 1:00 p.m. on January 6 in the
Capitol in order to declare the president and vice president so
all the other pieces related to the inauguration and the
transfer of power can happen.  And so the delay of the
proceeding itself, separate and apart from preventing a certain
congressperson or certain senator from being present, actually
accomplishes the end result.

In other words, at a trial, there are -- let me put it this
way:  For Congress, if a certain congressperson wasn't able to
attend, the proceeding would have still gone forward.  It's the
fact that Congress itself, the joint assembled Congress, all 535
people, could not be there to perform its constitutional duty,
that is what was being obstructed, and that was --

THE COURT:  But your theory number 1 is physically
preventing all members of Congress from attending the official
proceeding.

MR. NESTLER:  Correct.  Or on the flip side,
preventing the official proceeding from going forward because
the --

THE COURT:  This is why we need more clarity in a bill
of particulars, because your theory is shifting somewhat.  I'm
not criticizing you for it, but I think in order to resolve this
motion, I need to understand what the theory is.

1            MR. NESTLER:  Yes, Judge.

2            THE COURT:  All right.  Anything else, Mr. Welch or

3     Mr. Nestler?

4            MR. WELCH:  I believe I've covered the points I

5     intended to cover today.  Thank you.

6            THE COURT:  So, Mr. Nestler, you will file the

7     information we discussed by November 29th; correct?

8            MR. NESTLER:  Yes, Judge.

9            THE COURT:  All right.  Thank you all.

10            MR. NESTLER:  Should we set a further date, Your

11     Honor?

12            THE COURT:  Have I -- I have not reviewed the docket.

13     Remind me, Mr. Nestler, do we not have the pretrial date set?

14            MR. NESTLER:  I don't believe we do.  We received a

15     minute order after Your Honor's ex parte hearing with the

16     defendant and defense counsel rescheduling the trial from

17     November 15th to February 28th.  I can double-check if that

18     minute order included anything else.

19            THE COURT:  For the time being -- what would the

20     parties suggest in terms of the next court date?  Remind me.

21     Did I not set deadlines for the filing of motions in limine?

22            MR. WELCH:  Yes.

23            THE COURT:  When are those due?

24            MR. WELCH:  The 24th of this month, next week.

25            THE COURT:  Then they'll be ripe for resolution when?

1          MR. WELCH:  I think there was some time for a reply.

2     I've just got to look at that.

3          MR. NESTLER:  We already filed three motions in

4     limine, Your Honor.  I believe that the defense is (distorted

5     audio), as well as filing any motions in limine based on the

6     evidence we intend to introduce, which we've already provided.

7          THE COURT:  Sorry, Mr. Nestler.  I didn't catch what

8     you said.  You said you've already filed three motions in

9     limine?

10          MR. NESTLER:  Yes, and I don't believe the defense has

11     responded to any of them.

12       And I believe we also provided the defense, prior to our

13     last trial date and consistent with the judge's -- with Your

14     Honor's instructions, a copy of our exhibit list and drafts of

15     all of our exhibits.

16       And so I believe Your Honor's intention was for the defense

17     to file any motions in limine attacking or objecting to any of

18     our evidence so we could actually --

19          THE COURT:  Absolutely.  I trust, Mr. Welch, that

20     those are going to be filed by the 24th?

21          MR. WELCH:  Correct.  And oppositions are due

22     December 8th.

23          THE COURT:  Are you interpreting my order to give you

24     until December 8th to respond --

25          MR. WELCH:  No, no.  My understanding was that I had

1    to have that in by the 24th.  And then when you had asked about

2    when things would be ripe for the purposes of scheduling another

3    hearing, as the government is asking for, the oppositions are

4    due December 8th is what I was saying.

5              THE COURT:  Are you conceding the government's

6    motions?

7              MR. WELCH:  No.

8              THE COURT:  And when were those filed, Mr. Nestler?

9              MR. NESTLER:  Court's indulgence.

10        Those were filed on October 21st.

11             THE COURT:  Again, Mr. Welch, you must have

12   interpreted my order to give you until December 8 to oppose

13   motions in limine that were filed in October?

14             MR. WELCH:  Yes, to oppose those.  My motions in

15   limine are due the 24th.  Oppositions to all motions in limine

16   from either side are due the 8th of December.

17             THE COURT:  Mr. Welch, you've had a lot given to you

18   early, and I'm going to ask that you respond to those motions --

19   I can understand the ambiguity in the order, but given that

20   these motions have been pending as long as they have, I think

21   that you can file a response before the 8th.

22        So how long do you need to do that?

23             MR. WELCH:  Let me look at my calendar, please.

24        How about the 1st?  Would that be acceptable?

25             THE COURT:  Okay.  You will file that the 1st of

1    December.  And the motions will be ripe by December 15th; is

2    that right?

3                MR. WELCH:  I believe so.

4                MR. NESTLER:  Yes, Your Honor.

5                THE COURT:  I'm inclined to set a hearing late the

6    first week of January.  What is counsel's schedule like on

7    January 6 and 7?

8                MR. NESTLER:  I'm available on January 6 and 7, Your

9    Honor.  I'm just double-checking with -- we would prefer

10   January 6, Judge.

11               MR. WELCH:  Your Honor, I would need to ask for the

12   afternoon on those days, because currently -- and I can let you

13   know when this changes -- the Court of Special Appeals has asked

14   me to be available for an oral argument that week and a couple

15   of days the following week, but they haven't told me

16   specifically which ones.  Now, those are always in the morning.

17               THE COURT:  Are you available in the afternoon on the

18   6th, Mr. Nestler?

19               MR. WELCH:  Yes, I would be.

20               MR. NESTLER:  And that's fine with the government,

21   yes.

22               THE COURT:  So we will set this for 2:00 p.m., and

23   that will be, for lack of a better word, an initial pretrial

24   hearing, but it's really intended to take up your motions in

25   limine at that point.

1        And to the extent -- I know I need to put out a more

2   fulsome pretrial order, which I will do, before the Thanksgiving

3   break.  But at a minimum, you all should be prepared to argue

4   any motions I haven't resolved by January 6th on that date.

5        MR. NESTLER:  Yes, Your Honor.  And just to be clear,

6   Your Honor also asked us to submit joint proposed jury

7   instructions and voir dire by the 24th, and we're intending to

8   provide our drafts to Mr. Welch at the end of the day today of

9   those documents.

10        THE COURT:  Mr. Welch, this is a joint submission.  So

11   I'm really not looking for dueling instructions and voir dire on

12   everything.  If there's certain areas that you all disagree on,

13   which I suspect there will be, fine, but tell me also what you

14   agree on.

15        MR. WELCH:  I understand.

16        THE COURT:  Okay.  All right.  So is there a motion to

17   exclude time from now until January 6 in calculating the date

18   for a speedy trial, or have I already excluded time until the

19   date of trial?  Mr. Hopkins?

20        COURTROOM DEPUTY:  I'm checking that right now, Your

21   Honor.  It looks like you have -- you've excluded time until the

22   28th of February, Your Honor.

23        THE COURT:  All right.  So no need to do so again.

24        So I will see you back on January 6th at 2:00 p.m.

25        (Proceedings adjourned at 12:03 p.m.)

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7          Please Note:  This hearing occurred during the

8   COVID-19 pandemic and is, therefore, subject to the

9   technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick                 November 21, 2021

13   SIGNATURE OF COURT REPORTER      DATE

14

15

16

17

18

19

20

21

22

23

24

25