# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 21-24 (EGS) |
| ROBERT GIESWEIN, | |
| Defendant. | |

## MR. GIESWEIN'S MOTION FOR TRANSFER OF VENUE

Robert Gieswein, through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 21(a), hereby respectfully requests that this Court transfer the proceedings to the District of Colorado.

## ARGUMENT

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is so fundamental to Due Process that, notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court *must* transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire bias and actual juror bias). As recently as 2010, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide the lower courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage. [1] *Skilling*, 561 U.S. at 378.

Where it attaches, the Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change

---

[1] Though not relevant to the instant motion, the Court identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt.

of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, under this precedent, *voir dire* is simply not a cure for significant and substantiated Due Process concerns about the jury pool.

Mr. Gieswein respectfully submits that each of those concerns is pressing in this case.

### A. The size and characteristics of the District of Columbia jury pool weigh in favor of finding a presumption of prejudice.

The foundation for the presumption of prejudice is found in *Rideau*. 373 U.S. at 727. In *Rideau*, the first factor that the Court weighed in favor of a finding of prejudice was that about half of the small jury pool had been exposed to prejudicial media reporting about the case. *See id*. Despite the fact that *voir dire* revealed that only three jurors had actually seen the broadcasts at issue, the Court found that the share of the pool that was tainted was significant enough as to render the defendant presumptively prejudiced. *See id*.

Because measuring the reach and impact of negative media reporting is difficult, in applying *Rideau*, many courts have focused on population size and diversity as a proxy for the share of the population that was likely impacted. For example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal, and because

3

Houston is the fourth-largest city in the United States, and is highly diverse, a significant number of prospective jurors would have had no connection to Enron whatsoever. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.").

In contrast to Houston, the District of Columbia is one of the smaller major US cities, with a population under 700,000.[2] And the impact of the events of January 6 on the residents of the District of Columbia were far more widespread than that of Enron in Houston, affecting a far greater share of residents than the conduct at issue in *Skilling*.

First, as the Court is no doubt aware, a huge proportion of District of Columbia residents either work for the federal government themselves or have friends or family who do. Specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater DC area (excluding postal workers, federal bureau of investigation workers, and staff on several federal commissions).[3] Nearly 200,000 of those workers and annuitants are within the District itself. *Id*. With a total population of around 690,000, it seems

---

[2] *See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade*, DC.gov (Apr. 26, 2021) (DC population recorded by census as 689,545),https://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripled-compared-previous-decade.

[3] *Federal Civilian Employment*, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.

clear that any given member of the District jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the DC Policy Center, *active* federal employment (including postal workers) accounts for nearly a third of all jobs in the District itself.[4] And of course, for each federal worker, there are many friends and family members who are closely connected to the federal government by proxy.

In particular, nearly 15,000 individuals work for Congress directly, and many more residents have friends and family who do.[5] Another large share are in, or have friends and family in, the many law enforcement groups who took part in responding to January 6.[6] This means that an enormous share of District of Columbia residents

---

[4] *Trends in Federal Employment in DC,* DC Policy Center (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

[5] *Vital Statistics on Congress*, Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.

[6] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. *Human Capital Strategic Plan 2021-2025*, U.S.Capitol Police (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. *See Metropolitan Police Force Annual Report 2020*, DC.gov (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.pdf ; *see also About Us*, DC National Guard (2020), https://dc.ng.mil/About-Us/. More than 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html. And while not all individuals employed by these agencies reported to the Capitol on January 6, all 9,350 individuals *were* directly and adversely affected by the January 6 events in the form of increased presence and overtime demands in

have significant and unique connections with individuals or institutions that were affected by January 6. Such connections are not likely to be present in any other comparable district. Because the government and much of the media have characterized the events of January 6 – including the attempted obstruction in which the government alleges Mr. Gieswein participated – as an attack on our elections, government institutions generally, and democracy as a whole, this suggests that those District residents closely connected to the government are more likely to view themselves as the direct victims of the events.

Second, even District residents that have no direct connection to the government reported feeling deeply traumatized by the events that took place so close to where they live and work. For example, one DC resident shared in an interview that:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door[.] I've been having a lot of conversations with people this morning, loved ones. We're all hurting. We're terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45-year existence.[7]

_____

the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, The Hill (July 7, 2021), https://thehill.com/policy/national-security/561832-more-than-75-capitol-police-officers-have-quit-amid-low-morale-since.

[7] *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021), https://www.cbc.ca/radio/asithappens/as-it-happens-thursday-edition-1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns-atrocities-at-u-s-capitol-1.5864894.

Such accounts are typical of those gathered in interviews in the days following January 6, during which the Mayor declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend inauguration.[8] District neighborhoods became occupied by the Metropolitan Police and over 25,000 military personnel in the weeks that followed.[9] Indeed, a local subsidiary of the national public broadcasting network, *DCist*, reported that:

> Residents have rescheduled medical appointments or switched up their bike and run routes to steer clear of downtown D.C. or the Capitol complex. Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection. Some are making plans to leave the city for inauguration. And many have feelings of anger, sadness, and heightened anticipation for the near future. […] Some residents are also worried that a stepped up military and police presence in the city may only add to their unease.[10]

---

[8] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today;*Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021) (noting the many street closures),https://www.washingtonian.com/2021/01/11/dc-mayor-says-americans-should-not-come-to-washington-for-the-inauguration/.

[9] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan. 15, 2021),https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.

[10] Jenny Gathright and Rachel Kurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, DCist (Jan. 13, 2021), https://dcist.com/story/21/01/13/dc-state-of-emergency-residents/.

Moreover, as the Court is no doubt aware, the effects of these events continue to be felt in the District. Indeed, District residents reacted with fear in anticipation of protests planned for September of 2020 that were intended to show support for individuals detained in connection with prosecutions arising from the events of January 6. For example, the *New York Times* ran a piece titled "Washington, D.C. On Edge Over January 6 Protests,"[11] and the Associated Press similarly reported "In Edgy Washington, Police Outnumber Jan 6 Protestors," capturing the District's overall tenor and response to these ongoing demonstrations.[12]

Third, an overwhelming number of District of Columbia residents — over 92 percent — voted for President Biden.[13] According to the government's theory of the case, Mr. Gieswein and the others charged in connection with January 6 did what they did in order to prevent Joseph Biden from becoming President notwithstanding his share of the electoral and popular vote.[14] That is, the government's theory is that Mr. Gieswein and others were seeking to nullify the votes of an overwhelming majority of District residents[15] – in the *only* national election in which District

---

[11] Jonathan Weisman and Matthew Rosenberg, *Washington, D.C., on Edge Over Protest of Jan. 6 Arrests*, N.Y. Times (Sept. 18, 2021), https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html.

[12] Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021),https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters.

[13] *General Election 2020: Certified Results*, DC Board of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

[14] *See, e.g.*, Gov't Mem., ECF No. 19 at 13 (characterizing the events as an attempt to occupy the Capitol in order to prevent the certification of the Electoral College results).

[15] *See id.*

residents have any say, given their lack of representation in Congress. *See, e.g.*, *Castanon v. United States*, 444 F. Supp. 3d 118, 139 (D.D.C. 2020) ("Article I contemplates that only 'residents of actual states' have and may exercise the House franchise") (citing *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000)), *reconsideration denied*, No. CV 18-2545, 2020 WL 5569943 (D.D.C. Sept. 16, 2020), *aff'd*, No. 20-1279, 2021 WL 4507556 (U.S. Oct. 4, 2021). Finally, the government, the media, and even judges in this division speak of these prosecutions as designed to prevent "another January 6," and District of Columbia residents know that a repeat of January 6 can only take place in their home.[16] As such, the residents of the District sitting as jurors are highly likely to view Mr. Gieswein not only as someone who victimized them, but also as someone who might victimize them again in the future, raising a concern about punishing for propensity.

Given the electoral makeup of the District, it would be impossible to empanel a jury that was not full of people that the government charges were the targets of Mr. Gieswein's alleged offenses. *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (the

---

[16] *See, e.g.*, Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021) https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump-documentary-what-matters/index.html*; see also* Jordan Fischer et. al, *Judge Skewers DOJ At January 6 Sentencing*, WUSA9 (Oct. 28, 2021) (explaining that the sentence was **designed to alert** "others who might consider attacking the Capitol to know their punishment would 'hurt.'"), https://www.wusa9.com/article/news/national/capitol-riots/resolving-the-crime-of-the-century-with-misdemeanors-judge-skewers-doj-at-january-6-sentencing-beryl-howell-jack-griffith-anna-morgan-lloyd/65-352274e8-7279-4792-a878-cf4cb0cc20ae.

population of the greater metro area, including Virginia and Maryland, was large enough to not support an inference of prejudice by media reporting). Thus, though significantly more populous than the pool in *Rideau*, for example, Mr. Gieswein submits that the impact of the events of January 6 was felt by a far greater proportion of the residents and felt much more personally and viscerally. The events of January left those residents—and therefore the jury pool—neither impartial nor indifferent.

### B. The nature and volume of Mr. Gieswein's national and local media coverage weigh in favor of finding that there is a presumption of prejudice because of greater saturation and impact at the local level.

Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is especially true where publicity is both extensive and sensational in nature. *Quiles-Olivo*, 684 F.3d at 182. That said, observing that "prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance," the Supreme Court has repeatedly rejected claims of prejudice that rely exclusively on negative but dispassionate media reporting. *Skilling*, 561 U.S. at 358 (citing *Irvin*, 366 U.S. at 722). Something more, such as charged rhetoric or the reporting of gruesome details, is needed to establish prejudice. *See id.* (rejecting the argument

that media coverage was prejudicial where "media coverage, on the whole, had been objective and unemotional, and the facts of the case were neither heinous nor sensational."). The Court has repeatedly recognized that "something more" exists when the media coverage is particularly inflammatory, and where it pervades the court proceedings. *See Murphy*, 421 U.S. at 799 (1975) ("In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings"); *see also id.* ("[P]roceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled"). Finally, the problematic media must either be local in distribution, or must have greater local saturation or impact than in other districts; otherwise, there is no disparate prejudicial effect between different (comparable) venues.

For example, in *Skilling*, the defendant cited to hundreds of media reports about the Enron scandal in his motion for a transfer of venue. 561 U.S. at 358. He argued that as the former Chief Executive Officer, such articles necessarily implicated him by proxy, if not directly. *See id.* The Court disagreed, referencing its earlier opinions concerning the modern ubiquity of news media, and reiterating its former conclusion that volume does not, on its own, create prejudice. *See id.* at 382. Rather, it is sensationalism of the type that would be easily remembered—not an objective reporting of the facts—that was found to be prejudicial in prior cases before the Court.[17] *Id.* at 381. The Court observed that the stories that Skilling cited about

---

[17] Of course, as the concurrence in part pointed out, *voir dire* later revealed that these "objective" media reports had indeed created a bias among many potential jurors, and

Enron contained "no confessions, no blatantly prejudicial information," and were "largely objective and unemotional." *Id*. at 370-71, 382 (observing that none of the reports "invited prejudgment of his culpability"). As such, the Court held that it was inappropriate to apply a broad presumption of prejudice.

Here, in a city still feeling the impacts described *supra*, the pre-trial publicity—both national and local–has only served to enhance and sustain the effects and by extension, sentiments about the participants. The volume, depth of coverage, and duration of the reporting about January 6 has been almost entirely unprecedented, perhaps only comparable to the reporting following September 11.[18] And viewers who identified as Democrats—like most of the District population—were 20% more likely to have reported hearing "a lot" about the events than those who identify as Republicans.[19] It has also been sensational, including the repeated showing of select snippets of photographic and video footage appearing to show the destruction of the Capitol property and officers in distress. Indeed, some of these officers have testified before Congress about their experiences that may or may not have been

---

that the District Court failed to properly vet their assurances of impartiality after those biases were revealed. *See id*. at 427 (Sotomayor, J., concurring in part).

[18] "Nearly seven-in-ten adults (69%) say they have heard 'a lot' about the rioting at the U.S. Capitol on Jan. 6." *Views on the Rioting at the US Capitol*, Pew Research Center (Jan. 15, 2021), https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ ; *compare with The War On Terrorism*, Pew Research Center (May 23, 2002), https://www.pewresearch.org/journalism/2002/05/23/the-war-on-terrorism/.

[19] *See id*.

representative of the whole—testimony that was also widely circulated in print and through video.[20]

The language used in media coverage of the events of January 6 and of the defendants involved in those events has been especially charged and inflammatory. Reporters and their interviewees, including members of Congress, consistently refer to the defendants as "insurrectionists," "rioters," "seditionists," "domestic terrorists" "white supremacists" and "criminals" in the media.[21] For example, in late January, President Biden referred to those involved in the January 6 events as "a group of thugs, insurrectionists, political extremists, and white supremacists."[22] Similarly, representative Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack."[23] The coverage of the scene itself has also been sensationalist, relying on gruesome details in click-bait headlines to galvanize the public. For example, a recent video released on CNN began:

> Hours after the last rioters had been pushed from the Capitol, when there was still glass on the stairs and ***blood***

---

[20] *See, e.g.*, *Police Officers Deliver Emotional Testimony About Violent Day at the Capitol*, Washington Post (July 27, 2021), https://www.washingtonpost.com/politics/2021/07/27/jan-6-commission-hearing-live-updates/.

[21] *See* Ex. 1 (subset of media coverage in summary form).

[22] *Remarks by President Biden at Signing of an Executive Order on Racial Equity*, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-anexecutive-order-on-racial-equity/.

[23] *Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief'*, NBC4 Washington (Jan. 13, 2021), https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-in-chief/2540892/.

> ***on the floors***, Congress tried to get back to the business of
> democracy . . . [24]

This is hardly comparable to the "unemotional" reporting on Enron's collapse and the
white collar crime allegations against its management as described by the Court in
*Skilling*. 561 U.S. at 371-72, 382.

Additionally, much of the early reporting has since been shown to be factually
inaccurate. For example, immediately following the events of January 6, President
Biden, among other high-profile individuals, claimed that January 6 protestors *killed*
Officer Brian Sicknick, and he repeated the claim months after it became clear that
there was no basis for it.[25] Even the official press release stated that:

> Officer Brian D. Sicknick passed away *due to injuries*
> *sustained while on-duty*. Officer Sicknick was responding
> to the riots on Wednesday, January 6, 2021, at the U.S.
> Capitol and was injured while physically engaging with
> protesters.[26]

These claims were widely circulated and did reputational damage to defendants
before the medical examiner quietly reported—more than four months later—that
Officer Sicknick died of two strokes, and that he sustained no internal or external

---

[24] Wolf, *supra* note 16 (emphasis added).

[25] Christian Datoc and Jerry Dunleavy, *Biden Claims Jan. 6 Rioters Killed Capitol
Police Officer Brian Sicknick*, Washington Examiner (June 17, 2021), available at
https://www.yahoo.com/now/biden-claims-jan-6-rioters-161300824.html.

[26] *Press Release: Loss of USCP Officer Brian Sicknick*, United States Capitol Police
(Jan. 7, 2021) (emphasis added), https://www.uscp.gov/media-center/press-
releases/loss-uscp-colleague-brian-d-sicknick.

injuries from his exposure to chemical spray on January 6.[27] The often repeated but wrong claim that protesters killed this officer could be especially prejudicial to Mr. Gieswein, who also stands accused of using chemical spray on officers. Moreover, the reporting specific to Mr. Gieswein has been similarly riddled with inaccuracies. For example, articles in the *Washington Post*, among other outlets, have repeatedly linked Mr. Gieswein to extremist groups such as the Proud Boys and Three-Percenters, despite the fact that he is not affiliated with either group, as the government conceded in its detention arguments.[28]

The saturation of this charged and inflammatory reporting in the District is so substantial that it would be surprising to identify any potential jurors who have not been exposed to the coverage.[29] And although some in the jury pool may not have

---

[27] *Capitol Police Officer Died of Natural Causes, Officials Say*, Washington Post (Apr. 19, 2021), https://www.washingtonpost.com/local/public-safety/brian-sicknick-death-strokes/2021/04/19/36d2d310-617e-11eb-afbe-9a11a127d146_story.html.

[28] *See, e.g.*, *Actions by Proud Boy at Capitol Show 'Planning, Determination, and Coordination,' U.S. alleges*, Washington Post (Jan. 2021), https://www.washingtonpost.com/local/legal-issues/brothers-charged-eugene-goodman-chase/2021/01/29/80dec868-6239-11eb-afbe-9a11a127d146_story.html; *see also Proud Boys Organizer, Rioter Who Attacked Officer Arrested*, ABC News (Jan. 20, 2021) ("Robert Gieswein — part of the Oath-keepers, an extremist group related to The Three Percenters — was charged with assaulting a federal officer with bear spray and a baseball bat."), https://www.ktsa.com/proud-boys-organizer-rioter-who-attacked-officer-arrested/; *see also Video Investigation: Proud Boys Were Key Instigators in Capitol Riot at 8:00-9:00*, WSJ (Jan. 26, 2021), https://www.wsj.com/video/series/in-depth-features/video-investigation-proud-boys-were-key-instigators-in-capitol-riot/37B883B6-9B19-400F-8036-15DE4EA8A015.

[29] Mr. Gieswein respectfully requests permission to supplement the instant motion with additional data if and when such data becomes available. However, he submits that it is far from speculative that District residents have followed the national correspondence more closely than those in comparable districts, given their unique proximity to the events as described *supra* Part A and because of the additional ongoing local coverage of the prosecutions.

heard of Mr. Gieswein specifically, his presence at the Capitol that day will necessarily cause prospective jurors to link his conduct to the January 6 reporting generally. And as the Court found in *Rideau*, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." 373 U.S. at 726.

Finally, the media has widely reported comments of U.S. District Court Judges in this District regarding the events of January 6. For example, in comments that were widely reported, a judge stated that "*everyone* participating in the mob contributed to [the January 6] violence," and went on to conclude that "[m]embers of a mob who breach barriers and push back officers to disrupt the joint session of Congress are not trespassers, they are criminals."[30] There is no doubt that more than only District residents were exposed to these comments, which were in effect legal conclusions about every January 6 defendant who will go before a jury in this District. However, while the media coverage of these comments, among others, may not create disparate prejudice between the District jury pool and other jury pools by nature of its national broadcast, it *does* create disparate prejudice at the venue itself: because the comments were made by a member of the same court that is expected to provide instructions on burdens of proof and the presumption of innocence—instructions that are in direct conflict with the declarations that those involved are "criminals"—there

---

[30] *'Almost Schizophrenic': Judge Rips DOJ Approach to Jan. 6 Prosecutions*, Politico (Oct. 28, 2021) (emphasis added), https://www.politico.com/news/2021/10/28/almost-schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442; *see also* Fischer et al., *supra* note 16.

is a serious question as to whether the earlier comments will be disregarded in favor of the instructions that carry precisely the same institutional authority. Thus, by members of this Court commenting on guilt prior to trial, this venue is necessarily tainted.

### C. The timing of the proceedings weighs in favor of finding a presumption of prejudice.

Finally, in determining whether any prior prejudice has been mitigated by the passage of time, the Supreme Court has considered the years between the exposure of the offense conduct and the trial. For example, in *Skilling*, the Court found that because more than four years had passed between the Enron scandal and the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse," and any exposure to the early reporting would have become attenuated. *Skilling*, 561 U.S. at 383.

Here, in the 11 months since January 6, media reporting about the events of January 6 remains at an all-time high. This has been especially true in recent weeks, given the high-profile House Select Committee activities focused on investigating the events. In the last two months alone, new in-depth articles and video analyses about January 6 have appeared in the *Washington Post*, *New York Times*, *CNN*, *Vanity Fair*, *Rolling Stone*, and *NPR*, among many others.[31] Additionally, many

---

[31] Dan Berman, *The Latest in the Jan. 6 Investigation*, CNN (Nov. 28, 2021), https://www.cnn.com/2021/11/28/politics/january-6-investigation/index.html; *see also Inside the Capitol Riot: An Exclusive Video Investigation*, N.Y. Times (Nov. 10, 2021), https://www.nytimes.com/2021/06/30/us/jan-6-capitol-attack-takeaways.html; *see also* Jacqueline Alemany et al., *The Attack*, Washington Post (Sept. 26, 2021), https://www.washingtonpost.com/politics/interactive/2021/jan-6-insurrection-

documentaries that include extensive footage of the day have been released—footage that would likely be offered into evidence by the prosecution at trial. For example, HBO just released a feature-length *Four Hours at the Capitol* in late October, which includes one of the most widely-circulated videos from that day: the breaking of a Capitol window, which Mr. Gieswein is alleged to have aided and abetted.[32] There is no reason to think that coverage will wane before Mr. Gieswein's February trial, especially given the recent activities of the Select Committee.[33]

---

capitol/; *see also* Hunter Walker, *The 'JusticeForJ6' Rally Wasn't a Joke — It Was A Warning: support for the Capitol insurrectionists has taken root firmly inside the GOP*, Rolling Stone (Sept. 18, 2021), https://www.rollingstone.com/politics/politics-features/justiceforj6-rally-insurrection-capitol-trump-1228690/; *see also* Bess Levin, *January 6 Organizers Threw Back Champagne and Charcuterie as the Capitol Was Attacked*, Vanity Fair (Nov. 22, 2021), https://www.vanityfair.com/news/2021/11/january-6-organizers-text-messages-champagne-charcuterie.

[32] *Four Hours at the Capitol*, HBO (Oct. 4, 2021); *see also Day of Rage: How Trump Supporters Took the U.S. Capitol* at 18:17-21, N.Y. Times (June 30, 2021), https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

[33] Although the official schedule of the Select Committee has been clear for some time, the Committee members are active in their investigation, having recently issued several subpoenas and moved to enforce subpoenas that were ignored. *See, e.g.*, Zachary Cohen et al., *New January 6 Committee Subpoenas Issued for 5 Trump Allies Including Roger Stone and Alex Jones*, CNN (Nov. 22, 2021), https://www.cnn.com/2021/11/22/politics/roger-stone-alex-jones-subpoenas-january-6/index.html; *see also Jan. 6 Committee Prepares to Hold Former Trump DOJ Official in Criminal Contempt*, Washington Post (Nov. 30, 2021), https://www.washingtonpost.com/politics/clark-contempt-january-6/2021/11/29/17b009aa-514f-11ec-8927-c396fa861a71_story.html; *see also* Charlie Savage, *Appeals Court Questions Trump's Bid for Secrecy on Jan. 6 Papers*, N.Y. Times (Nov. 30, 2021), https://www.nytimes.com/2021/11/30/us/politics/trump-executive-privilege-capitol-riot.html.

Interest in the events of January 6 has been high since that day, and it has not waned in the District in the short time since. As such, the timing of the proceedings weighs in favor of a finding of presumed prejudice.

## CONCLUSION

Because each of the *Skilling* factors weighs in favor of finding a presumption of prejudice, Mr. Gieswein requests that the Court transfer the case to the District of Colorado, where he is domiciled and where defense witnesses reside.

Respectfully submitted on December 1, 2021.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____

Ann Mason Rigby
DC Bar No. 491902

Elizabeth A. Mullin
DC Bar No. 484020

Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
ann_rigby@fd.org
elizabeth_mullin@fd.org