UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :     No. 21-CR-24 (EGS) |
| | : |
| ROBERT GIESWEIN, | : |
| | : |
| Defendant. | : |

**UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION TO TRANSFER VENUE**

Forty-five years ago, the *en banc* D.C. Circuit rejected the argument made by defendant Robert Giewein here: that at least partly based upon "the District of Columbia's voting record in the past two presidential elections[,]" the defendants could not receive a fair trial in this District and a change of venue was required. *United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc). In that case, the defendants were former high-ranking members of the Nixon administration, and they were charged with crimes arising from the Watergate scandal, which "received extraordinarily heavy coverage in both national and local news media." *Id.* at 51, 59. Notwithstanding the fact "that Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party, as opposed to the Republican Party to which the defendants . . . belonged," and that roughly 80% of the voters in D.C. voted for the Democratic Party candidate when Nixon ran for president in 1968 and 1972, *id.* at 160, the court declared that that there was no legal support for the proposition "that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43.

Significantly, although 93 percent of the Washington, D.C. population knew about the charges against the *Haldeman* defendants and 73 percent of those individuals had an opinion of the defendants' guilt or innocence, *id.* at 144, the D.C. Circuit nonetheless held that the district

court "was correct to follow this circuit's well-established procedure by refusing [the defendants'] pre-*voir dire* requests for . . . a change of venue." *Id.* at 63-64. It also found that an "extensive *voir dire*" ultimately assured that the defendants "were tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70.

The same holds true here. The defendant's pre-*voir dire* Motion to Transfer (ECF No. 64) should be denied. As in *Haldeman* and other heavily publicized cases from this jurisdiction and elsewhere around the country, extensive pre-trial screening and *voir dire* will suffice to ensure that the defendant receives a fair trial by an unbiased jury. "And if an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*." Only then will the defendant be entitled to any actions necessary to assure that he receives a fair trial. *See Haldeman*, 559 F.2d at 63.

## BACKGROUND

Hundreds of individuals from all over the country traveled to Washington, D.C. for the events of January 6, 2021. On that date, as a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election, members of a large crowd that had gathered outside forced entry into the U.S. Capitol. Others in the crowd encouraged and assisted those acts. Scores of individuals entered the U.S. Capitol without authority to be there. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials. This event in its entirety is hereinafter referred to as the "Capitol Breach."

As relevant here, the defendant was one of the individuals who unlawfully entered the U.S. Capitol on January 6, 2021. He traveled to the District of Columbia from his home in Colorado,

committed federal crimes in the District of Columbia, and was subsequently indicted by a federal grand jury in the District of Columbia.

National and local news stations across the United States covered the events of January 6, 2021, and the Capitol Breach. Over 700 individuals have been charged in connection with the Capitol Breach with potentially more individuals to be charged. The defendant is but one person among several hundred from all over the country who have been charged in the District of Columbia based upon their involvement in the Capitol Breach. According to the defendant, his trial should be transferred to the District of Colorado in part because "an overwhelming number of District of Columbia residents—over 92 percent—voted for President Biden," Mot. at 8, District residents may think Mr. Gieswein will "victimize" them again, *id.* at 9, and because judges in this courthouse have condemned the attack when sentencing other rioters who have pled guilty, *id*. at 16. As discussed below, the defendant's Motion is meritless and, in any event, premature.

## LEGAL PRINCIPLES

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," Amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958); *see United States v. Levy Auto Parts*, 787 F.2d 946, 952 (4th Cir. 1986) ("Article III, § 2 of the Constitution requires that local crimes be prosecuted locally"). And they give rise to "a general presumption that a criminal prosecution should be retained in the original district." *United States v. Bowdoin,* 770 F. Supp. 2d 133, 138 (D.D.C. 2011) (Collyer, J.). If "extraordinary local prejudice will prevent a fair trial," however, a defendant may request that the case be transferred to another district under Federal

Rule of Criminal Procedure 21(a). *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) ("Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."). It is the defendant's burden to establish his entitlement to a transfer of venue. *See, e.g.*, *In re United States*, 273 F.3d 380, 388 (3d Cir. 2001) ("the courts have held that the criminal defendant has the burden of making the case for transfer" under Rule 21(b)); *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979) ("It has long been recognized as a general rule that a defendant, in order to establish a deprivation of due process, must show that potential jurors were actually prejudiced by the pretrial publicity").

## ARGUMENT

I. There is no Presumption of Prejudice.

The Supreme Court has recognized that a "presumption of prejudice" resulting from prejudicial pretrial publicity is appropriate "only [in] the extreme case." *Skilling*, 561 U.S. at 381. "[N]ews accounts of the crime" do not "alone presumptively deprive[ ] the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require ignorance." *Skilling*, 561 U.S. at 381. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (explaining that jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case"). Moreover, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). Consistent with these well-established principles, courts have declined to transfer venue in some of the most high-profile prosecutions in

recent American history: Dzhokhar Tsarnaev, one of the Boston Marathon bombers; Jeffrey Skilling, a longtime Enron executive; Zacharias Moussaoui, who conspired to commit the September 11 terrorist attacks; Ramzi Yousef and others who committed the 1993 World Trade Center bombing; and, in this jurisdiction, former Attorney General John Mitchell and others charged as part of the Watergate scandal. *See Skilling*, 561 U.S. at 399; *In re Tsarnaev*, 780 F.3d at 15; *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002); *Yousef*, 327 F.3d at 155; *Haldeman*, 559 F.2d at 70. In none of these cases did the courts apply a presumption of prejudice arising from extensive pretrial publicity of the defendants' crimes. Indeed, as discussed below, the D.C. Circuit appears to have never applied such a presumption.

The three cases in which the Supreme Court has found a presumption of prejudice (*Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966)) demonstrate just how high of a bar the defendant must clear to establish that the presumption applies. In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *See Skilling*, 561 U.S. at 379 (describing *Rideau*). The Court presumed prejudice because, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. In *Estes*, "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing. The media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Estes] was entitled.'" *Skilling*, 561 U.S. at 379-80 (quoting *Estes*, 381 U.S. at 536). And in

*Sheppard*, "a 'carnival atmosphere' pervaded the trial": "'[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.'" *Id.* at 380 (quoting *Sheppard*, 384 U.S. at 353, 355, 358).

The size of the District's population likewise distinguishes it from those few cases in which the Supreme Court has presumed prejudice. The Census Bureau estimates the District's population to be around 705,000 people, *see* QuickFacts, District of Columbia, *available at* https://www.census.gov/quickfacts/DC (last visited December 18, 2021), far more than the 150,000-person Louisiana parish at issue in *Rideau*, 373 U.S. at 724.[1] Indeed, the District is more populous than Clark County was in 1988, but a four-Justice plurality nonetheless concluded in *Gentile v. State Bar of Nevada* that there was a reduced likelihood of prejudice there "[g]iven the size of the community from which any potential jury venire would be drawn[.]" 501 U.S. 1030, 1044 (1991).

  II. <u>Neither the fact that the Federal Government nor the U.S. Capitol Are Located in the District of Columbia Requires a Change of Venue.</u>

The defendant argues that the court should transfer his case to the District of Colorado now, without first conducting *voir dire* to evaluate whether it is possible to select an impartial jury, in part, because the jury venire would contain too many government workers or people who know government workers, because the residents of the District would view the defendant as someone who "victimized them," and because the District of Columbia voted overwhelming for President Biden in the 2020 election. Mot. at 8-9. He contends as a result this Court should not even attempt to pick a fair and impartial jury in this case. *See id*.

---

[1] Additionally, unlike in *Rideau*, the news coverage that the defendant cites in support of his argument that venue must be transferred is national, rather than local, in scope.

As previously discussed, the *en banc* D.C. Circuit rejected a similar in *Haldeman*, 559 F.2d at 64 n.43. There, the defendants were not just vocal supporters of President Nixon, but were former high-ranking officials in his administration. *Id.* at 51. The defendants in that case were not among many hundreds charged in a high-profile crime of nationwide significance, but were instead just seven, nationally known figures "charged [in] what amounted to an unprecedented scandal at the highest levels of government," *id.*, that "led to the resignation of President Nixon," *id.* at 54 n.15. If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of the president's administration, *id.* at 64 n.43, it surely has no bearing on venue here. Ultimately, the question is whether the court can select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70. The District's voting record hardly suffices to establish a presumption of prejudice so invidious that this Court should not even attempt to select such a jury.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals such as John Poindexter, Oliver North, Scooter Libby, and, more recently, Roger Stone, all received fair trials in this jurisdiction by unbiased juries. *See United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990); *United States v. Stone*, Cr. No. 19-0018 (ABJ), 2020 WL 1892360 (D.D.C. April 16, 2020); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007). Indeed, in *Stone*, Judge Berman Jackson rejected an argument similar to the one the defendant makes here:

> At bottom, the defense merely posits that if you do not like Donald Trump, you must not like Roger Stone, or if you are concerned about racism on the part of some of the President's supporters, then you must be applying that label to Roger Stone because he was a supporter, too. While there is no evidence that proves this hypothesis, there is evidence that contradicts it . . . . At bottom, the motion appears to be based on the defendant's assumption that the juror must have known who he

7

was, what his relationship with Donald Trump has been over time, and what role he played in the campaign, and that since he was so central to the election, one could not possibly view him independently from the President. . . . But there is no basis to conclude that Roger Stone was a household name in . . . Washington, D.C.

2020 WL 1892360, at *30-31. Judge Jackson went on to explain that "[t]he case law in this Circuit makes it clear that one cannot assume that people in the community — even those who follow the news — have a deep understanding of the facts of a particular case. During the prosecutions that arose out of the Watergate and Iran-Contra investigations, the Court of Appeals repeatedly expressed its confidence that jurors with open minds could be found within the District, even though the investigations had received a great deal of public attention." *Id.* at *31. The same is true here.

The defendant also attempts to argue that the District of Columbia's status as the home of the federal government and the fact that the National Guard responded in the aftermath of January 6th means he will not get a fair trial in this district.[2] *United States v. Edmond*, 52 F.3d 1080 (D.C. Cir. 1995) forecloses defendant's argument that he is entitled to a change in venue because "the residents of the District sitting as jurors are highly likely to view Mr. Gieswein not only as someone who victimized them, but also as someone who might victimize them again in the future." Mot. at 9. Edmond was charged with running a long-term and large-scale drug operation in the District of Columbia at the height of the crack-cocaine epidemic. *See Edmond*, 52 F.3d at 1084. The defendants in that case cited to significant pretrial publicity of the case, including reports linking

---

[2] The defendant relies on reactions of D.C. residents, as reported in *DCist* in the wake of the Capitol Breach, to argue that he cannot receive a fair trial here. Mot. at. 7-8. He makes no attempt to argue how widespread fear of the type reported in *DCist* was in the days following January 6th, but even if the Court assumes *arguendo* that 100 percent of the jury pool was fearful in the days following the event, that information is of little moment in determining whether those residents can be impartial jurors in this case in February 2022. Gleaning that information is precisely the purpose of *voir dire*.

Edmond and his co-defendants to "Colombian drug cartels and as many as 30 homicides" with which they were not charged. *See id*. at 1094. A long-term drug operation run in the District, along with news articles linking the organization on trial to multiple homicides at the height of the crack-cocaine epidemic, shows much more potential for jurors believing the defendants victimized them and would do so in the future than the facts of this case, but the D.C. Circuit nonetheless found *voir dire* adequate to seat an impartial jury. *Id*. at 1099.[3]

Courts routinely conclude that, despite significant negative pretrial publicity, defendants received a fair trial in the location where they committed their crimes. This was true in *Skilling*, notwithstanding "the community passion aroused by Enron's collapse and the vitriolic media treatment" aimed at Skilling. 561 U.S. at 377. This was true for Dzhokhar Tsarnaev, one of the Boston Marathon bombers, notwithstanding the fact that "the reporting of the events" in that case "st[ood] unrivaled in American legal history (at least as of today)." *United States v. Tsarnaev*, 968 F.3d 24, 42 (1st Cir. 2020); *see id.* at 56 ("[I]f pressed to decide the venue question now, two of us would likely find the judge abused no discretion in finding venue proper in Boston in 2015."). It was true for Zacharias Moussaoui, who was prosecuted "in the Eastern District of Virginia, minutes by car from the Pentagon." *In re Tsarnaev*, 780 F.3d at 16; *see Moussaoui*, 43 F. App'x at 613. It was true in the World Trade Bombing case. *See Yousef*, 327 F.3d at 155. It was true in the post-Watergate prosecutions. *See Haldeman*, 559 F.2d at 70-71. It is true here, too.

There is no reason at this point to presume that the District's residents cannot distinguish the defendant from the thousands of other people involved in the Capitol Breach. A thorough *voir*

---

[3] The *Edmond* case additionally involved a lapse of five months between arrest and trial during which there was substantial publicity about the case, *id*. at 1094, which cuts against defendant's argument that the ongoing nature of the news coverage 11 months after the Capitol breach requires a change in venue. *See* Mot. at 17-18.

*dire* can and will ensure the defendant his right to a fair jury. *See, e.g.*, *Yousef*, 327 F.3d at 155 ("the key to determining the appropriateness of a change of venue is a searching *voir dire* of the members of the jury pool").

      III.      <u>Media Coverage of the Defendant Does Not Require a Change of Venue.</u>

In *Sheppard*, the Supreme Court found that "months" of "virulent publicity about Sheppard" and his crime—including "a three-day inquest" during which "Sheppard was examined for more than five hours without counsel" that was "televised live" and "ended in a public brawl"—did not by itself deny the defendant his right to due process. 384 U.S. at 354; *see Skilling*, 561 U.S. at 380 ("Pretrial media coverage, which we characterized as 'months [of] virulent publicity about Sheppard and the murder,' did not alone deny due process"). Neither the Supreme Court nor the D.C. Circuit presumed prejudice in any case in the 55 years since *Sheppard* was decided. To the contrary, in *Patton v. Yount*, the Supreme Court held that the trial court did not err "in finding that the jury as a whole was impartial" even where "*voir dire* showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box." 467 U.S. at 1029, 1032 (1984). In *Mu'Min v. Virginia*, the Court declined to presume prejudice despite "substantial" pretrial publicity that "w[as] not favorable" to the defendant. 500 U.S. 415, 429 (1991). In *Skilling*, the Court refused to presume prejudice notwithstanding "the magnitude and negative tone of media attention directed at Enron" because of the "large, diverse pool of potential jurors" in the Houston Area; the fact that, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; "over four years [had] elapsed between Enron's bankruptcy and Skilling's trial"; and "Skilling's jury acquitted him of nine insider-trading counts." 561 U.S. at 382-83.

Similarly, in *Haldeman*, the D.C. Circuit declined to find that the defendants' "due process rights were violated by the District Court's refusal to grant . . . a change of venue prior to attempting selection of a jury" notwithstanding the "massive," sometimes "hostile in tone and accusatory in content," pretrial publicity. 559 F.2d at 61-62. The court explained that, "unlike the situation faced by the [Supreme] Court in *Rideau*," the publicity surrounding Watergate gave the court "no reason for concluding that the population of Washington, D.C. was so aroused against [the defendants] and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated[.]" *Id*. The D.C. Circuit has similarly refused to presume prejudice in numerous other cases involving both national crimes such as Watergate and notorious local criminals such as Rayful Edmund. *See, e.g.*, *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995) (declining to presume prejudice, which "is reserved for only the most egregious cases"); *Edmond*, 52 F.3d at 1099 ("Neither the nature nor the impact of the publicity in this case presented the 'extreme circumstances' necessary to establish a presumption that a fair trial was impossible in this jurisdiction."); *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. 1976) ("An examination of the *voir dire* process and its results in this case makes clear that the extreme circumstances condemned by the Supreme Court in . . . *Sheppard* . . . and *Rideau* . . . are not present here."); *United States v. Chapin*, 515 F.2d 1274, 1287 (D.C. Cir. 1975) (rejecting "the argument is that no *voir dire* would have been effective in rooting out the prejudices of which [the defendant] complains").

This case is fully distinguishable from the few "extreme case[s]" where the Supreme Court has presumed prejudice based upon adverse pretrial publicity. The news stories about the defendant have "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.

11

Indeed, given the sheer number of people number involved in the Capitol Breach, it is unlikely that more than a handful of D.C. residents could identify the defendant by name. The defendant provides no reason to believe that, by the time his trial begins, D.C. jurors are likely to be able to remember and distinguish any reporting or social media distinguishing him from many hundreds of other people charged as part of the Capitol Breach. And even if they could, "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Id.* at 381 (emphasis in original).

Indeed, the examples the defendant cites for what he claims is inflammatory or inaccurate language, such as a White House statement regarding Officer Sicknick (with whose death the defendant is not charged), Mot. at 14-15, or a reference to blood on the floor, Mot. at 13-14, make no mention of him specifically.[4] Nor do the articles the defendant cites that directly mention him contain inflammatory language. See Mot. at 15, n.28. The *Washington Post* article cited by the defendant states that he is affiliated with the Three Percenters and that he moved with the Proud Boys on January 6th. He did in fact move with the Proud Boys on January 6th. The KTSA article states, "Robert Gieswein — part of the Oath-keepers, an extremist group related to The Three Percenters — was charged with assaulting a federal officer with bear spray and a baseball bat." The Wall Street Journal video shows the defendant moving and acting in concert with certain members of the Proud Boys. None of this is inflammatory language and most of it is a small part of another article or feature. It is exactly the type of pretrial publicity that can be addressed through *voir dire*.[5]

---

[4] The vast majority of the articles and video clips cited by the defendant in the attachment to his motion, ECF No. 64-1, likewise make no mention of the defendant by name.

[5] The defendant represents that the government "conceded in its detention arguments" the fact that the defendant is not affiliated the Three Percenters or Proud Boys. Mot. at 15. This is

Although there has been substantial publicity surrounding the Capitol Breach, that reporting has largely focused on the Capitol Breach generally, and it has been nationwide, not merely "local." *Id.* at 378. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 22 ("It is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally. But that would be true wherever trial is held, and the reporting has largely been factual."); *Haldeman*, 559 F.2d at 64 n.43 (noting that "a change of venue would have been of only doubtful value" where the pretrial publicity was nationwide in scope and where the crime was "simply not a local [one] of peculiar interest to the residents of the District of Columbia"). Finally, this Court can take measures to prevent a "carnival atmosphere" from pervading the defendant's trial and denying him "judicial serenity and calm" to which he is entitled. *See Sheppard*, 384 U.S. at 358 ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

The defendant's reliance on media reporting regarding judges' comments is both misplaced and misleading. He argues that Chief Judge Howell's statement—which he neglects to mention was made at sentencing of a rioter who entered a guilty plea——along with other uncited statements by other judges, creates "a serious question as to whether the earlier comments will be disregarded in favor of the instructions that carry precisely the same institutional authority." Mot. at 16-17. He cites no authority to support his attempt to depart from the long-standing rule that jurors are presumed to follow the Court's instructions. *See*, *e.g.*, *Zafiro v. United States*, 506 U.S.

---

both untrue and irrelevant, given the news coverage he cites. The government told the Court that it was not pressing the defendant's association with his self-described militia, the Woodland Wild Dogs, as a reason to detain the defendant. July 1, 2021 Hr'g Tr. 9:17-24. The government's opposition to the defendant's motion to revoke the detention order agreed that the defendant is not affiliated with the Proud Boys, but it noted that he marched with them throughout January 6th with his bat at the ready. ECF No. 19 at 17.

13

534, 540 (1993); *United States v. Brown*, 16 F.3d 423, 430 (D.C. Cir. 1994). Putting precedent aside, the defendant does not even attempt to argue why comments made by this Court's colleagues at other defendants' sentencings (which necessarily occur after a finding of guilt) would trump this Court's solemn instructions regarding the presumption of innocence at this defendant's trial. His motion should be summarily denied.

## CONCLUSION

The only question before the Court at this time is whether to presume that, whatever jury the Court picks, the defendant cannot possibly receive a fair trial in this jurisdiction. Because such a presumption has no legal or factual support in this case, and it runs counter to the D.C. Circuit's "well established procedure" against answering that question before conducting *voir dire*, the Court should deny his Motion.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        D.C. Bar No. 481052

By:   */s/ Erik M. Kenerson*
       ERIK M. KENERSON
       Ohio Bar No. 82960
       JASON B.A. MCCULLOUGH
       D.C. Bar No. 998006
       Assistant United States Attorneys
       555 4th Street, N.W.
       Washington, D.C. 20530
       (202) 252-7233 //
       jason.mccullough2@usdoj.gov
       (202) 252-7201 // Erik.Kenerson@usdoj.gov