UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT GIESWEIN,<br><br>            Defendant. | Crim. Action No. 21-24-1 (EGS) |

**MR. GIESWEIN'S RESPONSE TO GOVERNMENT MOTION TO PRECLUDE CERTAIN DEFENSE ARGUMENTS AND EVIDENCE**

Robert Gieswein, through undersigned counsel, hereby submits the following responses to the government's initial motions *in limine*, which seek to preclude certain defense arguments, and seek admission of certain evidence during trial in this case.[1]

**Response to Motion *in limine* No. 4:**     To preclude defendant from arguing self-defense or defense of others.

The government seeks to preclude the defense from offering evidence of self-defense, on the ground that the defense "will not be able to put forth any evidence that" Mr. Gieswein "had a reasonable belief that his actions were necessary to defend himself against the immediate use of unlawful force." Gov't Mot., ECF No. 63 at 6-7.

---

[1] In a conference, counsel for the government noted that the government filed these motions *in limine* on the date that both parties understood to be the deadline for "Rule 12 motions," uncertain of whether the Court also expected the government to file such motions by that date. The parties have agreed that either party may file motions *in limine* closer to trial, as contemplated by the proposed order setting forth trial-related deadlines that the parties anticipate jointly filing soon.

This motion is premature. The Federal Rules of Criminal Procedure require defendants to provide notice of certain defenses "within the time provided for filing a pretrial motion," but self-defense is not among them.[2] Moreover, this case is two months from trial, the government has not completed its planned disclosures of discovery, and the discovery it recently provided is uniquely voluminous. *See* Status Report regarding Discovery, ECF No. 53 (filed Nov. 5, 2021). At this stage, Mr. Gieswein cannot be expected to anticipate and litigate every defense the evidence might support.

Nothing in the law requires the defense to disclose its trial strategy at this point and under these circumstances. The government cites out-of-circuit authority about other affirmative defenses for the proposition that the defense must "proffer legally sufficient evidence" of self-defense in order to rely on the defense. *See* ECF No. 63 at 6 (citing authority from the Ninth Circuit). Although these opinions arose from government motions in *limine*, they did not hold that a defendant must give notice of intent defend himself on self-defense grounds at the Rule 12 stage, or even pre-trial, and certainly not this far ahead of trial, before discovery is complete.

Moreover, the government's motion suggests that there is no way that Mr. Gieswein can establish that any of his actions were necessary to defend himself or others against unlawful force at any individual point on January 6. The government relies on evidence it intends to offer to show that Mr. Gieswein consistently "push[ed]

---

[2] *See* Fed. Rs. Crim. P. 12.1, 12.2, 12.3.

forward and inside the Capitol." ECF No. 63 at 7. But evidence that Mr. Gieswein was trespassing, or engaged in disorderly conduct, or even attempting to obstruct proceedings, if available, would not preclude evidence that he or others were met with unlawful force at any particular point. And the government does not even claim that it does. It merely argues that its expected evidence will "undermine" and "belie" any claim of self-defense he may make. *Id.* These are closing arguments, not grounds to preclude a defense, particularly this early.

In short, Mr. Gieswein reserves his right to proffer evidence in support of this defense closer to or during trial.

**Response to Motion *in limine* No. 1:**   To preclude entrapment by estoppel defense.

The government's motion seeks to preclude Mr. Gieswein from arguing entrapment by estoppel, *i.e.,* that the former President gave permission to defendant. ECF No. 63 at 1-2. As already stated, the defense should not be required to disclose its potential defenses at this time.

Moreover, even if the defense does not later proffer evidence to support a defense of entrapment by estoppel before the jury at trial, evidence of the statements of Mr. Trump, or others, may be relevant to whether Mr. Gieswein had the requisite specific intent the government must establish to prove certain of the charges, such as whether he acted "corruptly" or intended to "obstruct" an "official proceeding" (the definitions of which are still not established at this stage of the litigation). In short,

Mr. Gieswein reserves his right to proffer evidence in support of this defense closer to or during trial.

**Response to Motion *in limine* No. 2:**   To preclude evidence about conditions at the D.C. jail, or regarding punishment.

The government seeks to preclude the defense from introducing evidence or making arguments regarding conditions at the D.C. jails, federal prisons, or the possibility that Mr. Gieswein could serve "a significant portion of his young life" in prison. ECF No. 63 at 3-4. The defense does not intend to offer such evidence, or comment on these issues during *voir dire*.

**Response to Motion *in limine* No. 3:**   To admit defendant's January 6 statement.

The government seeks leave to admit into evidence a video purporting to show Mr. Gieswein making a statement on January 6. ECF No. 63 at 4-5. As recounted in the government's motion, the person in the video appears to say "Hey, this is f*cking crazy [indiscernible]. I would die for this." *Id*. at 4. Asked what the "solution to this right here" is, the speaker responds, "To execute these fascists." *Id*. The Court should not permit the government to introduce this evidence.

    A.    *The government has not established the authenticity of the video.*

First, the government has not explained how it intends to authenticate this video. According to discovery, law enforcement viewed and downloaded the video (which the government has provided to the defense) from an Instagram account associated with a third person in September of 2021 by law enforcement. Law enforcement conclude in reports provided in discovery that the video was taken on

4

January 6 due to the appearance of the people in the background, and the subject matter under discussion, but that it was not posted until January 15. It is eight seconds long. The speaker in the video is wearing a medical mask over the lower half of his face.

The government has not provided evidence demonstrating what "evidence" it will produce that is "sufficient to support a finding that the item is what the proponent claims it is," as required by Fed. R. Evid. 901. For example, to the knowledge of undersigned counsel, the government has not provided evidence sufficient to establish that either the video or the audio were not altered. Until the government does produces evidence sufficient to authenticate the video, the Court should not admit this evidence even if the Court concludes that it overcomes the other hurdles discussed below.

### B. *The government has not established the relevance of the video.*

Second, the evidence is not relevant. The government argues that it is relevant substantive evidence of the defendant's intent on January 6, 2021. *Id.* at 5. The government claims the video is evidence of Mr. Gieswein's corrupt intent to obstruct the counting of the electoral votes on January 6 (which the government deems an "official proceeding"), as charged in Count One, and/or his intent to assault law enforcement officers, as charged in Counts Two through Four. *Id.* at 5-6. Specifically, the government argues that it is evidence of Mr. Gieswein's intent to spray police officers, as opposed to nearby civilians. *Id.*

5

"Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). But this statement is not relevant to prove the speaker's intent unless one assumes that the video was taken before the alleged offenses charged in the indictment, and unless the "fascists" to whom the speaker was referring are identified. "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104. Here, the government has failed to do that; instead, its arguments for relevance rest entirely on assumptions.

First, the government has not established when this video was taken. The government claims that the video was taken on January 6, but it has offered no proof of that. And even if the Court concludes that it was taken on January 6, there is nothing in it establishing whether it was taken before the moments at which the government alleges Mr. Gieswein committed the charged offenses, or before some but not others, or at some later point.[3] Of course, if the video was taken *after* Mr. Gieswein allegedly assaulted officers and attempted to obstruct the Congressional proceedings, that will solidify its irrelevance.

Second, the government has not established the subject of the speaker's statement, *i.e.,* to whom the speaker referred when he said that the "solution" "to this right here" was to "kill these fascists." The government does not say whether its

---

[3] Note that Mr. Gieswein has filed a motion seeking a bill of particulars relating to the assault charges (if they are not dismissed). *See* Def. Mot., ECF No. 61). Such a bill would aid in assessing how this video relates in time to the charged offenses.

6

theory is that the "fascists" the speaker is referring to are congressional officials conducing the counting of electoral votes, or the law enforcement officers that day. And there are at least two other obvious potential interpretations: the speaker's reference to "fascists" could have been to not to congressional officials or police officers, but instead to so-called Antifa that many expected to appear on January 6, or even to supporters of President Trump that the government says were protesting around the speaker.

The government assumes that the speaker must be referring to either congressional officials or law enforcement officers at the Capitol on January 6, but that depends on another assumption unsupported by the evidence, which is that the speaker is talking about the counting of electoral votes at all. But he says nothing about that, or about any congressional proceeding, or anything else supporting that assumption. It is entirely unclear from the video what the speaker in the video found to be "f*cking crazy," or what "this" was that he asserted he would "die for." Further, because the timing of the video is unclear, even if one assumes that the speaker's comments had anything to do with the counting of electoral votes, there is nothing showing that the speaker's supposed view was that officials (or law enforcement protecting them) should be killed *to obstruct* the counting of electoral votes, as opposed to that they should be killed *as retribution* for their actions with respect to the counting of votes.

In sum, whether this statement has the relevance the government suggests depends on these critical preliminary facts: when the statement took place, whom the

7

speaker asserted were "fascists," and what "this" meant in his statement.[4] But it is impossible to tell from what the government has proffered.

Third, the government's arguments that the video is relevant evidence of Mr. Gieswein's intent takes for granted that the speaker in the video was referring to action that *he* was prepared to take. But that is conjecture as well: even if the speaker truly meant that the "solution" was for unidentified "fascists" to be executed, he never stated that he personally would take anyone's life. Indeed, the word "execute" connotes state action, not individual action.

Finally, the video's exceedingly short length compounds its ambiguity and, thus, its lack of value as evidence of the speaker's intent. The eight-second clip gives no clue as to what transpired before or after it was recorded. There is no way to tell if the speaker followed up to say he was not serious, or that he was exaggerating, for example.

Accordingly, the evidence is not admissible whether offered under Rule 401, or Rule 404(b)(2). Indeed, it should be excluded under Rule 404(b)(1): absent clear evidence of exactly when the video was taken, who the speaker viewed as "fascists" in the moment it was taken, what the speaker found to be "crazy," who the speaker thought should do any executing, or what came before or after the eight seconds, the video amounts to nothing more than evidence of "a wrong, or act . . . to prove [the speaker's] character," that is, that he is a violent and dangerous person, that the jury

will take as evidence that Mr. Gieswein acted in conformity with that character on January 6, as charged. *See* Fed. R. 404(b)(1).

        C.      *The Court should exclude the evidence pursuant to Rule 403.*

Third, the Court should exclude the evidence pursuant to Rule 403. "Beyond Rule 404(b)'s specific limitations on the admission of prior bad acts, Federal Rule of Evidence 403 permits a court to exclude otherwise-relevant evidence 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *United States v. McGill*, 815 F.3d 846, 880 (D.C. Cir. 2016) (quoting Fed. R. Evid. 403). Even "'[e]vidence of other crimes or acts having a legitimate nonpropensity purpose," and thus unaffected by Rule 404(b), may nevertheless "contain the seeds of a forbidden propensity inference.'" *Id.* (quoting *United States v. Bowie*, 232 F.3d 930, 931 (D.C. Cir. 2000). "As a result, Rule 403's balancing of prejudice and probativeness may still bar the introduction of evidence, even if Rule 404(b) by itself would not." *Id.*

        1.      <u>The video has extremely limited probative value, even assuming it is relevant.</u>

Here, the probative value of the video is limited. Again, the subject of the speaker's statement is entirely unclear, the timing of the video is unclear, the statement in the video is not a clear expression of intent to do anything, other than an expression of a wish that someone else would do something, and the video's brevity and lack of context makes it all the more difficult to understand.

9

Moreover, even if the video reflects a threat, it was merely a general threat in the abstract. As such, it has less probative value than a more specific threat might (i.e., a specific threat against a particular member of Congress, or a particular police officer). *See United States v. DeLillo*, 620 F.2d 939, 944 (2d Cir. 1980) (commenting that evidence of a threat was excluded in another case in part because it was "generalized . . . not focused on anyone in particular" or on influencing any conduct in particular," which "count[ed] against" its probative value and made "it more prejudicial in its possible effects on the jury").

Consistent with this, there is also *nothing* in the evidence that corroborates the idea that the statement was a credible statement of specific intent to kill anyone. According to even the government's theory, Mr. Gieswein ultimately used nothing more than an aerosol spray against anyone on January 6. There is nothing to suggest, in other words, that this statement was anything other than an unserious statement, an empty threat or puffery, or an exaggeration to make a point, even if the video was taken early on January 6 and referred to either officials or officers. This further diminishes its probative value.

        2.    <u>The video is highly inflammatory evidence that would mislead and confuse the jury, and unfairly prejudice Mr. Gieswein.</u>

Finally, the unfair prejudicial effect this video will have if it is presented to the jury cannot be overstated. Divorced from context surrounding the eight seconds, there is a likelihood that the clip is misleading. And, although the government has never charged Mr. Gieswein with an attempt on anyone's life, and there is no evidence that he attempted to kill anyone, there is a substantial risk that the video will cause the

10

jury to view Mr. Gieswein as murderous if it is admitted, and even cause it to conclude that Mr. Gieswein had actual intent to kill people on January 6. Even the government seems to slip into that conclusion, arguing that the evidence shows "what [Mr. Gieswein] aimed to accomplish that day." ECF No. 63 at 6. There is an extremely high likelihood that – notwithstanding the limitations of this 8-second clip discussed above – jurors would also misconstrue this highly inflammatory video as evidence that Mr. Gieswein actually intended to accomplish one or more homicides on January 6.

As such, there is a substantial risk that jurors would convict Mr. Gieswein even if they conclude that there are gaps in the evidence that Mr. Gieswein assaulted officers as charged, or had the intent to obstruct a Congressional proceeding as charged. *See United States v. Blackwell*, 694 F.2d 1325, 1332 (D.C. Cir. 1982) (noting that picture showing that felon possessed a firearm on a date other than the date on which he was accused of possessing a firearm could induce unfair prejudice in jury because he "had *some* guns in his possession since his felony conviction" and due to the nature of the pictures themselves).

As interpreted by the government – that is, as an expression of intent to use violence up to and including murder – this is extremely inflammatory evidence. In weighing the prejudicial effect of the evidence in question, the Court should weigh how inflammatory it is in the abstract. *See United States v. Burwell*, 642 F.3d 1062, 1068 (D.C. Cir. 2011) ("The fact that [the proffered evidence that defendant] forcibly stole a car *from a grandfather and his two young grandchildren* could have struck the

11

jurors as particularly egregious. The district court should have considered this in its Rule 403 analysis." (emphasis added)); *Blackwell*, 694 F.2d at 1332 (noting that fact that picture showed felon defendant holding a firearm *in a firing position* added to prejudicial effect of picture taken on a date other than that reflected in the charge that he had illegally possessed a firearm); 1 McCormick On Evid. § 190.11 (8th ed.) ("In deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value, a variety of matters must be considered, including . . . the degree to which the evidence probably will rouse the jury to overmastering hostility").[5]

Indeed, federal courts have long recognized that "severe prejudice can result from the use of death threat testimony," and accordingly, courts should "carefully limit[] that use to situations where there was a clear need for the prosecution to use such evidence." *United States v. Check*, 582 F.2d 668, 685 (2d Cir. 1978) (commenting on government's use of "death threat" testimony in first drug conspiracy trial in anticipation of retrial, where witness had been permitted to testify that defendant said 'that if he had any problems with anyone he wouldn't hesitate to shoot them'"). Threat evidence is prone to "undue risk that the jury construe[s] the threat as evidence of [the defendant's] murderous propensity," and prone to "distract[ing] the

---

[5] Other factors noted by McCormick include "the strength of the evidence as to the commission of the other crime," or act, discussed above, "the similarities between the crimes, the interval of time that has elapsed between the crimes, [and] the need for the evidence, the efficacy of alternative proof . . ." 1 McCormick On Evid. § 190.11 (8th ed.)

jury from the issue in the case," and to "arous[ing] the jury's passions to a point where they would act irrationally in reaching a verdict," by "substitut[ing] the death threat evidence for consideration of the elements of the charged crimes." *United States v. Cummings*, 858 F.3d 763, 775–76 (2d Cir. 2017); *see also, e.g., United States v. Garces*, 133 F.3d 70, 76-77 (D.C. Cir. 1998) (noting with approval that the trial "judge was clearly aware of the potentially prejudicial nature of the witnesses' references to [defendant's uncharged threats with a gun that looked like the gun he was accused of possessing illegally], and indeed ruled them out"); *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) ("The potential of unfair prejudice from the introduction of threats is 'severe.'") (quoting *Check*, 582 F.2d at 685-86); *United States v. McManaman*, 606 F.2d 919, 926 (10th Cir. 1979) (noting that evidence of threats against government agents or informers has been said to "suggest a jury decision on an improper basis that defendants were 'bad men'") (citing *United States v. Weir*, 575 F.2d 668, 671-72 (8th Cir. 1978); *United States v. Gonzalez*, 703 F.2d 1222, 1223-24 (11th Cir. 1983) ("Because the potential prejudice from death threats may be great, the government must have an important purpose for introducing the evidence in order to satisfy the balancing test of Rule 403." (citing *Check*, 582 F.2d at 685)).

Such evidence is particularly inflammatory when the threat is closely related to the charged offenses, as it is here. *Cummings*, 858 F.3d at 775-76 (noting that similarity of death threat evidence to charged offense of shooting and killing two individuals "risked suggesting to the jury that it should convict Cummings of the prior murders because he was willing to murder for expedience").

13

And evidence of a threat to do something *worse* that the defendant is charged with doing, as is the case here, also is particularly prone to unfairly prejudicing the defendant insofar as it suggests that the defendant presents a higher threat or danger than even the indictment would suggest. *Cf. United States v. Mahdi*, 598 F.3d 883, 892 (D.C. Cir. 2010) (finding that evidence of uncharged incidents in which defendant had pulled a knife on two people, once while "playing," and another time during an argument, was not unduly prejudicial in part because the evidence "involved two relatively minor incidents which paled alongside the extreme violence of the acts of which Mahdi was indicted and convicted: shooting nine people . . . and stabbing and cudgeling two others"); *Burwell*, 632 F.3d at 1332 ("The prejudice resulting from the carjacking evidence is slight when compared to the evidence of the violent acts for which Appellants were indicted.").

Nor can a limiting instruction remove this unfair prejudice. The government suggests that the statement is evidence of intent. An instruction that the jury may only consider it as evidence of intent is akin to telling the jury that Mr. Gieswein intended to commit murder. As such, an instruction would only magnify the unfair prejudice inherent in the evidence.

In sum, this evidence is not authenticated, and is not relevant. And even if the Court ultimately finds that the evidence is authentic, and finds some relevance in the video, its probative value is substantially outweighed by its prejudicial effect, and the Court should exclude it on that basis.

## CONCLUSION

For all of these reasons, and such others as may be advanced at a hearing on this matter, Mr. Gieswein respectfully requests that the Court:

- deny the government's motions *in limine* numbered 1 and 3 as premature, without limiting the government' right to challenge evidence relevant to entrapment by estoppel or self-defense should the defense proffer such evidence at trial;

- deny the government's motion *in limine* number 2 as moot;

- deny the government's motion *in limine* number 4, and preclude the government from introducing the video or any testimony about it.

Respectfully submitted on December 24, 2021.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____
Ann Mason Rigby
DC Bar No. 491902
Elizabeth A. Mullin
DC Bar No. 484020

Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
ann_rigby@fd.org
elizabeth_mullin@fd.org