**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| ROBERT GIESWEIN, |
| Defendant. |

Crim. Action No. 21-24-1 (EGS)

## MR. GIESWEIN'S REPLY IN FURTHER SUPPORT OF MOTION FOR TRANSFER OF VENUE

In his opening motion, Robert Gieswein, through undersigned counsel requested that the Court transfer the proceedings to another venue pursuant to Federal Rule of Criminal Procedure 21(a). Def. Mot. to Transfer Venue, ECF No. 64. In response, the government offers a reading of the transfer standard so narrow that it would write the codified rule out of existence. Gov't Resp., ECF No. 72 at 5-6, 13-14. Ignoring the central purpose of the rule, i.e., ensuring that a defendant has a realistic chance of avoiding trial by a jury that is unduly biased for any reason at all, the government promotes a technical reading of Rule 21(a) that renders it applicable to virtually no set of facts in the modern media landscape. Compare id. (narrowly construing Fed. R. Crim. P. 21(a)), with In re Murchison, 349 U.S. 133, 136 ("[O]ur system of law has always endeavored to prevent even the probability of unfairness. To this end [. . . ] no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and

relationships must be considered."); accord Estes v. State of Tex., 381 U.S. 532, 542 (1965) (quoting Murchison as support for the same Due Process proposition in the Rule 21(a) context). Mr. Gieswein respectfully submits that the Court should reject the government's attempt to consign transfers of venue to history.

## ARGUMENT

I. **Transfer of venue should be granted because of the concrete, particularized, and compounding effects of the events and the media on the D.C. jury pool.**

   A. *The fact that an event garners national media does not mean that no transfer of venue is ever appropriate.*

In its Response, the government offers a narrow reading of Supreme Court case law from the 1960s to argue that, where media coverage of the alleged crime is national rather than local, transfer of venue is unavailable. *See* Gov't Resp., ECF No. 72 at 5, 13. However, the case law cited in the Response demonstrates that the media consideration is one of engagement and *impact*, not mere exposure, as the government itself notes elsewhere in the Response. *See id.* at 4 (citing *Skilling*, 561 U.S. 358, 378 (2010) ("Prominence does not necessarily produce prejudice"); *Murphy v. Florida*, 421 U.S. 794, 799 (1975) ("[N]ews accounts of the crime" do not "alone presumptively deprive[ ] the defendant of due process"); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (explaining that jurors are not required to be "totally ignorant of the facts and issues involved")). These cases stand for the proposition that it is not merely the potential for jurors to be exposed to media reporting that matters, but how particularized interest might lead residents of certain locales to follow the news more closely and be more affected by such reporting. Where members of a local jury pool

are more likely to follow and to be persuaded by national media coverage than residents elsewhere, transfer of venue must remain available.

The government cites to a *Haldeman* footnote to attempt to support the proposition that a defendant's national prominence cuts against transfer. Gov't Resp., ECF No. 72 at 13 (citing *United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976)). Not only is the authority *dictum*, but a closer read reveals that Mr. Gieswein's interpretation of the media coverage factor is correct.[1]  Specifically, in *Haldeman*, the Court of Appeals for the D.C. Circuit observed that little would be gained by transferring the case *only because* nothing about the facts of the case made it likely that the national media coverage had a *greater impact* on the D.C. jury pool than the jury pools in other districts: "a change of venue would have been of only doubtful value" where the media coverage was national in scope *and* where the crime was "simply not a local [one] of *peculiar interest* to the residents of the District of Columbia." 559 F.2d at 64 n.43 (emphasis added).

Here, by contrast, there are numerous reasons why the media coverage, including the coverage in the national media, would be of greater interest to D.C. residents than to those elsewhere, as Mr. Gieswein argued at length in his opening motion, *see* Def. Mot. to Transfer Venue, ECF No. 64 at 4-10, and below, *infra* Part II. It is simply not enough for the government to cite national media reporting to show

---

[1] *See* Def. Mot. to Transfer Venue, ECF No. 64 at 16-17 (arguing that the mere fact that there has been publicity in two or more districts does not necessarily mean that the impact to the proceedings is the same in both districts).

that the *Rideau* media factor cuts against the transfer of venue. Limiting the media coverage factor to the circumstances of *Rideau* or *Sheppard*, i.e., restricting the availability of a change of venue based in part on media coverage to cases in which small towns are inundated with news about a prosecution by media with only local circulation would write the Rule out of existence in today's environment, and in any market dominated by news that happens to also be national. Not only would this surely contravene the Rule drafter's intent, but it would violate the principles of Due Process reflected in the Rule.

> B. *The circumstances in this case are distinguishable from those in the D.C. Circuit cases relied upon by the government.*

In the Response, the government addresses the factors Mr. Gieswein submits in favor of transfer independently, rather than analyzing their cumulative effect. This cumulative effect is not present in *any* of the cases that the government offers for support.

First, the government cites to *Haldeman* to address political injury, but *Haldeman* did not involve any particularized or concrete injury to individual voters. Nor did it involve any alleged physical violence. Second, the government cites to *Edmond* to address widespread jury pool injury, but *Edmond* did not involve a single, shocking event of alleged mass violence, and as such, the reporting of those injuries was qualitatively different in important respects. This difference manifested in most potential jurors lacking knowledge about the case. Finally, the D.C. jury pool is both smaller in size and more homogenous than those in the cases relied upon by the government. Each of these shortcomings is explored in turn *infra*, sections (i)-(iii).

1.      <u>Voting demography was insufficiently relevant to the injuries resulting from the charged conduct in *Haldeman*.</u>

The government overstates the authority and applicability of *Haldeman* in the Response. Specifically, the government opens its briefing by asserting, without limitation, that in this District, voting demographics have no bearing on the assessment of prejudice for the purposes of a transfer motion. *See* Gov't Resp., ECF No. 72 at 1 (citing *Haldeman*, 559 F.2d at 64 n. 43). But the government fails to note that the *Haldeman* quote upon which it relies for this argument is *dictum*. More importantly, the dictum concerned an issue neither briefed nor argued by either party in motions or on appeal in *Haldeman*: it was raised only by the dissenting appellate judge, as the *per curiam* opinion seeks to underscore. *Haldeman*, 559 F.2d at 64 n. 43. Indeed, the thrust of the *per curiam's* disposition of the issue deals with the inappropriateness of the dissenting opinion reaching beyond the record for a finding of prejudice. *Id.* ("[U]ndeterred by the absence of any reference to voting results anywhere in the record or the appellate briefs, the dissent introduces the subject"). And yet despite the lack of precedential value in the single quote upon which the government relies, the government boldly declares that "[f]orty-five years ago, the *en banc* D.C. Circuit rejected the argument made by defendant Robert Gieswein here." Gov't Resp., ECF No. 72 at 1.[2]

---

[2] This is not the only mischaracterization of the *Haldeman* opinion in the Response. The government also says that the D.C. Circuit held that there was no prejudice despite the fact that "93 percent of the Washington, D.C. population knew about the charges against the *Haldeman* defendants and 73 percent of those individuals had an opinion of the defendants' guilt or innocence," omitting that the report it cites was from the dissenting opinion and was found to be unreliable by *both* the trial judge and the p*er curiam* opinion. *Compare* Gov't Resp., ECF No. 72 at 1,

Not only does the government exaggerate the force of the *Haldeman* dictum, but it also avoids engaging in any analysis as to *why* the majority believed that voting patterns were not relevant in the *Haldeman* case. A closer look reveals that Mr. Gieswein's case is distinguishable. The *Haldeman* proceedings involved many campaign aides who participated in the Watergate scandal. *Haldeman*, 559 F.2d at 52-59 (factual background on the Watergate scandal). As the Court is no doubt aware, those aides illegally sought advantage for President Nixon's reelection campaign by surveilling the activities of the Democratic National Committee. *See id.* at 52 (observing that the purpose of the plan was to gather political intelligence). Of course, the conduct was incendiary, and political. But the main targets and victims of that conduct were Democratic candidates, not voters themselves. *See id*. At best, *all* Americans, Democratic and Republican alike, were indirectly and abstractly injured by the conduct, insofar as the defendants sought to cheat them of their intangible right to fair and honest campaigns.

By contrast, the events that took place on January 6, 2021 have been routinely characterized by the government, media outlets, and private citizens as an attempt to "overturn" the results of the 2020 election.  Put differently, the events were allegedly intended to effectively steal the vote of Democratic voters who elected President Biden.  For Democratic voters everywhere, such deprivation would have been felt as a concrete and particularized injury, akin to disenfranchisement, which

---

*with Haldeman*, 559 F.2d at 64 n. 43 ("[T]he dissent relies heavily on two disparate, though equally suspect, indicia"). This lack of reliability—not the statistics—was cited by the court as a basis for denying transfer. *Haldeman*, 559 F.2d at 64 n. 43.

courts have recognized as an injury in other contexts.[3] For Democratic voters in the District, the injury could be expected to be felt particularly acutely, given that presidential elections are the only national elections in which District residents can vote. And notably, while the District has leaned heavily Democratic for decades, the proportion of Democratic voters has increased by more than 10% since the time that *Haldeman* was decided.[4]

In short, District Democratic voters were not nearly as likely to feel themselves to be direct targets of the attempted political acts in *Haldeman* as they allegedly were here – according to the government's theory, and much of the national and local media – and they make up a materially larger share of the jury pool than they did 50 years

---

[3] *See, e.g.*, *Richardson v. Texas Sec'y of State*, 485 F. Supp. 3d 744 (W.D. Tex. 2020) (recognizing disenfranchisement as injury in fact); *Fish v. Schwab*, 957 F.3d 1105, 1119 (10th Cir.), *cert. denied*, 141 S. Ct. 965 (2020) (same); *U.S. Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925 (E.D. Mich. 2008) (same); *cf. El-Amin v. McDonnell*, No. 3:12-CV-00538-JAG, 2013 WL 1193357, at *5 (E.D. Va. Mar. 22, 2013) (no injury resulting from deprivation of voting rights where party has not yet sought reinstatement through channels offered). Although "disenfranchisement" typically refers to governmental action resulting in the deprivation of the right to vote, federal courts have recognized effective disenfranchisement by private parties in other contexts. *See, e.g.*, *Federspiel v. Ohio Republican Party State Cent. Comm.*, 867 F. Supp. 617, 625 (S.D. Ohio 1994), *aff'd*, 85 F.3d 628 (6th Cir. 1996).

[4] *Compare Haldeman*, 559 F.2d 31, 160 ("The Statistical Abstract of the United States (1973) indicates that the candidate of the Democratic Party for President in 1968 received 81.8% of the total vote cast in the District of Columbia and in 1972 received 78.1% of that vote."), *with General Election 2020: Certified Results*, DC Board of Elections (Dec. 2, 2020) (reporting that President Biden received 92% of the total vote cast in the District in 2020), https://electionresults.dcboe.org/election _results/2020-General-Election.

ago. As such, whether it was or was not *Haldeman*, voting demography is an appropriate factor to consider in this case.[5]

        2.      <u>*Voir dire* showed that the *Edmond* defendant and his charged conduct was relatively unknown to the D.C. jury pool.</u>

Voting demography is far from the only reason why residents in the District are more likely to be "peculiarly" interested in the events of January 6. As Mr. Gieswein previously argued and as the government concedes in the Response, an enormous share of District of Columbia residents were directly affected by the events of January 6, or have connections to individuals and institutions that were directly affected by physical violence on January 6. Def. Mot. to Transfer Venue, ECF No. 64 at 4-7. Indeed, as discussed in the opening motion, *all* D.C. residents were under curfew on January 6, and many experienced the terrifying Capitol complex lockdown.[6] Instead of disputing the reasonable inference that such connections have

---

[5] In each "high profile" political case that the government cites in support of keeping Mr. Gieswein's case in the District, democratic voters neither sustained nor were at risk of sustaining any *personal* injury. *See* Gov't Resp., ECF No. 72 at 7 ("[T]he District has been home to its fair share of trials in politically charged cases. High-profile individuals such as John Poindexter, Oliver North, Scooter Libby, and, more recently, Roger Stone, all received fair trials in this jurisdiction by unbiased juries.") (citing *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990); *United States v. Stone*, Cr. No. 19-0018 (ABJ), 2020 WL 1892360 (D.D.C. April 16, 2020); *and United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007)). Mr. Gieswein readily concedes that mere speculation about jury pool bias based on voting history is insufficient for transfer in cases where no actual injury is sustained, and that these cases were correctly decided. However, in his case, actual injury to D.C. democratic voters is alleged in one of the very charges brought against him, putting voter demographics in a separate and heightened category of relevance here.

[6] *See also* Laurel Wamsley, *A Timeline Of Security Response At The Capitol On Jan. 6*, WAMU (Jan. 15, 2021) (documenting the Capitol complex lockdown and curfews implemented by the Mayor), https://www.npr.org/2021/01/15/956

a high likelihood of producing bias, the government purports to dispense with the viability of the argument by analogizing to a D.C. case involving a drug distributor of crack-cocaine in which transfer was denied. *See* Gov't Resp., ECF No. 72 at 8 (citing *United States v. Edmond*, 52 F.3d 1080 (D.C. Cir. 1995)).[7]

In *Edmond*, the case relied upon by the government, the defendants were charged with running a sustained, large-scale drug operation in the District at the height of the crack-cocaine epidemic. *Id.* at 1084. While the impact of the crack epidemic—a true public health crisis—was unquestionably broad, the impact was qualitatively different than that of this single day of mass violence. While it is true that many D.C. residents were victimized by the crack-cocaine epidemic, the damage it caused was so sustained and chronic that, over course of a decade, reporting about

---

842958/what-we-know-so-far-a-timeline-of-security-at-the-capitol-on-january-6. Additionally, many residents were deeply affected by the sheer physical proximity to the violence. *See, e.g.*, *'It Was An Attack On Our Hometown': How 11 Washingtonians Remember The Insurrection*, DCist (Jan. 5, 2022) ("As Hunter surveyed the riot engulfing the Capitol, he realized there was one key difference from his combat experience. 'Emotionally, it was different because you're on your home soil,' he says. 'You're in your city.'"), https://dcist.com/story/22/01/05/dc-locals-jan-6-capitol-insurrection-anniversary/.

[7] The government also argues elsewhere in the Response than the effects of physical proximity and these connections are attenuated by the passage of time. Yet, a recent Pew poll showed just the opposite: the only reported decline in a desire to redress the injuries through prosecution was among *Republican* voters. *See* John Gramlich, *A Look Back at Americans' Reactions to the Jan. 6 Riot at the U.S. Capitol*, Pew (Jan. 4, 2022) ("Around eight-in-ten Republicans (79%) said in the March survey that it was very or somewhat important to find and prosecute the Capitol rioters. By September, 57% expressed that view. Among Democrats, 95% said in both surveys that it was very or somewhat important to find and prosecute the rioters."), https://www.pewresearch.org/fact-tank/2022/01/04/a-look-back-at-americans-reactions-to-the-jan-6-riot-at-the-u-s-capitol/. This research shows that the interest in holding participants accountable has not declined at all among Democrats.

it likely became part of the background noise in the city. It is no surprise, given the nature of the injury, that the D.C. Circuit was ultimately unpersuaded that the reporting on the issue, or the prosecution, was concerning, noting that it was not focused on any single event, or single group of people. *See id*. at 1099 (emphasizing that the defendants submitted reporting about drug-related issues in general, as opposed to specific events involving the defendants). As the court pointed out: a small proportion of the jurors had been exposed to pre-trial media about *the case*, not just the defendants by name. *Id*. at 1096 (observing that the case was discussed in the media as "the Rayful Edmonds case," therefore asking prospective jurors about familiarity with the lead defendant's name—which few recognized—was a good proxy for their knowledge of the case and issues in general). Indeed, the familiarity with the case was the reason cited by the court for finding that the *voir dire* was acceptable, despite falling "short of the ideal." *Id*. at 1098-99.

Here, by contrast, the events of January 6 were an acute shock to the system of the people of the District of Columbia, both in their roles as (mostly) Democratic voters, and in their roles as residents of a small city, many of whom work for the federal government, including Congress, the Capitol Police, and the Metropolitan Police Department in particular. District residents have been and continue to be exposed to an onslaught of reporting about the shocking events of that single day in January.[8] That is why, unlike the potential jurors in *Edmond*, most Americans report

---

[8] Ex. 1, Def. Mot. to Transfer, ECF No. 64-1. In fact, in tabulating the comparative media coverage by region, defense counsel ran into database limitations because of the volume of terms matches for combinations of "insurrection," "Capitol,"

a high degree of familiarity with the event, as found by the Pew Research Center in a poll cited in the opening motion. *See* Def. Mot. to Transfer Venue, ECF No. 64 at 12.[9]

> 3.   Key features of the jury pools in the cases relied upon by the government are readily distinguishable from the jury pool for the District of Columbia.

Finally, the jury pool for the District of Columbia is geographically smaller and less diverse than the pools analyzed by the First and Fifth Circuits in *Tsarnaev* and *Skilling*. *See United States v. Tsarnaev*, 968 F.3d 24, 55 (1st Cir. 2020); *Skilling*, 561 U.S. at 382. For example, while *Tsarnaev* was indeed a compelling case for transfer,[10] the District of Massachusetts Eastern Division jury pool is broad, pulling from *nine* different counties, including many diverse locales—some rural, some urban; some

---

and "Jan. 6," even for extremely limited date ranges. For example, a Westlaw search of media referring to the event as an "insurrection" returned more than 3,000 hits for January 6 and 7, 2021 alone. The staggering volume of reporting has not changed much in one year: the same search yields more than 7,000 hits for the last month of reporting.

[9] Of course, familiarity extends beyond the jury pool in the District. However, for the reasons cited in subsection (i), and as explained *supra* Part A, D.C. residents are more likely to be *impacted* by this reporting.

[10] The government apparently finds it persuasive that under a deferential standard of review, two out of three appellate judges "would *likely* find" that the trial judge abused no discretion in declining to transfer venue in *Tsarnaev*. *See* Gov't Resp., ECF No. 72 at 9 (quoting *Tsarnaev*, 968 F.3d 24) (emphasis added). However, Mr. Gieswein submits that the lengthy and powerful dissents on the issue of venue in both the 2020 *Tsarnaev* appeal and the original 2015 appeal indicate that reasonable minds may differ. *See Tsarnaev*, 968 F.3d at 109 (Torruella, J., concurring in part) ("A presumption of prejudice was warranted"); *and In re Tsarnaev*, 780 F.3d 14, 29 (1st Cir. 2015) (Torruella, J., dissenting). Moreover, *certiorari* was recently granted by the Supreme Court to review the latest appellate decision. 141 S. Ct. 1683 (2021). Thus, it is far from a foregone conclusion that *Tsarnaev* was correctly decided.

wealthy, some poor; some almost entirely white (non-Hispanic), some racially and ethnically diverse; some with high levels of educational attainment, others with low levels of such attainment.[11] This diversity was revealed in the findings of the survey developed by the defense team itself, which showed that other, less diverse jury pool districts actually had a far greater proportion of respondents report a belief about Tsarnaev's guilt that those within the division in which he was indicted. *Tsarnaev*, 968 F.3d at 48 ("[T]he percentage of people who believe Dzhokhar is guilty is greater in those locales than in the Eastern Division"). The figure from the Eastern Division—that 68% of residents had pre-trial beliefs about guilt—reflects a range of sentiment that one would expect in such a geographically broad and demographically diverse jurisdiction.[12]

---

[11] *See Revised Jury Plan*, U.S. Courts (Nov. 1, 2015) (Eastern District includes "[t]he Counties of Essex, Middlesex, Suffolk, Norfolk, Bristol, Plymouth, Barnstable, Dukes, and Nantucket."), https://www.mad.uscourts.gov/resources/pdf/RevisedJuryPlan.pdf. For a comparison of demographic features by county, *see, e.g.*, *Nantucket County*, Data USA, https://datausa.io/profile/geo/nantucket-ma/, *and Suffolk County*, Data USA, https://datausa.io/profile/geo/suffolk-county-ma#demographics.

[12] Notably, in contrast to Massachusetts, Tsarnaev's survey showed that 86% of respondents in D.C. held beliefs about guilt, which seemingly underscores the point that jury pool diversity is essential to mitigating prejudice: despite a lower saturation of media about Tsarnaev on average, the District's comparable lack of diversity may have tended to create more of a consensus about guilt among its residents. *See also CBS, Inc. v. U.S. District Court*, 729 F.2d 1174, 1181 (9th Cir. 1984) ("The size and heterogeneity of such communities make it unlikely that even the most sensational case will become a 'cause celebre' where '[t]he whole community ... becomes interested in all the morbid details.'"); *see also United States v. Awadallah*, 457 F. Supp. 2d 246, 253 (S.D.N.Y. 2006) (relying on diversity within the district as the primary basis for declining a transfer) ("[T]he Southern District of New York serves one of the country's most diverse cross-section of ethnicities, backgrounds, and experiences"); *United States v. White*, No. 02 Cr. 1111, 2003 WL 721567, at *5 (S.D.N.Y. 2003) (same).

Similarly, in *Skilling*, the Fifth Circuit observed that because Houston was, at the time, the fourth-largest city in the United States, and highly diverse, a significant number of prospective jurors would have had no connection to Enron whatsoever. *Skilling v. United States*, 561 U.S. 358, 382 (2010) ("4.5 million individuals eligible for jury duty resided in the Houston area"). And indeed, *voir dire* ultimately showed that the selected jurors knew very little about Enron, and reported being disinterested in the matter. *See id*. at 389-90.

In sharp contrast to the District of Massachusetts Eastern Division and the Southern District of Texas, the District of Columbia jury pool is made up of juror from just *one* locale: the District of Columbia. It is geographically small, bounded by the limits of the urban city itself. It has a population of just under 700,000, and the real pool of jurors is likely much smaller, since many residents will be disqualified due to their proximity to the events of January 6.[13] Moreover, while Mr. Gieswein is expected to be tried earlier than many other January 6 defendants, it remains relevant to the analysis that fewer than 700,000 D.C. residents could be called upon to serve as jurors in each of the 704 January 6 cases that do not conclude with a plea: this is not a matter of finding 14 jurors for one defendant against whom many are biased; rather, it is a matter of finding potentially *thousands* of jurors for hundreds of similarly prejudiced defendants. When the number of January 6 cases are

---

[13] *See* Def. Mot. to Transfer Venue, ECF No. 64 at 4-5 (citing both the current District population as well as federal employment statistics).

accounted for, the proportional number of residents to defendants actually falls far below the number of jurors available in the small county in *Rideau*.[14]

      C.    *General prejudice held by jurors against those involved in January 6 will be transferred to Mr. Gieswein.*

In the Response, the government argues that because Mr. Gieswein is not personally named in a majority of the articles and other reporting about January 6, and because many potential jurors may not know of him by name before trial, he is not entitled to a presumption of prejudice. *See* Gov't Resp., ECF No. 72 at 11-12. This simply makes no sense: prejudice against a defined group of people is commonly attributed to an individual as soon as their status as a member of the group is learned—it is the basic precept of equal protection law and its regulatory progeny. *See, e.g.,* 42 U.S.C. 3601(k) (prohibits inquiries into protected class membership that is not readily apparent, such as familial status, because it is widely understood that learning of membership transfers the prejudice from the group to the individual). As soon as the jurors who are prejudiced against January 6 participants realize that Mr. Gieswein is a member of that particular group, he will enter the ambit of their prejudice. For that reason, inflammatory articles, documentaries, and comments by government officials—including the judiciary—about the January 6 participants are relevant to the prejudice inquiry, even if they never mention Mr. Gieswein.

---

[14] *Rideau* involved a parish with a population of 150,000, from which a jury was to be selected for a single defendant. 373 U.S. 723, 724 (1963). Here, that figure is *less than 1,000* potential jurors per January 6 defendant (not accounting for anticipated juror disqualifications and defendant pleas).

The government proffered similarly flawed logic *United States v. Salim*, in which it argued that the defendant could not be prejudiced by his association with "terrorism" in general. 189 F. Supp. 2d 93, 96 (S.D.N.Y. 2002). The court addressed the problem in its opinion, noting that "[t]he Government's response, however, does not address the eventuality that […] Salim will indeed be associated with crimes of terrorism." *Id*. It further observed that "[i]t is the Court's responsibility to assess the possible prejudicial effect of pretrial publicity based upon the possibility that evidence connecting Salim to terrorism may be presented." *Id*. Although no presumption ultimately applied in *Salim*, it was because the court found that the crime itself was relatively unknown, not just the defendant, as in *Edmond. See id.*; *see also Edmond*, 52 F.3d 1096 (observing a lack of pre-trial familiarity about the case among potential jurors).

Here, by contrast, the awareness about the events on January 6 are known by most Americans, though as a survey published in the *Washington Post* recently confirmed, the opinions about the events have been deeply divided along political lines.[15] The high level of awareness is easily attributable to the constant news cycle, as Mr. Gieswein documented in Exhibit 1 filed with his opening motion. *See* Def. Mot.

---

[15] "Nearly seven-in-ten adults (69%) say they have heard 'a lot' about the rioting at the U.S. Capitol on Jan. 6." *Views on the Rioting at the US Capitol*, Pew Research Center (Jan. 15, 2021), https://www.pewresearch.org/politics/2021/01/15/views-onthe-rioting-at-the-u-s-capitol/; *see also* Dan Balz, Scott Clement and Emily Guskin, *Republicans and Democrats Divided Over Jan. 6 Insurrection and Trump's Culpability,* Post-*UMD Poll Finds*, Washington Post (Jan. 1, 2022), https://www.washingtonpost.com/politics/2022/01/01/post-poll-january-6/.

to Transfer Venue, ECF No. 64-1.[16] And, although the government seeks to downplay the effect of that reporting by characterizing it as purely "factual" in the Response, it is objectively inflammatory: whereas Tsarnaev and Moussaoui were *actually charged* with counts of terrorism when labeled as terrorists by the media, the January 6 participants, including Mr. Gieswein, are repeatedly referred to as "domestic terrorists" despite not being charged with any count of terrorism.[17] *Cf. In re Tsarnaev*, 780 F.3d at 22 ("It is true that there has been ongoing media coverage […] But […] the reporting has largely been factual.").

Amplification of the charges in the media through intentionally loose colloquialism is necessarily editorialized reporting, not just "the facts" as the government contends. A recent *Washingtonian Magazine* article about the detained January 6 defendants asked "[w]hat's life like on the inside for the most hated

---

[16] Indeed, as of this writing, the top story on Apple News is about the ongoing relevancy of January 6. Billy House and Erik Wasson, *Jan. 6's Wounds in Congress Run Deep, and Trump Keeps Them Fresh*, Bloomberg (Jan. 6, 2022), https://apple. news/A5DkuBJhPQaWTsLTCBJnvPw. Because current reporting is relevant to the analysis here, Mr. Gieswein respectfully reserves the right to supplement the comparative media data provided in the opening motion.

[17] *See, e.g.*, Nicole Gaouette, *Terrifying Scope of Capitol Attack Becoming Clearer*, CNN (Jan. 16, 2021) ("[D]ozens of people on a terrorist watch list came to Washington for the January 6 events. The majority of them were suspected white supremacists with track records so disturbing they were put on the national Terrorist Screening Database as potential security risks."), https://www.cnn.com/2021/01/16/ politics/insurrection-investigation-washington-lockdown/index.html; *see also One Year Since the January 6 Insurrection*, Brookings (Jan. 5, 2022) ("One year ago this week, a violent mob of President Donald Trump's political supporters […] committed an act of domestic terrorism against the U.S. Capitol."),.

political group in the city?"[18]   With local publications making such a bold, pronouncements, it is difficult to see how the government can continue to argue that the reporting neither reflects prejudices that put at risk Mr. Gieswein's right to an impartial jury, nor creates them.

> D.   *The circumstances presented in Mr. Gieswein's case track closely with those in McVeigh, a case in which transfer was granted.*

The facts of January 6 and the resulting impact on the community are much more analogous to those in *United States v. McVeigh* than the cases relied upon by the government. 918 F. Supp. 1467 (W.D. Okla. 1996). In *McVeigh*, the defendant, Timothy McVeigh sought revenge on the federal government for the events that unfolded in the infamous Waco siege in 1993.[19]. According to various reporting from the time, McVeigh, an avid gun collector who was portrayed by the government as a White Nationalist militia man, believed that the siege represented extreme government infringement of individual rights, specifically on the right to bear arms.[20]. To effectuate his revenge for this "infringement," he traveled from out of state—Arizona to Oklahoma—and attacked a federal building, killing 168

---

[18] Andrew Beaujon, *The January Sixers Have Their Own Unit at the DC Jail. Here's What Life Is Like Inside*, Washingtonian Magazine 38 (Jan. 3, 2022). Note that the subtitle only appears in the print issue.

[19] *See The McVeigh Letters*, Guardian (May 6, 2001), https://www.theguardian.com/world/2001/may/06/mcveigh.usa.

[20] *See id.*; *see also* Michael Barkun, *Oklahoma City and the Rise of the Militias* 255–290 (1997); *see also* Mark Lawson Fetter, *The Criminal Behavior and Motivations Behind McVeigh's Decision to Bomb the Murrah Federal Building*, Cal. State Univ. (June 2002), https://scholarworks.lib.csusb.edu/cgi/viewcontent.cgi?article=3253&context=etd-project.

government employees and their children with a homemade bomb. *McVeigh*, 918 F. Supp. at 1469.

McVeigh was repeatedly portrayed by the prosecution as an outsider extremist, just like the defendants who participated in the events on January 6.[21] And the court in *McVeigh* was so persuaded by these dynamics that, despite significant *national* news coverage of the bombing, and despite the fact that a *small* percentage of Oklahoma City residents worked for or had connections to the federal government, the district court granted McVeigh's motion to transfer venue from Oklahoma, observing that "[t]he effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary." *McVeigh*, 918 F. Supp. at 1470.[22]

---

[21] "Prosecutors in the Timothy McVeigh bombing trial Monday began to paint a picture of the defendant as a gun-loving, right-wing extremist who pored over writings celebrating violence." *McVeigh Painted as Gun-loving Political Extremist*, CNN (Apr. 28, 1997), http://www.cnn.com/US/9704/28/mcveigh.wrap/.

[22] The government cites to the Fourth Circuit case *United States v. Moussaoui*, 43 F. App'x 612 (4th Cir. 2002) in support of the proposition that cases involving high-profile attacks, like *McVeigh*, may be tried where the attack occurred without a presumption of prejudice, *see* Gov't Resp., ECF No. 72 at 5; however, the change of venue motion that the district court denied in *Moussaoui* was filed *pro se* and the Fourth Circuit determined in its unpublished opinion that the Court of Appeals had no jurisdiction to review his appeal. 43 F. App'x at 613. The issue was never actually decided by that court. *See id*. Given the lack of legal briefing and court analysis on this issue (just like in *Haldeman*), *Moussaoui* should not be considered persuasive authority. And in *United States v. Youssef*, another case relied upon by the government for the same proposition, the Second Circuit, in applying a deferential standard of review, found it compelling that the defendant had not renewed his motion to transfer venue following *voir dire*, indicating that he was satisfied with the empaneled jury. *See* 327 F.3d 56, 155 (2d Cir. 2003). That is simply inapplicable here.

## II.     A juror questionnaire is necessary as an alternative to transfer.

Mr. Gieswein respectfully maintains that while venue should be changed. However, should the transfer request be denied, due to the high probability of prejudice documented herein, Mr. Gieswein requests, in the alternative, that the Court use a comprehensive juror questionnaire as a means to screen jurors with actual bias from the jury pool. Mr. Gieswein requests that he be permitted to submit a sample questionnaire for the trial Court's consideration at a time closer to trial.

## CONCLUSION

For all of these reasons, those previously given, and such others as may be advanced at a hearing on this matter, Mr. Gieswein respectfully requests that the Court order that the case be transferred to another venue.

Respectfully submitted on January 11, 2022.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____

Ann Mason Rigby
DC Bar No. 491902

Elizabeth A. Mullin
DC Bar No. 484020

Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0869
Facsimile: (703) 600-0880

ann_rigby@fd.org
elizabeth_mullin@fd.org

Maia Livengood
DC Bar No. 1724598

*FPD Legal Fellow*
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0895
Facsimile: (703) 600-0880
maia_livengood@fd.org