## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                                  Crim. Action No. 21-24-1 (EGS)

ROBERT GIESWEIN,

                    Defendant.

## MR. GIESWEIN'S SUPPLEMENT TO MOTION FOR TRANSFER OF VENUE

Data now available confirms that significant majorities of potential jurors in the District of Columbia share materially prejudicial views of the January 6 defendants as a group, including in ways that *voir dire* is not likely to reveal or cure.

- 84% have unfavorable opinions of those arrested for participating in the January 6 demonstrations;
- 62% would characterize these individuals as criminals;
- 71% have already formed the opinion that these individuals are people are guilty; and
- 85% have already concluded that those who entered the Capitol had the specific intent to overturn the election.

In light of this and other evidence explored below, the circumstances of this case, and the characteristics of the potential jury pool in the District of Columbia, Mr. Gieswein respectfully requests that the Court grant his motion for a transfer of venue pursuant to the Constitution, or Rule 21 of the Federal Rules of Criminal Procedure.[1]

---

[1] In a January 19, 2022 Minute Order, the Court granted Mr. Gieswein's consent motion to supplement his motion for transfer of venue. *See* Def. Mot. to Transfer, ECF No. 64; Def. Reply, ECF No. 87; Def. Mot. to Supp., ECF No. 95.

I.    **The new data reflects surveys of potential jurors in the District of Columbia, a comparable district in the Northern District of Georgia, and a news analysis.**

On behalf of all indigent clients charged in the wake of January 6, the Federal Public Defender for the District of Columbia retained the services of the professionals of Select Litigation to survey the District of Columbia jury pool at the direction of undersigned counsel. As explained in Exhibit 1, Select Litigation polled 400 potential District of Columbia jurors, and 400 potential jurors in the Atlanta Division of the Northern District of Georgia. The firm also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6. *See* Ex. 1, with appendices.

II.   **Significant majorities of potential jurors in DC have prejudged the January 6 defendants.**

Select Litigation's survey of District of Columbia potential jurors show that significant majorities of these potential jurors have unfavorable impressions of January 6 defendants, have already concluded they are guilty, and have already concluded they had the specific intent to obstruct.

A.    *D.C. residents have prejudged all January 6 defendants.*

Exhibit 1 summarizes Select Litigation's findings, but highlights include that District of Columbia residents overwhelmingly:

- have unfavorable opinions of those arrested for participating in the January 6 demonstrations (84%); and
- would characterize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, 54% respectively).

Ex. 1 ¶¶ 9, 14. These results indicate that most of the jurors will be predisposed against these defendants, will likely view them as guilty of conduct other than that with which they are charged, and will likely consider them as posing a danger to the community broadly, notwithstanding the strength or weakness of the evidence that they committed the crimes charged.

Significant majorities also

- would characterize these individuals as "criminals" (62%); and
- have already formed the opinion that these individuals are people are "guilty" of the charges brought against them (71%).

Ex. 1 ¶¶ 14, 10.

One would expect most respondents to report that they could not predict how they would judge a trial before it had begun, given social expectations arising from the well-known civic duty of jurors in criminal cases to not determine guilt before hearing all of the evidence. But over half of DC survey respondents are willing to *admit* that they are more likely to vote "guilty" if they find themselves on a jury in one of these cases (52%). Ex. 1 ¶ 11. The only thing that renders this unsurprising are the other results reported above – reflecting deep prejudice against the January 6 defendants.

These trends likely also explain the fact that close to four out of ten DC survey respondents – who know themselves and their fellow citizens well – would not trust a jury here to give them a fair trial if they themselves were accused of violating the law on January 6th. *See* Ex. 1 ¶ 8 (reporting that only 67% of potential DC jurors

stated that they believe that they themselves would receive a fair trial if they were defendants in a January 6 case).

Further, the assessment of those respondents who claim that they believe the January 6 defendants *can* get a fair trial is suspect. Of those who profess to believe that January 6 defendants can get a fair trial in this city, 76% have already decided that these defendants are guilty. *Id.* ¶ 12. Further, 56% of this group confess that they would be more likely to vote "guilty" if they were on a jury. *Id.*

B.    *D.C. residents have prejudged essential elements of the accusations.*

Perhaps most striking of all, Select Litigation's survey data shows that an overwhelming percentage of District residents have already made up their minds about an element essential to proof of several of the counts in the Superseding Indictment.

To prove that Mr. Gieswein "corruptly" obstructed an official proceeding under 18 U.S.C. § 1512 (c)(2) as charged, the government must at least prove that a defendant acted with the specific intent to obstruct a Congressional proceeding (the counting of electoral votes, in the government's theory). *See* Superseding Indictment, ECF No. 91, Count One.[2] And, as the government has now charged Mr. Gieswein with assault with intent to commit another felony, the question of whether he had the specific intent to obstruct the counting of electoral votes is also baked into the assault

---

[2] The parties disagree on much about Section 1512(c)(2), but there is agreement on this bare minimum, at least. *See* Gov't Opp. to Motion to Dismiss Count One, ECF No. 74 at 28-29.

charges (assuming the intended "other felony" is obstruction). *See id.* Counts Three, Five, Six. Moreover, the government has argued that proof of intent to obstruct the electoral vote count would also help prove the assault charges insofar as it would help establish that, if Mr. Gieswein sprayed something in the direction of police and civilians, he "was not taking aim at other actors in the crowd, but rather, those law enforcement officers who were defending the occupants of the Capitol." Gov't Motions *in Limine,* ECF No. 63 at 5-6. In short, whether Mr. Gieswein intended to obstruct the counting of electoral votes – or did not – is an issue central to the most significant charges against him.

Unfortunately, the survey data reveals that overwhelming majorities of potential DC jurors have already reached the conclusion that at least those who entered the Capitol on January 6 were acting with precisely that intent. They have concluded that these defendants were:

- trying to overturn the election and keep Donald Trump in Power (85%);
- insurrectionists (76%); and/or
- trying to overthrow the United States government (72%).

Ex. 1 ¶ 15, 18.

Thus, not only have most DC residents reached the broader conclusion that these individuals are "guilty," but the vast majority have prejudged an element essential to several charges in the case.

This is just the sort of pernicious bias that a typical *voir dire* would not reveal, as *voir dire* usually does not entail inquiring into jurors' ideas about each and every

element of charged offenses. And asking jurors to state whether they have reached conclusions that they cannot set aside during the trial will not reveal such prejudgment: jurors do not always understand which of their opinions are relevant, and what they cannot take for granted without proof beyond a reasonable doubt. *See United States v. Tsarnaev*, 968 F.3d 24, 58 (1st Cir. 2020), *cert. granted*, 141 S. Ct. 1683 (2021) (observing that asking potential jurors about whether they had read anything that influenced their opinion or otherwise made them biased in Boston Marathon bombing case was not likely to reveal bias in part because prospective jurors may be unaware of such bias) (quoting *Smith v. Phillips*, 455 U.S. 209, 221-22 (1982)) (internal quotations omitted).

That is apparently the case here: many of the people who expressed confidence that January 6 defendants can obtain a fair trial have unwittingly already prejudged an essential element in the case. That is, 78% of those in the survey who say that they believe the defendants will receive a fair trial also take it as a given that defendants who entered the building were trying to overthrow the government and/or to keep Donald Trump in power. Ex. 1 ¶ 16. And 82% of those who believe defendants can receive a fair trial also believe the term "insurrection" is an apt description for their actions. *Id*.[3]

---

[3] Indeed, according to Select Litigation, some of the relative few DC survey respondents who indicated that they are reserving judgment about whether they "think the people who were arrested for activities related to those demonstrations are guilty or not guilty of the charges brought against them," or are "more likely to vote that the person is guilty or not guilty of those charges," (*i.e.*, those answering "it depends" or "don't know," or refusing to answer Q4 or Q5) may also nevertheless have unwittingly have prejudged an essential element in the case. That is,

Even if this survey answer led to the Court to *voir dire* potential jurors about this issue (which it should, at a minimum), unless the *voir dire* probes every controversial element of each charged offense (such as whether any conduct directed at law enforcement could possibly have been justified by police misconduct), these results show that *voir dire* cannot be expected to preserve Mr. Gieswein's right to an impartial jury in this District.

## III. Survey results from the Northern District of Georgia are powerful evidence that District of Columbia residents are particularly unlikely to be impartial.

Select Litigation's study also reinforces Mr. Gieswein's argument that this District is perhaps uniquely unlikely to produce an impartial jury.

There is perhaps no other place like the District of Columbia. As Mr. Gieswein has already explored and Select Litigation notes, it is one of the least populous federal court divisions. A significant share of its population is employed by the federal government. A very high proportion of its residents have an associate's degree or higher. Ex. 1 ¶ 21. And the ratio of Biden to Trump supporters in 2020 was more lopsided than in any other federal judicial divisions. *Id.* ¶ 22. Mr. Gieswein predicted that some of these factors – and others, such as the fact that DC residents were personally impacted by the both the events of January 6 and its aftermath, and the fact that the government's theory of the case is that Mr. Gieswein was attempting to

notwithstanding their cautious answers to Q4 or Q5, many of these respondents indicated that they believe those who went into the Capitol were there to overturn the vote, participate in an insurrection, and/or overthrow the government (Q11). This was not reported in Select Litigation's report at Exhibit 1 because the sample size for these groups is too small to be statistically meaningful.

nullify votes for now-President Joe Biden – were bound to produce higher rates of prejudice against January 6 defendants in this district than in other districts that are comparable in other ways. Select Litigation's survey and analysis clearly supports this.

Select Litigation surveyed 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, which is similar demographically to the District of Columbia. Ex. 1 ¶ 19-23. The results show that significantly fewer potential jurors there have set their minds against January 6 defendants. For example:

- 84% of DC survey respondents view people arrested in the wake of January 6th unfavorably, but only 54% of Atlanta division respondents do;

- 71% of DC respondents are of the opinion that these individuals are guilty, but only 54% of Atlanta division respondents share this opinion;

- More than half of DC respondents say they are more likely to vote "guilty" if on a jury, but fewer than half of Atlanta division respondents say this;

- 62% of DC respondents would characterize the January 6 defendants as "criminals," and well over 50% would characterize them as "white supremacists" and "members of a violent right-wing organization," whereas fewer than half of Atlanta division respondents would characterize the January 6 defendants in these three ways (48%, 40%, and 39%, respectively).

Ex. 1 ¶¶ 23, 24.

Finally, the evidence suggests that jurors in other districts are more likely to be like the Atlantans than like DC residents. Select Litigation asked both sets of survey respondents to state whether they associated those who entered the Capitol on January 6 with certain purposes, a question that had also been asked in a recent

national poll recently conducted by CBS/YouGov. Ex. 1 ¶¶ 3, 18, 25.[4] The results show that potential jurors in *Atlanta* hold prejudicial views on this issue at similar rates as survey respondents do *nationally*. *Id.* ¶ 25. But a far greater share of potential jurors in the District of Columbia hold prejudicial views on this issue.

| Comparison of Beliefs among Jury-eligible Citizens in DC & Atlanta Division, & adults nationwide | | | | |
|---|---|---|---|---|
| | | **USA** | **DC** | **GA** |
| Trying to overturn the election and keep Donald | Would | 63% | 84% | 68% |
| Trump in Power | Would not | 37 | 9 | 19 |
| Insurrection | Would | 55% | 76% | 55% |
| | Would not | 45 | 13 | 27 |
| Trying to overthrow the US government | Would | 54% | 72% | 57% |
| | Would not | 46 | 20 | 33 |
| A protest that went too far | Would | 76% | 69% | 70% |
| | Would not | 24 | 24 | 21 |
| Patriotism | Would | 26% | 13% | 25% |
| | Would not | 74 | 81 | 63 |
| Defending freedom | Would | 28% | 10% | 21% |
| | Would not | 72 | 86 | 70 |

*Id.* ¶ 25. In short, the evidence suggests that it is *this district* that is the national outlier in terms of juror prejudice, not Atlanta.

---

[4] The results of the poll are reviewed at https://www.cbsnews.com/news /january-6-opinion-poll-2022/ (last visited 2/4/22), and its methodology is described at https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view (last visited 2/4/22). As noted in Select Litigation's Report, the firm mirrored the wording of the CBS/YouGov poll as closely as possible to maximize the comparative value, even though Select Litigation would have used different wording. Further, differences in methodology mean the comparison is not perfect. *See* Ex. 1 ¶ 18.

IV.   **Extensive media coverage may be one of many outside influences contributing to the material prejudice reflected in the survey data.**

Although many defendants request a transfer of venue citing pretrial publicity, the Sixth Amendment is concerned with whether jurors' conclusions will be induced by "*any* outside influence" rather than "only by evidence and argument in open court[.]" *Skilling*, 571 U.S. at 278 (quoting *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462 (1907) (opinion for the Court by Holmes, J.)) (emphasis added). That outside influence can be public print *or* "private talk." *Id.* (quoting *Patterson*, 205 U.S. at 462). It can be "the sheer number of victims." *See id* at 437-38 (Sotomayor, J., concurring in part and dissenting in part) (quoting with approval the Fifth Circuit's statement that the district court overseeing Skilling's trial "seemed to overlook that the prejudice came from more than just pretrial media publicity, but also from the sheer number of victims"); *id.* at 437 (quoting with approval the Fifth Circuit's statement that district court lost sight of the proposition that "[t]he evaluation of the volume and nature of reporting is merely a proxy for the real inquiry: whether there could be a fair trial by an impartial jury that was not influenced by outside, irrelevant sources"). Or the improper outside influence may be the *nature* of the media to which jurors have been exposed, or its prevalence close to the time to trial, or its tendency to provoke identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome." *Skilling v. United States*, 561 U.S. 382, 383 (2010) (discussing broadcast of confession in small town in *Rideau v.* Louisiana, 373 U.S. 723 (1963); *United States v. McVeigh*, 918 F. Supp. 1467, 1473 (W.D. OK 1996) (emphasis added). The outside influence may also

be "such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience." *McVeigh*, 918 F. Supp. at 1473.

Here, Mr. Gieswein has argued in previous filings that the characteristics of the District's population, the direct effect of January 6 on them, and the government's theory of the case are all outside influences likely to prejudice DC jurors against January 6 defendants. New evidence reinforces his argument that media coverage may be another of the outside influences contributing to the bias reflected in the survey results reported above.

> A.  *Videos and photos heavily featured in media about January 6 has been "of the type readers or viewers could not reasonably be expected to shut from sight," like the recorded confession in* Rideau.

Like the pretrial publicity on which the Court focused in *Rideau,* in which the Supreme Court ruled that the district court should have transferred the case to a new venue, the pretrial publicity about January 6 cases has been unforgettable, it has "invited prejudgment of . . . culpability," and it has been of the "smoking gun variety." *Skilling*, 561 U.S. at 383.[5] In *Rideau,* the Court concluded that no *voir dire* could

---

[5] In *Skilling v. United States*, although the Court established no bright line rules about when media can contribute to a constitutional need to transfer venue, Justice Ginsberg noted that, when the Court has ruled that a case should have been transferred to a new venue in order to preserve defendants' constitutional right to trial by an impartial jury, it has emphasized (1) "the size and characteristics of" the district with venue, (2) the extent to which news stories about the defendant contained confessions "or other blatantly prejudicial information of the type readers or viewers" in that venue "could not reasonably be expected to shut from sight," and (3) the time that has passed between periods of significant publicity and the trial (if any has). *Skilling,* 561 U.S. at 382-83; *id.* at 381 ("[P]resumption of prejudice . . . attends only the extreme case.").

cleanse the taint of a video of the defendant's uncounseled interrogation and "confession," which had been broadcast in a small town several times before trial. *Rideau*, 373 U.S. at 727. Here, potential jurors have been exposed to hours and hours of videos of the events of January 6, and hundreds of pictures of those events. Even digital newspapers include video footage embedded in articles.

Whereas the single recording at issue in *Rideau* captured a "dramatically staged confession of guilt," the hundreds of January 6 videos and photos circulated over the last 13 months capture the scene of the alleged January 6 crimes, and many of the alleged crimes themselves, including potential crimes committed by many other people easily confused with Mr. Gieswein. Vivid images splashed across DC papers and television for the last thirteen months show people scaling the Capitol walls, hoisting a hangman's gallows and noose, waving Confederate flags, putting their feet on the desks in the Capitol, rifling through papers on desks in the Capitol, milling about and hanging from the balconies in the Senate Chamber, and appearing to try to break into the House chamber, among hundreds of other scenes.[6] Many of the images – and the general impression that arises from viewing many of them – are "likely imprinted indelibly in the mind of anyone who [viewed them]," just like the

---

[6] *See, e.g.* Staff, "No pictures, no pictures': The enduring images from Jan. 6," *The Washington Post* (Jan. 4, 2022), at https://www.washingtonpost.com/nation/interactive/2022/photos-jan-6-capitol/ (last visited 2/3/22); "Chilling images from the Capitol riot: Jan. 6 insurrection in photos," *USA Today* (Jan 5. 2022), at https://www.usatoday.com/picture-gallery/news/politics/2022/01/03/jan-6-insurrection-photos-capitol-riot/9052798002/ last visited 2/3/22); D. Bennett, et al., "41 minutes of fear: A video timeline from inside the Capitol siege," *The Washington Post* (Jan. 16, 2021), at https://www.washingtonpost.com/investigations/2021/01/16/video-timeline-capitol-siege/ (last visited 2/3/22).

recorded interrogation in *Rideau* would have been. *See Skilling*, 561 at 382-83. Much of this evidence has nothing to do with Mr. Gieswein, but because DC jurors have been inundated with these videos, they cannot be expected to know that, or to "shut [them] from sight" during trial. *See Skilling*, 561 U.S.

As such, the pretrial publicity about January 6 has been "blatantly prejudicial," and distinguishable from the type of press coverage that failed to convince the majority of the Supreme Court that prejudice should be presumed in Skilling. *Skilling*, 561 U.S. at 382; (distinguishing publicity in that case from the publicity in *Rideau* because it contained "[n]o evidence of the smoking gun variety" and was not so shocking that it could not be shut from jurors' minds during trial).

B.   *Extensive local pretrial publicity about January 6 has not ceased in the short time that has passed between the event and upcoming trials.*

Moreover, data gathered by News Exposure at the direction of Select Litigation establishes that coverage of January 6 has been extensive and persistent, particularly in the District of Columbia. *In just one year*, District of Columbia newspapers have *already* published at least 500 articles about January 6, and local news syndicates have broadcast over 7000 stories about the day. Ex. 1 at App. B-7 (print data); App. B-1 (broadcast data).[7] This coverage is far more extensive than the coverage of the defendant that failed to persuade the Supreme Court that it should presume

---

[7] These estimates may understate coverage of January 6, as News Exposure only counted hits containing a short list of terms: "January 6 riot" or "Capitol insurrection" or "Capitol riot" or "2021 US Capitol attack" or "Capitol violence." The Washington, DC newspapers News Exposure considered were *The Washington Post, The Washington Times*, and *Washington Examiner*.

prejudice in *Skilling. See Skilling*, U.S. at 428-30 (Sotomayor, J., concurring in part and dissenting in part) (noting that it took multiple years between Enron's collapse and trial for there to accumulate hundreds of *Houston Chronicle* articles, and 1,600 local broadcast stories about Skilling).[8]

Select Litigation also asked News Exposure to analyze coverage of January 6 in the Atlanta division of the Northern District of Georgia, which is similar demographically to the District of Columbia. Ex. 1 ¶¶ 27-32. Comparison of coverage in this District to coverage in Atlanta reinforces how persistent coverage has been in the District of Columbia. For example, in the month where January 6 was covered least by local D.C. broadcast affiliates (August of 2021), January 6 was still mentioned more than it had been in Atlanta in nine of the 12 months evaluated. Ex. 1 ¶ 30; *id.* at App. B-1, B2. The data also shows that District of Columbia print, broadcast, and web coverage of January 6 has exceeded Atlanta's equivalent's almost every month, and has far surpassed Atlanta's coverage over the last year as a whole. Ex. 1, App. B. Indeed, for every story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been at least two in *The Washington Post.* Ex. 1 ¶ 28.

In short, the data shows that District residents have been exposed to an enormous amount of coverage of January 6, and more local coverage of January 6

---

[8] To be sure, most of the coverage has not focused on Mr. Gieswein himself. But his concern is that he will be prejudiced by his association with an event and a group of thousands that have been covered as a group incessantly – and negatively – by various news media in the last year, both nationally and locally.

than residents of a comparable district have, thereby reinforcing the point that January 6 is a local story in addition to being a national story, and Mr. Gieswein will have an easier time seating an impartial jury in this district than in others.

## V.    The data and other circumstances provide ample grounds to transfer.

The concept of presumption of prejudice is predicated on the idea that the institution of the jury is occasionally fallible. Of course, jurors are almost always trusted to represent their views wholly and accurately during *voir dire*, and to follow the court's instructions if selected for the jury. But the Supreme Court has recognized that a failsafe may be needed under a narrow set of conditions that make it more difficult for a juror to accurately assess their own bias, or to ignore salient community attitudes about the case. *See Rideau*, 373 U.S. at 726-27 (concluding that no review of "the *voir dire* examination of the members of the jury" was necessary to determine in that case that "that due process of law. . . required a [transfer]"); *see also, e.g.*, *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality [during *voir dire*] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows [during *voir dire*] is often its father.").

Common sense suggested that the circumstances of January 6, the small size of this district, its many federal employees, the aftermath of January 6, the political makeup of DC coupled with the government's theory of the case, and the persistent

news coverage of the events in this news- and politics-obsessed city make this venue uniquely unlikely to produce an impartial jury as the Constitution demands. Data Mr. Gieswein now submits confirms that there are extremely high levels of prejudice among potential jurors in this district, whether due to the influence of the factors above, particularly high levels of pretrial publicity, or all of the above. To a remarkable and standout degree, most potential jurors here have already made up their minds that the January 6 defendants are criminals, that they are guilty generally, and that they are guilty specifically of seeking to stop the counting of the electoral votes. They know that their friends and family have as well. Many do not even realize that they have already prejudged essential elements of the government's case. As a result, even those striving to be honest during *voir dire,* and striving to meet their obligations as jurors, would nevertheless remain partial in ways that *voir dire* could not reveal.

Under these extreme circumstances, prejudice must be presumed, and the Court should transfer this case to another venue to preserve Mr. Gieswein's rights under to the Constitution, or at least pursuant to the Court's discretion under Rule 21 of the Rules of Criminal Procedure. *See Skilling*, 561 U.S. at 446 n.9 (Sotomayor, J., concurring in part and dissenting in part) (noting that district courts have wide discretion to transfer a case to another venue even if trial in the originating venue would not violate the Constitution, and that it would not have been imprudent to transfer the Skilling case given "the widely felt sense of victimhood among

Houstonians and the community's deep-seated animus toward Skilling" even if these issues did not preclude a constitutional trial).

Finally, Mr. Gieswein is now scheduled for trial in late April. By that time, other January 6 defendants will have gone to trial. The already-small pool of even potentially eligible jurors will shrink, and pretrial publicity will likely experience other spikes. As such, the list of reasons for the Court to presume prejudice will only grow in the time between now and Mr. Gieswein's trial. To ensure that Mr. Gieswein's trial proceeds as scheduled, and that he is tried by an impartial jury, the Court should transfer this case to another suitable venue as soon as possible.

Respectfully submitted on February 4, 2022.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____
Ann Mason Rigby
DC Bar No. 491902

Elizabeth A. Mullin
DC Bar No. 484020

Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
ann_rigby@fd.org
elizabeth_mullin@fd.org