## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-24 (EGS)** |
| **v.** | : | |
| | : | |
| **ROBERT GIESWEIN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## SUPPLEMENT TO MOTION TO TRANSFER VENUE

Defendant Robert Gieswein has submitted a supplement to his pending motion to transfer venue, arguing that a recent telephonic poll and media analysis confirm that venue is inappropriate in this district.  Contrary to his claims, the new data do not indicate that he "cannot obtain a fair and impartial trial" in this district.  Fed. R. Crim. P. 21(a).

## BACKGROUND

Based on his actions on January 6, 2021, Gieswein was charged with obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); three counts of assaulting, resisting, or impeding officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); destruction of government property, in violation of 18 U.S.C. § 1361; and entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b).  He moved to transfer venue to the District of Colorado, where he lives, arguing that prejudice should be presumed in the District of Columbia based on the number of federal employees in the District, the impact that January 6 had on the District, and the extensive media coverage of January 6.  Doc. 64.

Gieswein supplemented his motion for change of venue based on data prepared by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia.  Docs. 101, 101-1.  Specifically, Select Litigation conducted a telephone poll of potential jurors in the District of Columbia and in the Atlanta Division of the Northern District of Georgia and contracted with a media research firm to analyze news media coverage of January 6 in both of those jurisdictions.  Gieswein argues that this new data supports his motion to transfer venue because it shows that an impartial jury cannot be selected in Washington D.C.

## ARGUMENT

As explained in the government's initial opposition (Doc. 72), the constitutional presumption is that a criminal case shall be tried in State and district where the crime was committed.  U.S. Const. Art. III, § 2, cl. 3; Amend. VI.  Transfer to another venue is appropriate only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 396 (2010).  A "presumption of prejudice" warranting a change of venue, however, "attends only the extreme case."  *Id.* at 381.  "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995).  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United* States, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

In this case, Gieswein cannot come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C.  *Skilling*, 561 U.S. at 382.

I.      **Pretrial Polling Does Not Support a Presumption of Prejudice Requiring a Change of Venue.**

Gieswein contends that this court should find a presumption of prejudice in the District of Columbia and order a change of venue without conducting voir dire.  Ordinarily, the better course when faced with a pretrial publicity claim is "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc); *see United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967) (observing that the "proper occasion" for determining whether an impartial jury can be selected "is upon the voir dire examination").  Gieswein offers no compelling reason to depart from that ordinary practice here.  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary."  *Jones*, 404 F.2d at 1238.

A.      **Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.**

Gieswein argues that this Court should find a presumption of prejudice based on the results of a poll of prospective jurors.  But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias."  *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the

3

"argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43.

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir

dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt.  *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19.  Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions."  *Rodriguez*, 581 F.3d at 786.  And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors."  *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed.  First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses.  *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions).  Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395.  Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it.  But that is not the

ultimate question when picking a jury.  A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722. Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723.  But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls.  And Gieswein has not offered any reason to depart from that usual practice here.  Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice.  But, as explained below, the Select Litigation poll does not support a presumption of prejudice in any event.

### B.    The Select Litigation poll does not support a presumption of prejudice.

Contrary to Gieswein's contention, the Select Litigation poll does not support a presumption of prejudice in this district.  For one thing, the poll indicates that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C.  The number of respondents who had seen "[a] lot" of coverage in each jurisdiction differed only by three percentage points (33% in D.C. versus 30% in Atlanta), which is within the margin of error.  Doc. 101-1 at 1-2, 14.  The number of respondents who had seen "[s]ome" coverage was exactly the same (25% in both jurisdictions), and the number who had seen "[q]uite a bit" of

coverage was not significantly different (28% in D.C. versus 20% in Atlanta). *Id.* at 14. The total percentage of respondents who were exposed to "[a] lot," "[q]uite a bit," or "[s]ome" news coverage was 86% in Washington, D.C. and 75% in Atlanta. *Id.* at 14. This relatively small difference does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

Gieswein points out (Doc. 101 at 3) that 71% of respondents in D.C. said they had formed the opinion January 6 arrestees were "guilty" of the charges brought against them. *See* Doc. 101-1 at 14. The survey failed, however, to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area. *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf ("Respondents must be made aware that they can say they do not know or have no opinion."). The survey instead gave respondents a binary choice between "guilty or not guilty." Doc. 101-1 at 14. Yet even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused." *Id.* This shows that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice. In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to the 71% here. *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). But the survey in *Haldeman* first asked respondents whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both

"No" (*i.e.* had not formed an opinion) and "Don't Know/No Opinion."  *Id.* at 178 n.2.  The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know."  *Id.*  Only after (a) being prompted to consider whether they could actually form an opinion and (b) being reminded of the presumption of innocence did 61% of respondents say "guilty."  *Id.*  Here, by contrast, respondents were not provided a "don't know" option, were not reminded of the presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty."  Doc. 101-1 at 14 (Questions 3, 4).

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty."  Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty."  Doc. 101-1 at 14.  In response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused."  *Id.*  Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know."  This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

Gieswein points out that, according to the Select Litigation poll, 84% of D.C. respondents had an "unfavorable" view of "people arrested for participating in the events at the U.S. Capitol on January 6."  Doc. 101 at 2; Doc. 101-1 at 14.  Although that is higher than the 54% of Atlantans with unfavorable views, it is quite similar to the results of a nationwide CBS poll that the defendant

cites (Doc. 101 at 9 n.4), which found that 83% of respondents "[s]omewhat disapprove" or "[s]trongly disapprove" of the "actions taken by the people who forced their way into the U.S. Capitol on January 6." *See* CBS News Poll, December 27-30, 2021, Question 2, https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view. Gieswein has not asked to be tried in Atlanta, but rather in his home state of Colorado. And, in any event, the fact that many D.C. residents have a generally "unfavorable" view of people "arrested" on January 6 does not mean that an impartial jury cannot be selected in this jurisdiction.

Gieswein also points out (Doc. 101 at 1, 3, 8) that 62% of D.C. respondents (compared to 48% of Atlanta respondents) would describe "most of the people who were arrested for their involvement in the events on January 6th" as "criminals." Doc. 101-1 at 14 (Question 10). The answers to this question likely reflect the commonly held view that most people arrested for crimes are in fact guilty of those crimes. But the fact that 62% of D.C. respondents expressed this off-the-cuff view about "most" of the 700-plus January 6th arrestees does not demonstrate that all of those respondents would be unable to impartially find the facts in a specific case after being properly instructed by the Court. Moreover, the question demonstrates that fully 28% of D.C. respondents would *not* describe those arrestees as criminals, and 9% were unsure or refused to answer. Doc. 101-1 at 14. And the 14% difference between D.C. and Atlanta—which could easily be explained by demographic differences such as age and education levels (*see* Doc. 101-1 at 15)— would not justify the conclusion that this is an "extreme case" in which a change of venue is required. *Skilling*, 561 U.S. at 381.

Nor does the poll show, as Gieswein claims (Doc. 101 at 4-5) that an "overwhelming percentage" of potential jurors have "already made up their minds" about the "corruptly" element in 18 U.S.C. § 1512(c)(2). The poll never mentioned the word "corruptly" or any equivalent. *See*

*United States v. Sandlin*, --- F. Supp. 3d ---, 2021 WL 5865006, at *11-12 (D.D.C. Dec. 10, 2021) ("As commonly defined, 'corruptly' means 'in a corrupt or a depraved manner.'").  The fact that substantial numbers of respondents "would" describe "the people who forced their way into the U.S. Capitol" as "[t]rying to overturn the election" (85%), engaging in "[i]nsurrection" (76%), or "[t]rying to overthrow the U.S. government" (72%), Doc. 101-1 at 15, is a far cry from their having "made up [their] mind[s]" that a particular defendant acted "corruptly" for purposes of § 1512(c)(2).  This is especially true given that the poll did not provide an "undecided" option but asked only whether respondents "would" or "would not" use those descriptions.  *Id.*  In short, the Select Litigation poll does not come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C.  *Skilling*, 561 U.S. at 382.

## II.   Media Coverage of the Events of January 6 Does Not Support a Presumption of Prejudice.

Gieswein next argues that "[n]ew evidence reinforces" his argument that media coverage created bias in the District of Columbia.  Doc. 101 at 11.  Neither the recent news articles that he cites nor the media analysis conducted by Select Litigation support his claim that an impartial jury cannot be found in this District.

### A.   The media coverage in this case is not like the televised, uncounseled confession in *Rideau v. Lousiana*.

Gieswein contends that the media coverage in this case was of the "smoking gun variety" that jurors could not reasonably be expected to ignore.  Doc. 101 at 11, 13.  He cites three news articles (two published after his original motion for change of venue) containing pictures and videos of the events at the Capitol on January 6.  *Id.* at 12 n.6.  Gieswein compares the "[v]ivid images splashed across DC papers and television for the last thirteen months" with the recording of the "dramatically staged confession of guilt" broadcast on television in *Rideau v. Louisiana*,

373 U.S. 723 (1963).  Doc. 101 at 12 (quoting *Skilling*, 561 U.S. at 382-83).   *Rideau* was an unusual case, in which video of the defendant's uncounseled confession to kidnapping and murder was broadcast to a large segment of the jury pool three times in the two months before trial. *Rideau*, 373 U.S. at 724-25.  The Supreme Court concluded that "to the tens of thousands of people who saw and heard it," this televised interview "in a very real sense *was* Rideau's trial—at which he pleaded guilty." *Id.* at 726.  In this case, by contrast, the extensive media coverage has focused on the overall events of January 6.  Comparatively little coverage has focused on Gieswein himself. And the coverage has not contained a dramatic confession like that in *Rideau*.

The fact that potential jurors have potentially been exposed to "hours and hours of video of the events of January 6, and hundreds of pictures of those events," does not establish a presumption of prejudice.  Doc. 101 at 12.  As an initial matter, there is no reason to believe that most D.C. residents have reviewed "hours" of video or have consumed more than a fraction of the media coverage of the events.  And, as explained above, prospective jurors in other jurisdictions have also been exposed to extensive news coverage.  *See* Doc. 101-1 at 14 (Question 8); *Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest).

Moreover, cases since *Rideau* have made clear that even "massive" news coverage of a crime does not require prejudice to be presumed, *Haldeman*, 559 F.2d at 61, and the Supreme Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be

expected to shut from sight." *Skilling*, 561 U.S. at 382.  And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *Haldeman*, 559 F.2d at 61.  The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.*

Similarly here, most of the media coverage of January 6 consists of "straight news stories," *Beck*, 369 U.S. at 556, which are "largely factual in nature," *Murphy v. Florida*, 421 U.S. 794, 802 (1975).  The high number of photos and videos of January 6 that have been publicly disseminated is a function both of modern technology and of the public nature of the January 6 attack, which took place in and around a public building in front of news reporters, security cameras, and hundreds of smartphone-wielding protestors.  Any photos or videos of Gieswein at the Capitol that have been made public would be admissible and highly relevant at trial.  *Compare Sheppard v. Maxwell*, 384 U.S. 333, 360 (1966) (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial.  Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

Nor can Gieswein show prejudice based on photos and videos that "ha[ve] nothing to do with" him.  Doc. 101 at 13.  The Court can guard against such spillover prejudice by instructing the jury to consider only the defendant's guilt.  Unlike the defendant's own confession in *Rideau*,

which would have been quite difficult for jurors to ignore, jurors can easily understand the common-sense notion that they cannot convict Gieswein based other people's separate actions on January 6. In most cases involving pretrial publicity, the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*). The events of January 6, by contrast, involved thousands of participants and have so far resulted in charges against more than 775 people. Although Gieswein has received some media coverage, his name is by no means widely known or widely associated with January 6. There is no reason to believe that the extensive coverage of January 6 in general has generated substantial bias against Gieswein specifically. And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. As the Select Litigation poll demonstrates, the number of potential jurors exposed to "[a] lot" of news coverage of January 6 differs only slightly between Washington, D.C. (33%) and Atlanta (30%). Doc. 101-1 at 14 (Question 8).

**B.     The Select Litigation media analysis provides no basis to presume prejudice.**

Gieswein also incorrectly contends that the media analysis conducted by Select Litigation supports a presumption of prejudice. Doc. 101 at 13-14. He first asserts that prejudice should be presumed because the "District of Columbia newspapers have *already* published at least 500 articles about January 6, and local news syndicates have broadcast over 7000 stories about the day," which he says is "far more extensive than the coverage of the defendant that failed to persuade the Supreme Court that it should presume prejudice in *Skilling*." Doc. 101 at 13. Gieswein incorrectly compares news coverage of January 6 *as a whole* with coverage of the *specific defendant* in *Skilling*, rather than the larger crime in which he was involved. Jeffrey Skilling was a former executive of Enron Corporation, and the Houston Chronicle "mentioned Enron in more than 4,000 articles during the 3-year period following the company's December

2001 bankruptcy" with "[h]undreds of these articles discussing Skilling by name." *Skilling*, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part).  During a 29-month period, "local stations aired an estimated 19,000 news segments involving Enron, more than 1,600 of which mentioned Skilling." *Id.* at 429.  Thus, the local Houston coverage of Enron's collapse was actually *higher* than the local D.C. coverage of January 6—with an average of more than 1,300 newspaper articles per year and more than 7,800 broadcast stories per year.

Gieswein acknowledges in a footnote that "most of the coverage" of January 6 "has not focused on Mr. Geiswein himself."  Doc. 101 at 14 n.8.  Yet it is *that* coverage—the coverage of Gieswein himself—that must be compared to "the coverage of the defendant" in *Skilling*.  *Id.* at 13.  And the Select Litigation media analysis does not address the coverage of Gieswein himself, much less establish that such coverage was more extensive than the coverage of Jeffrey Skilling. Gieswein expresses concern that "he will be prejudiced by his association" with other January 6 defendants, but the defendant in *Skilling* made a similar argument.  *See Skilling*, 561 U.S. at 384-85 (a co-defendant's well-publicized guilty plea shortly before Skilling's trial did not require a presumption of prejudice).  That is therefore no basis on which to treat all the January 6 coverage as if it were coverage of Gieswein himself.

Gieswein also argues that the media analysis shows that D.C. coverage of January 6 "has exceeded Atlanta's equivalent[]s almost every month, and has far surpassed Atlanta's coverage over the last year as a whole."  Doc. 101 at 14.  He asserts that "for every story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been at least two in the *Washington Post*."  *Id.* (citing Doc. 101-1 at 9, ¶ 28).  These raw numbers do not support his prejudice claim for at least four reasons.  First, the numbers fail to account for the comparative sizes of the two newspapers.  It should not be surprising that a large national newspaper would

print more articles on the same topic than a regional newspaper.  Second, these numbers do not take into account the fact that many Americans receive their news from national sources such as CNN or Fox News, often filtered through social media.  Thus, prospective jurors in both Washington, D.C. and Atlanta are not limited to their local newspapers and television broadcast stations and may well have been exposed to much of the same media coverage.  Third, the mere number of news articles in a given source is not a good way to measure prospective jurors' media exposure.  Indeed, the Select Litigation poll shows comparatively small variations in media exposure between Washington, D.C. and Atlanta.  According to that poll, 99% of D.C. respondents were aware of the January 6 demonstrations, compared to 93% in Atlanta, and 33% of D.C. respondents had seen "A lot" of coverage, compared to 30% in Atlanta.  Doc. 101-1 at 13-14. Fourth, mere exposure to pretrial publicity cannot justify a presumption of prejudice.  "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381.  This is particularly true where the pretrial publicity consists primarily of "straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness." *Beck v. Washington*, 369 U.S. 541, 556 (1962).

In short, the fact that Washington, D.C. news outlets have run more stories about January 6 than have Atlanta outlets does not suggest that an impartial jury cannot be selected in Washington D.C.  Gieswein asserts that the media coverage analysis demonstrates that "January 6 is a local story in addition to being a national story."  Doc. 101 at 15.  But that is true of *every* crime of national significance, yet courts have declined transfer venue for many other notorious crimes. *See* Doc. 72 at 4-5 (citing cases).  Like the Watergate scandal at issue in *Haldeman*, the storming of the Capitol on January 6, 2021, was "not a local crime of peculiar interest to the residents of the District of Columbia."  *Haldeman*, 559 F.2d at 64 n.43.  Indeed, unlike the defendants in

*Haldeman*, the defendants like Gieswein who are charged in connection with the events on January 6 come from across the country.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases.  But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses.  As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required.  *Haldeman*, 559 F.2d at 62.

## CONCLUSION

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Erik M. Kenerson*
ERIK M. KENERSON
Ohio Bar No. 82960
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov
(202) 252-7233
jason.mccullough2@usdoj.gov