UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT GIESWEIN,<br><br>          Defendant. | Crim. Action No. 21-24-1 (EGS) |

**MR. GIESWEIN'S REPLY TO GOVERNMENT OPPOSITION TO SUPPLEMENT TO DEFENSE MOTION FOR TRANSFER OF VENUE**

Mr. Gieswein has submitted survey data that confirms that significant majorities of potential jurors in the District of Columbia have materially prejudicial views of January 6 defendants in ways that *voir dire* will not necessarily reveal, or be able to cure. The data is just one of many factors upon which Mr. Gieswein relies, including the size and demographics of the D.C. jury pool, potential jurors' connection to the events and the aftermath of January 6, and the number of January 6 cases scheduled for jury trials. The inescapable conclusion from the combination of these factors is that the only way to safeguard Mr. Gieswein's constitutional right to an impartial jury is to transfer his trial to some venue other than the District of Columbia. In response, the government musters one unavailing critique of the survey, points to distinguishable cases, and generally attempts to chip notches into the trees without acknowledging that there is a forest of reasons to transfer this case. Because the government fails to refute that the cumulative impact of the issues Mr. Gieswein raises will deprive him of a fair trial, the Court should grant his motion to transfer venue.

I. **The government fails to undermine the value of the defense's survey results as evidence supporting transfer of venue.**

The survey results that Mr. Gieswein submitted to the Court show that 71% of District of Columbia respondents said that they had formed the opinion that January 6 defendants were "guilty" of the charges against them, and show many other signs of having prejudged all of these cases indiscriminately. Def. Supp., Ex. 1, ECF No. 101-1.[1] The government attempts to undermine all of these results by suggesting that courts have determined that no survey has value in the evaluation of whether a transfer of venue is appropriate in a given case, and by attempting to critique this specific survey. Neither effort is successful.

   A. *The government fails to establish that survey data can never support a transfer of venue.*

The government wrongly suggests that survey results cannot support a finding of presumed prejudice, citing select cases in which courts have declined to rely on surveys for that purpose. Gov't Opp., ECF No. 106 at 4-8. Each of these cases is distinguishable in one or more ways.

First, in all of the government's cases, survey respondents were asked entirely different questions than were asked here. Second, in many of these cases, survey respondents were not even asked to opine on the "guilt" of the defendants at issue. *See, e.g., United States v. Campa*, 459 F.3d 1121 (2006) (reflecting that respondents

---

[1] For example, 84% have unfavorable opinions of those arrested for participating in the January 6 demonstrations; 62% would characterize these individuals as criminals; and 85% have already concluded that those who entered the Capitol planned to overturn the election. Def. Supp. & Exhibit, ECF Nos. 101, 101-1.

in survey submitted in support of transfer motion by five men accused in Miami district of acting as unregistered Cuban intelligence agents were not asked to opine on anyone's guilt); *United States v. Causey, et al.*, Case No. H-04-205, 2005 WL 8160703 (S.D. Tx. Jan. 1, 2005) (noting that in Skilling case, respondents were asked to name all executives they believed were guilty of Enron crimes, which took for granted that the respondent must believe some were, and noting that 87.7% of respondents did *not* name Skilling in response).

Third, in others of the cases upon which the government relies, the court rejecting survey evidence as grounds to transfer venue did so only after discrediting many of the techniques employed by the survey-givers at issue. This was the case in *Campa*, in which the district and circuit courts rejecting survey data submitted by the defendants relied on many critiques of the survey techniques employed by the poll-taker the defense had hired, including criticisms the government had offered through its own expert. *Campa*, 459 F.3d at 1130-31, 1145-46 (describing several critiques offered by the government and the district court, and adopting many of them). As discussed further below, the government cannot level nearly the same kinds of criticism of Select Litigation's methods.

Finally, in the one case cited by the government in which the reviewing court rejected survey results as useful evidence in a venue analysis more generally, the majority betrayed a generalized bias against surveys that the government does not assert here, and which may have been a function of the era. *United States v. Haldeman*, 559 F.3d 31, 64 n. 43 (1979) (characterizing *all* polls as "suspect" and

3

noting that district court did not have to consider poll-giver "paid for by one side" as an expert without offering specific critique of pollster whose results the defense had submitted).

Over forty years later, the government does not suggest that polls are uniformly suspect, and it offers only one attempt to undercut Select Litigation's results. As shown below, that attempt fails to establish that the Court should disregard the defense's survey evidence that Mr. Gieswein will not be able to find an impartial jury at his trial in October.

> B. *The critique that the defense's survey did not include an option to answer "don't know" fails to undermine results.*

The only critique of the instant survey's mechanics that the government offers is a complaint that Select Litigation did not provide survey respondents with instruction that they could say they were "unsure" about the guilt of the January 6 defendants (or about other issues explored in the survey). ECF No. 106 at 7. The government asserts that such an option is "required" by standards issued by a professional organization, the American Society of Trial Lawyers (ASTL). *Id.* This attempt to undermine Select Litigation's methods fails.

First, the government does not establish why the Court should credit the set of standards upon which it relies. It offers no evidence that they are widely-adopted by experts in the area, and offers no expert opinion on this issue, or data undermining Select Litigation's results.

Second, there is good reason for Select Litigation's choice not to include a "don't know" prompt in its survey. This is established in a research and literature summary published in 2010, at least four years after the most recent study cited by the ASTL standards the government cites. This peer-reviewed article by two widely respected academic students of survey research notes that although there is evidence that offering "don't know" answers may "encourage people without information to admit it," so-called "DK filters" "may go too far and discourage people who do have information with which to generate a meaningful answer from expressing it." Jon A. Krosnick & Stanley Presser, "Question and Questionnaire Design," in *Handbook of Survey Research* (2d. ed. 2010, Peter V. Marsden & James D. Wright, eds.) at 263, 282 [hereinafter Krosnick & Presser], Exhibit 1.[2] "In fact, there is considerable evidence that DK filters do not improve measurement." *Id.* After reviewing several studies of this issue, the authors of this research summary conclude that "data quality does *not* improve when" the option to answer, "don't know" "is explicitly included in questions." *Id.* at 285 (emphasis added).

Third, the government implies that the ASTC standards provide that there must be an "unsure" option given with each question. ECF No. 106 at 7. But, in fact, the standards only require that respondents be "made aware that they can say they do not know or have no opinion." ASTL Standards at 9, *cited in* ECF No. 106 at 7. Select Litigation's results show that respondents *were* aware of that here. As the

---

[2] Mr. Hickman of Select Litigation informs undersigned counsel that this compendium is the "bible" of survey research.

government notes, about a quarter of respondents answered with some variation of "I don't know," or "it depends," or refused to answer altogether. *See* ECF No. 101-1 at 14. This is concrete evidence that a specific cue to provide that answer is not necessary to find out if there are some who do not hold a strong concrete opinion on a particular issue examined in a survey.[3]

Again, this is the government's only critique of Select Litigation's technique, unlike in *Campa* (which also included no question about defendants' guilt), and unlike in *Haldeman* (which revealed only 61% believed the defendants guilty, ten fewer percentage points than in this case). Not only is the critique unfounded, but it also rings hollow because the government itself knowingly or unknowingly embraces data from another survey that did not explicitly prompt respondents to answer "don't know," the CBS/YouGov survey. *See* Gov. Opp., ECF No. 106, 8-9 (citing the results of Question 2 of that poll to argue that this case should not be transferred to another

---

[3] Mr. Hickman informs undersigned counsel that those giving the surveys are instructed to do their best to sort *any* volunteered non-committal answer into one of these categories, and to never press or admonish anyone who give any such an answer. Thus, the technique effectively achieves what the American Society of Trial Lawyers standards seeks to achieve, awareness in respondents that they can say that they do not know or have no opinion.

Indeed, common sense (and the results here) suggest that Select Litigation's strategy would be better at capturing the widest universe possible of non-committal respondents, and more than surveys that restrict respondents to "don't know, guilty, or not guilty." A respondent may think, "well, I know what I think, but I prefer not to say," or "well, I know that I think all who went *into* the Capitol are guilty, but that's not all of them, so I have to say, 'it depends.'" Select Litigation's strategy is more likely to accurately capture all such respondents as not having a firm opinion.

venue).[4] In short, the government fails to discredit the Select Litigation survey results.

## II. The government fails to refute the ways in which the survey shows that *voir dire* will be inadequate in this case.

The government argues that the fact that 71% of DC residents believe those arrested in the wake of January 6 are guilty, the reported results for Q4 in Select Litigation's survey, does not support presuming prejudice. According to the government, the fact that "only" 52% say that they are "more likely to vote that the person is guilty or not" if they were on a jury, the results for Q5, arises from these jurors' discerning a meaningful difference between those "merely arrested," and those "charged." *Id.* And, the government argues, the differential in results for Q5 and Q4 proves that D.C. potential jurors are committed to keeping an open mind once "reminded of the presumption of innocence." Gov. Opp., ECF No. 106 at 8 (arguing that the Select Litigation question yielding the 52% result – how respondents would vote on a jury of a defendant charged with crimes after January 6 – is more akin to the *Haldeman* question that yielded the 61% result in that case, which offered respondents the option to answer "Not Guilty Until Proven" in addition to Guilty, Not Guilty, and Don't Know).

Mr. Gieswein's argument, of course, is that the survey results as a whole support his request for a change of venue; his arguments do not rise or fall on analysis

---

[4] *See* CBS News Poll, December 27-30, 2021, Question 2, *available at* https://drive.google.com/file/d/1QNzK7xBJe_WzKlTrHVobLgyFtId9Cgsq_/view.

7

of any one question, or even just the questions about "guilt." But the government is also relying on a host of assumptions in its analysis of these particular results.

In the end, the government has no way of knowing with any certainty exactly why people would not predict that they are likely to "vote guilty" on a jury even though they believe that these defendants *are* "guilty." Nor can Mr. Gieswein – but there is enormous risk and reason to believe that the differential arises from the facts that 1) the bias against January 6 defendants D.C. residents feel to an unusual degree, revealed in their answers to many questions, is deeply felt, *and* 2) many potential jurors are reluctant to admit their bias, consistent with research showing that people are prone to give socially acceptable answers. The risk that jurors will not reveal their true biases in *voir dire* – coupled with the many obvious grounds for D.C. residents to harbor bias that jurors in other venues would not – weighs in favor of transferring this case to another venue to ensure that Mr. Gieswein's right to an impartial jury are protected.

    A.    *The survey reveals bias that jurors may not report in voir dire.*

The government assumes that the fact that "only" 52% of potential D.C. jurors reported that they would be likely to "vote guilty" if they were on a jury for a defendant charged with offenses after January 6, though 71% say they believe those arrested for offenses after January 6 defendants "are guilty," reflects the power of the reminder of the presumption of innocence built into the former question, insofar as it refers to trials. From this, the government concludes that similar reminders, and the formalities of the *voir dire* process, absent from polls, will move potential jurors to

8

approach the case with an open mind. ECF No. 106 at 5-6. But this is an article of faith, not a conclusion supported by data. And, in fact, the data Mr. Gieswein has presented, and related research, call this article of faith into doubt.

As Mr. Gieswein has already laid out, the various ways in which Select Litigation probed pretrial bias against these defendants suggests that formalities and reminders about the presumption of innocence may do nothing more than induce virtue signaling, rather than the actual virtue the government assumes they will induce. That is, the results show that potential jurors will admit that they view the January 6 defendants unfavorably (84%), and that they have prejudged the defendants as guilty (71%), etcetera, when they are given no signals to not confess this. Even reminded that there will be trials, a large portion of them will admit that – with what the know about their own prejudices and their neighbors' – they would not expect a fair trial if they were charged with offenses stemming from January 6 (67%). ECF No. 101-1 at 3. It is only when prodded to say what *they* would do as jurors – where, as the government acknowledges, most know that the law requires a presumption of innocence – that many fewer admit to such bias (52%). *Id.*

These results are consistent with study findings that "[o]n questions about socially desirable (or undesirable matters), . . . there are grounds for expecting . . ." misreporting. Krosnick & Presser, *supra*, at 285. Thus, for example, one study found that "many more people said that they voted when polling place records showed they did not vote than said they did not vote when records showed they did." *Id.* And, contrary to the government's assumptions, studies show that people are *especially*

9

likely to lean toward the socially desirable response when face-to-face with others. For example, "Catholics in one study were more likely to report favoring legalized abortion and birth control on a self-administered questionnaire than to an interviewer." *Id.* at 286.[5] Given Select Litigation's results and these studies, we should expect many potential jurors to *mask* potential prejudices in *voir dire*, rather than expect *voir dire* to unmask or erase biases that jurors know to contravene what is expected of jurors.

To be clear, the defense's concern about the D.C. jury pool does not rest on the assumption that potential jurors would deliberately mislead the Court in *voir dire*. The concern is that true partiality may not be discernable to the Court, or even to jurors themselves, given what we know about how people respond to social cues, and given Select Litigation's results in this case. *See Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is of its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.").

In short, the Court should credit and consider Select Litigation's results showing what potential D.C. jurors said about bias when they didn't know what the

---

[5] Krosnick & Presser also note that answering "don't know" may help respondents "provide cover for socially undesirable responses," Krosnick & Presser, *supra*, at 287, so it is possible that the Select Litigation results showing high rates of pretrial bias against the January 6 defendants may actually underestimate the pretrial bias these defendants are facing. (And this is another reason "that it is better not to provide explicity DK options for sensitive items[.]" *Id.*)

10

"socially right answer" was as powerful evidence of deep prejudice in the D.C. juror pool, and not join the government in assuming without evidence that *voir dire* will root out partial jurors.

> B. *The government fails to refute the clear evidence that the survey results show that huge swaths of potential D.C. jurors already think they know the purpose of defendants' actions on January 6.*

Potential jurors' responses to other questions that were not obviously about how they would comport themselves as jurors in a trial were also particularly telling. Again, for example, 85% of D.C. jurors already think they know that those who went into the Capitol on January 6 were there to try to "overturn the election and keep Donald Trump in power." ECF No. 101-1 ¶¶ 15, 18.[6] And comparison to the responses to this question in the Northern District of Georgia and the nation as a whole show that this view is extraordinarily pervasive in D.C. *See id.* ¶ 25.

The government attempts to minimize the significance of this by noting that the survey did not use the word "corruptly," ECF No. 106 at 9-10, but that is just the point. Without using lawyerly terms or making clear that the question had to do with a trial, the survey brings out that prosecutors will have to do nothing in order convince almost 9 out of 10 jurors of one element of proof at trial that Mr. Gieswein acted "corruptly" as charged, that is, that "the defendant acted with the intent to obstruct or impede the official proceeding:" jurors already believe this. *See, e.g.,* Final Jury Instructions, ECF No. 119, *United States v. Reffitt*, Case No. 21-cr-00032-DLF,

---

[6] In addition, 76% would describe those who went into the Capitol as "insurrectionists," and 72% would describe them as "trying to overthrow the United States government." *See* ECF No. 101-1 ¶¶ 15, 18.

11

at 25 (filed Mar. 7, 2022). And this *includes* 78% of the potential D.C. jurors who expressed confidence in January 6 defendants being able to have a fair trial. ECF No. 101-1 ¶ 16. The results show that these optimistic jurors are wrong, because even they, and many others, have already drawn conclusions about an essential element at the heart of the government's case. It is likely that most of them do not know this: they do not know what the elements of proof of obstruction are. *See United States v. McVeigh*, 918 F. Supp. 1467, 1472 (W.D. Okla. 1996) ("The existence of prejudice . . . may go unrecognized in those who are affected by it.") But it is true, nonetheless. And it is concerning because "[t]he prejudice that may deny a fair trial . . . includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence." *Id.*

Unless *voir dire* examines jurors' views on every element the government must prove that may align with articles of faith uniquely pervasive in the D.C. community (such as what protestors' goals were on January 6, and whether police responded appropriately), there is extraordinary risk that Mr. Gieswein will not be tried by an impartial jury in this district. And the strong signs of prejudice, and signs that any *voir dire* in these cases will have to be prolonged and extraordinarily searching is itself evidence that prejudice should be presumed. *See Murphy v. Florida*, 421 U.S. 794, 802 (1975) (noting that the "length to which the trial court must go in order to select jurors who appear to be impartial" is a factor suggesting that prejudice should be presumed); *United States v. Rodriguez-Cardona*, 924 F.2d 1148, 1158 (1st Cir.

1991) ("When so many jurors admit to a disqualifying prejudice, the trial court may legitimately doubt the avowals of impartiality made by the remaining jurors.").

### III. The government fails to address the cumulative effect of the issues with the D.C. jury pool.

Just as the government picks at individual findings of the survey, it argues that media coverage of January 6 does not by itself establish that the Court should presume prejudice. Mr. Gieswein never said that it did, though he did offer evidence and argument that the coverage of January 6 has been of a type and volume capable of inducing unusual levels of pretrial prejudice. To the contrary, Mr. Gieswein has emphasized that multiple unusual factors combine to justify transfer here. And the government has yet to squarely address this central argument.

No, this case is not exactly like *Rideau v. Louisiana*, 373 U.S. 723, 724 (1963), and it is not exactly like any other case in which federal courts have granted a transfer. But it is also *unlike* the many cases not transferred. For example, it is *unlike* the many such cases in which potential jurors had no reason to identify as victims, such as *United States v. Haldeman*, 559 F.2d 31, 64, 52 (1976): Def. Reply, ECF No. 87 at 6-7 (noting contrasts between *Haldeman* and this case). And it is also *unlike* the many such cases in which potential jurors could not confuse the individual defendant at issue with hundreds of others accused of perpetrating similar crimes on the same day (or worse). And it is also *unlike* the many such cases in which trial was to be held in a large federal district, such as *United States v. Skilling*, 561 U.S. 358, 382 (2010) (noting that Houston was the fourth most populous city in the nation). And it is also *unlike* such cases in which the presiding judge was not presented with

13

credible data demonstrating that potential jurors in the venue harbored extraordinary levels of bias against the defendant and those with whom he might be confused, such as *Campa*, 459 F.3d at 1130-31, 1145-46. Indeed, as to every one of these factors, the contrary is true here, and like *Rideau*, this case is also "unusual," to say the least. *See* ECF No. 106 at 11 (noting that *Rideau* was unusual).

Put another way, the Court should transfer the case pursuant to either the Constitution or Rule 21 because of the cumulative impact of many factors that were not present in cases in which other courts have denied transfer, specifically that:

- 92% of D.C. residents were the targeted victims of Mr. Gieswein's offense of obstruction of justice, according to the government's theory, which is that he had the specific intent to corruptly obstruct the counting of electoral votes in order to prevent the election of Joseph Biden, the person that 92% of the city voted to elect in the one federal election in which they have a say (Def. Mot., ECF No. 64 at 8-9);

- very large shares of D.C. jurors have personal connections to people who were or could have been on the scene on January 6, given the huge numbers who work for, or know people who work for, Congress (*Id.* at 4-5);

- only DC jurors were subjected to the curfews, restricted access to roads, police and military patrols, and closures that followed the events of January 6 (and again in September 2020), and many locals felt fear, lost business, or were simply aggravated by the local fallout from that day (*Id.* at 7-8);

- the D.C. jury pool, which happens to include a lot of "politics junkies" and "news junkies," has been inundated with unending coverage of these events, which has included jarring, unforgettable videos and pictures of the scene of the alleged crimes, and of defendants easily confused with Mr. Gieswein;

- by the time of Mr. Gieswein's trial, not even two years will have passed since January 6;

- survey results show that material majorities of potential D.C. jurors have prejudged these cases, and that overwhelming majorities have prejudged essential elements, to a degree materially more significant

14

- than in at least one other, not dissimilar, district (and the nation as a whole);
- the pool of potential jurors in this District is particularly small (*Id.* at 4); and
- the pool of potential jurors in D.C. will get more and more shallow as trials progress this year, and potential jurors are excused for various reasons (including partiality), or become unavailable because they have participated in juries or *voir dire* in these cases.

## IV. The court should rule that transfer is appropriate, and only then turn to which district should receive the case.

The government dismisses the significance of the survey results showing that potential jurors in the Northern District of Georgia have prejudged the case to a much lesser extent than potential jurors in D.C. by noting that Mr. Gieswein did not seek transfer to the Northern District of Georgia. ECF No. 106 at 9. And the government is correct that Mr. Gieswein first asked for his case to be transferred to his home state of Colorado. But Mr. Gieswein's request for transfer does not arise from a desire to be tried in a particular district, but rather from a desire to not face trial in this uniquely impartial district.

The Northern District of Georgia and national results both parties cite do show that these defendants will face an uphill battle anywhere they are tried. Indeed, as the government notes, unfortunately, it is a fact of life that most people incorrectly believe anyone arrested is probably guilty. ECF No. 106 at 9. But Select Litigation's results from the Northern District of Georgia – which is quite similar to the District demographically – show that the bias against Mr. Gieswein and others like him in the District is *uniquely pervasive. See, e.g., id.* (noting that only 48% of Atlantans, but

15

62% of D.C. residents, thought of most arrested for involvement in January 6 events as "criminals," one of only many disparate results noted by Select Litigation).[7]

The most likely reason for these disparities, again, is that there are a combination of factors at play in the District of Columbia due to characteristics that are unique to this venue. Mr. Gieswein has presented evidence that these many factors – and maybe others – have resulted in there being a distinctly high level of pretrial prejudgment in the pool of potential jurors here that *voir dire* cannot be counted on to cure. Common sense dictates that as publicity about the trials continues, and the pool dwindles, the problem will grow, and that the bias in this district will be overwhelming by the time Mr. Gieswein goes to trial in October. If the Court agrees and grants the motion to transfer the case from the District of Columbia, where Mr. Gieswein's trial should be held would be secondary question. For now, Mr.

---

[7] The government blithely asserts that the wide disparity between results in D.C. and Atlanta "could easily be explained by demographic differences such as age and education levels," ECF No. 106 at 9, but offers no theory or data to support that notion.

Also, the government attempts to suggest that Atlantans, only 54% of whom held "unfavorable" view of "people arrested for participating in the events at the U.S. Captiol on January 6," may be the outliers, as opposed District residents, of whom a whopping 84% reported that view. ECF No. 106 at 8. To do so, the government compares apples, namely responses from citizens in these two venues to a question about "those *arrested for participating*" in January 6 events, to an orange, a CBS/YouGov question about whether people approve of those who "*forced their way* into the U.S. Capitol." *See id.* (emphasis added). That 83% nationwide say they disapprove of those who *forced* their way into the Capitol, *id.,* does not explain that a similar percentage of D.C. residents disapprove of *all of those arrested* for participating in the demonstrations on January 6. Indeed, the comparison only highlights that D.C. jurors seem to hold uniquely harsh views of *all* of those who were arrested after participating on January 6.

16

Gieswein respectfully requests that the Court grant his motion to transfer this case away from this venue pursuant to either the Constitution or the Court's discretion under the Federal Rules.

Respectfully submitted on March 11, 2022.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____
Ann Mason Rigby
DC Bar No. 491902

Elizabeth A. Mullin
DC Bar No. 484020

Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
ann_rigby@fd.org
elizabeth_mullin@fd.org