UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 21-cr-263 (TSC) |
| ) | |
| **RUSSELL DEAN ALFORD**, ) | |
| ) | |
| Defendant. ) | |
| ) | |

### ORDER

Defendant Russell Dean Alford is charged by Information with four counts of criminal conduct arising from the events at the U.S. Capitol on January 6, 2021:

1. Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1);

2. Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2);

3. Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and

4. Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

He moves to transfer his case to another venue, arguing that prejudice is so great in this district that an impartial jury cannot be empaneled. ECF No. 40, Def.'s Motion. He contends that there is a presumption of prejudice because of the political makeup of the District of Columbia jury pool, the impact of the January 6 events on Washington, D.C. residents, and the pretrial publicity surrounding the events of January 6, 2021. *See id.* at 5–13. Defendant asks that if the court denies his motion to change venue, that it at least expand its examination of prospective jurors to: (1) permit defense counsel to prepare and distribute a questionnaire to

prospective jurors, (2) allow the parties to be present for any pre-screening questioning of prospective jurors before the beginning of formal voir dire, and (3) allow the parties to question jurors individually during voir dire. *Id.* at 14–15.

The government opposes Defendant's request to transfer venue and his request to prepare and distribute a questionnaire to prospective jurors but does not oppose his request for the parties to be present for any pre-screening questioning of prospective jurors before the beginning of formal voir dire or his request to question jurors individually during voir dire. ECF No. 44, Gov.'s Opp'n.

For reasons explained herein, the court DENIES Defendant's request to transfer venue and GRANTS Defendant's request to expand examination of prospective jurors.

### I. LEGAL STANDARD

The U.S. Constitution provides that criminal defendants shall be tried by an impartial jury in the state where the crimes they are alleged to have committed occurred. U.S. Const. amend. VI. When an impartial jury cannot be empaneled where the alleged crimes occurred, a trial may be moved to a different venue to safeguard a defendant's right to due process. *Skilling v. United States*, 561 U.S. 358, 378 (2010) ("The Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request if *extraordinary* local prejudice will prevent a fair trial – a basic requirement of due process.") (internal quotation marks omitted) (emphasis added) (citation omitted). The law is well-established that only in "the extreme case" will a presumption of inherent jury prejudice arise from pretrial publicity. *Id*. at 381.

In *Skilling*, former Enron executive Jeffrey Skilling challenged his conviction on the grounds that pretrial publicity prevented him from receiving a fair trial in Houston, where Enron was located and where its collapse cost thousands of local employees their jobs and caused

financial distress. 561 U.S. at 375–76. In considering the matter, the Court compared Skilling's prosecution to cases in which a change of venue was warranted due to pretrial publicity, and held that no change was warranted in his case. *Id.* at 379.

The Court cited *Rideau v. Louisiana*, 373 U.S. 723 (1963), in which the defendant's jailhouse confession to robbing a bank in a small town in Louisiana, kidnapping three employees, and killing one of them was obtained by police without counsel present, filmed, and broadcast to local audiences.

> [T]o the tens of thousands of people who saw and heard it, we explained, the interrogation in a very real sense *was* Rideau's trial – at which he pleaded guilty. We therefore d[id] not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire*, that [t]he kangaroo court proceedings trailing the televised confession violated due process.

*Id.* at 379 (quoting *Rideau*, 373 U.S. at 726–27) (internal quotation marks omitted).

The *Skilling* Court cited two other cases in which "media coverage manifestly tainted" criminal prosecutions: *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966)). Those cases do not apply here because they involved media interference during trial, *see Skilling*, 561 U.S. at 382 n.14, and Defendant does not claim the media has interfered with proceedings before this court.[1]

*Skilling* made clear that extensive press coverage—even intense, negative press coverage about a defendant—does not necessarily violate a defendant's right to a fair trial. *Id.* at 380. The Court rejected the Fifth Circuit's conclusion that "the magnitude and negative tone of media attention directed at Enron" was sufficient to raise a presumption of juror prejudice, finding that the attention "did not present the kind of vivid, unforgettable information" likely to produce

---

[1] The trial in *Estes* was tainted by "overzealous reporting efforts" that led to "considerable disruption," denying the defendant the "judicial serenity and calm" he was entitled to have, and the trial in *Sheppard* involved "bedlam" and a "carnival atmosphere" as "newsmen took over practically the entire courtroom." *Skilling*, 561 U.S. at 380–81 (citations omitted).

prejudice. *Id.* at 384; *see also Nebraska Press Assn. v. Stuart*, 427 U.S. 239, 554 (1976) ("[P]retrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial."); *United States v. Caldwell*, 543 F.2d 1333, 1342–43 (D.C. Cir. 1974) (holding that "widespread, uncomplimentary publicity . . . without more, does not in itself constitute a sufficient showing of prejudice") (internal quotation marks omitted).

The requirement that a jury be made up of "impartial, 'indifferent jurors'" does not mean jurors must be "totally ignorant of the facts and issues involved" in a case. *United States v. Haldeman*, 559 F.2d 31, 60 (D.C. Cir. 1976) (citation omitted); *see also Skilling*, 561 U.S. at 360 ("[P]rominence does not necessarily produce prejudice, and juror *impartiality* does not require *ignorance*.") (emphasis in original). Over sixty years ago, the Supreme Court explained:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961). Since then, the advent of the internet and social media have dramatically increased the prevalence and speed of information sharing. Now more than ever, a standard that limits eligible jurors to those who carry no impressions or opinions of the merits of a case would be an impossible one. Instead, the correct standard is whether "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723 (citations omitted).

In considering whether to transfer venue because of pretrial publicity, courts consider: (1) the size and characteristics of the community in which the crime occurred, (2) the nature and extent of the pretrial publicity, (3) the length of time between the reported crime and defendant's

trial, and (4) any evidence of juror prejudice. *Skilling*, 561 U.S. at 382–84; *In re Tsarnaev*, 780 F.3d 14, 21–23 (1st Cir. 2015).

## II. ANALYSIS

### A. Request to Transfer Venue

#### 1. Size and Characteristics of District of Columbia

Defendant argues that the size and characteristics of the District of Columbia population create a presumption that no impartial jury could be empaneled. First, he argues that the District is relatively small, both in terms of population and geography, *see* Def.'s Mot. at 5–6 (contending that the District's total population of around 670,000 resides in a space of just 68.34 miles), and thus it would be difficult to find District residents who have not been impacted by the events of January 6 and subsequent media coverage, *id.* at 6. Defendant further contends that his case naturally stokes "partisan passions that in this District would be overwhelmingly hostile" to him. *Id.* at 7.

The government responds that there is no reason to believe that the District's entire population was so affected by the January 6 events that the court cannot seat an impartial panel. The court agrees.

Courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, even though some members of the community were victimized. *See e.g.*, *In re Tsarnaev*, 780 F.3d 14, 15–16 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (September 11, 2001 attacks, including on the Pentagon); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing). And in *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (citation omitted).

Although this district is less populous than most, but not all, federal judicial districts, voir dire is still "well suited" to the task of inspecting prospective jurors' connections to Defendant's alleged crimes. *Id.*

Second, Defendant argues that no impartial jury can be empaneled here because his case will "stoke partisan passions" that will be "overwhelmingly hostile" towards him. Def.'s Mot. at 7. Specifically, he contends that 92 percent of voters in this district voted for President Biden in the 2020 election, and though he concedes that "[c]onscientiously held political views are no reason to disqualify any juror," he argues "those views nevertheless serve to heighten the prejudice against" him. *Id.* at 7.

Defendant's argument is misleading and ultimately unavailing. He does not indicate what percentage of District residents actually voted in the 2020 election, so his emphasis on voters excludes many potential jurors who may not closely follow politics. Moreover, in the exhibit attached to Defendant's motion—the results of a survey of District residents commissioned by the Federal Public Defender—59% of District respondents reported that they consider themselves to be Democrats, while the other 41% reported that they consider themselves to be Independents, Republicans, other, or that they did not know. Def.'s Mot., Ex. A at 15. Defendant's own evidence thus paints a more complex picture of the District's political views than he asserts.

In any event, Defendant's assumptions concerning party affiliation in the District are not an appropriate basis for changing venue. Jurors' political leanings are not, by themselves, evidence that those jurors cannot fairly and impartially consider the evidence presented and apply the law as instructed by the court. *See, e.g.*, *Haldeman*, 559 F.2d at 61–62 (upholding district court's decision not to move Watergate-related trial and finding no reason to conclude

"that the population of Washington, D.C. was so aroused against appellants" that they could not decide the case based on the evidence presented at trial); *United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

To be sure, some potential jurors may have impressions or opinions of Defendant based on his presumed political views. But whether those impressions and opinions amount to prejudicial bias is a matter to be assessed during voir dire. Until then, "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895); *see also United States v. Stone*, No. 19-CR-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020) (rejecting argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign and the argument that "if you do not like Donald Trump, you must not like Roger Stone").

2. Nature and Extent of Pretrial Publicity

Defendant argues that media coverage of January 6, 2021, has been "pervasive and persistent" and has "overwhelmingly assigned *collective* fault to those who gathered at the Capitol Building on January 6." Def.'s Mot. at 8 (emphasis in original). Defendant provides no data to show that the percentage of news coverage relating to January 6 has been more "pervasive and persistent" in the District, and offers no evidence showing that media coverage here has focused on the "collective" fault of January 6 Defendants. Instead, he contends that

"media outlets throughout the country" have created bitter prejudice here, more so than in other districts.

For support, Defendant points to the results of a phone survey commissioned by the Federal Public Defender and conducted by a private organization. The survey interviewed 400 jury-eligible residents in this district and 400 jury-eligible residents in the Northern District of Georgia about their exposure to media related coverage about the January 6 riots and defendants.

For instance, the survey asked respondents:

> Thinking about the people who forced their way into the U.S. Capitol on January 6, 2021, tell me whether you would or would not describe their actions [as] . . . Trying to overturn the election and keep Donald Trump in power.

Def.'s Mot., Ex. A at 15. In this district, 85 percent of respondents answered that they "Would" use that description, 9 percent responded that they "Would not," and 6 percent responded either "Not Sure/Don't know" or "Refused." *Id.* In the Northern District of Georgia, 68 percent of respondents answered that they "Would" use that description, 19 percent responded that they "Would not," and 13 percent responded either "Not Sure/Don't know" or "Refused."

The survey also asked:

> From what you have heard or read, do you think the people who were arrested for activities related to those demonstrations are guilty or not guilty of the charges brought against them?

*Id.* at 14. In this district, 71 percent of respondents answered "Guilty," 3 percent answered "Not guilty"; and 26 percent volunteered an answer recorded as "Depends" or "Don't know/Refused." *Id.* Among Georgia respondents, 54 percent answered "Guilty," 10 percent answered "Not guilty," and the remaining 36 percent answered "Depends" or "Don't know/Refused." *Id.*

Another question posed by the survey was:

>Assume you are on a jury for a defendant charged with crimes for his or her activities on January 6th. Are you more likely to vote that the person is guilty or not guilty of those charges?

*Id.* In this district, 52 percent of respondents answered "Guilty," 2 percent answered "Not guilty," and 46 percent volunteered an answer recorded as "Depends" or "Don't know/Refused." *Id.* Among Georgia respondents, 45 percent answered "Guilty," 9 percent answered "Not guilty," and the remaining 45 percent answered "Depends" or "Don't know/Refused." *Id.*

Defendant argues that these responses show that District residents "have prejudged the guilt of January 6 defendants" and illustrate the need to transfer venues. *Id.* Not so.

The proper means for determining whether District residents are biased is not an 800-person phone survey commissioned by one party, but rather, voir dire, which makes practical sense for at least three reasons. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating questions designed to root out bias. Phone surveys, such as the one on which Defendant relies, may produce misleading results if the survey suffers from non-response bias, contains leading questions, or provides respondents with context that influences their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality of in-court proceedings in which respondents are placed under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, while Defendant contends that the poll's results show that respondents have formed opinions about January 6 defendants, that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because they have "formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722. Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at

723. Pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

Accordingly, courts commonly reject such polls as unpersuasive in favor of effective voir dire. For example, in *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. 559 F.2d at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43.

Other Circuits have reached similar conclusions. *See, e.g.*, *Campa*, 459 F.3d at 1146 (rejecting the import of a pre-trial survey showing 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were, and reasoning that "it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity"); *United States v.*

*Rodriguez*, 581 F.3d 775 (8th Cir. 2009) (finding no presumption of prejudice where poll indicated 88 percent of respondents believed defendant was guilty because district courts are not required "to consider public opinion polls when ruling on change-of-venue motions" and because "special voir dire protocols would screen out prejudiced jurors"). As one Circuit court observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d at 23; *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (reasoning that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Even crediting the results of Defendant's survey, the court is not persuaded that no impartial jury can be empaneled here. For instance, the survey results indicate that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C. *See* Def.'s Mot., Ex. A at 1-2, 14. And when asked about whether they would be more likely to find that a January 6 defendant is guilty or not guilty, 46 percent of District respondents responded that it "Depends" or "Don't know/Refused." Though the survey failed to provide respondents with the option of saying they were "unsure" about guilt, as some best practices dictate, *see* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9 ("Respondents must be made aware that they can say they do not know or have no opinion."),[2] close to half of residents in this district indicated an open-mindedness about the guilt of January 6 defendants. In short, the results of Defendant's pre-trial survey do not demonstrate that "12 impartial individuals could not be empaneled" in Washington, D.C. *Skilling*, 561 U.S. at 382; *see also Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (no presumption of prejudice where

---

[2] Available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf.

nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box").

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. The appropriate way to identify and address those biases is through careful voir dire that asks, among other things, whether prospective jurors can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). As in *Haldeman*, there is "no reason for concluding that the population of Washington, D.C. [i]s so aroused against [Defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. 559 F.2d at 62.

        3. <u>Length of Time Between January 6, 2021 and Defendant's Trial</u>

In *Skilling*, the Supreme Court noted that the argument for presumed prejudice was weakened by the passage of time: "[O]ver four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Skilling*, 561 U.S. at 383. Here, while fourteen months have elapsed since Defendant's alleged offenses, Defendant argues that the court should presume prejudice because "the reckoning over January 6 continues to generate front-page news." Def.'s Mot. at 12.

As an initial matter, more than fourteen months will have elapsed before Defendant's trial. On March 4, 2022, the court granted Defendant's motion for additional time to review discovery, *see* Min. Order (Mar. 4, 2022) (granting ECF No. 41, Def.'s Mot. to Continue Trial and Exclude Time Under the Speedy Trial Act), and the parties have not requested a new trial date. Defendant requests that the court continue to delay his trial to allow for expanded

examination of prospective jurors.  As explained below, the court grants that request and will provide counsel time to meet and confer to prepare a written questionnaire for prospective jurors and submit it to the court for review and approval.  The questionnaire must then be distributed and prospective jurors must be given time to respond.  The next status hearing is set for May 6, 2022, at which time the court will set a trial date that provides sufficient time for this process to run.  Moreover, the "mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defend of due process").  Indeed, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d at 15; *Skilling*, 561 U.S. at 399; *Yousef*, 327 F.3d at 155; *Moussaoui*, 43 F. App'x at 613; *Haldeman*, 559 F.2d at 70.

Defendant also contends that here, the passage of time *supports* his claim of prejudice because "the focus of media attention and public discourse has shifted away from the raw details of the events at the Capitol, and toward a matter that is far more prejudicial in this case: diagnosing protesters' motives."  *See* Def.'s Mot. at 13.  He offers no evidence to support that proposition, nor does he explain why voir dire is ill-suited to determine whether prospective jurors will maintain an open mind about his alleged motives.  He thus falls short of showing "extraordinary local prejudice" that would warrant a venue change.  *Skilling*, 561 U.S. at 378.

4. Evidence of Jury Prejudice

Because Defendant has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," 561 U.S. at 383—is

inapposite. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.

Ultimately, none of the *Skilling* factors support Defendant's contention that the court should presume prejudice and order a transfer of venue without even conducting voir dire.

B. **Request to Expand Prospective Juror Examination**

In the alternative to a change of venue, Defendant requests that the court expand examination of prospective jurors by (1) circulating a written questionnaire to summoned prospective jurors, (2) allowing the parties to be present during any "pre-screening" questioning before formal voir dire, and (3) conducting individual questioning during voir dire. Def.'s Mot. at 14-15. The government concurs only in the second and third of these requests.

Defendant's case is in many ways unique. Unlike most crimes that involve an identifiable victim or victims, the victims of Defendant's alleged crimes are more nebulous. The government alleges that Defendant acted knowingly and with intent to impede and disrupt a Joint Session of Congress convened to certify the results of the 2020 Presidential election. This allegation goes to the heart of the democratic process and arguably affects all Americans. And without question, there has been extensive media coverage of the January 6 events. Many District residents—and Americans throughout the country—including those who were not at the Capitol on January 6, may thus hold impressions and opinions about the day's events. Whether those impressions and opinions amount to disqualifying bias or whether prospective jurors can set aside any impressions and opinions and view the evidence against Defendant with an objective and open mind, is a question that deserves careful consideration. Accordingly, while

Defendant falls short of showing that no impartial jury can be empaneled here, the court finds good reason to expand examination of prospective jurors in each of the three ways he requests.

First, defense counsel will be permitted to prepare a written questionnaire for distribution to prospective jurors. Defense counsel shall meet and confer with the government regarding the questionnaire before submitting it for court approval.[3] To the extent the parties do not agree on any question, defense counsel, at the time it submits the proposed questionnaire, shall also submit a joint filing identifying the disputed language and succinctly stating the parties' respective positions. After review and approval by the court, the questionnaire will be distributed to summoned prospective jurors to return before trial. Second, the parties may be present for any pre-screening questioning of prospective jurors that the court conducts before the beginning of formal voir dire. And third, the parties will be permitted to ask reasonable follow-up questions of individual jurors during voir dire. This expanded examination will effectively screen for prejudice among potential jurors in this case.

### III. CONCLUSION

For reasons set forth above, the court DENIES Defendant's request to transfer venue and GRANTS his request to expand examination of prospective jurors.

Date: April 18, 2022

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

---

[3] The court's broad discretion in jury selection "includes deciding what questions to ask prospective jurors," and that "discretion does not vanish when a case garners public attention." *United States v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022).