UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 21-cr-24 (EGS) |
| v. | : | |
| | : | |
| ROBERT GIESWEIN, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S RESPONSE TO POLL CONDUCTED BY IN LUX RESEARCH

Defendant Robert Gieswein has submitted another poll of prospective jurors, ECF Nos. 118, 118-1, which he claims supports his argument that no voir dire conducted by this Court in the District of Columbia can safeguard his right to a fair trial. The defendant remains incorrect. The poll conducted by in Lux Research ("ILR") fails to overcome the Constitutional presumption that a jury trial take place in the location of the crime, fails to establish that prospective District of Columbia jurors could not follow the Court's instructions to decide the case on the evidence, and in fact undermines the defendant's assertion that jurors' attitudes in this District are unique compared to other districts. Moreover, since the defendant's venue motion was filed, four cases arising out of the events of January 6th have been tried to a jury in this District. The results of voir dire in those cases strengthens the government's argument that polls like the one conducted by ILR do not demonstrate a presumption of prejudice such that no fair jury could be empaneled in the District of Columbia. The Court should consequently deny the defendant's motion.[1]

---

[1] Every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion. *See United States v. Alford*, No. 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC);

## **BACKGROUND**

Based on his actions on January 6, 2021, Gieswein was charged with obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); three counts of assaulting, resisting, or impeding officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); destruction of government property, in violation of 18 U.S.C. § 1361; and entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b).  He moved to transfer venue to the District of Colorado, where he lives, arguing that prejudice should be presumed in the District of Columbia based on the number of federal employees in the District, the impact that January 6 had on the District, and the extensive media coverage of January 6.  ECF No. 64.[2]

Gieswein supplemented his motion for change of venue based on data prepared by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia.  ECF Nos. 101, 101-1.  The parties submitted supplemental briefing based on that poll.  ECF Nos. 106, 110, 110-1.

On April 18, 2022, the defendant submitted another poll, which was conducted by ILR at the request of two defendants charged in a different case arising from the events of January 6, 2021. At a motions hearing on April 20, 2022, the Court directed the parties to respond in writing to the ILR poll.

---

*United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

[2]At the April 20, 2022, motions hearing, the defendant clarified that he is withdrawing his request that the case be transferred to Colorado specifically.  He instead is asking the Court to determine that venue transfer is appropriate, and requests that the parties brief separately, if that request is granted, where the trial should be held.  *See* April 20, 2022, Hr'g Tr. 8:15-8:24.

## ARGUMENT

As explained in the government's initial opposition and its supplement (ECF Nos. 72, 106), the constitutional presumption is that a criminal case shall be tried in the State and district where the crime was committed.  U.S. Const. Art. III, § 2, cl. 3; Amend. VI.  Transfer to another venue is appropriate only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 396 (2010).  A "presumption of prejudice" warranting a change of venue, however, "attends only the extreme case." *Id.* at 381.  "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995).  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United* States, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*  In this case, Gieswein cannot come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C. *Skilling*, 561 U.S. at 382.

## I.    The ILR Poll Does Not Support a Change of Venue.

Defendant cited the ILR survey to assert that District of Columbia residents "more than anyone else are invested in the results of these trials," April 20, 2022, Hr'g Tr. 15:8-15:10,[3] and he argues that the survey "support[s]" his motion to transfer venue, ECF No. 118 at 1.  The ILR

---

[3]    A copy of this transcript will be provided to the Court and counsel under separate cover.

survey does not support his motion to transfer venue.  As an initial matter, Defendant has not requested transfer to any of the ILR survey's three comparator jurisdictions—the Ocala Division of the Middle District of Florida, the Eastern District of North Carolina, and the Eastern District of Virginia.  He initially requested that the case be transferred to the District of Colorado, which he has withdrawn, but he has not yet proffered another alternative.  The poll tells the Court nothing about the views or media exposure of prospective jurors in Colorado, or any district other than the three comparator jurisdictions surveyed by ILR.  The poll therefore cannot show that selecting an impartial jury would be any more difficult in the District of Columbia than in the defendant's preferred district, unless the defendant ultimately requests one of those three.  *See United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc) (per curiam) (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, to the extent the poll is useful at a more general level in comparing the District of Columbia to other districts, the poll demonstrates that that respondents in all four jurisdictions surveyed were aware of the events of January 6 at similar rates.  ECF No. 118-1 at 24 (Question 1) (93.12% of D.C. respondents "aware of" the demonstration at the U.S. Capitol, compared to 94.07% in Middle Florida, 91.60% in Eastern North Carolina, and 94.27% in Eastern Virginia).  The survey also shows that respondents' media or conversational exposure to the events of January 6 did not vary significantly between jurisdictions.  The survey asked respondents how often they "see, read or hear about the events of January 6th from either the Media, Local Leaders or the people around you."  ECF No. 118-1 at 21 (Question 4).  The percentage of respondents reporting "[a]t least 10 times a week" was only slightly higher in D.C., with a response rate of 32.02%, compared to rates between 25% and 28% in the other three jurisdictions.  ECF No. 118-1 at 24.

And the percentage of D.C. respondents answering "[s]everal times a week" or "[o]nce or twice a week" were generally within one or two percentages points of respondents from other jurisdictions. *Id.* (41.09% of D.C. respondents reported exposure "[s]everal times a week," compared to 39.82%, 39.30%, and 34.58% in the other jurisdictions, and 22.05% of D.C. respondents reporting exposure "[o]nce or twice a week," compared to 20.66%, 22.68%, and 23.99% in the other jurisdictions). The survey thus confirms that exposure to reports of the events of January 6 is not confined to D.C., and the relatively small different does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

The ILR survey's summary focuses on responses to "prejudicial prejudgment" questions. ECF No. 118-1 at 2. But those questions do not show that an impartial jury cannot be selected in this District. The questions categorized as "prejudgment questions" were:

(1) "Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?" (72% of D.C. respondents answered "Guilty.")

(2) "In your opinion, which of the following terms best characterizes the Events of January 6th? 1) An insurrection, 2) An attack, 3) A riot, 4) A protest that got out of control, 5) A rally." (82% of D.C. respondents chose insurrection, attack, or riot.)[4]

(3) "Do you believe that the individuals who entered the Capitol on January 6th

---

[4] This question (and others like it) provide very little useful information for the Court's consideration with respect to a venue transfer motion. The question the jury will be asked to decide is not whether the events of January 6th, writ large, were bad, good, or otherwise. They will be asked to decide whether defendant Gieswein is criminally liable for discrete actions he took on that day. Presumably, more than 82 percent of prospective jurors would, if asked, express an opinion that murder is bad. That would not mean that it would be impossible to find an impartial jury in murder cases, in part because the jury is not charged with determining whether murder is bad. It is instead charged with determining whether the defendant is responsible for the murder for which he or she is on trial.

planned to do it in advance or decided to do it that day?" (71% of D.C. respondents

selected "planned in advance.")

(4) "Do you believe The Events of January 6th were racially motivated?" (40%

of D.C. respondents answered in the affirmative.)

ECF No. 118-1 at 2-3, 8, 21-22.  The last three of these questions do not support a presumption of

prejudice because they have little relevant to the potential issues at trial.  The trial in this case

would not require jurors to determine whether the events of January 6 were an "insurrection," an

"attack," a "riot," or a "protest that got out of control."  Indeed, no defendant has been charged

with the offense of insurrection, 18 U.S.C. § 2383, in connection with the events of January 6, nor

has any defendant been charged with a violation of the Anti-Riot Act, 18 U.S.C. § 2101.

Nor would the charges in this case require the jurors to determine whether Gieswein

"planned in advance" to enter the Capitol or whether the crimes were "racially motivated."  Thus,

that fact that some D.C. respondents have formed "prejudgments" on those questions does not

demonstrate that they cannot follow this court's instructions and decide this case based on the law

and the evidence.  And even if it did, the solution would be to exclude prospective jurors who

indicated "prejudgments" during voir dire.  The ILR survey shows that some percentage of

respondents in *all* surveyed jurisdictions expressed these so-called "prejudgments."  ECF No. 118-

1 at 25 (Questions 6 and 9) (between 39% and 49% of respondents in other surveyed jurisdictions

thought entry into the Capitol was planned in advance, and between 11% and 20% believed the

events of January 6 were racially motivated).  This demonstrates that a careful voir dire would be

necessary in any jurisdiction, and it fails to show that voir dire would be inadequate to weed out

biased jurors in the District of Columbia.

Nor do the responses to the first "prejudicial prejudgment" question support a presumption

of prejudice. That question asked respondents whether, in the abstract, they were "more likely" to find a defendant charged in connection with January 6 "guilty or not guilty." The question failed to specify any specific crimes. And it failed to ask respondents whether they could keep an open mind and decide a case based on the law and the evidence if selected as a juror. Yet the Supreme Court has made clear that the key question in jury selection is whether a prospective juror could "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-23.

When focusing on whether prospective jurors could set aside their "prejudgments" and decide a case fairly, the ILR survey's responses actually undermine Defendant's claim that prejudice should be presumed in this district. When asked whether it would be "possible for [them] to be a fair and unbiased juror for a January 6th Defendant," ECF No. 118-1 at 23, a full 70.13% of D.C. respondents said that they "could," *id.* at 26. This number was actually *higher* than the affirmative responses in the other three jurisdictions: Middle Florida (61.29%), Eastern North Carolina (65.38%), and Eastern Virginia (69.52%). *Id.*

The ILR survey's findings section asserts that "this representation may actually indicate a failure to recognize or admit threats to fairness and impartiality." ECF No. 118-1 at 5. But the survey administrator fails to justify that assertion. The findings claim that because D.C. residents were more likely to characterize the events of January 6 as an "insurrection," "attack," or "riot," or to believe they were criminal, pre-planned, or racially motivated, *id.* at 22, 25, those residents "demonstrate[d] an inability to identify or unwillingness to report previously disclosed bias when asked if they could be a fair and impartial juror," *id.* at 5. But this assumes, contrary to clear decisions from the Supreme Court, that any knowledge of or preconceived opinions about a case make a juror unable to be impartial. *See Reynolds*, 98 U.S. at 155-56; *Irvin*, 366 U.S. at 723. It

also assumes that these jurors would fail to report these views to a judge during voir dire. Particularly because the ILR survey had already asked respondents specific questions that the survey claims showed "prejudicial prejudgment," there is no reason to believe that D.C. respondents were somehow unable or "unwilling[]" to report their own biases when asked if they could be impartial.

Moreover, when asked if their "neighbors would be fair and unbiased jurors for a January 6th Defendant," D.C. respondents still answered "Yes" at a higher rate than the other surveyed districts. *Id.* at 26 (53.25% in D.C., compared to 36.57% in Middle Florida, 45.10% in Eastern North Carolina, and 40.89% in Eastern Virginia). Thus, even when controlling for respondents' potential inability to discern their own biases, the survey does not indicate that D.C. residents are substantially less able to be fair than prospective jurors from other jurisdictions. Nor were D.C. respondents significantly more likely to worry about negative consequences if they were to "find[] a January 6th defendant Not Guilty." *Id.* at 22, 26 (19.29% in D.C., compared to 17.68% in Middle Florida, 19.66% in Eastern North Carolina, and 18.56% in Eastern Virginia). This is in stark contrast to the defendant's argument that D.C. jurors, "more than anyone else are invested in the results of these trials." April 20, 2022 Hr'g Tr. 15:8-15:10. The ILR survey does not support the conclusion that an impartial jury cannot be found in Washington, D.C.

All the findings of the ILR survey, as well as the Select Litigation cited in the previous round of briefing, suffer from the same flaw—they fail to show a level of bias against this particular defendant that requires this Court to presume prejudice, forgo voir dire, and transfer venue to another jurisdiction. *See United States v. Alford*, No. 21-cr-263 (TSC), ECF No. 46 at 11 (Even crediting the results of [the Select Litigation] survey, the court is not persuaded that no impartial jury can be empaneled here"). In any U.S. jurisdiction, most prospective jurors will have heard

about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.

## II.     The Voir Dire Process in the First Four January 6 Jury Trials Has Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.

At this point, four other January 6 cases have proceeded to jury trials, in which voir dire has been successful in identifying unbiased jurors without undue time and effort by the district court. *Cf. Skilling*, 561 U.S. at 384 ("Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron, the extensive screening questionnaire and followup voir dire were well suited to that task."). The voir dire records from three of those trials show that the majority of prospective jurors were able to set aside any preconceived opinions about the defendants' guilt or innocence and decide the case based on the evidence in those particular cases.[5]

Prospective jurors in these first cases were asked whether they have viewed media coverage of January 6. *See United States v. Reffitt*, 21-cr-32-DLF (D.D.C.), Tr. 2/28/22 AM at 22-23 (Voir Dire questions 3, 4); *United States v. Robertson*, 21-cr-34-CRC (D.D.C.), Tr. 4/4/22 AM at 14 (Voir Dire questions 17, 18).[6] While many jurors reported seeing some coverage of the events of

---

[5] The three cases for which partial or complete transcripts are available are discussed below. The fourth case, for which transcripts are not yet available, is *United States v. Thompson*, 21-cr-161 (D.D.C.), which resulted in a guilty verdict on April 14, 2022. Government trial counsel in *Thompson* recalled a similar voir dire experience to that in *Reffitt* and *Robertson*, and jury selection in *Thompson* was accomplished in a single day. *See United States v. Thompson*, 21-cr-161, Minute Entry (D.D.C. Apr. 11, 2022).

January 6, either contemporaneously or afterwards, very few reported being avid consumers of news about this topic, and most could not provide the names of any particular defendants they saw covered. Rather, most prospective jurors who had memories of seeing coverage of specific defendants could only identify the subjects they had heard about with descriptors like "the guy with the horns." *Reffitt*, Tr. 2/28/22 AM at 81; Tr. 2/28/22 PM at 210; Tr. 2/28/22 PM at 436; *see also Robertson,* Tr. 4/4/22 AM at 67 (prospective juror reporting possibly viewing news coverage of Defendant Robertson because the juror recalled seeing coverage of someone with a large wooden stick, which the Court had discussed in going over the statement of charges at the start of voir dire).

The presiding judges in these first January 6 trials also asked prospective jurors questions to elicit any prejudgment or bias. In *Reffitt*, this was covered in two main questions: Question 5, which asked whether prospective jurors had "such strong feelings or opinions about the events that took place at the U.S. Capitol on January 6, 2021, that it would make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case," and Question 6, which queried, "[D]o you have an opinion about Mr. Reffitt's guilt or innocence in this case?" Voir Dire Tr. at 23. Of the 56 prospective jurors examined in *Reffitt*, 24 (or 43%) answered yes to one or both of these questions.[7] When asked follow-up questions, only nine of these 24 prospective jurors were struck

---

[6] The transcripts from the voir dire proceedings in *Reffitt* and *Robertson* are being provided under separate cover to the Court and counsel. The government has requested but has not yet received back the transcripts from the voir dire proceedings in *United States v. Dustin Thompson*, 21-cr-161 (RBW), and *United States v. Webster*, 21-cr-208 (APM). Accordingly, while the government trial counsel in those matters reported, based on their recollections and notes, a similar voir dire experience to that of the *Reffitt* and *Robertson* trials, the government is not able to provide more detailed analysis of the Thompson and Webster trial's voir dire process here.

[7] *See* Voir Dire of Jurors 0038, 0045, 0313, 0328, 0344, 0365, 0432, 0443, 0457, 0464, 0514, 0548, 0728, 1046, 1054, 1221, 1332, 1419, 1484, 1486, 1541, 1566, 1655, 1747. The table

for cause based on their statements suggesting that they would not be able to set aside their feelings and decide the case impartially.[8]  Of the remaining 15 prospective jurors who answered yes to Questions 5 and 6, five were struck for other reasons[9] and ten were qualified after clarifying that they could decide the case fairly and impartially.[10]  In other words, removing the jurors who were struck for other reasons, only nine of 56 prospective jurors (or 16%) claimed to have such strong feelings or opinions about the events that took place at the U.S. Capitol on January 6, 2021, that it would make it difficult for them to serve as a fair and impartial juror and were then struck for cause.[11]

The voir dire process in the *Robertson* case produced similar results.  The presiding judge in *Robertson* asked two main prejudgment or bias questions: Question 19, which inquired as to whether prospective jurors had "such strong feelings about the events of January 6, 2021, that it would be difficult for you to follow my instructions and render a fair and impartial verdict if you were chosen as a juror," or Question 15, which asked, "Is there anything about the nature of these allegations that would prevent you from being neutral and fair in evaluating the evidence in this case?"  *Robertson*, Tr. 4/4/22 AM at 13-14.  Of the 49 prospective jurors examined in *Robertson*,

---

attached as Exhibit 1 sets forth the transcript citations where each juror's individual voir dire can be found.

[8] *See* Voir Dire of Jurors 0045, 0328, 0432, 0443, 0514, 1046, 1484, 1541, 1747.

[9] *See* Voir Dire of Jurors 0313, 0464, 0548, 0728, 1054.

[10] *See* Voir Dire of Jurors 0038, 0344, 0365, 0457, 1221, 1332, 1419, 1486, 1566, 1655.

[11] Incidentally, the experience of the voir dire process in the *Reffitt* and *Robertson* cases tracks aspects of the ILR survey commissioned by the defendants in this case.  When asked, "Would it be possible for you to be a fair and unbiased juror for a January 6th Defendant?" 70% of District residents answered, "Yes," and only 18% responded, "No."  ECF No. 93-1 at 23-24, 27.

only four (or 8%) answered yes to either Question 19 or Question 15.[12]  Another eight prospective jurors raised issues about their ability to be fair in answering other questions (*i.e.*, the questions about knowing the parties or living near the Capitol) or through talking to the judge and the attorneys in the course of voir dire generally.[13]  In total, only about 12 out of 49 (or 24%) of prospective jurors in *Robertson* raised concerns about their ability to be fair or impartial.  After being asked follow-up questions, only nine of these 12 prospective jurors were struck for cause.[14] In other words, removing the jurors who were struck for other reasons, only nine of 49 prospective jurors in *Robertson* (or 18%) claimed to have such strong feelings or opinions about the events that took place at the U.S. Capitol on January 6, 2021, that it would make it difficult for them to serve as a fair and impartial juror and were then struck for cause.[15]

Most recently, in *Webster*, the Court observed that it was able to "qualify 35 jurors after questioning 53 of them" and that only "about 50 percent" of the 18 people stricken for cause were stricken based on an expressed inability to be impartial, as opposed to a connection to the offense. *Webster,* 4-26-22 Tr. at 6-7 (provided to chambers and counsel under separate cover).  The Court also observed that "the actual number of folks that were stricken for cause based on their representation that they couldn't be fair and impartial was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case.  *Id.* at

---

[12] *See* Voir Dire of Jurors 0254, 1010, 1219, 1566.

[13] *See* Voir Dire of Jurors 0429, 0585, 0696, 0799, 0936, 1160, 1431, 1567.

[14] *See* Voir Dire of Jurors 0429, 0585, 0696, 0799, 0936, 1010, 1160, 1431, 1567.  Another six jurors were struck for cause having to do with not residing in the District, or hardship reasons. *See* Voir Dire of Jurors 0474, 0505, 0846, 1026, 1122, 1566.

[15] In the *Thompson* case, the responses to the voir dire tracked very similarly to the responses from prospective jurors in the *Reffitt* and *Robertson* cases, but the government does not yet have transcripts to conduct a similar analysis.

7.  *Compare Murphy*, 421 U.S. at 803 (where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt," the number of strikes "by no means suggeste[d] a community so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own"), *with Irvin*, 366 U.S. at 727  (giving "little weight" to prospective jurors' "statement[s] of impartiality" where 268 of 430 prospective jurors (62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner").

The experiences from the January 6-related jury trials held to date confirm that voir dire functioned as anticipated and adequately screened out those prospective jurors who could not sit fairly and impartially, leaving more than sufficient qualified jurors to hear the case.  The Court should allow this process to take place, assess through the voir dire process whether a fair and impartial jury can be selected from a District of Columbia venire, and decline Gieswein's request to short-circuit this process by presuming prejudice and transferring this case to another district.

<u>**CONCLUSION**</u>

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Erik M. Kenerson*
ERIK M. KENERSON
Ohio Bar No. 82960
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov
(202) 252-7233
jason.mccullough2@usdoj.gov