## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

ROBERT GIESWEIN,

               Defendant.

Crim. Action No. 21-24-1 (EGS)

## MR. GIESWEIN'S REPLY TO GOVERNMENT RESPONSE
## TO POLL CONDUCTED BY IN LUX RESEARCH

Robert Gieswein, by and through undersigned counsel, hereby submits this reply to the government's response to the survey results of In Lux Research, or "ILR" (ECF No. 124), which the defense submitted in support of its motion for transfer of venue (ECF No. 118; *see also* ECF Nos. 64, 72, 87, 101, 107, 110, 116). The ILR data corroborates Mr. Gieswein's arguments that District of Columbia residents are uniquely biased against January 6 defendants in ways that *voir dire* conducted five months from now cannot be expected to cure.

### I.   The ILR data confirms that bias against January 6 Defendants is uniquely pervasive in D.C.

The government is wrong that Mr. Gieswein "cannot show that selecting an impartial jury would be any more difficult in the District of Columbia than in the defendant's preferred district, unless the defendant ultimately requests one of" the four districts analyzed by ILR or by Select Litigation ("SL"). ECF No. 124 at 4. First, transfer is required where "the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair

and impartial trial there," or prejudice should be presumed. Fed. R. Crim. P. 21; *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963). There is no requirement that the defendant establish at this stage where the trial should go.

Second, and more importantly, the ILR data – combined with the Select Litigation and CBS/YouGov poll Mr. Gieswein has previously submitted – establish that there are *many* districts in which bias against January 6 defendants is significantly less pronounced than it is in the District of Columbia, because no matter how they are asked, jurors here show signs of bias markedly higher than potential jurors in a wide variety of other districts. For example, both the Select Litigation ("SL") and ILR surveys probed whether respondents would acknowledge having already formed an opinion that those charged with offenses after January 6 are guilty. The results show that D.C. jurors are *far* more likely than others surveyed to indicate that they already believe these defendants are guilty:

| Percentage of Potential Jurors Biased Toward Guilt: ILR Q3 and SL Q4[1] | | | | |
|---|---|---|---|---|
| DC | MDFL | EDNC | EDVA | MDGa |
| 71.89 – ILR 71 – SL | 37.18 | 48.17 | 48.20 | 54 |

[1] Select Litigation asked for D.C. and Middle District of Georgia respondents' opinion on "whether people arrested for January 6 activities are guilty or not guilty of the charges brought against them," and recorded answers for "guilty," or "not guilty," and answers such as "it depends" or "don't know/refused." ECF No. 101-1 at 7 (regarding Question 4). ILR asked respondents in D.C., the Middle District of Florida, the Eastern District of North Carolina, and the Eastern District of Virginia whether they were "more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?" ECF No. 118-1 at 9 (regarding Q3).

The ILR data about how many have prejudged January 6 defendants as "insurrectionists" also corroborates other data showing that D.C. jurors stand out amongst jurors across the country.

| Percentage of Potential Jurors Prejudging "Insurrection": ILR Q5, and SL Q11[2] | | | | | |
|---|---|---|---|---|---|
| DC | USA | MDFL | EDNC | EDVA | MDGa |
| 84.71 – ILR 76 – SL | 55 | 40.43 | 51.56 | 56.92 | 55 |

The data shows that D.C. residents are outliers. They are roughly 30% more likely to have already drawn conclusions essential to the proof of Count One in this case (obstruction of justice), that is, that at least those who allegedly entered the Capitol (like Mr. Gieswein), were there to revolt, not just to protest.[3]

Further, the ILR and Select Litigation survey data shows that D.C. residents are outliers on *every* question designed by either SL or ILR to assess pretrial bias.[4]

---

[2] Select Litigation borrowed language from a CBS/YouGov nationwide poll, asking, "Thinking about the people who forced their way into the U.S. Capitol on January 6, 2021, tell me whether you would or would not describe their actions in the following ways," and provided several descriptions, including "insurrection," and recorded whether respondents said they would describe their actions that way, would not, and either weren't sure / didn't know, or refused to answer. ECF No. 101-1 at 4-5, 8 (regarding Question 11 and the CBS/YouGov poll). ILR asked, "In your opinion, which of the following terms best characterizes The Events of January 6th?" where one response was "Insurrection." The above table lists the CBS/YouGov result in the "USA" column; the data from the federal judicial districts comes from SL and ILR.

[3] Responses to ILR Question 6 also reinforce this point: it shows up to 30% more D.C. residents have already concluded that those who entered the Capitol on January 6 planned in advance to do so. ECF No. 118-1 at 9 (regarding ILR Q6).

[4] The ILR data shows that respondents who exhibited any bias at all usually showed bias on more than one question, which was also not the case in other districts. ECF No. 118-1 at 10.

These consistent results provide further evidence that individual survey results are not flukes, and not a function of question design. To the contrary, they are evidence that bias in this district is deep-seated.

Not only do D.C. jurors consistently show significantly more bias than jurors in several other districts, but they show significantly more bias than jurors in a wide variety of demographic areas. For example, whether in the Middle District of Georgia, the district surveyed with the greatest proportion of people identifying as Democrats after D.C. residents (36% to D.C.'s 59%), or in the Middle District of Florida, where only about 26% view themselves as Democrats, rates of bias were universally much less prevalent out of D.C. than in D.C., as reflected above.[5] And, as the government notes, there has been considerable media coverage of the events of January 6 across the country; yet, D.C. residents consistently show more bias than potential jurors in other districts.

There does not need to be a fifty-state survey. The consistent results across surveys and across diverse districts shows that something is different in D.C. In short, the data supports the conclusion that there is unique and deep bias in D.C., and that Mr. Gieswein would have greater hope of a fair trial *anywhere* else in this country.[6]

---

[5] ECF No. 101-1 at 15; ECF No. 118-1 at 28.

[6] Mr. Gieswein would not object to trial in any of the jurisdictions studied to date.

II.     **The ILR data confirms that D.C. residents view themselves as victims of the events of January 6 in ways that non-residents do not.**

Common sense explains *why* the results in D.C. would be so different than in so many districts, some like D.C. and some not, notwithstanding extensive of media coverage everywhere. The events of January 6 took place only in D.C.; they could only have taken place in D.C.; they summoned D.C.-based police; they made only D.C. come to a standstill; they brought troops only to D.C.; only D.C. business lost business; and only D.C. residents face the prospect of a repeat. These practical, tangible effects of January 6 – are something that *only* D.C. residents experienced.

At the last hearing, the Court emphasized that the government's theory of the case is that January 6 was an attack on "democracy," such that citizens everywhere in the country might feel themselves to have been a target of the events of January 6. Mr. Gieswein does not dispute that. And indeed, the survey data shows there are large swaths of people in a great many types of areas that feel bias toward January 6 defendants.

But the government's case also has to do with alleged violence and destruction of property that only took place in D.C., the repercussions of which were only felt in D.C. And Mr. Gieswein has argued all along that the more direct after-effects of the events of January 6 were felt only in D.C., and that these – and the natural inclination to fear a repeat, which could only take place here – were prone to make D.C. residents particularly sensitive to all of the threats posed by the events of that day.

The ILR data confirms this: D.C. residents felt the effects of January 6 in ways that others did not. Close to half were "personally affected" by the events of January

6; fewer than 30% of non-D.C. residents said they were.[7] Close to half of D.C. residents suffered "inconvenience or restriction on movement due to curfews, road closures or restricted access imposed in response" to the events of that day; just around 15% of EDVA residents were, and fewer than 10% of those in the North Carolina and Florida districts surveyed felt that way.[8]




And well over half of D.C. residents – 66% – experienced concern about their own safety or the safety of people important to them due to the events of January 6.[9] Fewer than 40% of EDVA residents felt that way, and fewer still in the districts surveyed that are farther away:[10]

---

[7] ECF No. 118-1 at 11 (regarding ILR Q2).

[8] *Id.* (regarding ILR Q7).

[9] *Id.* (regarding ILR Q8).

[10] *Id.*



The government consistently seeks to avoid transfer by suggesting that Mr. Gieswein's motion should fail because of the ways that D.C. residents are similar to potential jurors outside of the city: they all were exposed to news, and they all are the beneficiaries of the democracy that the government says was under attack on January 6. This data confirms that D.C. residents are unique in at least one way: in *their* minds, *their* city was under attack on January 6. This is why a potential juror in the voir dire for *United States v. Robertson* said "I'm a Washingtonian, born and raised, so, you know, *this is my city*. I feel violated," and another, who lives on Capitol Hill and drove by the Capitol on January 6, said he was "outraged that people who come in *our city*" acted as they did.[11] *See* ECF No. 124-1 at 4, 5 (discussing statements of Jurors 1160 and 1566) (emphasis added).

The fact that so many D.C. jurors personally felt concerned for their safety due to the events of January 6, and feel that they were personally affected by the events that day, makes them unique. Moreover, it is just the sort of circumstance that is likely to make them more likely to know others who were impacted, to pay more

---

[11] Only the first of these two potential jurors was dismissed for cause.

attention to the vivid news about January 6, to feel strongly about that day, and to concern themselves with how their friends and neighbors feel about it. This alone raises the specter that "outside influence" will taint jury deliberations in Mr. Gieswein's case. *See Skilling v. United States*, 561 U.S. 358, 378 (2010) ("The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by *any* outside influence, whether of private talk or public print." (Emphasis added.)) (quoting *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462 (1907) (opinion for the Court by Holmes, J.)).

And that D.C. residents felt particularly targeted also likely amplifies the impact of all of the other reasons jurors everywhere might be biased against the January 6 defendants, including the nature of the news coverage (including videos of the scene of the alleged crimes), and the fact that this coverage will inevitably continue through Mr. Gieswein's October trial and may even increase as the January 6 Committee releases its work product. D.C. residents' sense of having been physically at risk will also magnify the effect of feeling victimized in their roles as beneficiaries of democracy (a role they share with all Americans), and in their roles as Democratic voters (an identity embraced by a uniquely large share of residents in this federal district).

In short, common sense and all of the data that Mr. Gieswein has provided to the Court lead to the conclusion that the combination of all of these sources of bias – including some unique to D.C. – coalesce to a point that prejudice must be presumed,

or at least compels the conclusion that "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial" in the District, justifying transfer under either the constitution or Rule 21. *See* ECF No. 101 at 10-11 (citing cases for the proposition that improper outside influence can arise from innumerable sources, including but not limited to the volume of news, the nature of news, the timing of news, private talk, the sheer number of victims, the prevalence of personal stakes in the outcome, identification with community point of view, or the likelihood that jurors will be concerned about the reactions of their neighbors, all of which are mere "proxies" for "the real inquiry: whether there could be a fair trial by an impartial jury that was not influenced by outside, irrelevant sources").

Nowhere in its response to the ILR survey does the government address the data showing that D.C. residents felt attacked by the events of January 6 in a different way than citizens elsewhere in the country. No doubt part of any response the government might offer would be the same as the response to any data defendants put forth: that the solution is to identify those impacted by January 6 or biased against these defendants during *voir dire*, and exclude them on that ground, at least if they cannot swear to disregard such concerns and follow the Court's instructions. But the ILR data also provides additional evidence that *voir dire* will not be enough to preserve the right to a fair trial in this case.

III.   **The ILR data provides additional evidence that *voir dire* cannot ensure a fair trial in this case.**

The government has never refuted the research showing that jurors are less likely to be honest in *voir dire* than in anonymous surveys taken in private. *See* ECF No. 110 at 9-10 (discussing Jon A. Krosnick & Stanley Presser, "Question and Questionnaire Design," in Handbook of Survey Research (2d. ed. 2010, Peter V. Marsden & James D. Wright, eds.), ECF No. 110-1, at 285, 286, describing studies showing that people are prone to providing socially desirable answers, particularly when they are face-to-face with others).

Nor has the government provided any evidence to negate the very real possibility that – consistent with this research – the reason that only 52% of Select Litigation D.C. respondents said they are more likely to *vote* "guilty" on a January 6 jury, even though 71% of the same population said they believe January 6 defendants *are* guilty, is that it is not socially desirable to admit that one has already determined how they would probably vote if on a jury, in light of the monition that any juror must presume innocence. *See* ECF Nos. 101 at 3, 101-1 ¶ 11, 110 at 7-10 (arguing that government is merely assuming that reminders of the presumption of innocence will cause jurors who have prejudged a case to presume innocence, when research and data suggests that such reminders are more likely to trigger nothing more than *claiming* that they will presume innocence when they actually will not).

The government makes much of the fact that 70.13% of D.C. residents reported to ILR that they personally feel that it would be "possible for [them] to be a fair and unbiased juror for a January 6ᵗʰ Defendant." ECF No. 124 at 7 (quoting ILR question,

ECF No. 118-23). But the government leaves out that 51% of these same people told ILR that they are more likely to find that a defendant charged with crimes for activities on January 6th is guilty. ECF No. 118-1 at 12. As ILR notes, "this representation may actually indicate a failure to recognize or admit threats to fairness and impartiality." ECF No. 118-1 at 6.

And the results from January 6 *voir dire* conducted in January 6 trials to date also suggest that potential jurors are not the best judge of their own impartiality. For example, the government notes that only 24 of the 56 prospective jurors examined in the *Reffitt* voir dire (43%) answered yes to either Question 5 (whether they had "such strong feelings or opinions about the events that took place at the U.S. Capitol on January 6, 2021, that it would make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case") or Question 6 ("[D]o you have an opinion about Mr. Reffitt's guilt or innocence in this case?"). ECF No. 124 at 10 (citing *United States v. Reffitt*, 21-cr-32-DLF (D.D.C.), Tr. 2/28/22 AM at 23). The government touts the fact that only nine of these were struck after follow-up. *Id.* at 10-11.

But we know that somewhere between 52 and 71 percent of D.C. prospective jurors have already concluded that *all* January 6 defendants are probably guilty, according to SL and ILR data discussed above. Given that, one would expect far more than 43% of the prospective *Reffitt* jurors to say that they had an opinion of Mr.

Reffitt's guilt or innocence, if they were being honest with themselves, and if they understood the questions.[12]

The SL and ILR data showing how many D.C. prospective jurors believe that all January 6 defendants are guilty, coupled with the data showing that between 76 and 85 percent of them believe that January 6 participants were insurrectionists attempting to overthrow the government, leads to the conclusion that far more than 43% of the *Reffitt* venire must have had opinions that would make it difficult to be impartial on the critical issue of intent. *See* ECF No. 101-1 at 8 (reporting on SL Q 11); ECF No. 118-1 at 9 (reporting on ILR Q5).

Similarly, it beggars belief that fewer than only 8% of the *Robertson* venire had feelings that would make it at least "difficult" for members of the venire to follow the court's instructions and render an impartial decision (as suggested by answers those potential jurors gave in *voir dire*), when data indicates that a much greater share of the venire had already reached damning conclusions about all January 6 defendants. *See id.* at 11-12 (discussing select questions in *voir dire* in *United States v. Robertson,* 21-cr-34-CRC (D.D.C.)).

---

[12] Throughout its response, the government emphasizes that the data the defense has offered focuses on January 6 defendants as a whole, and not any individual defendant. *See, e.g.*, ECF No. 124 at 2. But of course, bias toward a group feeds into bias toward individuals in that group; that is exactly why bias to a group can be so pernicious. It is not credible that so many people who think *all* January 6 defendants are guilty did not approach *voir dire* concerning a particular member of that group thinking that he was guilty.

For example, prospective jurors for the *Robertson* trial were asked whether, *in their own opinion*, they had "*such strong feelings* or opinions about the events . . . that it would make it difficult for [the prospective juror] to follow my instructions and render a fair and impartial verdict if you were chosen as a juror." ECF No. 124 at 11 (citing *Robertson* transcript). One juror said yes, and he was duly struck for cause when he said: "Automatically thought guilty when I heard January 6th." *See* ECF No. 124-1 at 4 (citing *Robertson* transcript). But the SL and ILR data suggests that *many* prospective jurors "automatically think guilty" when they hear "January 6th." And the *voir dire* evidence suggests that many of them, and many prospective jurors who have already concluded that January 6 was an insurrection long-planned by those who went into the Capitol, nevertheless answered "no," and accordingly faced no follow-up questions.

No one should be surprised by many potential jurors answering "no" to such questions when the data suggests their answers should probably be "yes": much of *voir dire* must rely heavily and jurors' subjective views of themselves, and most laypeople would have no reason at the *voir dire* stage to suspect how certain beliefs (such as that everyone who tried to enter the Capitol on January 6 was an insurrectionist trying to overthrow the government) might make it difficult for them to presume innocence (including because it is possible that at least some defendants lacked intent to obstruct) until it was proven to them beyond a reasonable doubt.

But the end result is that this Court can have little confidence that *voir dire* to date has weeded out people with tremendous prejudice against the individual

defendants. In fact, the SL and ILR data suggests that these January 6 juries probably included many people significantly biased against *all* January 6 defendants, which necessarily included the individuals who have gone to trial. This survey data undermining the results of *voir dire* in the cases the government cites means that the Court should view this case as more akin to *Irvin v. Dowd*, in which 268 of 430 prospective jurors (62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner," *Irvin*, 316 U.S. 717, 727 (1961), than to *Murphy v. Florida*, where only 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt[.]" *Murphy*, 421 U.S. 794, 803 (1975). In the former case, the large share of prospective jurors who were stricken for cause led the Supreme Court to give "little weight" to remaining prospective jurors "statements of impartiality," because the data showed that prejudgment was rampant, *Irvin*, 316 U.S. at 727; in the latter, the Court approved of the lower court's denial of transfer in part because the relatively lower number of strikes "by no means suggeste[d] a community so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own," *Murphy*, 421 U.S. at 803. Here, as in *Irvin,* available evidence shows that there is such significant pretrial prejudgment of all January 6 defendants that the Court should give little weight to statements of impartiality in *voir dire* to date.

Finally, the Court should also take note that not a single one of the January 6 juries that the government touts has acquitted any January 6 defendant on any single count. As the Supreme Court has recognized, "overwhelming victory for the

Government" does not "undermine in any way the supposition of juror bias." *Skilling*,
561 U.S. at 383.

## CONCLUSION

*Voir dire* is by its nature imperfect, in every case. It is nevertheless the tool
upon which our system relies as the best available for selecting an impartial jury. In
most cases, this is appropriate. But in some cases, where there is so much evidence
of bias about a group of people in a particular community, and so much evidence from
*voir dire* in trials of members of that group that *voir dire* is not up to the task of
revealing this prejudice, due process and Rule 21 demand a change of venue.
Everything before the Court suggests that this is that type of case.

Respectfully submitted on May 20, 2022.

**ROBERT GIESWEIN**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____
Ann Mason Rigby
DC Bar No. 491902
Elizabeth A. Mullin
DC Bar No. 484020

Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
ann_rigby@fd.org
elizabeth_mullin@fd.org