bweiner@blakeweinerlaw.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : Criminal No. 21-cr-24 (EGS) |
| ROBERT GIESWEIN, | : |
| Defendant. | : |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, and defendant Robert Gieswein, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt. It does not represent all relevant facts known to defendant Gieswein or the government.

## THE ATTACK ON THE U.S. CAPITOL ON JANUARY 6, 2021

1. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

2. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of

the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

3. As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

4. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

5. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

6.      Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### GIESWEIN'S PARTICIPATION IN THE JANUARY 6, 2021, CAPITOL RIOT

7.      As of January 6, 2021, defendant Gieswein resided in Woodland Park, Colorado. He drove alone from Colorado to Washington, D.C. to attend the events planned for January 6, 2021. At public events on January 5th, as well at on January 6th, the defendant wore a distinctive camouflage paramilitary kit, including a helmet.

8.      On January 5, 2021, the defendant gave an interview in which he stated that he hoped to keep then-President Trump in power.

9.      On the morning of January 6, Gieswein encountered a small group of Proud Boys members in downtown Washington, D.C. Gieswein was dressed in a camouflage paramilitary kit, and he was carrying a baseball bat. These individuals invited Gieswein to stay with them

throughout the day. At some point, one of the Proud Boys members gave Gieswein a piece of orange duct tape to place on his helmet, for the purpose of identifying him as a "friendly."

10. Gieswein walked with the small group of Proud Boys to the area surrounding the Washington Monument where he encountered a large group of individuals who held themselves out as Proud Boys, as well as others.

11. Shortly after 10 a.m., Gieswein marched with a large group of Proud Boys from the Washington Monument to the Capitol. Gieswein then marched around the Capitol to its east side and back to the west side of the building.

12. After marching with the Proud Boys group for nearly three hours, Gieswein arrived at the Peace Monument shortly before 1:00 p.m.

13. Upon arriving at the Peace Monument, which is located outside the pedestrian entrance to the Capitol grounds, it was clear that the U.S. Capitol Police had barricaded the area and restricted access to it. Certain members of the crowd (not including the defendant) assaulted law enforcement and dismantled police barricades. Once the barricades had been dismantled, a large mob, including the defendant, rushed into the restricted area of the Capitol grounds, and ultimately to the plaza to the west of the Capitol ("West Plaza").

14. While in the West Plaza, Gieswein participated with other rioters in, among other things, pushing on a barricade held by police that they were using to set a line between themselves and the rioters.

15. While in the West Plaza, Gieswein was stopped by a man with a microphone and asked how he was doing. In response, Gieswein stated, among other things, that "this" was "crazy," and that he "would die for this." Asked what the solution was to "this right here," Gieswein stated,

4

to "execute these fascists." Moments prior to making the statement, the defendant threw a water bottle at a line of police officers.

16. Shortly before 2:00 p.m., the crowd pushed up the stairs under the Inauguration scaffolding that led from the West Plaza to the Upper West Terrace. The defendant joined in this push. At the top of the stairs, the defendant sprayed an aerosol irritant at three members of the U.S. Capitol Police, who were attempting to prevent the crowd from further advancing towards the Capitol building.

17. Defendant Gieswein continued to advance with the crowd towards the Capitol building and again met a line of officers attempting to prevent the crowd from advancing to the Capitol building. Gieswein sprayed his aerosol canister at a line of officers at the top of the stairs leading to the Upper West Terrace.

18. Gieswein was one of the first rioters to reach the façade of the building, and he watched as the window adjacent to the Senate Wing Door was breached at approximately 2:13 p.m. He entered through that window, and he was one of the first rioters to enter the building.

19. The defendant walked up a flight of stairs to the Ohio Clock Corridor. Gieswein then traveled back downstairs to the area known as the Crypt. The crowd overran another line of officers in the Crypt and the defendant then charged into an adjoining room, which led to escalators that went down to the Capitol Visitor Center. Capitol Police Officers were retreating from the crowd and attempted to deploy a set of metal rolling doors that would prevent the crowd from reaching the Capitol Visitor Center. As the doors began to roll down, other rioters placed objects in the doors' path, which caused them to roll back up. As the doors rolled back up, at approximately 2:29 p.m., the defendant sprayed his aerosol substance at two Capitol Police officers on the other side of the doors.

20. The crowd, including the defendant, then continued down the escalator to the Capitol Visitor Center where they encountered another line of law enforcement. At approximately 2:34 p.m., the defendant sprayed his aerosol substance at a group of officers who were in the process of arresting another rioter. At least one officer, with initials N.V., was hit by the spray and experienced bodily injury. In response, officers attempted to arrest Gieswein, and a scuffle ensued, and Gieswein attempted to punch officer F.M. Gieswein broke free of the officers and was not placed under arrest.

21. The defendant then traveled back up the escalators and eventually made his way to the Rotunda. Inside the Rotunda, shortly after 3:00 p.m., the defendant and members of the crowd again encountered a line of officers who were attempting to repel the crowd. Gieswein participated with other rioters in pushing against a group of police officers who were trying to prevent the rioters from advancing up a hallway that led to Speaker Pelosi's office. Gieswein and others were unable to break through the line of officers and were pushed back into the Rotunda.

22. Shortly thereafter, the defendant exited the Capitol.

23. The defendant drove back alone from Washington, D.C. to Colorado.

24. At all times on January 6, the defendant understood the officers on Capitol grounds and in the Capitol to be carrying out their official duties. In deploying the spray, throwing a water bottle, and pushing against lines of officers, Gieswein was trying to interfere with the officers' efforts to hold the crowd at bay.

## LIMITED NATURE OF FACTUAL BASIS

25. This proffer of evidence is not intended to constitute a complete statement of all facts known by Gieswein or the government. Rather, it is a limited statement of facts intended to provide the necessary factual predicate for Mr. Gieswein's guilty plea.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Erik M. Kenerson
ERIK M. KENERSON
Ohio Bar No. 82960
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7233 //
jason.mccullough2@usdoj.gov
(202) 252-7201 // Erik.Kenerson@usdoj.gov

bWeiner@blakeweinerlaw.com

## DEFENDANT'S ACKNOWLEDGMENT

The preceding statement is a summary made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. I make this statement knowingly and voluntarily, and I stipulate and agree that this Statement of Offense concerning my actions is true and accurate. I have read every page of this Statement of Offense and have discussed it with my attorney, Blake Weiner. I am fully satisfied with the legal services provided to me in connection with this plea. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

Date: 02/27/2023

_____
Robert Gieswein
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of Offense and have reviewed it fully with my client, Robert Gieswein. I concur in my client's desire to adopt and stipulate to this Statement of Offense as true and accurate.

Date: 2-12-2023

_____
Blake A. Weiner
Attorney for Robert Gieswein