**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-24 (TNM)** |
| **ROBERT GIESWEIN** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Robert Gieswein to a term of 60 months' imprisonment, followed by three years of supervised release, $2,000 in restitution, and a $200 special assessment.

### I.      INTRODUCTION

Robert Gieswein came to the Capitol dressed in paramilitary gear on January 6, 2021, armed with a baseball bat, and marched with the Proud Boys for nearly three hours before being one of the first rioters to breach Capitol grounds, alongside that group.   He was on the restricted grounds of the Capitol for over two-and-a-half hours on January 6, 2021, over one of those inside the building itself. During that time, he committed five assaults on police officers with an oleum capsicum-like spray; he committed another with a water bottle; he attempted to assault another with his fists; and he twice attempted to push through defensive police lines.   As the riot on the West Plaza was unfolding, Gieswein told an interviewer that the solution to "this right here" was to "execute these fascists."   He committed five of his six assaults after making that statement (he

1

committed the other immediately prior to it).   The sheer volume of Gieswein's violent conduct on January 6, the large timeframe over which it took place, and the context—Gieswein was always advancing, never retreating—leaves no doubt that his intentions were to be violent on that day. In the context of Gieswein's actions before and after the riot and his statement, these actions justify a significant upward variance from the sentencing range prescribed by the U.S. Sentencing Guidelines.

The government recommends that the Court sentence Gieswein to 60 months' incarceration, which represents an upward variance equivalent to two offense levels under the advisory Sentencing Guidelines.   A 60-month sentence reflects the severe gravity, particularly the violence, of Gieswein's conduct, and addresses the need to avoid unwarranted sentencing disparities, but also acknowledges his admission of guilt.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 138, ¶¶ 1-6, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.   Gieswein's Role in the January 6, 2021 Attack on the Capitol

Robert Gieswein drove alone from Colorado to Washington, D.C. to attend the events planned for January 6, 2021.   During the day and into the evening on January 5, 2021, he wore distinctive paramilitary kit around the streets of Washington, D.C.   He also carried a baseball bat

and occasionally waved it in the air.



*Image 1: Gieswein on January 5*          *Image 2: Gieswein on January 5, Bat in Air*

Gieswein gave a videorecorded interview on January 5, 2021, in which he stated that he came to D.C. to "keep President Trump in," adding, "there's not a whole lot I can do as an individual, but I would think to make sure that both sides stay peaceful."   In response to a question about what was going on with the election and who would win, Gieswein stated, "I believe there is going to be a lot of bloodshed.   There's going to be a lot of stuff to come."

On the morning of January 6, 2021, Gieswein was invited to, and did, join members of the Proud Boys for the day by members of that organization.   Shortly before 10:00 a.m.—about three hours before the first breach of the restricted area of Capitol grounds—he was present at the Washington Monument, where dozens of Proud Boys and Proud-Boy affiliates met before marching to the Capitol, and in possession of the bat, which was at that point sticking out of his

backpack.



***Image 3: Gieswein at the Washington Monument Shortly Before 10:00 a.m.***

Gieswein marched with the Proud Boys group—which U.S. Capitol Police (USCP) contemporaneously estimated to number about 200—from the Washington Monument to the west front of the Capitol.   Gieswein left the Washington Monument area about an hour prior to the beginning of President Trump's speech at the rally on the Ellipse.   He marched with the Proud Boys to the west side of the Capitol, around to its east side, and then back to the west.   The group of which Gieswein was a part was worrisome enough to the USCP that officers began monitoring the group's movements nearly two hours before the initial breach.   For instance, a USCP officer broadcast over the radio at 11:07 a.m., "105, be advised, the Proud Boy group is now crossing Third Street onto US Capitol property, numbers still approximately 200."   *See* Exhibit 1.

Gieswein marched with the group to the Peace Circle, the location of the first breach of the restricted area of Capitol grounds, arriving there at approximately 12:50 p.m., three minutes before

that breach.



*Image 4: Gieswein at the Peace Circle, bat in hand, at approximately 12:50 p.m.*

After the breach of the barriers at the Peace Circle, Gieswein joined a multitude of other rioters, including those he had been marching with for the past three hours, in rushing onto the restricted area of Capitol grounds.   PSR ¶ 33.   As rioters had flooded into the West Plaza of the Capitol, Gieswein positioned himself towards the front of the crowd, which was swelling to the thousands, near the defensive line police were establishing.



*Image 5: Gieswein in West Plaza, approximately 1:00 p.m.*

From that point, Gieswein became increasingly aggressive and combative towards the

police officers attempting to prevent the crowd's further unlawful advance.   At approximately

1:35 p.m., Gieswein participated with other rioters in pushing against a line of officers attempting

to set a metal barrier between the crowd and the building, as depicted in Exhibits 2 and 3[1].   Exhibit

2 is a portion of the body-worn video camera of Metropolitan Police Department (MPD) Officer

N.M. Gieswein admitted to this conduct in his Statement of Offense, ECF 138, at ¶ 14.



***Image 6: Still Shot from Exhibit 2***

At approximately 1:47 p.m., Gieswein threw a water bottle at that same line of officers,

including Officer N.M.   That assault is depicted in Exhibit 5, at approximately 00:08 on the

counter.   Exhibit 4 is surveillance footage from the Capitol Dome, with highlighting added to aid

---

[1] Gieswein is first visible at 1:24 on the counter of Exhibit 2, corresponding with 1:36:05 p.m., and at 1:05 on the counter for Exhibit 3.   We included the previous portion of the videos to provide the Court with the full context.

the Court in identifying Gieswein among the crowd.



***Image 7: Still Shot from Exhibit 5, with Gieswein and Projectile Circled***

Later in that same video, beginning at about 00:20 on the counter, Gieswein can be seen being

interviewed by an individual with red hair and a black shirt.   That interview was recorded and was provided to the Court as Exhibit 5.   The dialogue is as follows:

>   **Interviewer:** How you doin', brother?
>
>   **Gieswein:** This is fucking crazy [unintelligible].   I would die for this.
>
>   **Interviewer:** What's the solution to this right here, man?
>
>   **Gieswein:** To execute these fascists.

Gieswein admitted to the water-bottle assault and this interview in his statement of offense.   ECF 138, ¶ 15.

Within minutes of Gieswein's assault on law enforcement with a water bottle, rioters breached a police line at the bottom of a set of stairs that led under the Inaugural scaffolding and to the Capitol itself.   By approximately 2:00 p.m., Gieswein had maneuvered to the top of that set of stairs, still under the scaffolding, where USCP officers had set up another defensive line.   He participated with other rioters in moving a police barricade defensively in front of the rioters, *see* Exhibit 6 at 00:20, and shortly thereafter—at approximately 2:03 p.m.—he fired an aerosol irritant spray (likely oleum capsicum, also known as "OC" or pepper spray) at the defensive line of officers, including M.F., A.D., and J.M.[2]   Exhibit 6 at 3:17.   This assault comprises Count Four,

---

[2] As explained in further detail below, Gieswein later assaulted a different officer, who was hit in the eyes by the spray and who likened the effects of Geiswein's spray to those of oleum capsicum.

one of the counts to which Gieswein entered a plea of guilty.



*Image 8: Still Shot from Exhibit 6*

Shortly after Gieswein's aerosol assault, rioters broke through this line of officers as well.

As the crowd continued to push up the stairs and closer to the Capitol building, Gieswein joined

the advance and again sprayed a group of Capitol Police officers who had formed a line between

the crowd and the Capitol.   Exhibit 7 depicts this assault, which occurred at 2:09 p.m., with

highlighting added to assist the Court in identifying Gieswein.[3]



***Image 9: Still Shot from Exhibit 7, showing Gieswein's Distinctive Helmet, Arm Outstretched and Firing Aerosol Spray***

As the Court will see from the exhibit, shortly after Gieswein's spray, the crowd advanced further up the stairs and towards the building. Further up those stairs, at approximately 2:10 p.m., Gieswein fired his irritant spray at yet another line of officers.   That assault is depicted below.

---

[3] This assault is not reflected in the Statement of Offense.

*See also* Statement of Offense, ECF 138, at ¶ 17.



**Image 10: Gieswein Sprays at Officers at Top of Stairs**

After the rioters broke through the police line on the receiving end of Gieswein's spray in Image 10, Gieswein and many others ran straight to the Capitol building.   Exhibit 8 shows this approach and more.   Within the first two seconds of the video, Gieswein can be seen on the left side of the screen, running towards the building, with bat in one hand and spray canister in the other.   At 00:14 of the video, Gieswein is depicted banging on a window to the left of the Senate

Wing Door.



**_Image 11: Still Shot from Exhibit 8, Gieswein Pounding on Window_**

At 00:40, Gieswein is depicted pointing at another rioter, who was in the process of breaking with

a U.S. Capitol Police riot shield.[4]   At that time, approximately 2:12 p.m., the Senate and House

---

[4]      That rioter, Dominic Pezzola, was a member of the Proud Boys who was also at the Washington Monument around 10:00 a.m. on January 6., and Pezzola marched along with Gieswein as part of the group that traveled from the Monument to the west side of the Capitol. Pezzola left the group before it went to the east side of the building, but then rejoined it near the time of the first breach of Capitol grounds at the Peace Circle.

were both still in session, and the building had not yet been breached by rioters.



***Image 12: Still Shot from Exhibit 8, Gieswein Directing Other Rioters' Attention to Window***

At 1:09 of Exhibit 8, Gieswein can be seen entering the building, either the second or third rioter

to have done so on January 6, 2021, at 2:13 p.m.

Once in the building, Gieswein walked up a flight of stairs to the Ohio Clock Corridor,

where rioters encountered another line of police officers.   Gieswein struck a menacing pose with

those officers, aerosol canister in one hand and baseball bat in the other.



**Image 13: Gieswein in the Ohio Clock Corridor**

Capitol Closed-Circuit Video footage establishes that Gieswein encouraged other rioters forward

as he entered this corridor, and that he gestured at police with his bat and hands.   *See* Exhibit 9,

with Gieswein entering at 00:24 on the counter.



***Image 14: Still Shot from Exhibit 9***

After leaving the Ohio Clock Corridor a couple of minutes later, Gieswein returned to the Senate

Wing Door, where he helped other rioters enter through the now-broken window that he had

initially pounded on when he had approached the building.



***Image 15: Gieswein Assists Other Rioters Entering Building***

From that point, Gieswein traveled to the Crypt, where a group of rioters who overran another line of officers.   Gieswein then charged into an adjoining room, with escalators that led down to the Capitol Visitors' Center.

There, Gieswein assaulted another group of USCP officers who were retreating behind a set of metal rolling doors.   Gieswein admitted to this assault in his Statement of Offense, ECF 138 at ¶ 19, and it is depicted in Exhibit 10.   At 00:10 on the counter, the metal crash barriers began rolling down, and at 00:30 they began rolling back up after rioters interfered with their lowering. At 00:40, Gieswein is depicted spraying under the doors at the location where officers had

retreated.



***Image 16: Still Shot from Exhibit 10, Gieswein Spraying at Retreating Officers***

At 00:58 on the counter, approximately 2:30:12 p.m., he is depicted advancing towards the Capitol

Visitors' Center after encouraging other rioters to advance with him.



***Image 17: Still Shot from Exhibit 10, Gieswein Encouraging Rioters to Advance***

Gieswein continued down the escalator, where he and other rioters encountered another

line of USCP Officers.   At approximately 2:34 p.m., while a group of officers (including Officer

N.V. and Lieutenant F.M.) were arresting another rioter in the course of executing their duties to

enforce the law at the Capitol, Gieswein fired his irritant spray at the officers.   His spray hit Ofc.

N.V. in the eyes, causing coughing and irritation.   His spray also hit Lt. F.H. in the eyes, causing

his eyes to water, and also causing coughing and a burning sensation.   Lt. F.H. likened the effect

of Gieswein's spray to oleum capsicum spray, with which he is familiar as part of his employment

with U.S. Capitol Police.   Gieswein's spray caused Lt. F.H. to let go of the person he was trying

to arrest, and to attempt to arrest Gieswein.   Gieswein then attempted to punch Lt. F.M.   Lt. F.M.,

Ofc. N.V., and Gieswein then engaged in a physical struggle, during which all three went to the

ground.

Gieswein broke free of the officers, and they were unable to place him under arrest.   Ofc.

N.V. would shortly thereafter engage in a physical altercation with a different rioter.   After that

second altercation, Ofc. N.V. realized he was injured in multiple parts of his body.    He sustained

injuries to his left knee, left big toe, right ankle, two fingers on his right hand one on his left

(including torn fingernails), contusions to his forehead, left eye and left cheek, and the left side of

his lower back.   Officer N.V. received treatment from a nurse's station, but he did not go to the

hospital or have x-rays taken.   He could not definitively say whether Gieswein, the individual

involved in the second altercation, or both, caused those injuries.[5]

After the assault on Ofc. N.V. and Lt. F.H.—his sixth in the preceding hour—Gieswein

---

[5]      Lieutenant F.H. and Officer N.V. were interviewed prior to Gieswein having been
identified as the perpetrator of the events they described.   Gieswein pled guilty to the spray assault
described above as part of his guilty plea, and he agreed to attempting to punch Officer F.M.   ECF

made his way to the Rotunda.   Shortly after 3:00 p.m., Gieswein and other rioters encountered officers who had set another defensive line across and exit from the Rotunda to prevent rioters from accessing a hallway leading to Speaker Pelosi's office.   Gieswein and other rioters pushed against this defensive line, but were unable to break through and were repelled back into the Rotunda.   Gieswein admitted to this conduct in his Statement of Offense, ECF 138, ¶ 21.

At approximately 3:25 p.m., over an hour after he entered the building, Gieswein sat down on the floor of the Rotunda, telling one officer that he couldn't breathe.   He told other officers, "I just don't want to get arrested," adding (ironically, given his actions over the prior two and one-half hours), "I'm doing this for us."   A portion of body-worn camera video containing the latter statement is attached hereto as Exhibit 11. Shortly thereafter, Gieswein finally left the building.

Gieswein drove back to Colorado alone after January 6.   When FBI agents executed a search warrant at his residence just ten days later, they did not locate the distinctive items of clothing he wore or the baseball he carried on January 6, 2021.   Additionally, although AT&T phone records revealed that Gieswein had used his phone up to and including January 16, 2021, agents did not locate the phone during this search or a subsequent search incident to arrest.   PSR ¶ 42.   Numerous photographs and videos from January 6 show Gieswein in possession of and using a smartphone.   In an unsolicited statement to agents who were transporting him for his initial appearance, Gieswein described himself as a "constitutionalist who wants the military to

---

138 at ¶ 20.

take back over the country and restore the Constitution."   PSR ¶ 43.

### III.   THE CHARGES AND PLEA AGREEMENT

On August 3, 2022 a federal grand jury returned a second superseding indictment charging Gieswein with 11 counts, including Counts Four and Nine, which charged him with violations of 18 U.S.C. § 111(a)(1) for his assaults under the Inaugural scaffolding and in the Capitol Visitors' Center.   Prior to the return of that indictment, the government offered the defendant a plea agreement to two counts of violating 18 U.S.C. § 111(a).   He rejected that offer.   In fall 2022, the defendant asked that the government reopen that offer, and it agreed to do so.   On March 6, 2023, Gieswein entered pleas of guilty to those counts pursuant to a plea agreement.   *See* ECF 137.

### IV.   STATUTORY PENALTIES

Gieswein now faces sentencing on two counts of violating 18 U.S.C. § 111(a)(1).   As noted by the plea agreement and the PSR, Gieswein faces, on each count, up to eight years of imprisonment, a fine of $250,000, a term of supervised release of not more than three years, and a special assessment of $100.

### V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The plea agreement and the PSR agree on the minimum Guidelines calculation for this case.[6]   *See* PSR ¶¶ 54-74 and ECF 127 (plea agreement) at ¶ 5.

---

[6] As discussed in further detail below, the government believes that a variance is appropriate in

Count Four: 18 U.S.C. § 111(a)(1) (assault on Officers M.F., A.D., and J.M.)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

Count Nine: 18 U.S.C. § 111(a)(1) (assault on Officer xxx)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[7] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3) | Causing Bodily Injury | +3 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **23** |

| | |
|---|---|
| **Combined Offense Level** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **22** |

Under the "grouping" rules in the Guidelines, Counts Four and Nine do not group because they are assaults on separate victims. U.S.S.G. § 3D1.2(a). Because the two counts of conviction do not group, and because the offense level for Count Four is "equally serious or from 1 to 4 levels less serious" than the offense level for Count Nine, the combined offense level is determined by adding two levels to the highest offense level. U.S.S.G. § 3D1.4(a).

*See* Plea Agreement, ECF 137, at ¶ 5(A).

---

this case, but it also submits that the facts of this case could warrant an upward departure for terrorism under U.S.S.G. § 3A1.4, n.4.

[7] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

As used in U.S.S.G. § 2A2.2(b)(3), "'bodily Injury' means any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, Application Note 1.(B). Exhibits 12 and 13, attached to this memorandum, are partially redacted FD-302 summaries of FBI interviews of Ofc. N.V. and Lt. F.H.[8] They describe Gieswein causing bodily injury to those officers during the assault that is the subject of Count Nine. Specifically, as noted above, Ofc. N.V. described being struck in the face and eyes by Gieswein's spray, which caused "coughing and slight irritation of the eyes." Officer N.V. also described physical injuries he suffered as a result of his struggles with Gieswein and, a short time later, another rioter. Those injuries included injuries to his left knee, left big toe, right ankle, ripped fingernails, bruising, and a sore back. Officer N.V. sought treatment for these injuries at a nurse's station, but he was not hospitalized. Lt. F.H. described the effects of Gieswein's spray as making his eyes water, and causing a "coughing, burning sensation."[9] He also likened the effects to OC spray, with which he was familiar from his employment with USCP.

The U.S. Probation Office calculated Gieswein's criminal history as category I, which is not disputed. PSR ¶ 77. Accordingly, Gieswein's Guidelines imprisonment range is 41 to 51 months.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,

---

[8] In Ofc. N.V.'s 302, Gieswein (who was at that point unidentified) is referred to as "UNSUB 1." In Lt. F.H.'s 302, Gieswein is referred to as "UNSUB 3."

[9] Gieswein admitted in the statement of offense that his assault caused bodily injury to Ofc. N.V. The government submits that this memorandum and the attachments establish that his spray caused bodily injury to Lt. F.H. as well.

the Section 3553(a) factors weigh in favor of a lengthy term of incarceration and an upward variance from the Guideline range, resulting in a sentence of 60 months' incarceration (this variance would be the equivalent of adding two offense levels to the defendant's Guidelines).

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Gieswein's felonious conduct on January 6, 2021 was part of a massive riot that succeeded in substantially delaying the certification vote, frustrating the peaceful transition of Presidential power, and almost throwing the United States into a Constitutional crisis.   Gieswein was one of the first rioters to enter Capitol grounds, at 12:53 p.m. He did so armed with a baseball bat and dressed in paramilitary gear.[10]   He was also one of the first rioters to enter the Capitol building, at 2:13 p.m., while Congress was still in session.   He also spent a significant amount of time in the Capitol—over one hour—and collapsed on the floor from exhaustion after having exerted himself so much.   In the two-plus hours from when Gieswein entered Capitol grounds to when he exited the building, he:

- Pushed on a barricade held by police in the West Plaza as they tried to establish a line between themselves and rioters.   ECF 138, ¶ 14.

- Told an interviewer that he would "die for this" and that the solution to "this right here" was to "execute these fascists."   *Id.*, ¶ 15.

- Threw a water bottle at a line of police officers on the West Plaza.   *Id.*

---

[10]    The government has reviewed numerous photographs and videos, some it has provided to the Court above, showing Gieswein in possession of the bat on January 5 and early on January 6. The evidence has not yet conclusively established at which point Gieswen came into possession of the OC-like spray he used to assault officers.

- Sprayed a chemical irritant, in a semi-enclosed space—under the Inaugural scaffolding—at the top of the stairs in the West Plaza, at three Capitol Police officers trying to prevent the crowd's further advance to the building.   *Id.*, ¶ 16.

- Sprayed a chemical irritant at two other lines of police officers trying to prevent the crowd's further advance to the building.   *Id*., ¶ 17; Ex. 7.

- Sprayed a chemical irritant, indoors, at officers who were attempting to retreat from the mob's advance.   *Id.*, ¶ 19.

- Sprayed a chemical irritant inside the Capitol Visitor Center at officers who were trying to effectuate an arrest of another rioter, causing bodily injury to those officers.   *Id.*, ¶  20.

- Attempted to punch one of those two officers, who was trying to arrest him for the assault with an OC-spray-like substance.   *Id.*

- Participated in an effort to push through officers in the Rotunda who were attempting to prevent the mob from reaching Speaker Pelosi's office.

The nature and circumstances of Gieswein's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 60 months' incarceration.

### 1.   An Upward Variance is Appropriate

A variance is appropriate based on the nature and circumstances of Gieswein's conduct. "A variance refers to a sentence outside of the recommended Guidelines range based on the applicable factors in 18 U.S.C. § 3553(a) taken as a whole. That is different from a departure, which refers to a sentence outside of the recommended Guidelines range based on factors specified

in the Sentencing Guidelines themselves." *United States v. Khatallah*, 41 F.4th 608, 644 n.21 (D.C. Cir. 2022) (cleaned up), quoting *United States v. Murray*, 897 F.3d 298, 308 n.8 (D.C. Cir. 2018). The plea agreement in this case expressly permits the parties to seek a variance. ECF 137 at ¶ 7.

The Guidelines simply do not reflect the dogged intent and determination, which manifested in assaults on law enforcement officers simply trying to maintain order, that the totality of Gieswein's offense conduct presents. They do not reflect that Gieswein came to Washington, D.C. already dressed in paramilitary gear and, on January 6, already armed with a baseball bat, nor do they reflect that he joined with a group of some 200 Proud Boys and their supporters who marched towards the Capitol before President Trump had even begun speaking. They do not reflect that Gieswein was one of the first on Capitol grounds nor that he was one of the first in the building and one of the last to leave the building. They do not reflect that he was near the front of rioters, assaulting law enforcement officers, at multiple different points. The Guidelines do not reflect the sheer number of assaults committed by Gieswein, since he pleaded guilty to only two of those assaults. Indeed, Gieswein admitted to three additional assaults in his statement of offense. Video evidence, in the form of Exhibit 7, conclusively establishes the sixth. They do not reflect the attempted assault on Lt. F.H., committed in the course of officers trying to place Gieswein under arrest for the assault underlying Count Nine. And they do not reflect the fact that Gieswein stated, on the West Plaza, that the solution to "this right here" was to "execute these fascists" the day after stating that he was in Washington, D.C. to keep President Trump in power.

The nature and circumstances of the offense, as well as the seriousness of the crimes, are

valid reasons for the Court to vary upward.   *United States v. Miller*, 35 F. 4th 807, 818 (D.C. Cir. 2022).   This Court has authority to vary upward in part based "based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *Id.*, quoting *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014).   The nature and circumstances of Gieswein's conduct on January 6 support such a variance.

### 2.   An Upward Departure Under Section 3A1.4 Note 4 is also Applicable

Should the Court disagree with the government that a variance is appropriate, Gieswein's conduct also meets the definition for an upward departure under U.S.S.G. § 3A1.4, Application Note 4.   Section 3A1.4 allows for an adjustment to the Guidelines range where the defendant's offense of conviction "involved, or was intended to promote, a federal crime of terrorism," as defined by 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4, cmt. n.1. Where, as here, a defendant's conviction was not for, or was not "intended to promote," an enumerated "federal crime of terrorism," an upward departure is "warranted" under U.S.S.G. § 3A1.4, cmt. n.4(A) ("Note 4(A)") if "the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

When seeking an upward departure, "the government has the burden of proof by a preponderance of the evidence." *United States v. Walls*, 80 F.3d 238, 241 (7th Cir. 1996); *accord United States v. Okane*, 52 F.3d 828, 835 (10th Cir. 1995). The government bears the burden to prove that the U.S.S.G. § 3A1.4 adjustment is applicable with reference to Gieswein's conviction and "relevant conduct." *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 190 (D.D.C. 2018).

A defendant's "relevant conduct" is the conduct that "occurred during, in preparation for, or to evade responsibility for" the offense of conviction and includes "all harm that resulted from" or "was the object of" the defendant's "acts and omissions," even if uncharged. *Id*. at 187-88 (citing U.S.S.G. § 1B1.3).

Here, the PSR, Statement of Offense, and exhibits attached to this sentencing memorandum show that Gieswein's conduct was calculated for these ends because (1) Gieswein's statements and travel in advance of the events at the Capitol on January 6, 2021, reflect the requisite intent; (2) Gieswein was aware of the importance of the events at the Capitol on January 6—he stated he intended to keep President Trump in power—and he made the Capitol, elected officials inside, and those guarding them his targets ("execute these fascists"), so that he could retaliate against them or affect the government conduct in which they were engaged; and (3) Gieswein physically assaulted police officers in multiple different locations, inside and outside the building, encouraged other rioters to do the same, banged on the then-unbroken Capitol windows, and attempted to push through multiple police lines, further evincing his intent to affect and retaliate against government conduct "by intimidation or coercion," so that he could enter the building and stop the proceeding itself.

The government acknowledges that this Court has previously declined to apply the terrorism enhancement in the case of *United States v. Judd*, No. 21-cr-40 (TNM), which involved the defendant throwing a lit device that, at the least, resembled a firecracker, into a tunnel filled with police and rioters.[11]   In issuing its ruling, the Court noted that "the enhancement [] suggests

---

[11] The government acknowledges that Judge Friedrich in *United States v. Reffitt,* No. 21-cr-32,

a level of planning and premeditation that is not shown here," citing to Judd's claim (and the government's lack of evidence to the contrary) that he picked up a firecracker that he saw lying around. *Judd*, Feb. 27, 2023, Hr'g Tr. at 42. Gieswein's violent conduct, by contrast, spanned nearly 90 minutes—he pushed on the barricade in the West Plaza at approximately 1:35 p.m., and police repelled his and other rioters' push into the Speaker's lobby shortly after 3:00 p.m. During that time, Gieswein made countless decisions to push forward and to further engage violently with police. He committed five separate assaults with his irritant spray. Those assaults alone spanned over 30 minutes and took place at five separate locations, each against police guarding the Capitol, and each successive assault either closer to or further within the building than the one that came before it. They were premeditated and they were deliberate.

Gieswein's violent conduct was calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct. Gieswein attacked the United States Capitol—the legislative seat of our government—while the entire complement of legislators and the Vice President of the United States were inside performing their constitutional and statutory duties. No one can seriously doubt, with these specific facts, that Gieswein wanted to influence government by means of force. The level of force Gieswein used is on par with that actually used on the ground on January 6 by individuals to whom Judge Mehta recently applied a Note 4(a) departure. In finding that the departure was warranted in *United States v. Rhodes*, *et. al.*, No. 22-cr-15 (APM), Judge Mehta emphasized not only the agreement to use force, which

Judge Mehta in *United States v. Gardner*, No. 21-cr-622, and Judge Kollar-Kotelly in *United States v. Wright,* No. 21-cr-341, have also declined to apply Note 4(a) enhancements.

involved in that case the stockpiling of weapons in Virginia in case they were needed, but also "the actual use of force by others who went into the building and applied that force against police officers who were doing their duty that day."   *Rhodes*, No. 22-cr-15 (APM), May 25, 2023, Hr'g Tr. at 78-79.[12]

Gieswein's violent actions on January 6, spanning a significant period of time and multiple locations on Capitol grounds, and which were calculated influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct, warrant a two-level departure from the Guidelines under Note 4(a).

**B.  Gieswein's History and Characteristics**

As noted above, the government agrees with probation that Gieswein's criminal history is Category I, and it acknowledges the history laid out in the PSR at ¶¶ 82-94.   The government has weighed this information in its sentencing recommendation, and submits that its requested sentence is justified for the reasons stated elsewhere in this memorandum.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Gieswein's criminal conduct on January 6 was the epitome of disrespect for the law.

---

[12]  A copy of a portion of this transcript is attached hereto as Exhibit 14.   Judge Mehta applied the Note 4(a) departure to all defendants who have been sentenced in that case so far, including those who were acquitted of seditious conspiracy, and regardless of whether each individual defendant was involved with the weapons in Virginia.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Gieswein has a criminal history category of I, his statements postdating January 6 indicate a man who does not believe that the fight is over.  *See* PSR ¶ 43 (expressing belief that the Military was needed to restore the Constitution, in a statement made after his arrest for the instant offense). Second, although Gieswein has now pled guilty and accepted responsibility for his offense, he has to this point expressed neither remorse nor contrition.  Indeed, Gieswein has given at least one interview while incarcerated, which was published on April 14, 2022, in which he stated that we "are living in a post-constitutional communist overthrow."  It was a similar belief—the belief in a stolen election—that motivated Gieswein to commit the crimes he did on January 6.  Gieswein has made clear by his words ("execute these fascists") and conduct (six assaults) on January 6, 2021, that he believes violence is an acceptable answer to political

---

[13] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

questions.   His lack of remorse extends to a lack of belief that that what happened on January 6 was a problem that was partially of his making.   He stated on the same podcast, recorded from jail, that January 6 was "set up" between police on the ground, unnamed agitators, and the Department of Justice "to entice Trump supporters to act in a way they would not normally act." The Court needs to impose a lengthy period of incarceration to deter Gieswein from repeating his actions from January 6, 2021.

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. In this case, for the reasons articulated above and below, the government submits that those Guidelines, while deserving of respectful consideration, do not capture all of Gieswein's conduct, and thus an upward variance is warranted.

### F.        Unwarranted Sentencing Disparities

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[14]

---

[14] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Robert Morss*, No. 21-cr-40, this Court imposed a sentence of 66 months following a stipulated trial, at which Morss was convicted of violations of 18 U.S.C. § 111(a)(1), 2111, and 1512(c)(2).   Morss, like Gieswein, arrived in Washington, D.C., expecting violence: he was wearing a tactical vest and carried, among other things, scissors and a knife. (Gieswein wore a paramilitary kit and carried a baseball bat), and he committed multiple acts of violence against law enforcement in different parts of the Capitol grounds, including the theft of a riot shield. Gieswein, committed the aforementioned six assaults, and multiple other acts of interference with law enforcement, spanning from his first entry onto the restricted grounds at approximately 12:53 p.m., to his attempt to push into the Speaker's Lobby at 3:00 p.m.

In *United States v. Sandlin*, 21-cr-88 (DLF), Judge Friedrich sentenced the defendant to a term of incarceration of 63 months, a fine of $20,000, and $2,000 in restitution, following a plea of guilty to one count of violating 18 U.S.C. § 111(a)(1), and one count of violating 18 U.S.C. § 1512(c)(2).   Much like Gieswein, Sandlin came to Washington ready for violence, bringing knives, bear spray, and a pistol to the D.C. area (he did not bring the pistol to the Capitol), while Gieswein brought a bat on January 6.   He encouraged the mob's advance at key points, as did Gieswein, and he directly assaulted two officers, while aiding and abetting in the assault of four

others—Gieswein directly committed six assaults on officers. He also gave public statements about being the victim of political persecution, as did Gieswein in his podcast from jail.

Following trial in *United States v. Robertson*, 21-cr-34 (CRC), Judge Cooper sentenced Robertson to 87 months' incarceration.   Robertson and his co-defendant Fracker, both officers with the Rocky Mount, Virginia Police Department, were off duty when they headed for Washington, D.C. in Robertson's car on the morning of Jan. 6, 2021. Both donned gas masks and approached the Lower West Terrace of the Capitol, where they joined an advancing mob of rioters. Robertson carried a large wooden stick and confronted members of the Metropolitan Police Department, who had arrived to provide back-up to U.S. Capitol Police officers who were defending the West Front of the Capitol from the mob. Fracker entered the Capitol at approximately 2:14 p.m. and Robertson entered a few minutes later. They met up inside the Capitol's Crypt, where they took a selfie of themselves making an obscene gesture in front of a statue. Throughout the day, both Robertson and Fracker used their mobile phones to take photos and video footage of their activity.   Robertson and Fracker were arrested on Jan. 13, 2021. Prior to their arrests, federal law enforcement officers called them, informed them of their arrest warrants, and ordered them to turn themselves in later in the day. After learning he had been criminally charged for his conduct at the Capitol, Robertson took Fracker's phone and destroyed it and his own phone to hide the evidence of their crimes.   Gieswein similarly concealed his phone in this case.   The 87-month sentence in that case came without any charged assaults on law-enforcement officers.

Judge Kelly sentenced Joshua Pruitt to 55 months of incarceration, following a guilty plea to 18 U.S.C. § 1512(c)(2), in Case No. 21-cr-23.   Pruitt, like Robertson, was not convicted of any assaults on law-enforcement officers (as opposed to the six assaults in Gieswein's relevant conduct), and his aggressive action towards them nonetheless justified a 60-month sentence. Pruitt, unlike the defendant was a member of the Proud Boys, but he did not march with them for three hours or breach the first barricades with them, like this defendant did.   Pruitt refused to comply with law enforcement's commands on Capitol grounds; he aggressively pointed at and taunted police in the Crypt, to the point where officers took a defensive position against him, expecting an assault; and threw a chair in the direction of officers in the Capitol Visitors' Center; he chased Senator Schumer and his security detail; and Pruitt also taunted and challenged officers to fight as they attempted to arrest other rioters.

The need to avoid unwarranted sentencing disparities further supports the government's request for a variance here.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[15]  Generally, restitution under the VWPA must "be tied to the

---

[15] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Gieswein must pay $2,000 in restitution, which reflects in part the role Gieswein played in the riot on January 6.[16] As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. Gieswein's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.[17]

---

[16] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[17] The government has received no information from the identified victim-officers regarding any restitution amounts specific to them.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 60 months' incarceration, followed by 3 years' supervised release, $2,000 in restitution, and a $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


By:      */s/ Erik M. Kenerson*
ERIK M. KENERSON
OH Bar No. 82960
JASON B.A. MCCULLOUGH
NY Bar No. 4544953
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530
Erik.Kenerson@usdoj.gov
(202) 252-7201