```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
     * * * * * * * * * * * * * * *    )
 3   UNITED STATES OF AMERICA,        )        Criminal Action
                                      )          No. 21-00024
 4                  Plaintiff,        )
                                      )
 5      vs.                           )
                                      )
 6   ROBERT GIESWEIN,                 )        Washington, D.C.
                                      )        June 23, 2023
 7                  Defendant.        )        10:02 a.m.
                                      )
 8   * * * * * * * * * * * * * * *    )

 9

10                 TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE TREVOR N. McFADDEN,
11                  UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:      ERIK M. KENERSON, ESQ.
                              JASON B. A. McCULLOUGH, ESQ.
15                            UNITED STATES ATTORNEY'S OFFICE
                                FOR THE DISTRICT OF COLUMBIA
16                            555 Fourth Street, Northwest
                              Eleventh Floor
17                            Washington, D.C. 20530

18   FOR THE DEFENDANT:       BLAKE WEINER, ESQ.
                              BLAKE WEINER LAW, PLLC
19                            1806 Summit Avenue
                              Suite 300
20                            Richmond, Virginia 23230

21   FOR U.S. PROBATION:      SHERRY BAKER

22   REPORTED BY:             LISA EDWARDS, RDR, CRR
                              Official Court Reporter
23                            United States District Court for the
                                District of Columbia
24                            333 Constitution Avenue, Northwest
                              Room 6706
25                            Washington, D.C. 20001
                              (202) 354-3269
```

1           THE COURTROOM DEPUTY:  Your Honor, this is

2    Criminal Case 21-24, the United States of America versus

3    Robert Gieswein.

4           From Probation, Officer Sherry Baker.

5           Counsel, please come forward to identify

6    yourselves for the record, starting with the Government.

7           MR. KENERSON:  Good morning, your Honor.  Erik

8    Kenerson on behalf of the United States, along with Jason

9    McCullough.

10          THE COURT:  Good morning, gentlemen.

11          MR. WEINER:  Good morning, your Honor.  Blake

12   Weiner on behalf of Robert Gieswein.

13          THE COURT:  Good morning, Mr. Weiner.

14          Good morning, Mr. Gieswein.

15          We're here for the sentencing of the Defendant,

16   Robert Gieswein, who's pled guilty to two counts of

17   assaulting, resisting or impeding certain officers in

18   violation of 18 USC 111(a)(1).

19          I've received and reviewed the presentence

20   investigation report and sentencing recommendation from the

21   probation office as well as sentencing memoranda from the

22   Government and defense.  I've also reviewed the Defendant's

23   supplemental videos and I've got the Government's videos and

24   still photographs.

25          Are there any other documents or materials that I

1    should have reviewed?  Mr. Kenerson?

2          MR. KENERSON:  Not from the Government, your

3    Honor.

4          THE COURT:  And Mr. Weiner?

5          MR. WEINER:  Your Honor, I don't know if you would

6    classify this as a document, but it is a case that was, I

7    believe, just recently decided within the last 48 hours,

8    where the Government had moved for a departure similar to

9    what it has in this case.

10          Under Note 4 of Chapter 3 under -- I believe it

11    was Judge Jackson.  And Judge Jackson denied the departure

12    for a different argument than what we made in our reply

13    brief, which was essentially that -- this is Judge Jackson's

14    decision -- essentially that not only did the departure not

15    apply because of the Defendant's circumstances, but actually

16    the note application itself for a departure is an

17    inapplicable way for the Sentencing Commission to

18    unilaterally basically change the guideline.  And so that's

19    an argument we would make.  I can provide the case number,

20    your Honor.  I don't know if you would consider that new

21    material.

22          THE COURT:  Yes.  I don't think you need to submit

23    that.  I'm happy to hear from you in argument at the

24    appropriate time on that point.  Thank you.

25          MR. WEINER:  Thank you.

1           THE COURT:  Mr. Gieswein, this sentencing hearing

2     will proceed in four steps, some of which may seem a bit

3     mechanical to you.  But I want you to keep in mind why we're

4     here today and the gravity of the situation:  You've

5     committed a federal crime.  Today's proceeding is a serious

6     matter, as it is about the consequences that you will face

7     because of your decision to engage in criminal behavior in

8     violation of federal law.

9           Sir, the first step of today's proceeding is for

10    me to determine whether you've reviewed the presentence

11    report and whether there are any outstanding objections to

12    it and, if so, to resolve those objections.

13          The second step is to calculate your recommended

14    sentence under the sentencing guidelines.

15          The third step is to hear from the Government,

16    from your attorney and you, sir, if you wish to be heard

17    about sentencing in this case.

18          And the last step requires the Court to fashion a

19    just and fair sentence in light of all of the factors

20    Congress set forth in 18 USC 3553(a).  As part of this last

21    step, the Court will actually impose the sentence along with

22    the other required consequences of the offense.

23          So turning to that first step, Probation filed its

24    final presentence investigation report and sentencing

25    recommendation on June 16th.  Mr. Gieswein filed his

 1    memorandum in aid of sentencing that day and the Government

 2    filed its memorandum the following day.

 3            Does the Government have any objection to any of

 4    the factual determinations set forth in the presentence

 5    report?

 6            MR. KENERSON:  We do not, your Honor.

 7            THE COURT:  Mr. Weiner, have you and Mr. Gieswein

 8    read and discussed the presentence report?

 9            MR. WEINER:  Your Honor, we have read the

10    presentence report and I have reviewed it with my client.

11            THE COURT:  And does he have any objection to any

12    of the factual statements set forth in it?

13            MR. WEINER:  No, your Honor.

14            THE COURT:  Mr. Gieswein, could you join your

15    attorney at the podium there, sir.

16            Sir, are you fully satisfied with your attorney in

17    this case?

18            THE DEFENDANT:  Yes, your Honor.

19            THE COURT:  Do you feel you've had enough time to

20    talk with him about the probation office's presentence

21    report and the papers the Government filed in connection

22    with the sentencing?

23            THE DEFENDANT:  Yes.

24            THE COURT:  You may have a seat, gentlemen.

25            The Court will accept the facts as stated in the

1    presentence report.  The presentence report will serve as my

2    findings of fact for purposes of this sentencing.

3            The presentence report lays out the probation

4    office's calculation and the advisory guideline range that

5    applies in this case.  I'll attempt to summarize the

6    probation office's calculation, which I do not believe the

7    parties challenge.

8            Probation states that the guideline for Counts 4

9    and 9, as I say, both of which are assault charges, is

10    2A2.4; and because the conduct constituted aggravated

11    assault, the cross-reference to 2A2.2 applies.

12            Counts 4 and 9 are not grouped because they

13    involve assaults on different victims under guideline

14    3D1.2(a).

15            Probation submits that for both counts, the base

16    offense level is 14, again supplied by 2A2.2(a).

17            Probation also states that for both counts, a

18    six-level official victim enhancement under 3A1.2(a) applies

19    because the victims in this case were law enforcement

20    officers and the offense was motivated by that status.

21            For Count 9, Probation submits that a three-level

22    enhancement applies under 2A2.2(b)(3) because Mr. Gieswein

23    caused bodily injury to Officer NV during the assault.

24            So for Count 4 -- that's Group 1 -- the adjusted

25    offense level is 20.  For Count 9, Group 2, the adjusted

1    offense level is 23.

2          Probation then assigned units under 3D1.4(a), (b)

3    and (c).  One unit is assigned to the group with the highest

4    offense level, which is Group 2 here, and then one unit is

5    assigned to any group that is one to four levels less

6    serious than the highest level.  So Probation assigned one

7    unit to Group 1, which gives a total of two units.

8    Therefore, Probation states that Group 2 carries the greater

9    of the adjusted offense levels with a total of 23 and the

10   offense level should be increased based on the number of

11   units assigned under 3D1.4, which is two units, to a total

12   of 25.

13         Probation then submits that a two-level decrease

14   for acceptance of responsibility and an additional one-level

15   decrease for helping authorities in their investigation are

16   appropriate.

17         So that would bring us back down to a total

18   offense level of 22.

19         Mr. Gieswein has no prior criminal history and

20   zero criminal history points, placing him in Criminal

21   History Category I.

22         So I'll now discuss the applicable penalties,

23   which include imprisonment, probation, fines and

24   restitution.  Under the statute, the maximum prison term the

25   Court may impose for each of these two offenses is 20 years.

1    Under the guidelines, with a total offense level of 22 and a

2    criminal history category of I, the applicable guideline

3    range would be 41 to 51 months.

4           Turning to fines, for both counts, the maximum

5    fine is $250,000.  The guideline range for this offense is

6    $15,000 to $150,000.

7           There's also a special assessment of $100 for each

8    count.

9           Turning to supervised release, each count carries

10   a potential term of supervised release of not more than

11   three years under the statute.  Under the guidelines, since

12   these are Class D felonies, the guideline range is a term of

13   supervision of one to three years.

14          Because the offenses are Class D felonies,

15   Mr. Gieswein is eligible for not less than one nor more than

16   five years of probation under the statute, but under the

17   guidelines he's ineligible for probation because the

18   guideline range is in Zone D of the sentencing table.

19          Finally, looking to restitution, according to 18

20   USC 3663A, restitution is mandatory in this case.  And

21   Mr. Gieswein has agreed to pay $2,000 in restitution.

22          Have I accurately stated the statutory framework

23   under which we are operating in regards to this case?

24   Mr. Kenerson?

25          MR. KENERSON:  Yes, your Honor.

1          THE COURT:  And any objections for the record to

2     any of those?

3          MR. KENERSON:  No.

4          THE COURT:  And Mr. Weiner?

5          MR. WEINER:  No objection, your Honor.

6          THE COURT:  Having determined the applicable

7     guidelines sentence, the next step is for the Court to

8     consider departures from the guidelines sentence.

9          The presentence report does not include any

10    departure grounds.

11         Is either party seeking a departure as opposed to

12    a variance here?  Mr. Kenerson?

13         MR. KENERSON:  Your Honor, as noted in our

14    memorandum, we think a variance is appropriate in this case;

15    but we also noted that in the Government's view, this case

16    would be eligible for a departure under 3A1.4, Note 4.

17         THE COURT:  Do you want to make any additional

18    arguments on the departure at this point?

19         MR. KENERSON:  Your Honor, I think we've laid out

20    our position in our memorandum.  If the Court has any

21    questions, we would of course be happy to answer them.  But

22    other than that, we're happy to submit on the papers.

23         THE COURT:  So you cite to Judge Mehta's case.

24    Was that *Oath Keepers*?

25         MR. KENERSON:  That was the *Oath Keepers* case.

1    Yes.

2            THE COURT:  It looked to me -- I reviewed the

3    transcript that you provided.  It looked to me that he was

4    placing some weight on the fact that this was a seditious

5    conspiracy.

6            MR. KENERSON:  He certainly was, and certainly was

7    placing some weight on that as to I think how it certainly

8    within the framework of a seditious conspiracy case meets

9    the portion of the enhancement that calls for a -- or

10   portion of the departure notes; excuse me -- that calls for

11   the crime to be calculated to influence or retaliate against

12   the government.

13           That is -- Judge Mehta certainly relied on the

14   seditious conspiracy nature of the case to get to that

15   portion.

16           We would submit that that certainly is sufficient

17   but not necessary for the Court to get there here.  The

18   Defendant's conduct standing alone was based on his actions

19   that day as we laid out, calculated to influence or

20   retaliate against the government.

21           The portion of Judge Mehta's transcript that we

22   did want to, of course, make sure the Court was aware of was

23   where he said that as to the force portion of it, the

24   intimidation or coercion portion of it, it was not limited

25   solely to the fact that the *Oath Keepers* case involved guns

1    in Virginia, which of course never came into the District.

2    It was the actions of the folks on the ground who assaulted

3    law enforcement officers.

4          That is similar to the conduct that Mr. Gieswein

5    engaged in here.

6          So we do think that his conduct meets it; and we

7    don't think that Judge Mehta's decision is kind of limited

8    to the seditious conspiracy.

9          THE COURT:  My recollection -- and I understand

10   this is not necessarily dispositive -- but my recollection

11   is that Judge Mehta ended up varying downward at the end of

12   the day in just about all of these sentences.

13         MR. KENERSON:  I think that's correct, certainly

14   as to a number of them.  I can't say whether it's all of

15   them.

16         THE COURT:  Okay.

17         MR. KENERSON:  But certainly as to a number of

18   them he did wind up varying downward, though he did find

19   that that departure provision applied.

20         THE COURT:  And I haven't seen this case that

21   Mr. Weiner mentioned.  I'm not sure if you're familiar with

22   it.  But it sounds like this is a variation of that.  I'm

23   going to forget the name of the D.C. Circuit case, but that

24   says that you can't -- you know, it's where the guideline

25   talks about I think distribution and then the commentary

1    talks about attempts.  And the Circuit has said that the

2    Commission can't amend the guidelines through the

3    commentary.

4            MR. KENERSON:  I'm assuming that's what he's

5    referring to as well.

6            I've not seen Judge Berman Jackson's decision or

7    transcript.  I'm aware of the facts of that case.  I'm aware

8    of the sentence she handed down.  Until Mr. Weiner brought

9    it up, I was not aware of what she had done with our request

10   for the terrorism enhancement.

11           So the Court can ask any questions of Mr. Weiner

12   or questions afterwards.  We're happy to get the transcript

13   and brief the Court if you want to hear from us on it.

14           But one thing I would note about that case

15   certainly is that that was in a case with obviously an

16   assault, with a Taser.  And the Defendant in that case was

17   sentenced to 12 years, kind of regardless of what -- or

18   possibly over 12 years, but somewhere in the 12-year range,

19   regardless of what Judge Jackson did with the terrorism

20   enhancement.

21           THE COURT:  Thank you.

22           MR. KENERSON:  Thank you.

23           THE COURT:  Mr. Weiner, do you wish to be heard on

24   this?

25           MR. WEINER:  Yes, your Honor.

1          First, your Honor, similar to the Government, the

2     defense is happy to submit most of the argument on the

3     papers.  We believe that adequately reflects our position.

4          I do just want to make a couple of further points

5     and a couple of further points of emphasis.

6          Essentially, your Honor, if the Court were to have

7     an upward departure here, it would be basically

8     unprecedented.  As the Government pointed out in their

9     brief, courts across this jurisdiction are routinely

10    rejecting this argument that this upward departure should

11    apply in circumstances like this.  And then the one time

12    where there was this upward departure, it involves the Oath

13    Keepers; it involves, as the Government's pointed out,

14    holding guns.

15         Mr. Gieswein is nothing like those circumstances.

16    He came to Washington, D.C., alone.  He's not associated

17    with the Oath Keepers.  There's no evidence he brought any

18    weapons to Washington, D.C.  He left Washington, D.C.,

19    alone.

20         It's nothing like that case.

21         So to have an upward departure here would

22    literally be unprecedented based on the facts and

23    circumstances here.

24         And, your Honor, that also -- to make clear, that

25    simply just -- that assumes that the note can't apply.  And

1    as we were just discussing and the Court was just

2    discussing, there is this argument that we have that the

3    note application can't even apply even if the Court believed

4    that the facts and circumstances warranted it here.

5             And then finally, your Honor, just one more point

6    of emphasis:  In that *Oath Keepers* case, the individual was

7    sentenced to -- I believe it was over 200 months of

8    incarceration.  That's just to emphasize the kind of

9    difference circumstances that was found in that case where

10   the Court for one of the few times did have that upward

11   departure.

12            THE COURT:  Thank you.

13            So I'm not going to apply the terrorism

14   enhancement.  I'm not going to base it on this point about

15   Judge Jackson's ruling, although I think that's an

16   interesting point.  I'd encourage the Government to consider

17   this, that just by my very quick glance at it, it does seem

18   like this note is really moving well away from the guideline

19   itself.  And that may create appellate issues for the

20   Government.

21            But regardless, even assuming that the note does

22   apply, I don't believe that the Defendant's actions here

23   were calculated to influence or affect the conduct of

24   government by intimidation or coercion or to retaliate

25   against government conduct.

1          The Defendant has pled guilty to 111(a) charges,

2     but I think assaulting officers is less serious than the

3     type of conduct described in that note.

4          I think as I've suggested before, when I think

5     about terrorism, I think it suggests a level of

6     premeditation that is almost certainly present in the

7     seditious conspiracy cases.  But I don't think I have

8     evidence of that here.  I understand the Government's point

9     that the Defendant was involved in a series of assaults for

10    over an hour.  This was not necessarily a split-second

11    decision.

12         Nonetheless, when I think about terrorism, I think

13    about planning; I think about affirmative steps to carry out

14    a predetermined plan such as the Government proved in the

15    *Oath Keepers* case.  And it is not present here.

16         So I think there's also a level of not only

17    premeditation; but attempted terrorism to my mind, anyway, I

18    think suggests mass casualties, either attempted or

19    accomplished.  And while that might be a closer question

20    here, I don't think the Government has shown by a

21    preponderance of the evidence that that type of mass

22    violence was accomplished or intended by the Defendant.

23         So for all those reasons, I'm going to deny the

24    Government's motion for a terrorism departure.

25         Before I discuss the other -- and I should say, I

1    do that, I think, both fully consistent with what Judge

2    Mehta -- I'm not at all quibbling with what Judge Mehta said

3    in the *Oath Keepers* case.  I do think a seditious conspiracy

4    situation would be a very different set of facts from what

5    we have here.  And I'm certainly not disagreeing with Judge

6    Jackson.  She may, as I say, quite possibly be right about

7    the problems with the Commission trying to amend the

8    guidelines through the commentary.  But I don't think I even

9    need to reach that question here.

10           Before I discuss the other sentencing factors that

11    will bear on the Court's final decision, I will at this

12    point share with the parties the particular sentence the

13    probation office has recommended, taking into account the

14    advisory guidelines sentence, the available sentences and

15    all of the factors listed in Section 3553(a):  The probation

16    office has recommended a sentence of 48 months as to each

17    count to run concurrently, 36 months of supervised release

18    for each count to run concurrently, a special assessment of

19    $200 and restitution of $2,000.

20           The recommendation of the probation office is

21    based solely on the facts and circumstances contained in the

22    presentence report.

23           And my thanks to Officer Baker for her work on

24    this case.

25           I must now consider the relevant factors that

1    Congress set out in 18 USC 3553(a) to ensure the Court

2    imposes a sentence that is sufficient but not greater than

3    necessary to comply with the purposes of sentencing.

4         These purposes include the need for the sentence

5    imposed to reflect the seriousness of the offense, to

6    promote respect for the law and to provide just punishment

7    for the offense.

8         The sentence should also afford adequate

9    deterrence to criminal conduct, protect the public from

10   future crimes of the Defendant and promote rehabilitation.

11        In addition to the guidelines and policy

12   statements, I must consider the nature and circumstances of

13   the offense, the history and characteristics of the

14   Defendant, the need for the sentence imposed, the guideline

15   ranges, the need to avoid unwarranted sentence disparities

16   among defendants with similar records who have been found

17   guilty of similar conduct and the types of sentences

18   available.

19        Does the Government wish to be heard on the

20   application of the factors set forth in 3553(a), request a

21   variance or otherwise make a sentencing recommendation?

22        MR. KENERSON:  Yes, your Honor.

23        Thank you, your Honor.  Good morning again.  Thank

24   you for hearing from us.

25        I know the Court has read the materials.  I don't

1    want to belabor the points made in our memorandum.  But I do

2    want to just highlight a few things for the Court and

3    respond to a few things that the defense said.

4           I want to start a little bit with what sets

5    Mr. Gieswein apart from other defendants and even other

6    assault defendants from January 6th in our view; that is,

7    kind of the timespan and the breadth of his conduct on

8    January 6th, which in turn demonstrates his intent.  And

9    this gets to the nature and circumstances that the Court has

10   to consider and the need for the sentence to reflect the

11   severity of the offenses.

12          And I do want to emphasize that this -- the

13   Government is arguing about Mr. Gieswein's intent on

14   January 6th, kind of regardless of when it forms.  I read

15   Mr. Weiner's submission in response saying the kind of -- if

16   there was no preplanning, he couldn't have the intent.  His

17   actions on January 6th, starting at 10:00 in the morning,

18   marching to the Capitol, show his intent through the end of

19   the day.

20          And his actions and his words show that by the

21   time his assaultive conduct, his spree of assaults, started

22   in the west plaza, he had formed the intent to assault

23   police officers guarding the Capitol; and he acted on that

24   intent over and over again on January 6th.

25          And as early as 10:00, he demonstrated that he was

1    not in Washington to attend the rally.  He didn't go to the

2    Ellipse.  He did not seek out the president's speech.

3              And he instead joined up with the Proud Boys, who

4    welcomed him into their ranks, and he willingly participated

5    in a three-hour march around Washington away from the rally

6    location.

7              THE COURT:  So this was -- I just want to make

8    sure I understand.  There's the Stop the Steal Rally

9    happening on one end of the Mall and he actually is marching

10   away from it --

11             MR. KENERSON:  Correct.

12             THE COURT:  -- while it's going on?

13             MR. KENERSON:  He is marching away from the Stop

14   the Steal Rally while it's going on.

15             In fact, he left the area of the Washington

16   Monument where they had all congregated prior to the

17   president even beginning his speech.

18             His attire on January 6th shows that he was

19   expecting violence.  He was dressed in a paramilitary kit

20   that included a helmet, goggles and a bat.  And the bat's

21   significant here because while he may have received it on

22   January 5th, he made a conscious choice to bring it on the

23   6th.

24             And while we agree that the Government's evidence

25   does not show him hitting anyone with the bat, for most of

1    the day he did not have it kind of stowed away in his

2    backpack.  He did at points; but for large portions of the

3    day, he was carrying that bat at the ready, kind of a signal

4    to anyone who saw him that he was -- it was ready and

5    available for him to use.

6            And in fact, I'm sure the Court has reviewed the

7    302 of Lieutenant FH that we submitted.  But he noted that

8    the bat's presence stuck out to him on his own during his

9    interactions with the Defendant and caused him a matter of

10   concern for law enforcement.

11           So the Defendant's use of the bat on that day is

12   absolutely relevant to his intent and is relevant to his

13   conduct as the Court considers the sentence.

14           THE COURT:  So I think in Mr. Gieswein's letter,

15   he notes that he heard about violence from Antifa at prior

16   rallies; and I think that's pretty well-documented, that a

17   lot of his preparations were really for that rather than

18   intending to assault police officers.

19           How should I factor that in?

20           MR. KENERSON:  Certainly.

21           So when he comes here dressed like he was, whether

22   he is intending to protect himself from Antifa, whether that

23   be self-defense or whether that be some sort of offensive

24   action against Antifa, or whether he is intending at that

25   point to use it against the police, he is aware of and

1    expecting physical violence to happen here in Washington,

2    D.C., and signaling a willingness to participate in that

3    violence.

4           And that's true regardless of who's on the other

5    side and also regardless of what his intent may have been in

6    arming himself the way that he did.  By the time he started

7    his assaultive spree, it should have been very clear,

8    certainly was very clear from the videos, that it's not

9    Antifa who was doing this.  It's not Antifa who was

10   preventing the crowd from advancing.  That was law

11   enforcement.

12          At the time he made the statement that "The

13   solution to this right here is to execute these fascists,"

14   that was right after the police had started taking control

15   back of the west plaza.  And it's after that statement that

16   he commits the five different OC-based spray assaults.

17          So whatever his intent may have been, whether it

18   be police or Antifa, his intent was to be ready to engage in

19   violence.  And then once he focused in on the police, he

20   acted on that intent against the police.  And that's how we

21   would ask the Court to consider that evidence.

22          So once he arrived at the restricted area -- he

23   arrived around 12:55:00 p.m.  President Trump was still

24   speaking.  He was present when the first barricades went

25   down at the entrance to the Peace Circle, the Peace Circle

22

1    entrance to the plaza.  He rushed on to the fence or on to

2    the restricted area over the trampled fences while the

3    president was still speaking, went forward, positioned

4    himself at the front of the line with police officers early

5    on, starting at 12:53 p.m.

6         We showed in the photo or -- excuse me -- in the

7    memo a photo of the Defendant at 1:00 p.m. up in the west

8    plaza close to police.

9         Now, what's striking -- and we touched on this a

10   little bit in our response to the Court's question about

11   Antifa -- it's striking the Defendant's number of assaults

12   on January 6th.  But it's striking not only that he used OC

13   spray against law enforcement, who were at that point just

14   trying to keep the mob at bay, but that while he's doing

15   this he's continuously advancing.  So the first assault he

16   committed that day that was charged as an assault was the

17   water bottle throw at 1:47 p.m.

18        Then he makes that statement.  He advances up the

19   stairs, closer to the building at the top of the stairs,

20   sprays his OC spray at three officers who were behind a bike

21   rack.

22        Once that line is pushed down, rioters continue

23   further up the stairs.  He's again towards the front of the

24   that line, sprays at another set of officers who had set up

25   another line.

1      The crowd goes further up the stairs.  Now a third

2  spray at officers within at that point just a matter of

3  minutes from, I believe, 2:03 to 2:10 p.m.  He's committed

4  three separate assaults at the front of the crowd as they're

5  advancing towards the building.

6      After that third assault there, he is one of the

7  first rioters in the building after having directed others

8  to the fact that the window was being broken next to him.

9      Once he goes in the building, goes up the Ohio

10  Clock Corridor, that shows that even in places where he did

11  not commit an assault in a particular location, the video I

12  think we showed to the Court indicates that he's still

13  encouraging rioters at that point.  He is staring menacingly

14  at the police.  He is pointing his bat at the police up

15  there.  He has his OC spray canister in his hand out and at

16  the ready to go even at a time when he's not assaulting

17  police.

18      He continued further into the Capitol from there,

19  went down to the Crypt, assaulted officers who were

20  retreating past a set of metal doors and then continued on

21  his final OC assault of the day.  He assaulted law

22  enforcement as they were trying to arrest another rioter,

23  then continued attempting to assault police as they

24  attempted to arrest him.

25      Once he escaped that attempted arrest, he tried

1    one last time with rioters to break police defensive lines,

2    keeping the mob from the speaker's office before he

3    collapsed in exhaustion.

4         So we respectfully disagree with counsel's

5    statement as a response to our memo that there's serious

6    doubt as to the Defendant's intent to be violent on

7    January 6th.  He did it over and over and over again in a

8    continually advancing way on January 6th.

9         And whatever you think about -- whatever anyone

10   may think of his intent prior to joining the mob, once he

11   did, it was very clear what his intent was.  He made that

12   clear by his actions and by his words.

13        And his individual assaults not only aided his own

14   advance, but that of countless other rioters.  He certainly

15   wasn't the only rioter assaulting police at each of those

16   occasions, but he was one of a member of the crowd who

17   collectively were able to overpower police and allow the

18   mass of rioters behind them to break through the lines and

19   advance on the building.  He was an instrumental part and

20   played an instrumental role in that by adding his spray, his

21   assaults to those committed by those around him.

22        And so for all those reasons, we believe his

23   offenses here are of the utmost seriousness; and the Court's

24   sentence under the 3553(a) factors should reflect that.

25        Now, as we noted in our memo, we are asking the

1    Court to vary upwards from the guidelines.  And that's

2    largely for many of the reasons that I just went into -- a

3    few more are in the memorandum -- that the guidelines just

4    don't capture here.

5         And so they don't reflect the length of time he

6    engaged in violent activity on January 6th.  They don't

7    reflect the fact that his assaults were progressive over a

8    matter of over an hour as opposed to an instantaneous

9    decision.

10        They do not reflect his march away from the rally

11   before the president even began speaking.  They don't

12   reflect his relentless advance once he obtained that can of

13   OC spray or the fact that he led the charges on so many

14   occasions.

15        So we would submit that under -- this is the

16   quintessential area where a variance is appropriate, because

17   the guidelines don't really account for all of his offense

18   conduct.

19        One of the things the Court also has to consider

20   is that the sentence has to promote respect for the law.

21   And his offense conduct on January 6th shows a profound

22   contempt for the law and eagerness to assault police who

23   were actually trying to enforce that law, an eagerness to

24   illegally enter one of our nation's most sacred buildings

25   through a window that he saw smashed out with a riot shield

1    and then to commit more assaults on law enforcement officers

2    inside that building.

3              So the Government's requested sentence, we submit,

4    would promote respect for the law as the Court must

5    consider.

6              The Court's sentence must also avoid unwarranted

7    sentencing disparities.  Our memorandum went into some of

8    the comparators that we suggest the Court should look at.

9    I'm happy to answer any questions the Court has there.  And

10   I know the defense did some as well.

11             And just to speak to some of the cases that the

12   defense cite in their memorandum as comparators, we would

13   submit that they really are not in fact comparators here, at

14   least not ones the Court should rely on.  One was a sentence

15   that this Court handed down against a defendant named

16   Council.  The Court there relied heavily on a mental health

17   diagnosis.

18             One was a defendant named Mehaffie who was

19   involved in the tunnel case that your Honor is presiding

20   over.  The Government there agreed that he was at the lower

21   end of the culpability of those particular Defendants.

22             The *Leffingwell* case had one assault and punches,

23   but no weapons.  And that Defendant apologized to officers

24   on January 6th when he was arrested.

25             Young was two pushes on barricades.  Mr. Young did

1    not go inside the building.

2            Sargent was an open-handed slap at an officer.

3            Dickinson was one assault with no bodily injury --

4    two assaults total, one assault that he pled to.

5            Ackerman pushed an officer, and the offense

6    conduct there included only one assault.

7            Willden was one assault with OC spray, but not the

8    prolonged conduct that we see here.

9            And Hernández was one assault with no bodily

10    injury.

11            The comparators that we cited to the Court in

12    contrast all involve the type of prolonged conduct that

13    Mr. Gieswein engaged in here.

14            So for all those reasons and the reasons in the

15    memo, we'd submit that 60 months is an appropriate sentence.

16    I'm happy to answer any questions the Court might have.

17    Otherwise, that's our allocution.

18            THE COURT:  Mr. Kenerson, I'd be interested in how

19    you think about this kind of very serious conduct but in

20    light of a record of somebody who doesn't even have any

21    arrests.  That's not very typical at least outside of the

22    January 6th cases for the types of defendants you and I see

23    here.

24            MR. KENERSON:  Right.  And, you know, that is

25    always, from all types of sentencing cases going back to

1    cases that are prosecuted here, prosecuted in state court.

2    It can be striking when someone's first offense is an

3    offense as serious as this one.  And certainly there are

4    arguments that Mr. Weiner will make that that is a reason

5    for mitigation here.

6        It can also be a reason to wonder what caused

7    someone to commit offenses as prolonged and serious as these

8    and to do so in a situation where they had had no criminal

9    history.  It is certainly to Mr. Gieswein's credit that he

10   did not have criminal history prior to January 6th.

11       But the fact that he was a law-abiding citizen up

12   until then certainly did not stop him from assaulting law

13   enforcement officers over and over and over and over again.

14   And part of what motivated him was a belief in the stolen

15   election; and that appears to be a belief not in the stolen

16   election per se, but the idea that the Constitution is not

17   currently in force.  He said -- we cited in our memorandum

18   he stated that he needed -- the military needed to put the

19   Constitution back into place, was claiming on a podcast from

20   jail on April 2022 that all of January 6th was essentially a

21   setup.

22       The beliefs that led the Defendant to take the

23   actions that he took on January 6th don't appear to have

24   dissipated.  So while he is still -- while he has no

25   criminal history ahead of time, I do believe that the

1    seriousness of his conduct combined with -- this is the

2    point we make on specific deterrence in our memorandum --

3    combined with the fact that the conditions that prompted him

4    to take these actions appear to still be in place for him

5    specifically militate towards a higher sentence in this

6    case.

7              THE COURT:  Thank you, Mr. Kenerson.

8              MR. KENERSON:  Thank you.

9              THE COURT:  Mr. Weiner, do you wish to be heard on

10   the application of the factors laid out in 3553(a), request

11   a variance or otherwise make a sentencing recommendation?

12             MR. WEINER:  Yes, sir.

13             THE COURT:  Thank you.

14             MR. WEINER:  Your Honor, I'm not going to focus

15   too much on repeating the arguments we made in our

16   sentencing memorandum.  I just want to respond to some of

17   the points the Government's made.

18             First, I just want to start off with -- the

19   overall point that I want to make here most importantly is

20   that in sum, I think a lot of what the Government is arguing

21   for here when they're requesting a variance or they're

22   requesting focus on specific factors is that a lot of those

23   things are already encompassed by the convictions.  They're

24   already encompassed by the statute and they're already

25   encompassed by the guidelines.

1          The Government continues to just generally talk

2     about the assault, assaulting officers, et cetera,

3     et cetera.

4          Mr. Gieswein accepted responsibility for that.  He

5     pleaded guilty to those assaults.  It's encompassed by the

6     guidelines.  He regrets his actions that day.  There's no

7     question about all of that.

8          But those -- the things that have caused him to be

9     here today is not a reason to vary upward.  It's already

10    encompassed.

11         Excuse me, your Honor.

12         The Government also continues to focus on things

13    like he's always moving forward, never retreating, always

14    moving forward, never retreating.

15         But that's not accurate.  There are multiple

16    instances -- one of them is cited in one of their

17    exhibits -- where he's pushing up against a barricade.

18    They're pushing back.  He falls on the ground.  He gets up

19    and he walks away.

20         It also doesn't encompass the fact that he left.

21    Nobody arrested him that day and threw him in jail.  He left

22    voluntarily.

23         So while there's no question that he made certain

24    decisions that day that he regrets, and that were, no

25    question, unlawful, this idea that nobody was stopping

1    Mr. Gieswein until we stopped him, it's not accurate.  It's

2    not true.

3            They're also focusing on the gear that he had.

4    And interestingly, they will pick and choose statements that

5    he made in the heat of the moment that day, but they don't

6    want to focus on the statements he made earlier when he was

7    already in D.C. and when he had a sound state of mind where

8    he was asked:  What's going on here?

9            He basically said:  I just hope this is peaceful,

10   demonstrating that he was wearing that gear for strictly

11   protection purposes.  He wasn't going to -- wearing this

12   gear hoping I'm going to assault some people and I need this

13   to protect myself.

14           Additionally, the Government has no evidence and

15   they've proffered no information to this Court about how

16   many times in Mr. Gieswein's life he has worn gear like this

17   to political rallies in fear of being attacked.

18           For all we know, this could happen dozens of times

19   and there's never been an issue with Mr. Gieswein because

20   he's not wearing the gear to assault people; he's wearing it

21   in case he feels like he's attacked, and that's why he was

22   wearing it that day.

23           THE COURT:  So what happened here, then,

24   Mr. Weiner, when -- I mean, he was so assaultive and

25   aggressive and continued over the course of an hour.

1          MR. WEINER:  Right.  And that's -- that segues

2     perfectly into my next point, which is what's really unique

3     about this case and what's different in these circumstances

4     as compared to just a typical assault on a law enforcement

5     officer is the circumstances surrounding January 6th.  It's

6     obviously a moment in our history that will be remembered

7     forever, specifically because it was so unique.

8          I believe the Court can take note of the

9     commonsense idea of what happens when you are in a mob of

10    people, in a large group of people that are angry and that

11    are emotional and that are moving forward and then you have

12    people in response pushing back up against you.

13         In those moments, people lose their logic.  They

14    lose their reasoning.  And that is not an indictment on

15    Mr. Gieswein's character; it's an indictment on the human

16    condition.

17         And so Mr. Gieswein, who takes full responsibility

18    for his actions -- and that's why he pleaded guilty and why

19    he's here today, because he recognizes looking at his

20    actions that day that was wrong.  That was illegal.  That

21    was not me.  And I deserve to have punishment for it.

22         What we're arguing is that because of that unique

23    circumstance, this is not an individual that the Court has

24    to worry about this happening again.

25         He has zero criminal history.  He was a certified

1   nurse's assistant.  He is a leader amongst his friends.  He

2   has shown nothing but great character.  And on one day in an

3   incredible circumstance that we haven't seen potentially

4   ever, he along with a lot of other people lost their logic,

5   lost their emotions and acted in ways they normally never

6   would.

7           And we would argue, your Honor, that ultimately

8   his history, his character that he has demonstrated every

9   single day of his life except for a couple hours on that one

10  day, those pieces of information is what should contribute

11  to a variance downward under 3553.  And the circumstances of

12  that day is what should lead to a variance downward under

13  3553.

14          Mr. Gieswein did not travel alone to D.C. and walk

15  to the Capitol alone with this idea in his head alone, I'm

16  going to do these things.  This was a situation where he

17  lost his logic.  And he's here today because he accepts

18  responsibility for that.

19          THE COURT:  Thank you, Mr. Weiner.

20          MR. WEINER:  Thank you.

21          THE COURT:  Mr. Gieswein, you have the right to

22  make a statement or present any information to mitigate this

23  sentence.  Would you like to say anything that you would

24  like me to consider before imposing sentence?

25          If you could approach the podium, sir.

1          THE DEFENDANT:  Thank you, your Honor, for giving

2     me the opportunity to speak.

3          I just want to say that I did act out of character

4     that day.  I've never been around so many people in my life,

5     and there was a lot of specific circumstances.  I did

6     receive the spray in the crowd.  It wasn't intentional to

7     assault the police.  I witnessed up until the point of

8     assaulting the police a lot of violence from both sides, and

9     the munitions that were being fired and everything that was

10    going on was scary.  I'm not putting blame on anybody or

11    trying to make any excuse.

12         I just -- I've already served 29 months for my

13    actions that day.  I take full responsibility for my actions

14    that day.

15         My mom and my little sister are sick.  My

16    stepfather, who is like my real father, passed away in 2018.

17    I've taken care of them since then.  And I'd really like to

18    get back to them to be able to take care of them.  I've

19    worked consistently since I was 14 years old.  In November

20    of 2020, the pandemic took away my table games job, which I

21    just started making really good money at.  And I was out of

22    work consistently until January 6th.

23         So again, I'm not trying to make any excuses.  I

24    don't know if that contributed to head space being off or

25    whatever.  I didn't go -- I didn't wear my gear with any

1   intentions of violence, like it's been stated.  I think I

2   put that in my letter.  I've worn the same gear at Second

3   Amendment rallies I've held in the past in my hometown in

4   Colorado Springs and around Manatee Springs.  I've never

5   engaged in violence.  I have no criminal history.  I'm not

6   an aggressive person.

7           And I don't have anything more prepared.  Sorry.

8   But I understand the severity of the crime, and I do not

9   think that it's okay to assault the police.  I just -- in a

10  crazy situation with a lot of things going on, I didn't act

11  rationally.  There's a lot of the day that I don't even

12  remember.  So when we talk about it being over an hour of

13  violence, you know, in the moment it felt like five minutes

14  or it didn't even feel like it was real or -- I don't know

15  how to explain that more.

16          So that's all I have for you.  Thank you.

17          THE COURT:  Thank you, sir.

18          Let me take a few moments to consider this.  I'll

19  be back with you all shortly.

20          (Thereupon a recess was taken, after which the

21  following proceedings were had:)

22          THE COURT:  Sir, if you could approach the podium.

23          I've assessed the particular facts of this case in

24  light of the relevant 3553(a) factors, and I now want to

25  provide remarks for the record and for you, Mr. Gieswein,

1    about my considerations in regard to those factors.

2            On January 6th, you were a foot soldier in one of

3    the most disturbing riots our nation has seen in years.  And

4    unlike many of the people who were at the Capitol on

5    January 6th, you came prepared for trouble.  You wore

6    paramilitary gear, carried a baseball bat and pepper spray,

7    although I recognize you say that someone gave you the spray

8    that morning.

9            I think Mr. Kenerson's point about you not even

10   attending the rally is very disturbing.  I've sentenced many

11   defendants now in January 6th cases, and most of them were

12   there at the rally and somehow got whipped up there.  Some

13   say they were listening to the president's comments about

14   going to the Capitol and then followed.

15           But for you not even to attend the rally and

16   decide to just go straight to the Capitol with members of an

17   extremist organization is hard to understand, sir, and

18   really does put a bad light on your subsequent conduct.

19           And your conduct on January 6th was shocking.  You

20   repeatedly pepper-sprayed police officers guarding the

21   Capitol, including two officers who were hit in the eyes by

22   the spray.  You helped lead efforts to advance on the police

23   lines repeatedly.  You threw water bottles at officers and

24   participated in an effort to push through officers trying to

25   guard the speaker's office.

1          You attempted to punch an officer who was trying

2     to arrest a rioter and then resisted officers' attempts to

3     arrest you.

4          That is in itself a crime.

5          You were one of the very first rioters to enter

6     the Capitol on January 6th through a broken window, no less,

7     and you stayed inside for well over an hour.  You roamed

8     throughout the building and you told an interviewer that we

9     should, quote, "execute these fascists," presumably

10    referring to the police officers and the members of Congress

11    they were protecting.

12         In short, among the many rioters on January 6th, I

13    think your conduct is near the more violent, extensive and

14    egregious end of the spectrum.  I think there's a strong

15    need for the sentence here to reflect the seriousness of the

16    offense and to provide just punishment.

17         I also think there's a strong need for general

18    deterrence.  I take assaults on police officers very

19    seriously.  And you repeatedly assaulted officers over the

20    course of an hour.

21         Having said all that, I acknowledge that your

22    conduct on January 6th was a strange aberration for you.

23    You have no criminal history whatsoever.  You have a solid

24    employment record, although you were unemployed at the time

25    of the offense due to COVID and no fault of yours.  And I

1    think you're probably right that the fact that you were

2    unemployed at the time because of COVID did contribute to

3    your actions on January 6th.  I think there were a number of

4    people who were very angry and feeling lost and just not in

5    their right minds at that time because of the economic

6    situation and COVID.  And I can certainly understand how you

7    would have been one of them.

8            I've also considered the letters written on your

9    behalf.  They describe you as a thoughtful and generous

10   person who has primary care for your sick mother.

11           I think it's important to recognize that you were

12   still a young man at the time of the offense.  You had just

13   turned 24, and frankly you were by no means the first young

14   man to get caught up in the moment in doing something you

15   wish you hadn't done.

16           I think these are all factors in your favor that

17   argue for a reduced sentence.

18           I also credit your acceptance of responsibility

19   and your remorse, including the statements you made today.

20   I think you're right that you weren't acting rationally on

21   the day, and your conduct is in many ways an exemplar of the

22   dangers of mobs and mob mentalities and how people who get

23   caught up in a mob situation do things they never would have

24   done otherwise.

25           I've considered the Government's proposed

1    sentencing comparators, and in particular I've considered

2    Robert Morss, 21-CR-40, who I sentenced to 66 months for

3    assaultive and obstructive conduct on January 6th.

4          Ultimately, I think his conduct was more severe

5    and there were various aggravating factors such as his heavy

6    body armor and the robbery that are not present here.

7          Still, I agree with the Government that that

8    sentence is a useful data point; and I agree with the

9    Government that your sentence should be lower than his.  I

10   also agree with the Government that the proposed comparators

11   that Mr. Weiner has suggested are less serious than the

12   conduct that you engaged in on January 6th.

13         The Government seeks an upward variance based upon

14   your uncharged conduct.  I agree with the Government that

15   your two assault convictions here do not fully capture the

16   totality of your misconduct.

17         However, your attorney also points to several

18   mitigating factors, including the need for you to care for

19   your sick family members and the serious adversities you

20   faced as a child.

21         This is not just a matter of adding up mitigating

22   and aggravating circumstances, but I do think both parties

23   have strong arguments in this case and that here a

24   guidelines sentence best captures the requirements of

25   3553(a).

1     And specifically, I agree with Officer Baker's

2  recommendation here.

3     Sir, you're going to be spending more time in

4  prison.  But you will still be a young man when you're

5  released with most of your life ahead of you.  I encourage

6  you to rely on your family and friends and ensure that you

7  never again find yourself in a similar situation as you do

8  today.  January 6th does not need to define you or the rest

9  of your life.  You can be better than this.

10     I will now impose the sentence.

11     It is the judgment of the Court that you, Robert

12  Gieswein, are hereby sentenced to serve a term of 48 months'

13  incarceration on Counts 4 and 9 each.

14     You are also sentenced to 36 months of supervised

15  release for each count.  All terms of incarceration are to

16  run concurrently and all terms of supervised release are to

17  run concurrently.

18     You must also pay a $200 special assessment and

19  restitution in the amount of $2,000.

20     Within 72 hours of release from custody, you shall

21  report in person to the probation office in the district to

22  which you are released.

23     While on probation, you must abide by the

24  following mandatory conditions:  You must not commit another

25  federal, state or local offense; you must not possess or use

1     any controlled substance; you must refrain from any unlawful

2     use of a controlled substance; you must submit to one drug

3     test within 15 days of placement on supervision and at least

4     two periodic drug tests thereafter as determined by the

5     Court.  And you must cooperate in the collection of DNA.

6     You must also abide by the recommended standard conditions

7     of release found in Guideline 5D1.3(c).

8            You shall also comply with the following special

9     conditions:  You must participate in mental health testing

10    and treatment as determined by the probation office and

11    follow the rules and regulations of that program.

12           You must provide the probation officer access to

13    any requested financial information and authorize the

14    release of any financial information.

15           The probation office may share financial

16    information with the United States Attorney's Office.

17           You must not incur any credit charges or open

18    additional lines of credit without the approval of the

19    probation officer.  The Court finds that you do not have the

20    ability to pay a fine, and therefore waives imposition of a

21    fine in this case.

22           You are ordered to make restitution in the amount

23    of $2,000 to the Architect of the Capitol.  The Court

24    determines you do not have the ability to pay interest and

25    therefore waives any interest that may accrue on the

1    balance.

2              Restitution payments shall be made to the Clerk of

3    the Court for the U.S. District Court for the District of

4    Columbia for disbursement to the Architect of the Capitol,

5    Office of the Chief Financial Officer.

6              Having assessed the Defendant's ability to pay,

7    payment of the total criminal monetary penalties is due in

8    monthly installments of $75 to commence 30 days after your

9    release from incarceration.

10             The financial obligations are immediately

11   payable -- or actually, that is not true.  But the financial

12   obligations are payable to the Clerk of the Court for the

13   U.S. District Court for the District of Columbia.

14             The probation office shall release the presentence

15   investigation report to all appropriate agencies, which

16   includes the United States Probation Office in the approved

17   district of residence, in order to execute the sentence of

18   the Court.

19             Treatment agencies shall return the presentence

20   report to the probation office upon the Defendant's

21   completion or termination from treatment.

22             Pursuant to 18 USC 3742, you have the right to

23   appeal the sentence imposed by this Court if the period of

24   imprisonment is longer than the statutory maximum.

25             If you choose to appeal, you must file any appeal

43

```
1     within 14 days after the Court enters judgment.

2            As defined in 28 USC 2255, you also have the right

3     to challenge the conviction entered or sentence imposed if

4     new and currently unavailable information becomes available

5     to you or on a claim that you received ineffective

6     assistance of counsel in entering a plea of guilty to the

7     offense of conviction or in connection with sentencing.

8            If you're unable to afford the cost of an appeal,

9     you may request permission from the Court to file an appeal

10    without cost to you.

11           Are there any objections to the sentence imposed

12    that are not already noted on the record?  Mr. Kenerson?

13           MR. KENERSON:  No, your Honor.

14           THE COURT:  And Mr. Weiner?

15           MR. WEINER:  No, your Honor.

16           THE COURT:  Mr. Kenerson, do you have a motion?

17           MR. KENERSON:  Yes, your Honor.

18           At this point, the Government moves to dismiss the

19    remaining counts in the indictment.

20           THE COURT:  Mr. Weiner?

21           MR. WEINER:  No objection.

22           THE COURT:  That motion will be granted.

23           Mr. Kenerson, anything further for the Government?

24           MR. KENERSON:  No, your Honor.  Thank you.

25           THE COURT:  And Mr. Weiner?
```

1               MR. WEINER:  No, your Honor.

2               THE COURT:  Mr. Gieswein, you're remanded to the

3     custody of the Attorney General.  Good luck to you, sir.

4               (Proceedings concluded.)

1                        **CERTIFICATE**

2

3                I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10                Dated this 25th day of July, 2023.

11

12            /s/ Lisa Edwards, RDR, CRR
              Official Court Reporter
13            United States District Court for the
                District of Columbia
14            333 Constitution Avenue, Northwest
              Washington, D.C. 20001
15            (202) 354-3269

16

17

18

19

20

21

22

23

24

25